1   POMERANTZ LLP
2   Jennifer Pafiti (SBN 282890)
    Jeremy A. Lieberman (*pro hac vice*)
3   Murielle J. Steven Walsh (*pro hac vice*)
4   600 Third Avenue, 20th Floor
    New York, New York   10016
5   Telephone:   (212) 661-1100
6   jpafiti@pomlaw.com
    jalieberman@pomlaw.com
7   mjsteven@pomlaw.com

8   *Co-Lead Counsel for Lead Plaintiff & the Proposed Class*
9
10  — additional counsel on signature page —

11              **UNITED STATES DISTRICT COURT**
12              **CENTRAL DISTRICT OF CALIFORNIA**

13  | | |
    |---|---|
14  | SAMUEL BLAKE, Individually and On Behalf of All Others Similarly Situated, | **Case No. 2:21-CV-02873-FMO-JPR (Consolidated)** |
15  | | |
16  |              Plaintiffs, | Case No. 2:21-CV-02879-FMO-JPR |
17  |      v. | Case No. 2:21-CV-03080-FMO-JPR |
18  | CANOO INC., TONY AQUILA, ULRICH KRANZ, and PAUL BALCIUNAS, | |
19  | | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
20  | | |
21  |              Defendants. | |
22  | | |
23  | | **JURY TRIAL DEMANDED** |
24
25
26
27
28

              CONSOLIDATED AMENDED CLASS ACTION COMPLAINT:
                 Consol. Case No. 2:21-CV-02873-FMO-JPR

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ...................................................................................1

II.   JURISDICTION AND VENUE ............................................................6

III.  PARTIES .................................................................................................7

      A.   Plaintiffs .......................................................................................7

           1.   Lead Plaintiff Vladi Shaulov .............................................7

      B.   Defendants ....................................................................................7

IV.   BACKGROUND ..................................................................................10

      A.   Legacy Canoo ............................................................................10

      B.   Hennessy Capital Acquisition Corp. ........................................12

      C.   The Merger .................................................................................14

V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
      OMISSIONS MADE BETWEEN AUGUST 18, 2020 AND MARCH 29, 2021 18

VI.   THE TRUTH ABOUT CANOO'S OPERATIONS IS REVEALED, AND THE
      PRICE OF THE COMPANY'S SECURITIES DECLINES PRECIPITOUSLY 30

VII.  MEDIA AND ANALYSTS REACTED HARSHLY TO DEFENDANTS'
      ADMISSIONS ......................................................................................36

VIII. THE DEEMPHASIS OF ENGINEERING SERVICS WAS MATERIAL TO
      INVESTORS ........................................................................................46

IX.   THE ABANDONMENT OF THE SUBSCRIPTION MODEL CONSTITUTED
      A MATERIAL CHANGE TO THE BUSINESS PLAN ......................48

X.    THE COLLAPSE OF THE AGREEMENT WITH HYUNDAI MOTOR GROUP
      WAS MATERIAL TO INVESTORS .................................................53

XI.   FORMER CANOO EMPLOYEES CONFIRM DEFENDANTS' PUBLIC
      STATEMENTS WERE FASLE WHEN MADE..................................55

      A.   A former Canoo executive confirms that during the Class Period Canoo
           misstated the nature of the Company's relationship with Hyundai and
           misrepresented its contract engineering efforts..........................55

      B.   Prior To the Merger, Canoo Planned to Change the Subscription Model,
           But Never Disclosed These Plans to Investors ...........................56

XII.  POST CLASS PERIOD DEVELOPMENTS........................................56

XIII. ADDITIONAL INDICIA OF SCIENTER.........................................58

i

A.    Aquila received a large number of Canoo shares upon the completion of the Merger. ...................................................................................................59

B.    Defendants Aquila, Kranz and Balcuinas Are Eligible for stock incentive awards based on Canoo's stock price performance. ...................................64

XIV.  LOSS CAUSATION ...........................................................................................66

XV.   CLASS ACTION ALLEGATIONS.....................................................................68

XVI.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........................................................70

XVII. STATUTORY SAFE HARBOR INAPPLICABLE ...........................................73

COUNT I....................................................................................................................74

COUNT II...................................................................................................................77

COUNT III.................................................................................................................80

PRAYER FOR RELIEF ...........................................................................................81

JURY TRIAL DEMANDED .....................................................................................82

Lead Plaintiff Vladi Shaulov ("Lead Plaintiff" or "Shaulov"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's Consolidated Amended Class Action Complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys. This investigation included, among other things: (1) reports and documents filed by Canoo with the U.S. Securities & Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Canoo and its business; (3) press releases, news articles, transcripts, and other public statements issued by or about Canoo, its business, and the Defendants; (4) an investigation conducted by Lead Plaintiff's attorneys, including interviews with confidential witnesses ("CWs"), including former Canoo employees; (6) consultations with experts; and (7) other publicly available information concerning Canoo, its business, and the allegations contained herein.

# I.   INTRODUCTION

1.      This is a federal class action brought individually and on behalf of all other persons and entities who purchased or otherwise acquired publicly traded Canoo, Inc. ("Canoo" or the "Company") common stock and/or warrants from August 18, 2020, through and including March 29, 2021, (the "Class Period"), seeking to recover damages pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder (the "Class").

2.      Beginning in November 2017, Canoo's predecessor entity, also called Canoo, Inc. (and f/n/a EVelozcity Inc.), operated as a private mobile technology company developing electric vehicles.  Canoo was working on a concept for an electric vehicle ("EV") platform, called a "skateboard."  The skateboard's highly modular

design would allow Canoo to design customized models for multiple vehicle programs in both the commercial and consumer markets.

3.    On February 11, 2019, Hennessy Capital Acquisition Corp. IV ("Hennessy" or "HCAC") filed a Registration Statement with the SEC for a planned $300 million initial public offering ("IPO"). Hennessy intended to operate as a publicly traded special purpose acquisition company ("SPAC"). A SPAC is a shell, or "blank check," company formed for the sole purpose of raising money through a public offering to eventually acquire one or more companies.

4.    On March 5, 2019, Hennessy conducted its IPO. Despite having no commercial operations of its own, Hennessy raised $313,731,500 through a combination of stock units and warrants. Hennessy intended to use most of the proceeds to identify and complete an "initial business combination" with the target entity operating "in the industrial, infrastructure solutions and value-added distribution sectors in the United States." After the business combination was complete, the new company's stock would be publicly traded without many of the investor safeguards associated with traditional initial public offerings.

5.    Hennessy faced an initial deadline of September 5, 2020 to complete a business combination. On August 5, 2020, Hennessy filed a Definitive Proxy Statement urging it shareholders vote to extend the merger deadline to December 31, 2020. On August 18, 2020, before the voting period ended, Hennessy announced to investors that it had concluded a Merger Agreement with Canoo, which would result in Canoo becoming a publicly traded company (the "Merger").

6.    The deal valued Canoo at $2.4 billion. The combined company would receive approximately $500 million in proceeds from an upsized fully committed common stock private investment in public equity ("PIPE") offering of over $300 million and had approximately $300 million cash held in trust from Hennessy's IPO. The Merger required an affirmative vote from HCAC shareholders to be approved.

7.     In support of the Merger, Hennessy and Canoo commenced a roadshow by filing a Form 8-K with the Securities and Exchange Commission touting the proposed benefits of the business combination. Many of the statements contained in the Form 8-K were, as Defendants later admitted, "presumptuous," "premature," and too "aggressive" and created a false and misleading impression about Canoo's operations and prospects.

8.     Beginning with the August 18, 2020 announcement of the Merger and continuing through a series of amended proxy statements and shelf offering documents, Defendants described Canoo's "three phases of revenue streams," along with its innovative technology, as it distinguishing features that formed the basis for investors' understanding of the Company's business and operations.

9.     The first revenue stream was the Company's "Subscription-based Model," whereby Canoo "members" would pay "a single monthly fee" with "no upfront payment" that would allow members to "enjoy the benefits of an all-inclusive experience that, in addition to your own canoo[1] vehicle includes maintenance, warranty, registration and access to insurance and vehicle charging." According to Defendants, the subscription model resulted in greater operating margins than its competitors and created an opportunity for Canoo to sell electric vehicles to consumers who wanted to utilize the technology but were apprehensive of taking on substantial financial commitments associated with traditional car purchases/leases.

10.     The second purported revenue stream was Canoo's "Engineering Services" which Defendants described as "all the material consulting and contract engineering work that is in high demand due to our team's specialized experience and technical capabilities in EV development." Defendants explained that "Canoo's pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategics and high growth technology companies." Defendants claimed its engineering services "offer[ed] a unique opportunity to generate

---

[1] Canoo's general vehicle design is referred to as "canoo."

immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021[.]"

11.    The third revenue stream was the Company's "B2B Service," which Defendants claimed allowed Canoo to "leverage its modular skateboard with its existing powertrain, electrical architecture and thermal system to produce B2B delivery vehicles for the last mile delivery segment. These customers may include retailers, large corporations, logistics companies, or fleet managers, among others." B2B Services, however, were not expected to launch until 2023 as additional product offerings were brought online.

12.    The ultimate success of Canoo would, of course, turn on the commercial validity of its still-under-development skateboard technology.  To reassure investors of its technical viability, Defendants claimed that:

> Canoo successfully designed, developed and produced a Beta prototype of our first vehicle within 19 months and with an investment of approximately $250 million, a process that realistically could take three to five years and require billions of dollars for some of our competitors or traditional OEMs to undertake.

13.    Defendants pointed to this development success as a basis for Canoo's February 2020 "strategy partnership agreement with Hyundai Motor Group to "co-develop a future EV platform based on Canoo's modular and scalable skateboard technology, providing external validation of Canoo's technical leadership."

14.    On December 21, 2020, HCAC shareholders voted to approve the Merger. The combined Company's common stock and warrants would trade on the NASDAQ under the ticker symbols "GOEV" (common shares) and "GOEVW" (warrants) beginning on December 22, 2020.

15.    Fueled by Defendants' positive but false and misleading statements made in connection with the Merger, the price of Canoo stock soared in early trading, opening

at $22.75 per share on December 22, 2020, and hitting a high of $24.90 with over 13 million shares traded on that day.

16.     For the next few days, Canoo's share price traded at approximately $19 per share.  By December 31, 2020, the shares were trading around $15 per share, with a sustained volume of over 4 million trades a day through the end of 2020. On January 6, 2021, the stock price rose above the $15 mark. On January 11, 2021, the price per share exceeded $17 a share.

17.     Then, on January 13, 2021, announced a shelf offering for the sale of up to an aggregate amount of 24,353,356 shares of common stock. The offered shares consist largely of stock held by insiders and early investors. Documents filed in support of the offering, which were filed publicly just days after Canoo completed its fourth quarter of 2020, contained the same false and misleading statements about Canoo's revenue streams and third-party relationships.

18.     After the filing of the Shelf Registration, Canoo's stock price continued to climb, hitting a high of $20 during January 2021.  Through the end of January, the stock price remained relatively stable trading at or above $14.80 per share on sustained volume of over 3 million trades a day. That trend continued, and over the course of February, 2021 the stock primarily traded at or above $15 per share.

19.     On March 29, 2021, after the markets closed, Canoo conducted its first public conference call to discuss its quarterly results. In a shocking development, the call was conducted by Defendant Anthony (Tony) Aquila ("Aquila"), who at the time served as Canoo's Executive Chairman of the Board.   Defendant Ulrich Kranz ("Kranz"), who was a co-founder of legacy Canoo and the Company's Chief Executive Officer ("CEO") at the time, did not participate on the conference call. Nor did Defendant Paul Balciunas ("Balciunas"), who at the time served as Canoo's Chief Financial Officer (the "CFO"), participate on the call.

20.     Defendant Aquila, in his prepared remarks, informed investors that Canoo would not be operating in the manner described in prior public statements and filings. Defendant Aquila stated that, following a "deep dive to determine how to optimize growth opportunities and maximize our shareholder value," Canoo decided to "deemphasize the originally stated contract engineering services line" – a revenue stream that Defendants earlier claimed was "is supportive of a projected $120 million of revenue in 2021[.] In fact, the Company had generated *zero dollars* from its engineering service line in 4Q2020.

21.     Moreover, Defendant Aquila explained on the call that Canoo would be abandoning its "membership model" because significantly weighting its business to subscription users created "a big cash hit" that was detrimental to efforts to bring its vehicles to market and also indicated that Canoo's relationship with Hyundai had been terminated and that no further partnerships were being pursued.

22.     Following this dramatic announcement, coming just weeks after the Shelf Registration, the price of Canoo stock plummeted. Canoo stock, which had traded at $12.46 when the markets opened on March 29, 2021, fell to $9.64 at the open on March 30, 2021 and reaching a low that day of $8.52.

23.     As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act"), *codified as amended*, 15 U.S.C. §§ 78j(b), 78t(a), and pursuant to the rules and regulations duly promulgated thereunder, including SEC Rule 10b–5, *codified as amended*, 17 C.F.R. § 240.10b–5.

25.     This Court has exclusive subject-matter jurisdiction of all claims asserted herein pursuant to Section 27 of the '34 Act, *codified as amended*, 15 U.S.C. § 78aa (for

violations of the Exchange Act), and original subject-matter jurisdiction of all claims asserted herein pursuant to 28 U.S.C. § 1331 because this is a case or controversy arising under federal law.

26.    Venue lies in the Central District of California pursuant to Section 27 of the '34 Act, 15 U.S.C. § 78aa, because Defendants transact business in this District and because the Company's principal place of business is and at all relevant times was located at 19951 Mariner Avenue, Torrance, California 90503, which is situated within this District.  Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(d) because many of the acts and transactions that constitute the violations of law complained of in this Amended Complaint, including the dissemination to the public of materially false or misleading statements, occurred or emanated from within this District.

27.    In connection with the acts, omissions, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, the facilities of the national securities markets, and interstate telephonic and digital communications systems.

## III.    PARTIES
### A.    Plaintiffs
#### 1.    Lead Plaintiff Vladi Shaulov

28.    Vladi Shaulov a/k/a Vladi Chaoulov ("Lead Plaintiff") is an Israeli citizen domiciled in Cyprus.  Lead Plaintiff purchased or otherwise acquired the Company's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures alleged herein.

### B.    Defendants

29.    Canoo Inc. ("Canoo") is a Delaware corporation, with its principal executive offices located within this District, at 19951 Mariner Avenue, Torrance,

California 90503. Canoo's securities trade, and at all relevant times after December 22, 2020 traded, in an efficient market on the NASDAQ under the ticker symbol "GOEV" (common shares) and "GOEVW" (warrants).

30.   Hennessy Capital Acquisition Corp. IV ("Hennessy" or the "HCAC") is a special purpose acquisition company ("SPAC"), and the predecessor-in-interest of Canoo.   Prior to the Merger, Hennessy's securities traded on the NASDAQ stock exchange under the ticker symbols "HCACU" (units), "HCAC" (Class A common stock), and "HCACW" (warrants).[2]

31.   Defendant Aquila is the current CEO and Chairman of Canoo.   Aquila, through his investment vehicle Aquila Family Ventures ("AFV") Partners, LLP, was an early investor in the Company, claiming to have provided "rescue capital to the company in July 2020" and participating as a PIPE investor. Defendant Aquila was named Chairman of the Board on or about October 19, 2020, and began serving as Executive Chairman and Director on or about December 21, 2020, after the Merger was completed. This role obligated Aquila to "develop and execute the Company's long-term strategy and product and business roadmap," and he was granted "the authority typically associated with the most senior executive of the Company, with authority over the senior management team of the Company, including, without limitation, all hiring and other personnel decisions." Effective April 30, 2021, Aquila became CEO.

32.   Defendant Kranz served as Co-Founder and CEO of Canoo Holdings until the Merger, when he became the Company's CEO-in-Charge.   Kranz was responsible for all relevant SEC filings throughout the Class Period.

33.   Defendant Paul Balciunas ("Balciunas") served as Chief of Finance and Corporate Development of Canoo Holdings until the Merger, when he became Canoo's

---

[2] Upon the closing of the IPO, Hennessy completed the private sale of 13,581,500 private-placement warrants, for gross proceeds of approximately $13.5 million.  The private placement warrants were sold to Hennessy Capital Partners IV LLC, and to certain other funds and accounts managed by subsidiaries of BlackRock, Inc. at $1.00 per private placement warrant.

CFO until his resignation from the Company effective April 2, 2021. Balciunas was responsible for all relevant SEC filings throughout the Class Period.

34. All references to the "Individual Defendants" in this Consolidated Amended Class Action Complaint are to Aquila, Kranz, and Balciunas, jointly and severally.

35. The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

36. The Company is liable for the acts of its executives, directors, officers, and agents at common law and under the doctrine of *respondeat superior* because all the wrongful acts and omissions complained of in this Consolidated Amended Class Action Complaint were carried out during and within the scope of each such person's employment. The scienter of the Company's executives, directors, officers, and agents is similarly imputed to the Company under established agency principles.

37. All references to the "Defendants" in this Consolidated Amended Class Action Complaint are to Canoo, Hennessy, Aquila, Kranz, and Balciunas, jointly and severally.

## IV.   BACKGROUND

### A.   Legacy Canoo

38.   Canoo, previously known as EVelozcity Inc., was cofounded by Defendant Kranz and non-party Stefan Krause.  On November 7, 2017, EVelozcity Inc. incorporated in Delaware.  At all relevant times, Canoo's principal place of business was in Torrance, California.

39.   On November 14, 2017, Canoo Holdings Ltd., registered as an exempted company in the Cayman Islands (Registration No. 329139), with an authorized share capital of $0.82 Cayman Islands Dollars.  Its directors were Defendant Kranz and non-parties Foster Chiang and Pak Tam Li.

40.   EVelozcity Inc. registered in California on March 26, 2018.

41.   On April 4, 2019, EVelozcity Inc. changed its corporate name to Canoo Inc. (which it registered with California on April 22, 2019).

42.   Canoo claimed to have developed a breakthrough electric vehicle ("EV") platform, or skateboard, purpose built to be highly modular and to facilitate rapid development of multiple vehicle programs in both the commercial and consumer markets.

43.   On or about September 24, 2019, Canoo debuted its first subscription only electric model, called the "canoo," to much fanfare.  The Company's press release of the same date stated:

> Canoo, the Los Angeles based company creating electric vehicles (EV) for subscription only, has unveiled today its first model, simply called canoo.  The design challenges traditional automotive shape and functionality and capitalizes on EV architecture in a way that provides significantly more interior space.  Canoo created this spacious vehicle for a world in which transportation is becoming increasingly electric, shared and autonomous.
>
> In less than 19 months since Canoo started, the company claimed to achieve a major milestone by designing and

engineering its first model, which is ready to present to the public.

We believe that the potential of EV architecture can enable a post SUV era that addresses the ever growing desire for space and value. . . .We promised a truly different approach for EVs, and our canoo proves that we can deliver on that vision.  The unveiling also kicks off the period of beta testing, meaning we are on track for our launch date in 2021.  We are very proud of the team.  In my 30 years' experience, I have never seen so many quality achievements in such a short time.

44.   Also on September 24, 2019, *The Verge* reported that "Canoo reportedly has a commitment of around $1 billion from a group of unnamed investors," and that "Canoo plans to start road testing the vehicle later this year, ahead of the planned 2021 launch."

45.   Similarly, on September 24, 2019, *TechCrunch* published an article titled "Canoo takes the covers off of its debut electric vehicle."  In the article, *TechCrunch* reported that "[t]he Los Angeles based startup Canoo has finally unveiled its first model, the eponymously named canoo," which Canoo planned to launch in 2021 in Los Angeles and in eight additional cities on the East and West Coasts.

46.   Canoo claimed to have achieved the production through a contract manufacturer.  Canoo's first cars were slated to appear on the road by 2021. According to the *TechCrunch* article:

Canoo has completed the design and engineering of its first model in just 19 months and is preparing its vehicles for production through a contract manufacturer.  The first cars are slated to appear on the road by 2021, according to the company's current leader, [Defendant] Kranz.

* * *

Canoo will launch its first vehicles in the Los Angeles market and expects to not only provide its "skateboard" platform for its own vehicles, but potentially work with other customers that would put their own cabin on top of the Canoo platform, [Defendant] Kranz says.

*The company intends to go to market with an entirely new business model by providing customers with its cars for a monthly subscription fee.* That service will likely include perks like automatic vehicle registration, maintenance, insurance management and charging through a single app on a customer's phone. The idea, the company says, is to bring the convenience and affordability of a Netflix movie service to the auto industry.

\* \* \*

*The rental model will help, as will the company's conservative rollout plan.* [Defendant] Kranz says that Canoo will start offering its subscription vehicles in one geography and scale slowly from there.

## B.     Hennessy Capital Acquisition Corp.

47.     Hennessy Capital Acquisition Group, a/k/a Hennessy, a/k/a HCAC, was incorporated in Delaware on or about August 6, 2018. HCAC was a special purpose acquisition corporation, called a "SPAC." A SPAC is a shell, or "blank check," company formed for the sole purpose of raising money through a public offering to eventually acquire one or more companies. SPACs have become magnets for fraud, has and have caused great concern among U.S. regulators and investors.[3]

48.     Hennessy, which had no commercial operations of its own, was authorized to issue 111,000,000 shares, consisting of (a) 110,000,000 shares of common stock, comprising (i) 100,000,000 shares of Class A Common Stock and (ii) 10,000,000 shares of Class B Common Stock; and (b) 1,000,000 shares of Preferred Stock.

49.     On February 11, 2019, Hennessy commenced a $300 million IPO and filed its Registration Statement with the SEC. In the February 11, 2019 Registration

---

[3] *See, e.g.*, John Coates, Acting Director, Div. of Corp. Fin., U.S. Sec. & Exch. Comm'n, *SPACs, IPOs and Liability Risk* (2021) (noting that "[s]ome . . . have claimed that an advantage of SPACs over traditional IPOs is lesser securities law liability exposure," but explaining that any such claim "is overstated at best, and potentially seriously misleading at worst."), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

Statement, Hennessy stated that, with respect to identifying a suitable acquisition target, it recruited and organized a group of eight highly accomplished and engaged directors to aid the Company in investment origination, key risk assessment, opportunities, and due diligence.  The Company represented that its directors had extensive experience with acquisitions, divestitures and corporate strategy, and possessed relevant domain expertise in the sectors then being targeted by the Company for a business combination.

50.    In the February 11, 2019 Registration Statement, the Company stated it had certain criteria or guidelines to evaluate prospective target businesses, including:

- Established Companies with Proven Track Records.
- Companies with Proven Revenue and Earnings Growth or Potential for Revenue and Earnings Growth.
- Companies with, or with the Potential for, Strong Free Cash Flow Generation.
- Strong Competitive Position.
- Experienced Management Team.
- Sectors Exhibiting Secular Growth or with Potential for Cyclical Uptick.

51.    On February 28, 2019, the SEC declared Hennessy's February 11, 2019 Registration Statement to be effective for the IPO.

52.    On March 5, 2019, Hennessy issued a press release, announcing that it had closed its IPO of 30,015,000 units at an offering price of $10.00 per unit, resulting in gross proceeds of $300,150,000.  Simultaneously with the closing of the IPO, Hennessy sold 13,581,500 warrants at a price of $1.00 per private placement warrant in a private placement, generating an additional $13,581,500 in proceeds.

53.    According to Hennessy's 2019 Annual Report filed with the SEC on March 16, 2020, as of the same date, 7,503,750 of the Company's 10,000,000 shares of Class B Common Stock (or 75.04%) were held directly by, or indirectly for the benefit of, Daniel J. Hennessy, Blackrock, Inc., Greg Ethridge, Nicholas A. Petruska, Bradley Bell, Richard Burns, Peter K. Shea, James F. O'Neil III, Juan Carlos Mas, and Gretchen W. McClain.  88.4% of the Company's Class B Common Stock was held by directors and

executive officers.   Additionally, 23% of the Company's Class A Common Stock was held directly by, or indirectly for the benefit of, three (3) institutional investors: Polar Asset Management Partners Inc., Magnetar Financial LLC, and Karpus Investment Management.

54.   Hennessy's IPO documents obligated it to complete a business combination by September 5, 2020, or it would be required to provide investors redemption rights – *i.e.*, an opportunity to cash out the initial investment for roughly the investment price.

### C.   The Merger

55.   On August 6, 2020, the Company filed with the SEC a Definitive Proxy Statement Pursuant to Section 14(a) of the '34 Act, setting a date of August 27, 2020 for a "Special Meeting" and told investors that it had "entered into a letter of intent with a prospective target for an initial business combination in the electric vehicle (EV) and advanced mobility sector," but that "there can be no assurance that a definitive agreement will be entered into or that the proposed transaction will be consummated." Accordingly, the August 6, 2020 Definitive Proxy Statement asked shareholders to vote to amend the Company's Charter "to extend the date by which the Company has to consummate a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (a 'business combination'), from September 5, 2020 to December 31, 2020."

56.   On August 17, 2020, less than one month before the Underwriting Agreement and Trust Indenture required HCAC to dissolve and distribute 100% of the assets in the Trust Account to the Public Shareholders, Hennessy and Canoo signed a Merger Agreement and Plan of Reorganization (the "Merger Agreement").

57.   According to the Merger Agreement, Hennessy, two of its direct wholly owned subsidiaries, and Canoo Holdings Ltd.. At the time, Hennessy maintained a trust account holding $308,737,340 as of August 17, 2020.

58.     According to the Merger Agreement, the Merger was to take place in two phases.  During the first phase, HCAC IV First Merger Sub, Ltd., merged with and into Canoo Holdings Ltd.  Canoo Holdings Ltd. was the surviving corporation ("Phase One" or "Private Merger").

59.     During the second phase, Canoo Holdings Ltd. merged with and into HCAC IV Second Merger Sub, LLC.  HCAC IV Second Merger Sub, LLC was the surviving entity ("Phase Two" or "Public Merger").

60.     Phase One of the Merger was complete upon the filing of the Merger Agreement with the Cayman Islands Registry on August 17, 2020.

61.     On August 18, 2020, Hennessy announced the Merger by filing with the SEC a Schedule 14A (the "Proxy Statement"), setting forth the details of the proposed transaction and encouraging investors to vote in favor of the proposed Merger.  The Proxy Statement was accompanied by a Form 425, which set forth additional information about the purposed Merger and an investor presentation that was filed with the SEC by Hennessy on Form 8-K.

62.     On August 25, 2020, Canoo and Hennessy issued a press release on Form 8-K announcing nominees for Canoo's Board of Directors in the event the Merger was approved.  Defendants Aquila and Kranz were among the nominees, along with Chairman and CEO of HCAC, Daniel J. Hennessy. The press release attributed the following statement to Defendant Aquila regarding his decision to invest in Canoo:

> We have looked at many of the EV opportunities in the market and have decided to put our support and industry track record behind Ulli and the Canoo team. ***We believe that this platform is uniquely positioned to meet the rapidly growing needs of the entire EV mobility and logistics ecosystem with a multigenerational platform approach***.

63.     On August 27, 2020, the Company filed with the SEC a Form 8-K, in which it announced that it received shareholder approval to extend the date by which the

Company must consummate a business combination from September 5, 2020 to December 31, 2020.

64.    On September 18, 2020, the Company filed with the SEC its Registration Statement on Form S-4 (the "September 18, 2020 Form S-4"), requesting the Company's stakeholders vote in favor of the Merger. Among other things, the filing highlighted that Canoo's engineering services business "*offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021*," and that "[w]e expect our engineering and technology services business to offer significant growth potential in the future."

65.    The September 18, 2020 Form S-4 also stated that the Company had a contract with Hyundai Motor Group ("Hyundai"), which provided "further validation of Canoo's technical leadership and external confidence in its commercial prospects."

66.    Moreover, the September 18, 2020 Form S-4 also asserted the following: "In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk the overall business model."

67.    On October 23, 2020, Hennessy filed an Amended Form S-4, which repeated the many false and misleading statements concerning the three revenue streams previously contained in public filings.

68.    On November 27, 2020, Hennessy filed Amendment to the Form S-4, which again repeated the many false and misleading statements concerning the three revenue streams previously contained in public filings. According to Hennessy's Amended Form S-4 filed with the SEC on November 27, 2020, Hennessy's board of directors failed to obtain a third-party valuation or fairness opinion in connection with Hennessy's recommendation that stockholders vote to approve the Public Merger.

69.     On December 4, 2020, Hennessy filed with the SEC a Prospectus in connection with the Merger, which was declared effective the same day. The Prospectus set December 21, 2020 as the date for the shareholder vote to be completed and repeated the many false and misleading statements concerning the three revenue streams previously contained in public filings.

70.     On December 21, 2020, Hennessy and Canoo announced that, at a Special Meeting of the same date, Hennessy's stockholders voted to approve the stockholder proposals necessary to complete the Public Merger, which closed on the same date.  The Company also announced that Hennessy would change its name to "Canoo Inc."

71.     At all relevant times prior to December 22, 2020, Hennessy's securities were actively listed and traded on the NASDAQ and commenced trading under the ticker symbols "HCACU" (units"), "HCAC" (Class A common shares), and "HCACW" (warrants).  Each Hennessy unit consisted of one share of Hennessy's Class A common stock and three-fourths of one redeemable warrant, entitling the warrant holder to purchase one share of Class A common stock at $11.50 per share.

72.     On the same day, commenting on the Public Merger, Defendant Aquila stated:

> This next chapter is a very important one for Canoo as we prepare to complete advanced testing of our innovative electric mobility platform and to bring our recently unveiled multi-purpose delivery vehicle to limited production in 2022, and to commercial production and rollout in 2023.  On behalf of all of us at Canoo, **we are committed and excited about our go-to-market opportunities and to bring both consumers and businesses the benefits of our platform.**  We are extremely passionate about fulfilling our mission to bring EVs to everyone.

73.     Investors would soon learn Canoo's future operations would be dramatically different than the concept upon which the Merger was justified.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE BETWEEN AUGUST 18, 2020 AND MARCH 29, 2021

74.   On August 18, 2020, Hennessy issued a press release announcing that it had entered into a merger agreement with Canoo Holdings Ltd., which would result in Canoo becoming a publicly traded company.  The press release stated, in relevant part:

> Daniel Hennessy, Chairman & Chief Executive Officer of HCAC said, . . .Unlike any other EV company, Canoo has created a go-to-market strategy that captures both B2C and B2B demand with the same skateboard architecture ***and technology that has already been validated by key partnerships such as with Hyundai.***  HCAC has an abiding commitment to sustainable technologies and infrastructure, and we are excited to serve as a catalyst to advance the launch of the Canoo vehicle offerings.

75.   The statement in ¶ 74 was false and misleading. Canoo's relationship with Hyundai did not provide validation of the skateboard technology because, during the Class Period, Canoo did not work "with or for Hyundai" and, as Defendant Aquila later admitted, Canoo's claims regarding the benefits derived from partnerships were "aggressive," "premature," "presumptuous," and not up to the "standard of representation to the public markets."

76.   On August 18, 2020, Canoo held a conference call with investors to discuss the proposed Merger, during which Defendant Kranz touted the fundamental aspect of Canoo's three streams of revenue.  In addition to business to business ("B2B") sales, Defendant Kranz touted its engineering services business and a subscription-based consumer vehicle service business:

> We have three phases of revenue streams.  ***In the first phase, we call it Engineering Services.  This is a phase that already exists today.  So, we are working for companies and we are already making money with the first revenue stream.***  The second revenue stream is B2C.  ***This is a stream that we will have available when we launch our first vehicle, our lifestyle***

*vehicle, by 2022.  This is a consumer vehicle and it will be on subscription.*  The B2B services, that you see on the right side, is our third revenue stream.  This will be a vehicle introduced in 2023, what we call a last-mile delivery vehicle, and this will be for sales.  *Three different revenue streams give us very good flexibility, and it makes also sure that we can really tap into different areas to be profitable.*

77.    In another slide, Canoo stated its engineering services partnerships "validate[d] Canoo's technology" and that the revenue generated by those services would "reduce the Company's overall execution risk", which it explained as follows:

78.    The statements in ¶¶ 76–77 relating to Canoo's proposed subscription model were false and misleading because Defendants knew but failed to disclose that: (1) the subscription model was not financially sustainable or economically feasible; (2) the proposed subscription model would have required additional capital to be raised to offset the "big cash hit" that develops due to accounting requirements; (3) as a result, Defendant Aquila was pressing Canoo's executives to abandon it.

79.     The statements in ¶¶ 76–77 relating to contract engineering services were false and misleading because Defendants knew but failed to disclose that: (1) revenue derived from the contract engineering services division was the result of a single performance obligation, which had been completed in July 2020; (2) at the time statement was made, all of Canoo's engineering work was for its own products; (3) during the Class Period, Canoo did not work "with or for Hyundai"; (4) engineering services did not offer Canoo a unique opportunity to generate immediate revenues; and (5) as a result, statements relating to the financial impact of contract engineering services were later admitted to be "aggressive," "premature," "presumptuous," and not up to the "standard of representation to the public markets."

80.     Also, during an August 18, 2020 conference call discussing the proposed Merger, Defendant Balciunas explained the benefits of a subscription-based business model and how it created Canoo's completive advantage, saying:

> Looking at our margin, our target rate is approximately 40% for the subscription business. ***As we look at other competitors that offer subscription products in the technology sector, we see that this margin is very similar and there's a lot of similarities between our model and their model***, even though at initial glance it may appear to be very different. . . . ***Because depreciation is such a fundamental part of our business, think about it like a rental car business, for us to be able to achieve a 20% operating profit is far greater than what you see in the traditional automotive OEM business model where that margin is closer to 5% to 10%. So, it really does highlight the power of a subscription business model with this figure being a fully-burdened margin.***

81.     The presentation accompanying the call highlighted how the subscription model was superior to leasing:



82.     The presentation further described how the subscription-based model would be "more profitable & resilient":



83.     The statements in ¶¶ 80–82 were false and misleading because Defendants knew but failed to disclose that: (1) the subscription model was not financially sustainable or economically feasible; (2) the proposed subscription model would have required additional capital to be raised to offset the "big cash hit" that develops due to accounting requirements; (3) as a result, Defendant Aquila  was pressing Canoo's executives to abandon it.

84.     On August 25, 2020, Defendant Aquila was quoted in an article titled "Electric Vehicle Company Canoo Announces Board Members." Defendant Aquila adopted and approved Canoo's business plan, stating:

> We have looked at many of the EV opportunities in the market and have decided to put our support and industry track record behind [Defendant Kranz] and the Canoo team. ***We believe that this platform is uniquely positioned to meet the rapidly growing needs of the entire EV mobility and logistics ecosystem with a multigenerational platform approach***.

85.     On September 18, 2020, Canoo filed its Registration Statement on Form S-4 with the SEC.  In the September 18, 2020 S-4 Registration Statement, the Company touted Canoo's engineering services, stating:

> ENGINEERING AND TECHNOLOGY SERVICES
>
> Canoo's engineering and technology services business covers all the material consulting and contract engineering work that is in high demand due to our team's specialized experience and technical capabilities in EV development. ***This business offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021.***  We expect our engineering and technology services business to offer significant growth potential in the future as projected demand grows for EVs and their related technologies, namely in platform/skateboard development, powertrain, battery technologies and power electronics, among other areas, in which we have substantial

expertise. ***In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model.***

Canoo's pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategics and high growth technology companies. ***There is a significant market for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs. Canoo is at a distinct competitive advantage to capitalize on this growing demand.*** In fact, whereas other new EV entrants are forced to license key technologies and/or outsource primary engineering development to larger OEMs, ***Canoo has already received significant OEM interest in our skateboard technology and our team's expertise in platform engineering, powertrains and vehicle design, as is exemplified by the announcement of an agreement between Hyundai Motor Group and Canoo for the co-development of a future EV platform based on Canoo's modular technology.***

***Contract engineering opportunities serve as concrete points of external validation for our technology and the talent of our team, as well as provide additional sources of revenue and long-term commercial opportunities (such as skateboard and technology licensing) as the relationship matures. Canoo is also in discussions with a number of other partners and expects to be in a position to announce many more partnerships in due course.***

86.   Similarly, the Registration Statement stated that Hennessy's Board considered Canoo's engineering services and subscription model to be "positive factors" supporting the Merger.

87.     The September 18, 2020 S-4 Registration Statement was subsequently amended on October 23, 2020 and on November 27, 2020, with each subsequent amendment containing the same false and misleading statements found in ¶¶ 85–86. Canoo also filed its prospectus on Form 424b3 with the SEC on December 4, 2020, making substantially the same statements.

88.     The statements in ¶¶ 85–86 relating to contract engineering services were false and misleading because Defendants knew but failed to disclose that: (1) revenue derived from the contract engineering services division was the result of a single performance obligation, which had been completed in July 2020; (2) at the time statement was made, all of Canoo's engineering work was for its own products; (3) during the Class Period, Canoo did not work "with or for Hyundai"; (4) engineering services did not offer Canoo a unique opportunity to generate immediate revenues; and (5) as a result, statements relating to the financial impact of contract engineering services were later admitted to be "aggressive," "premature," "presumptuous," and not up to the "standard of representation to the public markets."   Additionally, the statements in ¶¶ 85–86 were false because, as Defendant Aquila himself later admitted on March 29, 2021, the Company had no basis for asserting that it would be able to generate $120 million in 2021 from the engineering services division.

89.     On December 21, 2020, Canoo announced that its business combination with Canoo Holdings Ltd. had been completed and that the combined Company's common stock and warrants would trade on the NASDAQ beginning on December 22, 2020.

90.     On the same day, commenting on the Public Merger, Defendant Aquila stated:

> This next chapter is a very important one for Canoo as we prepare to complete advanced testing of our innovative electric mobility platform and to bring our recently unveiled multi-purpose delivery vehicle to limited production in 2022, and to commercial production and rollout in 2023.  On behalf

of all of us at Canoo, **we are committed and excited about our go-to-market opportunities and to bring both consumers and businesses the benefits of our platform.** We are extremely passionate about fulfilling our mission to bring EVs to everyone.

91.     The statements in ¶¶ 87–90 were false and misleading because Defendant Aquila knew but failed to disclose that: (1) the subscription model was not financially sustainable or economically feasible; (2) the proposed subscription model would have required additional capital to be raised to offset the "big cash hit" that develops due to accounting requirements; (3) as a result, Defendant Aquila was pressing Canoo's executives to abandon it.

92.     On January 13, 2021, Canoo filed a registration statement on Form S-1 with the SEC, signed by Defendants Aquila and Balciunas, for a shelf offering of Canoo stock.

93.     In the January 13, 2021 S-1, Canoo again touted the value of its EV engineering experience, its deal with Hyundai to provide engineering services, and discussions with other industry participants:

> This experience and advanced progress have garnered the attention of prospective collaboration partners, including leading global automotive OEMs. **In February 2020, we entered into an agreement with Hyundai Motor Group to co-develop a future EV platform based on our modular and scalable skateboard technology, providing further validation of our technical leadership. The agreement provides for the co-development of a platform for a small segment electric vehicle for which the intellectual property developed will be jointly owned by us and Hyundai Motor Group.** The agreement provides that it may be terminated for convenience by either party; however, certain provisions, including with respect to the joint-ownership of intellectual property, survive any such termination. **We are also currently in discussions with multiple other blue-chip industry participants interested in leveraging our technologies and engineering expertise for their own commercial products.**

94.     The statement in ¶ 93 as relating to contract engineering services were false and misleading because Defendants knew but failed to disclose that: (1) revenue derived from the contract engineering services division was the result of a single performance obligation, which had been completed in July 2020; (2) at the time statement was made, all of Canoo's engineering work was for its own products; (3) during the Class Period, Canoo did not work "with or for Hyundai"; (4) engineering services did not offer Canoo a unique opportunity to generate immediate revenues; (5) as a result, statements relating to the financial impact of contract engineering services and/or benefits derived from partnerships were later admitted to be "aggressive," "premature," "presumptuous," and not up to the "standard of representation to the public markets."

95.     The January 13, 2021 S-1 also repeated many of the same claims about Canoo's competitive advantages found in prior public filings, including:

ENGINEERING AND TECHNOLOGY SERVICES

Our engineering and technology services business covers all the material consulting and contract engineering work that is in high demand due to our team's specialized experience and technical capabilities in EV development. ***This business offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021.*** We expect our engineering and technology services business to offer significant growth potential in the future as projected demand grows for EVs and their related technologies, namely in platform/skateboard development, powertrain, battery technologies and power electronics, among other areas, in which we have substantial expertise***. In addition to providing external commercial validation of our technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model.***

Our pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategics and high growth technology companies. ***There is a significant market for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs.  We are at a distinct competitive advantage to capitalize on this growing demand.***  In fact, whereas other new EV entrants are forced to license key technologies and/or outsource primary engineering development to larger OEMs, we have already received significant OEM interest in our skateboard technology and our team's expertise in platform engineering, powertrains and vehicle design, as is exemplified by the announcement of an agreement between us and Hyundai Motor Group for the co-development of a future EV platform based on our modular skateboard technology.

***Contract engineering opportunities serve as concrete points of external validation for our technology and the talent of our team, as well as provide additional sources of revenue and long-term commercial opportunities (such as skateboard and technology licensing) as the relationship matures.  We are also in discussions with a number of other partners and expect to be in a position to announce many more partnerships in due course.***

96.     The statements in ¶ 95 relating to contract engineering services were false and misleading because Defendants knew but failed to disclose that: (1) revenue derived from the contract engineering services division was the result of a single performance obligation, which had been completed in July 2020; (2) at the time statement was made, all of Canoo's engineering work was for its own products; (3) during the Class Period, Canoo did not work "with or for Hyundai"; (4) engineering services did not offer Canoo a unique opportunity to generate immediate revenues; and (5) as a result, statements relating to the financial impact of contract engineering services were later admitted to be "aggressive," "premature," "presumptuous," and not up to the "standard of

representation to the public markets."  Additionally, the statements in ¶ 95 were false because, as Defendant Aquila himself later admitted on March 29, 2021, the Company had no basis for asserting that it would be able to generate $120 million in 2021 from the engineering services division.

97.      The S-1 continued to tout the Company's "innovative" business model:

Both our Lifestyle Vehicle and our Sport Vehicle are initially intended to be made available to consumers via an innovative subscription business model. ***With a single monthly payment, customers will enjoy the benefits of an all-inclusive experience that, in addition to their own vehicle, also includes standard maintenance, warranty, registration and access to both insurance and vehicle charging***.  We plan to utilize an asset-light, flexible manufacturing strategy by outsourcing our direct vehicle production operations to a world-class vehicle contract manufacturing partner for our initial vehicle programs.  ***In doing so, we will significantly reduce our up-front capital investment and eliminate the recurring fixed costs and overhead that would be required for us to own and operate our own assembly facility.***

98.      Regarding Canoo's subscription model, the Form S-1 stated, in relevant part:

Subscription Offerings

Both our lifestyle Vehicle and our Sport Vehicle are initially intended to be made available to consumers via an innovative subscription business model.  Research from Volvo and the Harris Poll shows that 74% of drivers believe EVs are the future of driving, but many are concerned about trying a new technology.  40% of non-EV drivers responded that a 30 day "try before you buy" period would increase the likelihood of them purchasing an EV.  ***In other words, consumers are increasingly interested in EV technology, but long-term commitments (or other hurdles like sizable down payments) remain a significant barrier to entry.  By reducing the commitment required for a typical car purchase or lease, we believe the subscription model will help reduce the barriers***

*to entry for consumers looking to drive an EV, while also providing us with a distinct opportunity for recuring revenue and a unique profit margin profile.   We believe this model is supported by a number of key trends in consumer preferences and strong underlying financial metrics as compared to a traditional one-time sale model.*

\* \* \*

During 2020, our revenue has been derived from the provision of engineering, development and design consulting services on a project basis. ***Once we reach commercialization and commence production of our EVs, we expect that the significant majority of our revenue will be derived from our consumer subscription program for our Lifestyle Vehicle and Sport Vehicle***, as well as sales of our Multi-Purpose Delivery Vehicle.

99.    The statements in ¶¶ 97–98 were false and misleading because Defendants knew but failed to disclose that: (1) the subscription model was not financially sustainable or economically feasible; (2)the proposed subscription model would have required additional capital to be raised to offset the "big cash hit" that develops due to accounting requirements; (3) as a result, Defendant Aquila was pressing Canoo's executives to abandon it.

100.    On January 25, 2021, Canoo filed its prospectus on Form 424b3 for the issuance of common stock upon the exercise of certain warrants, making substantially the same statements identified in ¶¶ 93, 95, 97–98.

101.    The statements in ¶¶ 93, 95, 97–98, 100 were materially false and misleading because Defendants knew but failed to disclose material, adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants knew but failed to disclose to investors that: (1) the subscription model was not financially sustainable or economically feasible; (2) the proposed subscription model would have required additional capital to be raised to offset the "big cash hit" that develops due to

accounting requirements; (3) as a result, Defendant Aquila was pressing Canoo's executives to abandon it.

## VI.   THE TRUTH ABOUT CANOO'S OPERATIONS IS REVEALED, AND THE PRICE OF THE COMPANY'S SECURITIES DECLINES PRECIPITOUSLY

102.   On March 29, 2021, the Company announced its fourth quarter and full year financial results for 2020. Remarkably, the Company reported no engineering services revenue during the fourth quarter of 2020, after having reported $2.55 million in engineering services revenue during the first nine months of 2020.

103.   Also on March 29, 2021, the Company held a conference call to discuss its financial results for the Company's fiscal fourth quarter and full year 2020 (the "Q4 Call").

104.   The Q4 Call commenced with Defendant Aquila providing prepared remarks. Neither Defendant Kranz nor Defendant Balciunas participated.

105.   Further, Defendant Aquila announced that Defendant Balciunas, who served as the CFO of Canoo following the close of the Merger, had resigned, effective April 2, 2021.

106.   The shocking revelations did not end with the executive turmoil. Defendant Aquila proceeded to inform investors that Canoo was deemphasizing its engineering and technology services line of business, that it abandoning its subscription based model, and that its arrangement with Hyundai was essentially cancelled.

107.   Specifically, during the Q4 Call, Defendant Aquila revealed that the Company would no longer focus on its engineering services line, stating:

> ***Due to the expansion of our derivatives and the best return on capital, it was decided by our Board to de-emphasize the originally stated contract engineering services line, and this will further accelerate the creation of IP and the launch of***

*our derivatives which enhance our opportunity for the highest return on capital.*

108.   Analysts present during the Q4 Call were quick to point out that the Company's decision to "deemphasize the originally stated contract engineering services line" contradicted the strategy that the Company had touted in soliciting investors' approval of the SPAC merger.

109.   For example, analyst Craig Irwin of ROTH Capital Partners stated, "So I would acknowledge that these are significant surprises on the call today, and that's not ideal after a SPAC – the IPO process.  So I just wanted to underline that."  Irwin went on to ask:

> [Y]ou talked about how engineering IP broadens your TAM [i.e., Total Addressable Market], but then you announced that you're deemphasizing your engineering services.  Can you help us resolve that and maybe give us a little bit more color about why you would deemphasize engineering given that the original story was it would subsidize the development and broaden the partner opportunity with potentially multiple hats under license?

110.   Defendant Aquila replied to Irwin as follows:

> *I would say that from a Company perspective, it was a contradiction. . . . Just $25 million, it would yield us, we at the Board really feel like the best thing to do is to accelerate our derivatives and focus our talent on creating IP for the Company.*
>
> *. . . And from my perspective, if I had been more involved earlier, certainly, once I invested and then took the Chairmanship, we started the analysis. I had concerns about this. . . . And we'll continue to look at things, but to be a contract engineering house is just really not going to drive the best shareholder value.*

111.   In another exchange during the Q4 Call, Defendant Aquila conceded that Company management had been "aggressive," "premature," "presumptuous," and not up to the "standard of representation to the public markets":

> Steve Sakanos, Cronos Capital: [D]uring the course of the year, you stated a couple of times that you had under discussion with some OEMs and possibly the contract manufacturer.  You said that there are going to be some announcements by the end of Q4.  I'm just wondering what happened that changed all of that?
>
> Defendant Aquila: Right.  *So you're again owning the past as much as the present in the future.*  Look, I can only speak to what I know about this.  *I think that they [i.e., other Company management] were focused on maybe a little more aggressive than I would be in their statements.  I think more maturity of this team would not be that presumptuous.  We only announced what is contracted.  But yes, I think they had the opportunities but they weren't at our standard of representation to the public markets.*
>
> ***
>
> *And then with respect to contract manufacturing again we wouldn't make an announcement.  Again, this comes back to having an experienced public company here to be careful of the statements you make.  So again, I think it was a little premature.*

112.   Analysts present on the Q4 Call sought to determine what caused the Company's sudden change in strategy with respect to the subscription business model. For example, analyst John Murphy of Bank of America asked:

> I mean, you tweak[ed] the business model a little bit.  But I mean, just curious on the sort of retail to the consumer side, how you're thinking about that going forward?  Is there just too much opportunity on the commercial side and you're kind of putting that sort of back burner or is this subscription model still in play?  Because I know that was part of the story before.

113.  In response, Defendant Aquila explained he believed that the strategy change was a better use of capital and stated:

> . . . *when I came in and took my role and we spent a lot of money analyzing the weight that this will have on the balance sheet.* . . . And *so you can only have a certain percentage of your business on membership.  Otherwise, you've got a big cash hit that starts to develop on you as you can probably imagine*.

> . . . *What [sic – Would] I have changed the sequence of top hats and use cases I would have went after based on my experience without a doubt, as you can see the modifications we're doing.  [sic]*

> . . . on a financial burden basis on the balance sheet, *yes, there's probably 80% change [in the business model],* but it's to the mathematical positive. . . .

> . . .*And again I apologize to anybody.  As a leader, you always own the past before the present or the future.*  And so I take everyone's comments in all three categories.

114.  During the Q4 Call, another analyst sought to clarify whether the Company's shift in strategy meant that the "original SPAC model is no longer guidance" for the market.  Defendant Aquila confirmed, stating:

> [A]t this point, it doesn't make sense to give guidance until we complete the work that we have started.  *And with all that's going on in the SPAC world, in the pre-revenue side, we want to be very conservative*.  . . .  And so doing this at a high public company standard, I think, is important for all SPACs, and certainly, we're going to do our best to lead the way here.  *And so we will be step-by-step building this and we will be delivering information as it is known and contracted, not*

*based on light rev reservation models.   I think that's dangerous.  I think this could be somewhat misleading.*

*And so typical of any leadership change, different standard comes in. And we'll guide you through that. Kamal will be following up with you on a regular basis. Certainly do acknowledge your point, Craig, that you got, so to speak, as you mentioned, showed a different model . . .*

\*\*\*

*Obviously, I wasn't here when they did their original model, but certainly I wanted to get ahead of this and explain to you how this really is going to work and how to build a profitable company,* which we've done in the past.  And we intend to do here.  But hey, *we understand the situation it puts you in, and we will work closely to rectify that so you can understand very clearly where we're going*.

115.   During the Q4 Call, Defendant Aquila also seemed to acknowledge that the Company no longer had a partnership with Hyundai.  For example, during the Q4 Call, Defendant Aquila did not correct an analyst who stated, "the Hyundai arrangement, the original one, which I am assuming that's now off the table."

116.   As another example, analyst Joseph Spak of RBC Capital Markets went on to ask during the call:

You mentioned IP leakage as one of the potential problems with that arrangement.  Can you just talk about like how do you unwind that sort of I guess memorandum of understanding?  What work was done?  Do you think there was any IP related, [ph] obviously, Hyundai coming out with their own electric vehicle platforms as well?"

117.   Defendant Aquila responded to Spak stating:

. . .So I think the Company just like any adolescent company is it's [sic] learning, its way and all of us go through it. *But it factored in contract manufacturing based on the labor of*

*engineers, not based on the value of IP, which would change the value of that contract significantly.* . . .

*So it's kind of caused us to say, hey, let's put that on hold, we have so much demand for our three derivatives, let's get all that work done, and then let's look at if there partnerships* [sic]. Partnerships can work in this industry but contract manufacturing work is, as you know, is not the best business line to be in. And so was there some leakage? Well, I'll leave it to you to make that decision. But obviously, I'm not a big fan of doing that type of business.

118. During the Q4 call, in response to a question about Canoo's manufacturing process, Defendant Aquila said:

*So we're not trying to be an assembler of parts. We're creating IP, which goes to the reason why the return on capital wasn't as good to have our engineers doing contract engineering work for another brand versus creating our own IP,* which we think gives us a very tangible asset that we have today that is very leverageable as we build out our delivery strategy state by state, country by country.

119. In response to a question about potentially returning to "the subscription model" in the future, Defendant Aquila said:

No, *it's a ratio issue,* Joe. We're going to focus on something sub 20% of our sales will be in category. We just—*otherwise, we got to have to raise a lot more capital, as you know, because you're going to have to see this on your books, and then you're going to have all this accounting mark to market*. . . .

In addition to that, you get into the areas of it doesn't positively impact incentives. You got to—there's a whole bunch of factors, tax—accelerated tax depreciation for the class. *So we're looking at it in a much more detailed and return on capital perspective, not only for us but for the owners of the vehicle and/or those in the membership.* So

> membership is not going away.  It's just being appropriately managed on our balance sheet.  . . .

120.   The disclosures in ¶¶ 102–19 revealed to investors that at all times prior to March 29, 2021, Defendants knew but had failed to disclose material, adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants knew but failed to disclose to investors that: (1) the subscription model was not financially sustainable or economically feasible; (2) the proposed subscription model would have required additional capital to be raised to offset the "big cash hit" that develops due to accounting requirements; (3) as a result, Defendant Aquila was pressing Canoo's executives to abandon it.

121.   Following the March 29, 2021 corrective disclosure, the price of Canoo stock fell from its close at $11.80 on March 29, 2021 to low of $8.11 on March 30, 2021.

122.   On March 31, 2021, the Company filed its Annual Report for 2020 on SEC Form 10 K, in which it reported Total Revenues of $2,550,000 for 2020.  For the first time, the Company disclosed:

> During 2020, the Company's revenue was derived from the provision of consulting services on a project basis.  The Company's fixed price contracts related to these services contain a single performance obligation, which was satisfied in July 2020 when the Company provided the final report to the customer.  Revenue for these services was recognized at a point in time, when the project was delivered.

123.   Following the March 31, 2021 corrective disclosure, the price of Canoo stock continued to fall, reach a low of $8.05 on April 5, 2021.

## VII.  MEDIA AND ANALYSTS REACTED HARSHLY TO DEFENDANTS' ADMISSIONS

124.   When Canoo announced its 2020 fourth quarter and full year financial results, the Company revealed it had not generated any engineering services revenue

during the quarter and disclosed that the Company's CFO was resigning. These disclosures revealed a drastic, unexpected shift in the Company's core operating model away from what investors and the public at large were previously told. Published media and analyst reports in the wake of the press release and earnings call demonstrate the market's swift, adverse reaction to these revelations.

125. On March 29, 2021, *The Verge* published an article shortly after the Q4 Call, reporting in relevant part:

> ***The deal between Canoo and Hyundai to build electric vehicles appears to be dead***, as the California EV startup is moving away from trying to sell its electric vehicle technology to other automakers.
>
> Canoo chairman Tony Aquila shared the news Monday during an icy investor call—Canoo's first as a publicly-traded company. ***Canoo's CEO was also absent from the call, and the company announced earlier in the day that its CFO had resigned to take another job—the second major departure in recent weeks following Canoo losing its head of corporate strategy.***

126. The March 29, 2021 article from *The Verge* noted the "significant surprises" on the Company's first quarterly conference call, stating as follows:

> ***"These are significant surprises on the call today, and that's not ideal,"*** Roth Capital analyst Craig Irwin said at one point on the call.
>
> The deal with Hyundai was announced in February 2020, and it was supposed to result in both the Hyundai and Kia brands building vehicles on Canoo's electric vehicle platform. ***It was seen as a major vote of confidence in the startup, which was just two years old at the time, as well as its tech.*** Canoo called it a "key partnership." Hyundai did not immediately

respond to a request for comment.  Canoo did not respond beyond Aquila's statements.

127.  Moreover, the March 29, 2021 article from *The Verge* noted that Canoo's "planned engineering services business," which had been a prominent talking point both before and after the merger, would no longer be part of the Company's business:

> In documents filed with the Securities and Exchange Commission, both before and after the merger, **Canoo had said its planned engineering services business presented "a significant market for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs."**
>
> * * *
>
> The startup [(*i.e.*, the Company)] also said **these types of partnerships would serve as "concrete points of external validation for our technology and the talent of our team, as well as provide additional sources of revenue and long-term commercial opportunities."**  Canoo said it was "in discussions with a number of other partners and expects to be in a position to announce many more partnerships in due course."

128.  In addition, *The Verge* article also noted that Canoo was now abandoning the "subscription model" it had touted:

> But on Monday, Aquila said Canoo will now focus more on making and selling its own vehicles to commercial operators. The company has so far announced a delivery vehicle, a pickup truck, and a van, all of which are built on the same underlying technological platform.  **Canoo will focus even less on the idea of selling its electric van to consumers through a subscription model—the original pitch when the startup broke cover in 2018.**

*Aquila has previously spoken about focusing more on selling to fleet operators and small businesses as opposed to customers, though it wasn't until Monday that he explained just how far he is willing to take that strategy shift.* To wit, Canoo quietly uploaded a new investor presentation to its investor relations website on Monday that no longer mentions Hyundai.

129.   *The Verge* article further addressed why Canoo was now retreating from prior public statements, and Defendant Aquila conceded those statements were "presumptuous" and "premature," stating as follows:

"We have so much demand for our three [vehicles], let's get all that work done, and then let's, you know, look at if there [are partnership]," he [*i.e.*, Defendant Aquila] said.  Aquila explained he believes that this will make for a more sound business with less risk.  *When pressed on the startup's previous claims about this part of its business, Aquila—who invested $35 million into Canoo before the SPAC merger— pointed to its prior leadership.  Aquila said they were "a little more aggressive" than he would've been with some of their public statements, and that talk of potential partnerships was "presumptuous."*

"You've got to be careful with statements you make.  So, you know, again, *I think it was a little premature*," he [*i.e.*, Defendant Aquila] said.

While some of those executives are indeed now gone, like cofounder and former CEO Stefan Krause, others remain— though they weren't on Monday's call.  At one point Aquila was asked directly if Krause's replacement, Canoo cofounder Ulrich Kranz, was still the CEO.  Aquila confirmed he is, though as *The Verge* first reported *late last year, Kranz's contract was recently renegotiated and he was removed from the board of directors.*

> Aquila said he believes the refocused business will help "protect" the intellectual property Canoo has developed, and that the original deal with Hyundai didn't factor in the value of that IP. When one analyst asked if Aquila think Hyundai misappropriated any of Canoo's IP, Aquila said "well I'll leave it to you to make that decision."

130. On March 30, 2021, ROTH Capital Partners issued a report titled "GOEV: 4Q20 Results Were OK; Complete Change in Direction Is Not; DG to Neutral" (the "ROTH Capital Report"). The ROTH Capital Report no longer recommended buying Canoo stock, noting that Roth Capital was "downgrading shares of Canoo to Neutral (from Buy) given a hard pivot in the business model and a rest on operations, which are clearly still ongoing."

131. The March 30, 2021 ROTH Capital Report further criticized the business model shift: "A hard pivot in the business model brings confusion with deemphasis of both eng'g services and the B2C [business to consumer] subscription model." As a result, the ROTH Capital Report lowered the target price from $30 to only $12. ROTH Capital also pulled estimates for 2023-25 in response to Defendant Aquila's confirming that the Company's original SPAC guidance through fiscal year 2025 was no longer applicable.

132. On April 4, 2021, *The Bangkok Post* published an article titled "EV Companies Went Public With Big Plans. They're Quickly Hitting Snags," which stated:

> On March 29, aspiring electric car and truck maker ***Canoo Inc. told investors it was abandoning or scaling back numerous key aspects of the strategy laid out when it raised $630 million last year.***
>
> \* \* \*
>
> Canoo boasted to investors of its "innovative subscription business model" in which it would lease vehicles directly to consumers a month at a time. The company told investors a deal to jointly build car components with Hyundai Motor Co.

showed "external validation of our technical leadership" in the sector.

On March 29, Canoo's executive chairman, Tony Aquila, announced strategic shifts on *a conference call that included awkward exchanges with analysts, including one in which he was asked whether Ulrich Kranz was still the chief executive officer.*

* * *

Canoo intends to move away from its plan to engineer car components for other companies, he said, as the practice "is just really not going to drive the best shareholder value."

Finally, Mr. Aquila said Canoo now plans eventually to make its own factories. *That emphasis reflects a departure from its prior approach, which the company called an "asset-light, flexible manufacturing strategy" that relied on third-party manufacturers.*

133.   On April 20, 2021, Bank of America ("BoA") issued an analyst report titled, "Paddling its own Canoo, while business model remains very much in flux" (the "BoA Report"). The BoA Report set a $6 price objective, noting "we remain concerned that challenges associated with some of these changes will persist and that the business model may still further pivot."

134.   BoA detailed "three recent and significant shifts" that the Company made, namely: "1) De-emphasis of Engineering services; 2) De-emphasis of subscription program; 3) Plan to now manufacture in-house, as well as use a contract manufacturer." BoA reviewed the plan in unfavorable terms:

In our view, *GOEV's two-pronged market approach of B2C and B2B may be a greater challenge to successfully execute versus peers with more targeted strategies. We continue to have the most skepticism around the B2C business, where*

> *GOEV's Lifestyle/Sport Vehicles may be more novelty product than those with durable demand, and that its (even limited) subscription program may introduce significant operational/financial hiccups (volatile fleet usage, dynamic monthly pricing, unanticipated maintenance/repair, depreciation/residual accounting, etc.).* And while we believe its B2B model could be somewhat successful, we would note that competition in that segment is fierce.

135.   As a result of the significant shift, BoA asserted, "we believe GOEV's financial targets provided upon going public are no longer valid; and even early targets for EBITDA/FCF breakeven in 2024E+ appear optimistic to us." BoA also noted "the company's business model is no more refined or planned than it was at its inception. . . . [T]he change introduces further risk around the company's ability to execute in a timely fashion." BoA continued, "the shift in strategy is occurring in real time, so the ultimate model is unclear."

136.   BoA also noted that the shuttering of its engineering services business segment also meant the end of Canoo's most notable partnership with Hyundai, an arrangement that Canoo touted to lend the newly public Company credibility as it sought to raise capital, stating as follows:

> [W]ith the de-emphasis of GOEV's Engineering Services business, it appears the collaboration between the two companies is essentially on hold (if not, completely cancelled). . . . *In our view, the potential [Hyundai Motor Group] collaboration was validation by a major industry player, but is no longer a precursor to future deals. The move by newer management to deemphasize the Engineering Services business does seem odd, as GOEV had highlighted that was in discussion with several other industry participants, and had initially projected $120mm of revenue in 2021E for a pipeline of 7+ projects.*

137.   Moreover, on March 29, 2021, Canoo revealed that it no longer planned to rely solely on contract manufacturing to produce cars, a key strategy that the Company

repeatedly highlighted before the late-March corrective disclosure.   Instead, Canoo disclosed it now would use contract manufacturing to help launch production, and subsequently open a mega micro-factor to manufacture in-house.   In BoA's view, the two-phased manufacturing plan was "another recent and significant shift in GOEV's business model."

138.   BoA further recognized that Canoo's changed manufacturing plan would have significant consequences on the capital needed to execute the Company's business plan, alter the volume that Canoo could produce over the next few years, and materially deviated from what Defendants previously told investors.   Specifically, BoA said, "[a]s a result, what appeared to be a more asset-light business model by using a contract manufacturing (similar to peer FSR) has now shifted more towards a capital-intensive manufacturing model (more like peers RIDE and TSLA, and even incumbent OEMs)."

139.   As the BoA Report summarized, the original strategy of relying on contract manufacturing had multiple benefits, which Defendants highlighted when justifying their business plan to investors:

> GOEV's contract manufacturing setup has allowed the company to reach a beta version of its vehicle not only faster than competitors, but also with significantly less capital deployed.   Additionally, GOEV has highlighted the following key benefits of its contract manufacturing relationship:

- Reduced cash and capital requirements
- Ability to plug into existing manufacturing systems
- Ability to quickly scale volumes up/down based on demand
- Leverage existing manufacturing know-how and process
- Reduced overcapacity and production risk

140.   The shift away from contract manufacturing threw the Company's estimates for production and, in turn, its revenue estimates, into question.   As the BoA Report recognized, "GOEV established the following volume targets, although these

were outlined prior to the introduction of its newly announced pickup and prior to the de-emphasis of its subscription model, so they should no longer be viewed as valid: Manufactured vehicles of 10k in 2022E, 30k in 2023E, 60k in 2024E, 95k in 2025E, and 150k in 2026E; and Cumulative Fleet of 10k in 2022E, 35k in 2023E, 85k in 2024E, 160k in 2025E, and 260k in 2026E."

141.   Finally, the BoA Report noted that with the shift in strategy came a wholesale shift in management personnel:

> In our view, **one of the most significant risks for GOEV as a company is significant management turnover since the reverse merger, which appears to have been catalyzed by Executive Chairman Tony Aquila's entrance into the company.** Specifically, recent departures of key executives involved in the business combination (**particularly in the analyst/investor education process around the company, strategy, business plan, and projections**) include Paul Balcunias [*sic*] (former CFO) and Alex Marcinkowski (former In Charge of Corporate Strategy). **It also sounds to us that current CEO Ulrich Kranz may be transitioned into more of an advisory (rather than executive) role at the company over time, which we view as a significant risk.**

> **And while we originally viewed GOEV's executive team as capable, with many years of combined automotive experience, we have much less confidence in the newer management team that is still being put in place**.

142.   On June 17, 2021, the negative reaction of the market and analysts was summarized by Mr. Richard E. Loran, of Cohen Milstein Sellers & Toll PLLC, in an article titled, "What the SPAC?!  Blank-Check Explosion Draws New Regulatory Scrutiny"[4]:

---

[4] Richard E. Loran, *What the SPAC?!  Blank-Check Explosion Draws New Regulatory Scrutiny*, MONDAQ (June 17, 2021), https://www.mondaq.com/unitedstates/securities/1080686/what-the-spac-blank-check-explosion-draws-new-regulatory-scrutiny.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT:
Consol. Case No. 2:21-CV-02873-FMO-JPR

The August 18, 2020 news release announcing the planned merger said Canoo would rely on a "unique business model" based on three revenue streams: providing engineering services under contract to other vehicle makers; offering vehicles to consumers via a subscription service; and selling "last-mile" delivery vehicles to businesses.

The news release and accompanying presentation, which was filed with the SEC, said the consumer subscription service would be especially important, since it would be "more profitable and resilient" than selling new vehicles.  In later public statements, the Canoo team continued to stress the three revenue streams.  The company also touted a February 2020 agreement to provide contract engineering services to Hyundai Motor Group as an example of its experience and potential in that area.

But in its first post-merger earnings call on March 29, 2021, Canoo abruptly changed course, announcing the departure of its CFO, saying it would "deemphasize" the contract engineering services, and casting doubt on the future of the subscription service.

Adding to the confusion, the merged company's CEO, who had co-founded and run Canoo as a privately held company, did not appear on the conference call, which was run by Executive Chairman Anthony Aquila, who had joined the company two months before the merger.  As one analyst said, these were "significant surprises."  Soon after the call, *The Verge* reported the deal with Hyundai "appeared to be dead."

*Asked to explain the shift, Aquila pointed to the inexperience of the prior leadership team, which had been "a little more aggressive" and "presumptuous" than advisable in its public statements about business prospects and didn't meet "our standard of representation to the public markets."*

*"This comes back to having an experienced public company team," Aquila said, referring to statements about potential*

***engineering contracts with other manufacturers.   "You've got to be careful of the statements you make."***

Well, yes.  Canoo's stock price fell 21% the next day.

## VIII.   THE DEEMPHASIS OF ENGINEERING SERVICS WAS MATERIAL TO INVESTORS

143.   During the Class Period, Canoo focused investors on the significant, immediate revenue opportunity and technological validation presented by it contract engineering services.

144.   In commenting on the proposed Merger during an August 18, 2020, investor conference call – a copy of the transcript of the call was filed with the SEC – Defendant Balciunas stated that third-party engineering contracts provided important validation of Canoo's technology, saying:

> This is something that we are incredibly proud of, to have this partnership with a world-class OEM like Hyundai. This is a multiple-phase partnership and we currently are in the first phase in doing some contract engineering work that leverages our existing technology, but we're tailoring it to Hyundai's specifications. With the potential opportunity to move forward into future phases, we would then be drilling into specific componentry and also doing simulations and tests on software, and then ultimately the final phase could potentially be delivering hard assets that could be tested and validated in the real world. ***So, this is a really great opportunity and benchmark for the marketplace, to have this kind of validation, especially considering that we are much smaller company versus Hyundai.***

145.  Later in the same call, Defendant Balciunas said:

> On engineering and B2B, in the first two years the $120 million and $250 million, ***this is just Engineering Services,*** and then in 2023 is when the delivery vehicle comes to market and we begin selling that product, and then revenue grows as volumes ramp up.

146.  In the September 18, 2020 Form S-4, Canoo stated:

> B2B Engineering and Licensing Opportunities: Canoo's engineering and technology services business includes consulting and contract engineering **work that is in high demand due to the team's unique experience and technical capabilities**. Canoo's pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategics and high growth technology companies. Canoo has already received significant interest in its skateboard technology and the Canoo team's expertise in platform engineering, powertrains and vehicle design, **as is exemplified by the announcement of an agreement between Canoo and Hyundai Motor Group** for the co-development of a future EV platform based on Canoo's modular skateboard technology. **In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk the overall business model.**

147.  The statement in ¶_146 was repeated in the subsequent amendments to the Form S-4 dated October 23, 2020 and November 25, 2020.

148.  In its January 13, 2021 S-1, Canoo made the following claim about its contract engineering services:

> This business offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021.

149.  The January 13, 2021 S-1 also repeated the claims found in the Forms S-4 regarding the importance of contract engineering to Canoo as both a pre-production revenue stream and a form of validation for its technology.

## IX.   THE ABANDONMENT OF THE SUBSCRIPTION MODEL CONSTITUTED A MATERIAL CHANGE TO THE BUSINESS PLAN

150.   During the Class Period, the Company touted its "innovative subscription business model," pursuant to which the Company's Lifestyle Vehicle and Sport Vehicle would be offered to consumers.

151.   During the August 18, 2020 call with investors soliciting votes in favor of the Merger, in describing Canoo's "innovative" subscription model, the Company explained that the model is "not a car swapping model, it's not a Zipcar model, and we're not a ride sharing company.   At its core, subscription is a fundamental readaptation of a lease."   The Company continued that its subscription model, "in addition to being outright superior to a lease, it is the most efficient and simplest way to have an electric vehicle for as long as you want."   In discussing the economic viability of its subscription model, the Company stated that, "most importantly, the vehicle needs to be made for membership specifically.   This is where your vehicle strategy and your go to market and business strategy need to be married from day one, and what I mean by this is that [at] Canoo we made a lot of conscious design and engineering choices to build a vehicle specifically for a subscription model."   The Company continued, "we absolutely do not want to pressure people into purchasing vehicles.   That is not our Company strategy and that's not our brand.  . . . So, by us going direct to consumer, we not only craft that first user experience to be truly unique, but also continue to build and support our member base throughout their subscription."

152.   During the August 18, 2020 call with investors soliciting votes in favor of the Merger, in describing the "cash flow" of Canoo's "innovative" subscription model, the Company explained that:

> [*First,*] *this model is highly cash flow generative, yielding positive free cash flow in every year after the first year.* The second [conclusion] is that this vehicle will actually longer [sic] than 12 years.  I'm not going to ask investors to value 2034 cash flow, but conceptually, *it's important to*

*understand that we have a long lived asset, that is professionally maintained,* and has a functional base purpose as a transportation tool.  So, whether it's putting this vehicle into ride share models or a decontented [sic] subscription, there is significant upside in this analysis that's not being captured.  The third thing I'd like to highlight is the return on equity.  The auto industry has historically bad ROE because of large fixed cost investments, and what this model does, because the only equity required is the equity financed portion of the BOM, we can leverage that amount over a lifetime of free cash flow, which results an ROE in a steady state of greater than 100%, which we believe is very compelling.

So, in conclusion, I know, and I have to acknowledge, that subscription, it tends to be a fluffy word, but *I would encourage people to take a long hard look at this model, and if you look at how we modeled this on a granular level, the macro tailwinds that support the demand side of this model, the future change to autonomous driving, and the true margin potential of subscription, we do think this warrants a strong look, but can also be one of the main drivers of equity value for Canoo in the future.*

153.  Defendants also pushed the purportedly unique business model in a media blitz.  On August 18, 2020, Defendant Kranz and Hennessy were quoted in an article titled "Canoo and HCAC to merge":

Today marks an important milestone of Canoo's effort to reinvent the development, production and go to market model of the electric vehicle industry.  Our technology allows for rapid and cost effective vehicle development through the world's flattest skateboard architecture, *and we believe our subscription model will transform the consumer ownership experience.*  We are excited to partner with Hennessy Capital and we are energized to begin our journey through a shared passion to deliver an environmentally friendly and versatile vehicle development platform to the market.

Daniel Hennessy, Chairman & Chief Executive Officer of HCAC said, "We are thrilled to partner with Canoo on their

mission to reinvent urban mobility with a greener, simpler and more affordable portfolio of EV solutions. ***Unlike any other EV company, Canoo has created a go to market strategy that captures both B2C and B2B demand with the same skateboard architecture and technology that has already been validated by key partnerships such as with Hyundai***. HCAC has an abiding commitment to sustainable technologies and infrastructure, and we are excited to serve as a catalyst to advance the launch of the Canoo vehicle offerings."

\* \* \*

***Canoo's consumer go to market strategy capitalizes on changing consumer preferences to deliver a month to month, commitment free, subscription based business model. With a single monthly fee and no upfront payment, Canoo members enjoy the benefits of an all inclusive experience that, in addition to your own canoo vehicle, includes maintenance, warranty, registration and access to insurance and vehicle charging. This go to market model is designed to deliver an affordable and simplified customer experience while also enhancing lifetime vehicle revenue and margin to shareholders***.

154.   In an article published on August 18, 2020 in the New York Observer titled, "A New Electric Car, With a Couch Inside, Is Targeted at Broke Millennials," Defendant Kranz was quoted, providing further elaboration on the Company's subscription model: "You know, the Millennials are not willing to make long term commitments and make a down payment for a car," Kranz added. "They will appreciate what we are doing. I believe this is the new way of buying vehicles."

155.   In the September 18, 2020 Form S-4, the Company described its subscription model as follows:

With a single monthly payment, customers will enjoy the benefits of an all inclusive experience that, in addition to their own Canoo vehicle, also includes standard maintenance, warranty, registration and access to both insurance and vehicle charging. Canoo plans to utilize an asset light, flexible manufacturing strategy by outsourcing its direct vehicle

production operations to a world class vehicle contract manufacturing partner for its initial vehicle programs. ***In doing so, Canoo will significantly reduce its up front capital investment and eliminate the recurring fixed costs and overhead that would be required for Canoo to own and operate its own assembly facility.***

156. Elsewhere in the September 18, 2020 Form S-4, the Company described its subscription model as follows:

> Subscription is a direct to consumer, transparent alternative to leasing or buying a vehicle, that will help reduce the barriers to entry for consumers looking to try their first EV, while also providing Canoo with a distinct opportunity for recurring revenue, a unique profit margin profile and compelling return on equity.

157. Additionally, the Company provided the following discussion of its subscription model in the September 18, 2020 Form S-4:

> Canoo Subscription
>
> ***
>
> ***Canoo's subscription business further benefits from its asset-light model that focuses on partnership with third parties for elements of the business that are capital intensive or require development of extended expertise; this reduces up front capital expenditure and improves the quality of the product offering to consumers***. As a result of these factors Canoo believes its subscription program can potentially generate consistent cash flow and strong return on equity over the lifetime of the Lifestyle Vehicle. In addition, ***by owning the vehicles, Canoo has upside potential not available in traditional models. We will have a long-lived asset in our Canoo EVs, which have been specifically designed to last under a subscription model*** and been professionally maintained and had continuous capital invested in their maintenance and repair. Whether it is putting older vehicles into rideshare models or alternative subscription packages,

there is further upside in our model by utilizing our durable, high quality, older EVs.

158.   In urging shareholders to approve the Merger, the Company further listed Canoo's subscription model as one of the "reasons for the approval of" the Merger.  In the Company's Form S 4 filed on September 18, 2020, the Company stated:

> Favorable Opportunities for Revenue and Earnings Growth Due to Secular Growth Trends in the EV Industry and Canoo's Unique Multi Pronged Go to Market Strategy. . . .
>
> ***
>
> Compelling Financial Model with Long Term Attractive Margin and Cash Flow Generation Potential.   Canoo's subscription based consumer model deviates from the traditional OEM model of vehicle sales or traditional leases, and can achieve attractive returns by elongating the revenue generation horizon of a single vehicle over the long life of the asset.   ***Under a consumer subscription model, Canoo generates consistent cash flows, and estimated margin of approximately four times that of a one time sale, and compelling return on equity given the leveragability of the underlying individual vehicle assets*** . . .   Further, Canoo is much less dependent on new vehicle sales creating a considerably more profitable and resilient business model which is expected to create steady and recurring cash flow.

159.   The September 18, 2020 Form S 4, also stated:

> Compelling Financial Model with Long Term Attractive Margin and Cash Flow Generation Potential.   Canoo's subscription based consumer model can elongate the revenue generation horizon of a single vehicle over 12 years, resulting in a compelling return on equity, recurring and consistent cash flow and an estimated margin of approximately four times that of a one time sale. ***As a result, Canoo's projected operating profit margin of ~20% compares favorably to the traditional***

> **automotive OEM business model with margins closer to 5%
> or 10% historically.**

160.   In the September 18, 2020 Form S-4, the Company projected that revenue from subscriptions for its Lifestyle Vehicle and Sport Vehicle would total: (1) $79 million in 2022 (or 24.01% of Total Revenue for 2022); (2) $265 million in 2023 (or 31.55% of Total Revenue for 2023); (3) $630 million in 2024 (or 44.06% of Total Revenue for 2024); (4) $1,191 million in 2025 (or 50.86% of Total Revenue for 2025); and (5) $1,927 million in 2026 (or 46.69% of Total Revenue for 2026).

161.   In the September 18, 2020 Form S-4, the Company projected that gross profit from consumer subscriptions for its Lifestyle Vehicle and Sport Vehicle would total: (1) $30 million in 2022 (or 24% of Total Gross Profit for 2022); (2) $108 million in 2023 (or 54.82% of Total Gross Profit for 2023); (3) $256 million in 2024 (or 59.67% of Total Gross Profit for 2024); (4) $468 million in 2025 (or 66.20% of Total Gross Profit for 2025); and (5) $730 million in 2026 (or 61.97% of Total Gross Profit for 2026).

## X.   THE COLLAPSE OF THE AGREEMENT WITH HYUNDAI MOTOR GROUP WAS MATERIAL TO INVESTORS

162.   On August 21, 2020, Broke Man Finance published a YouTube video that, as of March 1, 2022, had 19,692 views, in which Andrew Pate and Adam Wilson discussed the Company's August 18, 2020 presentation to investors:

> They are licensing this technology out and allowing other car manufacturers to use this technology. ***They are partnering with Hyundai and they are going to be making Hyundai's EV vehicles based off the skateboard as well as a EV car for Kia***. ***That's a very big deal.***

163.   On February 11, 2020, Electrek published an article titled "Hyundai will use Canoo's EV skateboard for small electric cars."

164.   On February 13, 2020, the Los Angeles Business Journal published an article titled "Canoo Partners with Hyundai."  In the article, Defendant Kranz is quoted

as saying, "It is a real honor for us to help Hyundai and explore EV architecture concepts for their future models," and "We have been working diligently to develop a bold new electric vehicle, and partnering with Hyundai is a validating moment for our young company."

165.   On March 11, 2021, R.F. Lafferty Equity Research issued an analyst report titled "Canoo Inc. Initiation of Coverage: Rating: Buy, Price Target $23 per share" (the "R.F. Lafferty Report").   The R.F. Lafferty Report highlighted Canoo's business, operations, and prospects under its now-defunct business model and guidance.

166.   The R.F. Lafferty Report cited Canoo's partnership with Hyundai Motor Group in developing a future EV platform, Canoo's asset light business model, and the Company's multiple potential revenue streams, such as its Engineering Services operations, as central reasons for its suggested target price of $23.

167.   The proposed business model, as the R.F. Lafferty Report explained, removed potential barriers to entry by allowing for rapid production and reducing production risk, which presented the opportunity to generate revenue in the short term:

> Canoo has multiple revenue opportunities within the electric vehicle market.  ***In the near-term, Canoo expects to generate approximately $120 million in 2021 from its Engineering Services Business.***
>
> [. . .]
>
> **Revenue Outlook**
>
> Canoo has multiple revenue opportunities within the electric vehicle market.  ***Canoo expects to generate approximately $120 million in 2021 from its Engineering Services Business, which the company provides its service to other OEMs. Looking forward to 2025, the company estimates Engineering services could generate $450 million, a 39% CAGR from 2021.***
>
> [. . .]
>
> **Asset Light Model**
>
> . . .

> *The contract manufacturing model has numerous*
> *advantages of which reduction of upfront capital and*
> *operating cash is the prime benefit. Also, this model allows*
> *for rapid production and reduces the production risk*
> *associated with automotive startups.*

## XI.   FORMER CANOO EMPLOYEES CONFIRM DEFENDANTS' PUBLIC STATEMENTS WERE FASLE WHEN MADE

### A.   A former Canoo executive confirms that during the Class Period Canoo misstated the nature of the Company's relationship with Hyundai and misrepresented its contract engineering efforts.

168.   Confidential Witness 1 (CW 1) was a head executive for a department at Canoo between late 2020 and early 2022. During his/her employment at Canoo, CW 1 reported directly to Defendant Kranz until Defendant Kranz's resignation on April 2, 2021; thereafter, CW 1 reported directly to Defendant Aquila until CW 1 resigned.

169.   Although the Company announced in February 2020 that it had entered into an agreement with Hyundai to co-develop a future EV platform based on Canoo's modular and scalable skateboard technology—and continued to promote that deal in its SEC filings as recently as January 2021—CW 1 stated that at no time during his/her employment did he/she ever work "with or for Hyundai," and he/she was never "involved with Hyundai and never talked to anybody there" (at Hyundai).

170.   According to CW-1, while Canoo told investors that it was providing engineering services to other companies and earning revenue from those services, there was in fact no outsourcing of engineering services during CW-1's tenure.  According to CW 1:

> All of our engineering was for our own product.  We talked to
> other OEMs about possibilities—like almost every company
> would—but we didn't have any deal to do that.  All of our
> engineering was subscribed to internal product development.
> We had no contracts with anyone to outsource them.  There
> are no services I was aware of [during my employment].

171.   CW 1 explained that Canoo's "engineering technologies were focused on product development." "If there was engineering to do that was more than developing

the vehicles we were working on, then CW 1 would have been aware of it." According to CW 1, "there definitely wasn't any outsourcing of engineering work from late 2020 to early 2022."

**B.    Prior To the Merger, Canoo Planned to Change the Subscription Model, But Never Disclosed These Plans to Investors**

172.    Confidential Witness 2 (CW 2) was a director in Canoo's engineering division between mid-2016 and mid-2019. For the duration of his/her tenure with the Company, CW 2 reported directly to Peter Burchowycz, Canoo's Business Plan Director, who in turn reported directly to Defendant Kranz.

173.    In his/her role at Canoo, CW 2 was heavily involved in developing the initial business plan for production and manufacturing the skateboard platform.

174.    According to CW 2, during his/her employment, Canoo executives frequently changed business plans, which halted the skateboard/chassis platform from advancing beyond a virtual computer plan.   According to CW 2, the subscription model business plan "changed 180 degrees," which "totally change[d] [the] overall balance sheet and cash flow."

**XII.   POST CLASS PERIOD DEVELOPMENTS**

175.    On May 17, 2021, the Company filed with the SEC its Quarterly Report for the First Quarter of 2021 on Form 10 Q (the "1Q2021 10 Q"), in which the Company disclosed that:

> Subsequent to the issuance of the Company's [2020 10 K], on April 12, 2021, *the SEC Division of Corporation of Finance [sic] released Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies* ("SPACs") (the "Statement").  Upon review and analysis of the Statement, *management determined that the Company's private placement warrants issued in connection with HCAC's IPO on March 5, 2019 do not meet the scope exception from derivative accounting*

*prescribed by ASC 815 40, Contracts in Entity's Own Equity. Accordingly, the private placement warrants should have been recognized by the Company at fair value as of the Closing Date and classified as a liability, rather than equity in the Company's previously reported consolidated balance sheet as of December 31, 2020.* Thereafter, the change in fair value of the outstanding private placement warrants should have been recognized as a gain (loss) within other (expense) income each reporting period in the Company's consolidated statement of operations. *The fair value of the private placement warrants as of the Closing Date on December 21, 2020 and December 31, 2020 amounted to $9.7 million and $6.6 million, respectively. The change in fair value from the Closing Date through December 31, 2020 amounted to a gain of $3.1 million.*

176. In the 1Q2021 10 Q, the Company disclosed that it was subject to an SEC investigation stating:

[O]n April 29, 2021, *the SEC's Division of Enforcement advised that it has opened an investigation related to, among other things, HCAC's initial public offering and merger with the Company, the Company's operations, business model, revenues, revenue strategy, customer agreements, earnings and other related topics, along with the recent departures of the Company's officers*. The SEC has informed the Company that its current investigation is a fact finding inquiry. . . . We intend to provide the requested information and cooperate fully with the SEC investigation.

177. On May 17, 2021, the Company hosted a conference call with investors to discuss the Company's 1Q2021 earnings results (the "1Q2021 Earnings Call"). During the 1Q2021 Earnings Call, Aquila Defendant Aquila essentially told public investors to "get used to" shifting targets because SPACs are different from IPOs:

I'm pro for the democratization of venture capital, private equity and public equity to participate in innovation. We see our competitive countries doing similar things. So from my perspective, it absolutely accelerates the innovation curve, and I think it's super positive impact [sic].

> ***What it does do, though, is there's kind of having taken another company public and been involved in public offerings before [sic], a traditional IPO is different than a SPAC, as you know.   They're called emerging growth companies, and they have a little bit different standard.   So the public has to get used to some of the fact that some of this stuff is being evolving in front of the public view, and that's why it's called an EGC [(i.e., emerging growth company)], right?***  So that was the point that I was making there.

> However, from our side, being that we have public company experience, ***what we've done is we move dramatically much more to our style, which is to be conservative***.  One, it's better to outperform than underperform.  It's a long term investing game. . . .

178.   On June 10, 2021, shortly after Defendant Kranz stepped away from Canoo, it was widely reported that he had been hired by Apple, Inc. to help lead its efforts to develop an electric vehicle.

179.   On March 1, 2022, the Company filed its Annual Report for 2021 on SEC Form 10 K, in which it disclosed for the first time that "[n]o revenue was generated during 2021," "since the Company is an early stage growth company in the pre commercialization stage of development."

180.   Not once during the Class Period did Defendants disclose that the Company was not generating revenue.  To the contrary, during the Class Period, the Company affirmatively stated that it expected to derive all of its revenues from consumer subscriptions and from its engineering services technologies from 2020 through 2026 (¶¶ 74–101).

## XIII.  ADDITIONAL INDICIA OF SCIENTER

181.   The allegations in this Section XIII are in addition to, expressly incorporate by reference, do not supplant, and are intended to be construed together with all of the

other allegations in this pleading giving rise to the plausible inference that, with the intent to defraud, manipulate, or deceive investors in connection with their purchases or sales of the Company's securities: (1) Defendants made the statements alleged to be materially false or misleading; (2) Defendants employed a device, scheme, or artifice; or (3) Defendants engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

### A. Aquila received a large number of Canoo shares upon the completion of the Merger.

182. Defendant Aquila describes himself as a "businessman, investor, serial entrepreneur, and inventor[.]"

183. In June 2019, Aquila founded AFV Partners, which he described as "an affirmative low-leverage capital vehicle that invests in long-term mission critical software, data and technology businesses," and Aquila has served since its founding as Chairman and CEO.

184. In connection with AFV Partners, Aquila touts his "proven track record of 70+ transactions with $15bn+ in aggregate value and an industry leading return profile" and claims to have founded AFV Partners as "a long-term sustainable capital vehicle that invests globally in assets that contribute to a net positive impact on the environment. Through his control of AFV Partners, Aquila has obtained several leadership positions is various companies in which AFV Partners invested, including:

> (a) Since January 2020, Aquila has served as Chairman of the Board of Directors of Aircraft Performance Group, LLC, which claims to be the industry leader in Runway Analysis with an easy-to-use application that allows airlines to calculate weight and balance data for airplane takeoffs.
> (b) Since March 2020, Aquila has served as Chairman of the Board of Directors for RocketRoute, a worldwide flight planning and navigation service for the aviation industry;

(c) Since May 2021, Aquila has served as a Board Member at The Lost Explorer Mezcal Company, which claims to be a sustainable producer and distributor of Mexcal; and

(d) Since June 2021, Aquila has served as Board member and Chairman of the Compensation committee at Weedmaps (aka WM Technology Inc.), which claims to be a "leading technology and software infrastructure provider to the cannabis industry."

185.    Despite spreading his efforts over a wide variety of businesses, Canoo is of particular importance to AFV Partners.  According to AFV Partners' website:

> Canoo is currently one of AFV's significant investments. ***Tony initially agreed to provide rescue capital to the company in July 2020. This was followed by his participation in the PIPE***. His investments in Canoo were based on his assessment of the company's competitive advantage: its industry unique focus on proprietary engineering and technology. In preparations for the SPAC merger, ***Tony was asked to join the board and, effective with the completion of the merger and de-SPAC with Hennessy Capital Acquisition Corp. IV in December 2020, became its Chairman.***
>
> ***In April 2021, in the midst of maturing pains as a public company and the increased market scrutiny of SPAC businesses***, particularly in the EV space, ***Tony accepted the CEO position***, based on his deep belief in the design and engineering team, to accelerate the transformation of the business to set it apart from the herd.

186.    AFV Partners and Aquila have substantially grown their holdings of Company stock following their initial involvement in July 2020.   According to Company filings:

> From July 2020 to August 2020, Canoo issued $80.0 million aggregate principal amount of secured Convertible Notes to Remarkable Views and $35.0 million aggregate principal amount of unsecured Convertible Notes (collectively, the "$115M Notes") ***to AFV Partners SPV-4 LLC ("AFV")***, one of Canoo's 5% or greater shareholders and an entity affiliated with Tony Aquila, one of New Canoo's director nominees. The $115M Notes accrued simple interest at 8% per year. Unless earlier repaid, converted or extended by the investors, outstanding principal and unpaid accrued interest on the

$115M Notes are due on January 17, 2022, January 30, 2022, February 6, 2022 and July 14, 2021.

**In August 2020, the $100M Notes, the $15M Notes and the $115M Notes were converted into 41,207,011 Canoo Preference Shares. No principal or interest was paid on the $100M Notes, the $15M Notes or the $115M Notes.**

187.    Aquila, through AVF Partners' fully own subsidiary AFV Partners SPV-4 LLC ("AFV 4"), also participated in the Subscription Agreement with Hennessy Capital, which allowed AFV 4 to obtain 3.5 million PIPE Shares for an aggregate purchase price of $35.0 million.

188.    Based on later filings made by Aquila relating to his Canoo holdings, as of August 17, 2020 and upon completion of the Merger, AFV Partners would own "8,729,754 shares of New Canoo Common Stock held by [AFV 4] to be issued in exchange for outstanding pre-Closing Canoo Preference Shares at the Closing (which will be converted into Canoo Ordinary Shares immediately prior to the Closing) and (ii) the subscription of AFV 4 to 3,500,000 PIPE Shares in the PIPE Financing[.]"

189.    On August 25, 2020, the Company publicly announced that Aquila would join the Board.

190.    In October 2020, the Company announced Aquila would serve as Executive Chairman upon consummation of the public merger.

191.    November 27, 2020, the Company filed with the SEC a Second Amendment to the Form S-4 Registration Statement, which attached a Letter Agreement Between Canoo Inc. and Anthony Aquila dated November 25, 2020.  The terms of the agreement provided for significant compensation to Aquila, stating as follows:

Compensation Generally: Except with respect to the vesting commencement dates for the Equity Awards set forth below, each of which shall be as set forth in Exhibit A hereto, effective upon the date of signing of this Agreement, but retroactive to August 17, 2020, the Company will provide you the following payments and benefits:

a)      Annual Fee. ***During the Term, the Company will pay you an annual fee of $500,000*** ("Fee"), payable in advance in equal quarterly installments (with payment for any pro-rated quarter made with the payment for the following quarter), with such payment to occur no later than 30 days following the commencement of the applicable calendar quarter.

b)      Private Company Equity Award. Contingent upon the approval of the Board, ***you will be granted incentive equity compensation pursuant to the terms of the Company's 2018 Share Option and Grant Plan (the "Private Company EIP") covering approximately 1,619,816 ordinary shares of the Company ("Ordinary Shares") (the final number of Ordinary Shares will be an amount equal to 2,000,000 Shares (as defined below) following the effective date of the Merger)***, the material terms of which are set forth on Exhibit A hereto (the "Private Company Equity Award").

c)      Public Company Equity Award. As soon as practicable following the commencement of the Term and contingent upon (i) the approval of the Board and the effectiveness of a Form S-8 Registration Statement that registers the shares of common stock of the new public parent company to be granted under the new public parent company 2020 Equity Incentive Plan (the "Public Company EIP") and (ii) your eligibility to receive a grant pursuant to the terms of the Public Company EIP as of the date of grant, ***you will be granted incentive equity awards covering 1,000,000 shares of common stock of Canoo Inc. (each, a "Share"), pursuant to the standard forms of award agreement thereunder***, the material terms of which are set forth on Exhibit A hereto (the "Public Company Equity Award" and collectively with the Private Company Equity Award, the "Equity Awards").

192.    Additionally, the Letter Agreement provided the following terms relating to Aquila's incentive payment structure:

- Award Type:

  ***Private Company Equity Award (1,619,816): Approximately 809,908 Ordinary Shares (50% of the Private Company Equity Award) granted in the form of performance-based restricted stock units ("Private Company PSUs") and 809,908 Ordinary Shares (50% of the Private Company Equity Award) granted in the form of time-based restricted stock units*** ("Private Company RSUs" and collectively with the Private Company PSUs, the "Private Company Awards").

The Company will settle the Private Company PSUs and RSUs no later than March 15th of the year following the year of vesting.

***Public Company Equity Award (1,000,000): 500,000 Shares (50% of the Public Company Equity Award) granted in the form of PSUs ("Public Company PSUs"), and 500,000 Shares (50% of the Public Company Equity Award) granted in the form of time-based restricted stock units ("Public Company RSUs")*** and collectively with the Public Company PSUs, the "Public Company Awards"). The Company will settle the Public Company PSUs and RSUs no later than March 15th of the year following the year of vesting.

193.   On December 22, 2020, Defendant Aquila filed a Form 3, disclosing his initial statement of beneficial ownership of Canoo securities, stating that he directly owned 35,000 shares of Canoo common stock.

194.   That same day, on December 22, 2020, Defendant Aquila filed a Form 4, disclosing Aquila directly controlled 35,000 shares of Canoo common stock, while maintain a pecuniary interest in 12,359,387 shares of Canoo common stock indirectly through AFV 4 (which consisted of 8,859,387 shares acquired pursuant to the Merger Agreement and 3.5 million shares purchased through the PIPE financing for $10 per share).

195.   On December 30, 2020, Defendant Aquila filed an amended Form 4, which showed an increase to 1,038,828 shares of Canoo common stock purposedly acquired on December 21, 2021, including "1,003,828 shares subject to Restricted Stock Units that vest through October 19, 2023."

196.   On December 31, 2020, AFV 4 filed with the SEC a Schedule 13D, which indicated that AFV 4 held 13,359,387 shares of Canoo. The Form 13D adds to the explanation of Aquila's holdings, saying the 1,038,838 were "acquired prior to the closing of the Transactions." At this time, Aquila controlled 5.7% of Canoo's common stock.

197.   On January 25, 2021, Canoo filed its Shelf Registration.  According to the Shelf Registration, Aquila and AFV-4 collectively held 15,333, 504, which consisted of:

> (i) 35,000 shares of Common Stock held by Tony Aquila; (ii) 1,003,828 shares of Common Stock subject to RSUs held by Tony Aquila that vest through October 19, 2023; (iii) the contingent right held by Tony Aquila to receive 172,086 Earnout Shares; (iv) 12,359,387 shares of Common Stock held by AFV 4; and (v) the contingent right held by AFV 4 to receive 759,375 Earnout Shares.

198.   On April 22, 2021, Canoo announced that Aquila would replace Defendants Kranz as Canoo's CEO upon Kranz's resignation effective April 30, 2021.

199.   On April 23, 2021, Aquila filed a Form 4 indicating that on April 21, 2021 he received 2 million shares of Performance-Based Restrict Stock Units, which were to vest "Upon Issuer's Common Stock achieving certain specified prices per share."

200.   On May 18, 2021, Defendant Aquila filed a Form 4 indicating that on May 14, 2021 he received 3 installments of RSU, each in the amount of 2,000,000, subject to vesting based on the performance of Canoo stock. The filing also indicated that AFV Partners had received an option to purchase from DD Global Holding 2.4 million shares of Canoo for $5.83 per share, and an option to purchase from Remarkable Views Consultants LLC 1.2 million shares of Canoo for $5.83.  According to later filings, the options to purchase these shares were granted "for no consideration." Following the transaction, according to the Schedule 13D/A, Aquila controlled 15,959,387 shares of Canoo, amounting to 6.7% of the total shares outstanding.

**B.     Defendants Aquila, Kranz and Balcuinas Are Eligible for stock incentive awards based on Canoo's stock price performance.**

201.   According to Annex I of the Merger Agreement, each of the legacy investors, including each Individual Defendant, was to receive certain "earnout"

payments conditioned upon certain public share price milestones within specified timeframes.

202.   The first tranche of 5 million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $18 per share for any 20 trading days within any consecutive 30 trading-day period on or before December 21, 2022. Alternatively, the first tranche of 5 million Earnout Shares will issue in the event of a change in control on or before December 21, 2022, if the per-share consideration in such a transaction equals or exceeds $18.

203.   The second tranche of 5 million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $25 per share for any 20 trading days within any consecutive 30-day period on or before December 21, 2024. Alternatively, the second tranche of 5 million Earnout Shares will issue in the event of a change in control on or before December 21, 2024, if the per-share consideration in such a transaction equals or exceeds $25.

204.   The third tranche of 5 million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $30 per share for any 20 trading days within any consecutive 30-day trading period on or before December 21, 2025. Alternatively, the third tranche of 5 million Earnout Shares will issue in the event of a change in control on or before December 21, 2025, if the per-share consideration in such a transaction equals or exceeds $30.

205.   Immediately following the Merger, Canoo's stock reached an artificially inflated price exceeding $18 for several days and nearly reached $25, getting to a high of $24.90 on December 22, 2020, but the price did remain above the price points for the required number of days for Earnout shares to vest.  Still, the Individual Defendants continue to be eligible to receive Earnouts based on share price targets being obtained in the future.

## XIV.  LOSS CAUSATION

206.  Prior to and during the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities and operated as a fraud or deceit on Class Period purchases of the Company's common stock by failing to disclose and by misrepresenting the adverse facts detailed herein.

207.  Lead Plaintiff and Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions (prior to and during the Class Period) purchased the Company's securities at artificially inflated prices.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased the Company's securities at the artificially inflated prices at which they traded during the Class Period.

208.  As alleged in more detail *supra* Section VI, ¶¶ 102–19, 122, the truth regarding Defendants' fraud was revealed in a series of corrective disclosures and/or materializations of concealed risk that occurred on March 29 and 30, 2021.  On March 29, 2021, the price of Canoo's common stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited the Canoo common stock.  It was not until the corrective disclosure and/or materialization of concealed risk on March 30, 2021 that the full truth was known to the market, such that there was no longer any artificial inflation in the price of Canoo common stock attributable to the fraud.

209.  The decline in the price of Canoo common stock during this period is directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions prior to and during the Class Period.

210.  As a result of their purchases of the Company's securities during the Class Period, Lead Plaintiff and other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading

statements had the intended effect and caused the Company's common shares to trade at artificially inflated levels throughout the Class Period and, in certain instances, caused inflation in the Company's stock price.

211. By concealing from investors the adverse facts detailed herein, Defendants presented a false and misleading picture of the Company's business. As the truth about the Company and the extent of the fraud were revealed to the market, the price of the Company's securities fell significantly. This decline removed the artificial inflation from the price of the Company's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

212. Moreover, the market for the Company's securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' misstatements and material omissions, as alleged herein, the Company's common stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased the Company's securities relying upon the integrity of the market relating to the Company's common stock, and suffered economic losses as a direct and proximate result thereof.

213. Defendants' disclosures on March 29, 2021, and the related news coverage reporting on the Company's representations about its subscription model, contract engineering services business line, and contracts with OEMs, were a foreseeable consequence of, and within the zone of the risk concealed by, the Defendants' misrepresentations and omissions.

214. Moreover, the March 29, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market, in that they revealed that Defendants' prior misstatements and omissions touting the Company's subscription model, contract engineering services business line, and contracts with OEMs, were false and misleading at the time that they were made.

215.   As a direct and proximate result of these corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of the Company's common stock declined by $0.66 (or 5.3%) per share, to close at $11.80 per share on March 29, 2021.

216.   On March 30, 2021, the Company's stock price continued to fall in response to the news, falling by another $2.50 (or 21.2%) per share, to close at $9.30 per share on March 30, 2021, on heavy trading volume.

217.   The declines in the Company's common stock price on March 29 and 30, 2021 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors.  The timing and magnitude of the Company's common stock price declines evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the losses incurred by Lead Plaintiff and other Class members were caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

## XV.   CLASS ACTION ALLEGATIONS

218.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and who were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of any Defendant who is a natural person; (iii) any person who was an officer or director of the Company during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

219.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, the Company's securities were actively traded on the NASDAQ.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by the Company, its transfer agent(s), or its domestic depositary(ies), and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

220.   Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

221.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigations.   Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

222.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the Defendants' acts and omissions as alleged herein violated the federal securities laws;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, prospects, and management of the Company;

(c)   whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

223.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XVI.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

224.   To the extent Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material to a reasonable investor;

(c)     the Company's securities traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)     Lead Plaintiff and other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose

material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)    the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g)    as a regulated issuer, the Company filed periodic public reports with the SEC and the NASDAQ;

(h)    the Company regularly communicated with public investors via established market communication mechanisms, including *inter alia* regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)    the Company was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Roth Capital Partners, RBC Capital Markets, Cowen, Loop Capital, and Collers Securities, and other financial, tech and automotive website all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

225.   As a result of the foregoing, the markets for the Company's securities were open, well-developed, and efficient at all relevant times, and promptly digested current information regarding the Company from publicly available sources and reflected such information in the Company's securities price(s).  Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information relating to the Company.  Under these circumstances, all persons and entities who or which purchased or otherwise acquired the Company's securities during the Class

Period suffered similar injuries through their purchase of the Company's securities at artificially inflated prices and thus, the presumption of reliance applies.

226.   During the Class Period, the artificial inflation of the Company's securities was caused by the material misrepresentations and/or omissions particularized herein, causing the damages sustained by Lead Plaintiff and other members of the Class.   On December 10, 2020, the Company's securities on the NASDAQ closed at a Class Period high of $22.00 per share.   As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated and maintained at artificially inflated levels at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

227.   The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to misjudge the value of the Company's common stock.   The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to purchase the Company's securities at artificially inflated prices.

228.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

229.   To the extent Defendants concealed or improperly failed to disclose material facts with respect to the Company's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).   Defendants were obligated to disclose, but failed to disclose, material facts with respect to the Company's

business operations and financial prospects, so that "positive proof of reliance is not a prerequisite to recovery." *Id.*

## XVII. STATUTORY SAFE HARBOR INAPPLICABLE

230.   The PSLRA's statutory safe harbor concerning forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading.  First, many of the statements alleged to be false and misleading herein relate to historical (*i.e.*, then-existing) facts or conditions.  Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

231.   To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

232.   In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement."  15 U.S.C.  §§ 78u-5(c)(2)(A)(i)–(ii).   Defendants failed both to identify certain oral statements as forward-looking and to include the cautionary language prescribed by the PSLRA.

233.   Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.   To the extent Defendants included any cautionary language, that language was not meaningful because any

potential risks identified by Defendants had already passed or manifested.  As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, the Company had no plans to generate revenue from its subscription model, contract engineering services business line, or from contracts with OEMs.

234.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each such statement was made, the speaker had actual knowledge, or recklessly disregarded the risk, that the forward-looking statement was materially false or misleading; or, the false forward-looking statement was authorized or approved by an executive officer of the Company who knew, or recklessly disregarded the risk, that the statement was false when made.

## COUNT I

### For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 (Against All Defendants)

235.   Lead Plaintiff repeats, realleges, and incorporates by reference each and every allegation heretofore pleaded as if fully set forth herein.

236.   This Count is asserted against Defendants and arises under Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and pursuant to SEC Rule 10b-5, *codified as amended*, 17 C.F.R. § 240.10b-5.

237.   During the Class Period, Defendants utilized the means or instrumentalities of interstate commerce, including but not limited to the mails, the Internet, and the facilities of the NASDAQ, to engage in a plan, scheme, conspiracy, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiff and other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

238. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence, and which did influence, the market for the Company's securities  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

239. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully, consciously, or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

240.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers, directors, and officers of the Company, the Individual Defendants had first-hand knowledge of the details of the actual state of the Company's internal affairs.

241.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the Company's statements.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Company's actual business and financial condition, which were concealed by Defendants, Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

242.   During the Class Period, the Company's securities were listed and actively traded on and in an efficient market.  Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or

acquisitions by Lead Plaintiff and the Class, the true market value of the Company's securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class.  The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein, to the injury of Lead Plaintiff and the other Class members.

243.  By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated both Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, *codified as amended*, 17 C.F.R. § 240.10b-5.

244.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements to the investing public.

245.  By reason of the foregoing, Lead Plaintiff and the other members of the Class are entitled to recover money damages from Defendants, and each of them, for Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, *codified as amended*, 17 C.F.R. § 240.10b-5.

## COUNT II

**For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(a) and (c) (Against All Defendants)**

246.  Lead Plaintiff repeats, realleges, and incorporates by reference each and every allegation heretofore pleaded as if fully set forth herein.

247.  This Count is asserted against Defendants and arises under Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b).

248. This Count is brought solely and exclusively under the provisions of SEC Rule 10b-5(a) and (c), *codified as amended*, 17 C.F.R. § 240.10b-5(a) and (c). Accordingly, Lead Plaintiff need not allege in this Count, nor prove in this case, that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under SEC Rule 10b-5(b), *codified as amended*, 17 C.F.R. § 240.10b-5(b), and/or any other provisions of law.

249. During the Class Period, Defendants employed the means or instrumentalities of interstate commerce, including but not limited to the mails, the Internet, and the facilities of the NASDAQ, to carry out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the other members of the Class; (ii) artificially inflate the price of the Company's securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase the Company's securities at artificially inflated prices.

250. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants utilized the means or instrumentalities of interstate commerce, including but not limited to the mails, the Internet, and the facilities of the NASDAQ, to employ devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class in connection with their purchases of the Company's securities, all in violation of Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and SEC Rule 10b-5(a) and (c), *codified as amended*, 17 C.F.R. § 240.10b-5(a) and (c).

251. Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of the Company's scheme to defraud investors, including Lead Plaintiff and the other members of the Class, concerning, among other things, the Company's

purported subscription model, contract engineering services line, and contracts with OEMs.

252.   Despite the numerous misrepresentations and omissions that were made to or withheld from the market—and ample opportunity to supplement, alter, or correct such misrepresentations and omissions—Defendants failed to do so, thereby concealing the Company's scheme to defraud from the investing public, including Lead Plaintiff and the other members of the Class.

253.   Lead Plaintiff and the other members of the Class reasonably relied upon the integrity of the market in which the Company's securities traded.

254.   During the Class Period, Lead Plaintiff and the other members of the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme on the market price of the Company's securities. Had Lead Plaintiff and the other members of the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased the Company's securities, or if they had, they would not have done so at the artificially inflated prices paid for such securities.

255.   As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

256.   By reason of the foregoing, Defendants violated Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b) and SEC Rule 10b-5(a) and (c), *codified as amended*, 17 C.F.R. § 240.10b-5(a) and (c), and thus Defendants, and each of them, are liable to Lead Plaintiff and the other members of the Class for damages suffered in connection with their purchases of the Company's securities during the Class Period.

1
2
3

# COUNT III

## For Violations of Section 20(a) of the Securities Exchange Act of 1934
### (Against the Individual Defendants)

4    257.   Lead Plaintiff repeats, realleges, and incorporates by reference each and
5    every allegation heretofore pleaded as if fully set forth herein.

6    258.   This Count is asserted against the Individual Defendants and arises under
7    and pursuant to Section 20(a) of the Securities Exchange Act of 1934, *codified as*
8    *amended*, 15 U.S.C. § 78t(a).

9    259.   During the Class Period, the Individual Defendants participated in the
10   operation and management of the Company, and conducted and participated, directly
11   and indirectly, in the conduct of the Company's business affairs.   Because of their
12   senior positions, the Individual Defendants knew, or had access to or possession of, the
13   adverse non-public information about the Company's misstatements and omissions
14   alleged herein.

15   260.   As officers and/or directors of a publicly-owned company, the Individual
16   Defendants had a duty, but failed, to disseminate accurate and truthful information with
17   respect to the Company's financial condition and results of operations, and to correct
18   promptly any public statements issued by the Company which had become materially
19   false or misleading.

20   261.   By reason of their positions of control and authority as senior officers, the
21   Individual Defendants were able to, and did, control the contents of the various reports,
22   press releases, and public filings which the Company disseminated in the marketplace
23   during the Class Period concerning the Company's results of operations.   Throughout
24   the Class Period, the Individual Defendants exercised their power and authority to cause
25   or permit the Company to engage in the wrongful acts and omissions complained of
26   herein.   The Individual Defendants, therefore, were "controlling persons" of the
27   Company within the meaning of Section 20(a) of the Securities Exchange Act of 1934,

28

*codified as amended*, 15 U.S.C. § 78t(a).  In this capacity, the Individual Defendants participated in the unlawful conduct alleged herein, which artificially inflated the market price of the Company's securities.

262.  By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts, omissions, and other conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities, acts, and omissions which constitute the primary violations of the federal securities laws alleged elsewhere herein.  The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a).  In this capacity, the Individual Defendants participated in the unlawful conducted alleged herein, which artificially inflated the market price of the Company's securities.

263.  By reason of the foregoing, the Individual Defendants are liable in money damages to Lead Plaintiff and the other members of the Class for the Company's primary violations of the federal securities laws alleged elsewhere herein, pursuant to Section 20(a) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a).

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays relief and judgment, as follows:

A.      Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class Representative on behalf of the Class;

B.     Requiring Defendants, and each of them, to pay damages sustained by Lead Plaintiff and other members of the Class by reason of the acts, omissions, and transactions alleged herein, in an amount to be proven at trial;

C.     Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs and expenses; and incurred in investigating, bringing, and maintaining this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all issues so triable in this Action.

Dated:  April 8, 2022

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Murielle J. Steven Walsh*
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
600 Third Avenue
20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
mjsteven@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue
15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Co-Lead Counsel for Lead Plaintiff &*
*the Proposed Class*

**HOLZER & HOLZER, LLC**

By: */s/ Corey D. Holzer*
Corey D. Holzer (*pro hac vice*)
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone:  (770) 392-0090
Facsimile:   (770) 392-0029
cholzer@holzerlaw.com

*Co-Lead Counsel for Lead Plaintiff &*
*the Proposed Class*