POMERANTZ LLP

Jennifer Pafiti (SBN 282890)
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York  10016
Telephone:  (212) 661-1100
jpafiti@pomlaw.com
jalieberman@pomlaw.com
mjsteven@pomlaw.com

*Co-Lead Counsel for Lead Plaintiff & the Proposed Class*

— additional counsel on signature page —

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAMUEL BLAKE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CANOO INC., TONY AQUILA, ULRICH KRANZ, and PAUL BALCIUNAS,<br><br>Defendants. | **Case No. 2:21-CV-02873-FMO-JPR**<br>(**Consolidated**)<br>Case No. 2:21-CV-02879-FMO-JPR<br>Case No. 2:21-CV-03080-FMO-JPR<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ...................................................................................1

II.     STATEMENT OF FACTS .......................................................................2

        A.      Background ...................................................................................2

        B.      Defendants' Class Period statements falsely described Canoo as uniquely positioned to capture share of the electric vehicle industry. ........................3

        C.      Defendants continued to emphasize Canoo's unique business model in its shelf registration filed after the Merger was approved. ................................4

        D.      Defendants reveal dramatic changes to Canoo's fundamental business model during their first public earnings call. ...................................5

        E.      The SEC announced an investigation into Canoo's SPAC merger. ............6

III.    STANDARD OF REVIEW .....................................................................6

III.    THE CAC ALLEGES FALSE STATEMENTS .......................................7

        A.      Defendants misrepresented Canoo's engineering services. .........................8

        B.      Defendants falsely touted the viability of a subscription sales model. .......12

        C.      Defendants' statements are not protected by the safe-harbor. ....................14

        D.      Defendants' statements are not mere opinions or puffery. .........................16

V.      DEFENDANTS MADE STATEMENTS WITH SCIENTER ...........................18

        A.      Defendants' misstatements were made with deliberate recklessness. ........18

        B.      Defendants obtained material benefits from their fraud. ............................20

        C.      The CAC contains additional allegations evidencing scienter. ..................22

        D.      An inference of scienter is more compelling than Defendants' competing inference. ..........................................................................................22

VI.     THE CONFIDENTIAL WITNESSES' STATEMENTS ARE RELIABLE. .......23

i

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

VII.   DEFENDANTS' CONDUCT VIOLATED RULES 10B-5(A) AND (C). ..........25

VIII.  THE CAC SUFFICIENTLY ALLEGES A §20(A) CLAIM...............................25

IX.    CONCLUSION.................................................................................................25

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC*,
446 U.S. 680 (1980)................................................................................25

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) ................................................................16

*Berg v. Popham*,
412 F.3d 1122 (9th Cir. 2005) ..............................................................12

*Berson v. Applied Signal Tech.*,
527 F.3d 982 (9th Cir. 2008) ..................................................................8

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v.
Transocean Ltd.*,
866 F.Supp.2d 223 (S.D.N.Y.2012) .....................................................17

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..................................................................8

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ................................................................17

*Craig Frazier Design, Inc. v. Zimmerman Agency LLC*,
No. C 101094 SBA, 2010 WL 3790656 (N.D. Cal. Sep. 27, 2010).....................7

*Curry v. Hansen Med., Inc.*,
No. 5:09-cv05094-JF (HRL), 2011 WL 3741238 (N.D. Cal. Aug. 25,
2011) ......................................................................................................25

*Cutler v. Rancher Energy Corp.*,
No. SACV 13-00906-DOC, 2014 WL 1153054 (C.D. Cal. Mar. 11,
2014) ......................................................................................................17

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ................................................................18

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ..................................................................................24

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ................................................................................14

*Feyko v. Yuhe Int'l, Inc.*,
  No. CV 11-05511-DDP, 2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ..............14

*Flynn v. Sientra, Inc.*,
  No. CV 15-075548 SJO, 2016 WL 3360676 (C.D. Cal. June 9, 2016) ............21

*Friedman v. Endo Int'l PLC*,
  No. 16-CV-3912 (JMF), 2018 WL 446189 (S.D.N.Y. Jan. 16, 2018)..............13

*Garcia v. J2 Glob., Inc.*,
  No. 220CV06096FLAMAAX, 2021 WL 1558331 (C.D. Cal. Mar. 5,
  2021) ......................................................................................................................11

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ................................................................................20

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ..................................................................................8

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ..............................................................................18

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) ..................................................................................7

*In re Banc of California Sec. Litig.*,
  2017 WL 3972456 (C.D. Cal. Sep. 6, 2017) ......................................................22

*In re Cadence Design Sys., Inc. Sec. Litig.*,
  692 F.Supp.2d 1181 (N.D. Cal. 2010)..................................................................19

*In re Century 21-RE/MAX Real Est. Advert. Claims Litig.*,
  882 F. Supp. 915 (C.D. Cal. 1994) ......................................................................17

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ..............................................................................24

*In re Fusion-io, Inc. Sec. Litig.*,
  No. 13-CV-05368-LHK, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ..............9

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005)..................................................................19

*In re Netflix, Inc., Sec. Litig.*,
  923 F. Supp. 2d 1214 (N.D. Cal. 2013)...............................................................19

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .............................................................................20

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .......................................................................14, 18

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)................................................................15

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009).................................................................22

*In re Vaxart, Inc. Sec. Litig.*,
  No. 20-CV-05949-VC, 2021 WL 6061518 (N.D. Cal. Dec. 22, 2021) .......10, 11

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ...............................................................................22

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
  282 F. Supp. 3d 1074 (N.D. Cal. 2017)...............................................................20

*Johnson v. Knapp*,
  No. CV 02-9262- DSF (PJW), 2009 WL 764521 (C.D. Cal. Mar. 16,
  2009) ......................................................................................................................7

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...........................................................................7, 25

*Kovtun v. VIVUS, Inc.*,
  2012 WL 4477647 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v.
  VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015) ..................................................14

*Livid Holdings Ltd v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ...............................................................................14

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

*Longo v. OSI Sys., Inc.*,
    No. CV 17-8841 FMO (SKX), 2021 WL 1232678 (C.D. Cal. Mar. 31,
    2021) ....................................................................................................................20

*Lorenzo v. Sec. & Exch. Comm'n*,
    139 S. Ct. 1094 (2019)........................................................................................25

*M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*,
    2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) ...................................................20

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
    521 F.3d 1097 (9th Cir. 2008) ..............................................................................7

*Miller v. Thane International, Inc.*,
    519 F.3d 879 (9th Cir. 2008) .................................................................................9

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020)................................................................15

*Mulligan v. Impax Lab'ys, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014)............................................................16, 17

*Murphy v. Am. Gen. Life Ins. Co.*,
    74 F. Supp. 3d 1267 (C.D. Cal. 2015) ..................................................................7

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West
    Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ..............................................................................21

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ............................................................................24

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ........................................................................17, 20

*Rihn v. Acadia Pharma. Inc.*,
    No. 15cv00575 BTM (DHB), 2016 WL 5076147 (S.D. Cal. Sept. 19,
    2016) ....................................................................................................................22

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ........................................................................20, 22

*Salameh v. Tarsadia*,
    726 F.3d 1124 (9th Cir. 2013) ...........................................................................6, 7

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ...............................................................................18

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
    485 F. Supp. 3d 1113 (N.D. Cal. 2020)..............................................................12

*SEC v. Mozilo*,
    2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) .....................................................11

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ...............................................................................16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..................................................................................18, 20, 22

*Tomek v. Apple, Inc.*,
    636 Fed. App'x 712 (9th Cir. 2016) .....................................................................8

*Turocy v. El Pollo Loco Holdings, Inc.*,
    No. SACV151343DOCKESX, 2016 WL 4056209 (C.D. Cal. July 25,
    2016) ....................................................................................................................17

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .............................................................................15

*Yourish v. California Amplifier*,
    191 F.3d 983 (9th Cir. 1999) ....................................................................9, 13, 22

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .................................................................................7

**Statutes**

15 U.S.C. §78u-4(b)(2) ...............................................................................................18

15 U.S.C. § 78u-5(c)(1)(A)(i) .....................................................................................16

Private Securities Litigation Reform Act of 1995 .......................................7, 18, 22

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................7

Fed. R. Civ. P. 15(a)(2)..............................................................................................25

**Other Authorities**

17 C.F.R. § 240.10b-5....................................................................................8, 20, 25

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

## I.   INTRODUCTION

This action arises from a "bait and switch" that Defendants[1] orchestrated when taking Canoo public via its merger with Hennessy Capital, a special purpose acquisition company ("SPAC").  Defendants sold investors on Canoo's three-prong business model consisting of: 1) its then-existing contract engineering services activity that was generating "immediate" pre-sale revenue; 2) its subscription sales model that "de-risked" the business and was superior to competitors' lease-based model; and 3) future business to business sales. Defendants highlighted Canoo's supposed partnership with Hyundai as validation of its electric vehicle platform. Using this justification, Defendants obtained shareholder approval of the SPAC merger on December 21, 2020 (the "Merger") and filed for a shelf offering on January 13, 2021.

On March 29, 2021, Defendants unexpectedly announced Canoo had deemphasized its contract engineering division and jettisoned its subscription sales model, stating that any agreement with Hyundai ended. Investors had no warning such a change was even under consideration, and Canoo's stock price cratered as a result.

The CAC is replete with allegations raising a cogent and compelling inference that Defendants made misleading Class Period statements of material fact with at least deliberate recklessness.  The CAC shows that Defendants claimed that Canoo would take advantage of existing relationships to advance its operations, but they knew the relationships were not as described. The CAC also shows that the subscription model Defendants claimed would distinguish Canoo and reduce the barriers to entry for potential EV purchasers was known to be unsustainable.  As Aquila admitted, the Class

---

[1]The "Defendants" are Canoo, Inc. ("Canoo" or the "Company"); Hennessy Capital Acquisition Corp. IV ("Hennessy Capital" or "HCAC"); Anthony (Tony) Aquila ("Aquila"); Ulrich Kranz ("Kranz"); and Paul Balciunas ("Balciunas"). ¶¶29-33. Cites to "¶" refer to the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "CAC"). *See* ECF No. 85.

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

Period statements were "premature," "aggressive," "presumptuous" and did not meet the "standard of representation to the public markets."

Defendants' Motion to Dismiss (the "Motion") fails to meaningfully counter these well-pled allegations. *See* ECF No. 89-1. In a kitchen-sink approach, the Motion seeks to distract from the totality of allegations by focusing on irrelevant and extraneous points while stating in conclusory terms what, in Defendants' view, is missing from the CAC.  As set forth herein, Defendants are wrong on both the facts and the law. The CAC alleges actionable securities fraud, and the Motion should be denied in full.

## II.   STATEMENT OF FACTS

### A.   Background

On March 5, 2019, Hennessy Capital conducted its initial public offering ("IPO") and became a publicly traded SPAC.  ¶¶4, 30.  With no operations of its own, the SPAC's sole purpose was to merge with a private company such that the resulting business combination would be publicly traded. ¶47.  Hennessy Capital faced a September 2020 deadline to complete the merger before it would be required to cash out its investors at roughly their initial investment. ¶54.  A month before the deadline, Hennessy Capital filed a Definitive Proxy Statement setting a special meeting for August 27, 2020, requesting its shareholders vote to extend the time to complete a business combination, and further announced it had identified an acquisition target.  ¶55.

The target was electric vehicle ("EV") manufacturer, Canoo, which purportedly developed an EV "skateboard" that was modular in nature, could support commercial and consumer markets, and could be paired with its own or other manufacturers' cabins. ¶¶42-46.  Hennessy Capital and Canoo Merger Agreement and Plan of Reorganization (the "Merger Agreement") was subject to shareholder approval.  ¶56.  In support of the Merger, Hennessy Capital and Canoo issued a press release on Form 8-K announcing, among other things, nominees to serve on Canoo's Board of Directors, including Aquila and Kranz.  ¶62.  The press release included a statement from Aquila hyping the

Company's business model and citing Canoo's current management and business approach as reasons he invested in Canoo. *Id*.

During the Class Period, the Individual Defendants all held leadership roles within Canoo: Kranz served as CEO, Balciunas served as CFO, and Aquila was a large investor tabbed to serve as Chairman of the Board starting October 19, 2020, and then as Executive Chairman and Director starting on December 21, 2020.  ¶¶31-33.  In Aquila's role as Executive Chairman, he was responsible for developing and executing Canoo's long-term strategy and product and business roadmap and thus had strong influence over Canoo's direction.  ¶31.

**B.    Defendants' Class Period statements falsely described Canoo as uniquely positioned to capture share of the electric vehicle industry.**

After announcing the Merger Agreement, Defendants pitched Canoo as a company able to generate an immediate revenue stream through engineering consulting contracts.  ¶¶76, 85. Defendants touted its supposed partnership with Hyundai to provide engineering services and co-develop an EV platform as validation of Canoo's technology.  ¶¶74, 77.  In its September 18, 2020 Form S-4 (the "Registration Statement"), Canoo stated that its current contract engineering work was "supportive of a projected $120 million of revenue in 2021[,]" which was expected to offer "significant growth potential in the future." ¶85.

Defendants also represented that Canoo's engineering contracts provided "external commercial validation of Canoo's technical capabilities," that there was a "significant market for contract engineering services among legacy OEMs" who lacked expertise in this area, and that there was "significant interest" in Canoo's services. *Id*. Defendants stated that "Canoo expects to be in a position to announce many more partnerships in due course." *Id*.  These false claims were repeated in the October and November amendments to the Registration Statement.  ¶87. As Aquila admitted,

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

however, these statements were "aggressive", "premature", "presumptuous," and "not up to our standard of representation for a public company." ¶111.

Another supposed key differentiator was Canoo's subscription plan for its vehicles. ¶96 (describing "unique profit margin profile"). Throughout the Class Period, the subscription model was presented as being consumer-friendly and better for Canoo's bottom line. *E.g.,* ¶¶80-81, 87, 97-98. Balciunas described the benefits of the subscription model, citing the Company's research, as a model that provided Canoo the ability to achieve operating profit margins that were two to four times greater than an OEM's traditional business model. ¶80. Defendants claimed the subscription model benefited consumers due to its lack of upfront fees or down payment, the ability to opt-out at any time, covered maintenance, and an all-in-one package that included registration, insurance, and other benefits. ¶81. The subscription model was supposed to be "more profitable and resilient" because it was less dependent on new vehicle sales, creating "consistent cash flow and strong ROE" over a vehicle's lifespan. ¶82. Defendants pushed their "innovative" subscription model to the exclusion of alternatives, exclaiming: "we absolutely do not want to pressure people into purchasing vehicles. That is not our Company strategy and that's not our brand." ¶151.

On December 21, 2020, Hennessy shareholders approved the Merger and Canoo became a publicly traded electric vehicle company. ¶70.

**C.    Defendants continued to emphasize Canoo's unique business model in its shelf registration filed after the Merger was approved.**

On January 13, 2021, Canoo filed a Registration Statement on Form S-1 (the "January S-1") announcing a shelf offering for the sale of more than 24 million shares, which was signed by Aquila and Balciunas. ¶¶17, 92. The January S-1 again hyped Canoo's engineering contract services business segment and touted its agreement with Hyundai to "co-develop a future EV platform…for which the intellectual property developed will be jointly owned by us and Hyundai[.]" ¶93. Canoo also claimed it was

4
LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

"in discussions with multiple other blue-chip industry participants" for contract engineering services. *Id.* Canoo portrayed its contract engineering work as a core business segment due to its ability to reduce risk, generate immediate revenue, and provide "long-term commercial opportunities." ¶95.

The January S-1 also touted the benefits and viability of Canoo's subscription model as "reduc[ing] the barriers to entry for consumers looking to drive an EV, while also providing us with a distinct opportunity for recuring revenue and a unique profit margin profile." ¶98. Defendants stated that "we expect that the significant majority of our revenue will be derived from our consumer subscription program for our Lifestyle Vehicle and Sport Vehicle." *Id.* Defendants claimed Canoo's unique approach to manufacturing, which purportedly reduced risks and capital expenditures by utilizing contract manufacturing, would "significantly reduce our up-front capital investment and eliminate the recurring fixed costs and overhead that would be required." ¶97.

**D.    Defendants reveal dramatic changes to Canoo's fundamental business model during their first public earnings call.**

On March 29, 2021, Canoo announced its fourth quarter and full year 2020 financial results and hosted an earnings conference call. ¶¶102-103. Aquila conducted the call and announced that Balcuinas, then CFO, had resigned, while Kranz, though reportedly still CEO, was unable to join the virtual meeting because of California's COVID restrictions. ¶¶104-105. After informing investors of the management change, Aquila announced dramatic changes to Canoo's business. ¶106.

Aquila first revealed the Company planned to "de-emphasize" its contract engineering services line. ¶¶107-108. Aquila admitted the dramatic shift in focus "was a contradiction[.]" ¶110. Aquila also conceded the Class Period claims Canoo would have partnerships by end of fourth quarter were "aggressive" and not "at our standard of representation to the public markets." ¶111. Aquila went so far as to say the Defendants

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

prior statements were "dangerous" and "could be somewhat misleading." ¶114. Finally, Aquila also revealed that the partnership with Hyundai was effectively over. ¶117.

Aquila dropped another bombshell when announcing that Canoo was deemphasizing the subscription model. ¶¶113, 119. Aquila cited the strain a subscription system would have on the balance sheet for the dramatic shift, noting the dramatic shift amounted to "probably 80% change in the business model," with "sub 20% of our sales will be in the [subscription] category." *Id*. Instead of using the less capital-intensive third-party manufacturing strategy to produce its vehicles, Aquila also signaled a shift towards Canoo building its own factories and handling production in-house. ¶132. Finally, Aquila confirmed that Canoo's previously issued guidance was no longer valid, acknowledging that investors were shown "a different model." ¶114.

Analysts skewered Canoo for these "significant" and wide-ranging changes that gutted Canoo's risk analysis, with some analysts slashing target prices by more than half. *See, e.g*., ¶¶130-141. On March 31, 2020, in the wake of the disastrous investor call, Canoo's stock price fell by $2.50 per share, or more than 20%, on heavy trading volume. ¶¶121. On March 31, 2021, Canoo filed its annual report for 2020 on Form 10-K, sending its stock price down to $8.05 per share. ¶¶122-23.

**E.** **The SEC announced an investigation into Canoo's SPAC merger.**

In its Form 10-Q filed on May 17, 2021, Canoo disclosed that it was subject to a wide-ranging SEC investigation. The investigation was reported to relate to, among other things, the Merger and Canoo's "operations, business model, revenues, revenue strategy, customer agreements, earnings and other related topics, along with the recent departures of the Company's officers." ¶175. The investigation remains ongoing.

**III.   STANDARD OF REVIEW**

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Salameh v. Tarsadia*, 726 F.3d 1124, 1129

6

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

(9th Cir. 2013).[2] "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. Rule 12(b)(6) dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support one." *Murphy v. Am. Gen. Life Ins. Co.*, 74 F. Supp. 3d 1267, 1287 (C.D. Cal. 2015) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)).

On a 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s] them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017). "[T]he purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to decide its merits[.]" *Craig Frazier Design, Inc. v. Zimmerman Agency LLC,* No. C 101094 SBA, 2010 WL 3790656, at *6 (N.D. Cal. Sep. 27, 2010). Defendants cannot insert their own version of the facts in place of a complaint's particularized allegations. *See Johnson v. Knapp*, No. CV 02-9262- DSF (PJW), 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009). The Court's analysis is confined to the complaint and any materials that are the proper subject of judicial notice or incorporation by reference. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The Court is not to decide disputed facts asserted in SEC filings or conference calls transcripts or otherwise allow a defendant to introduce external evidence to quarrel with well pled facts. *Id*. at 1002.

## IV. THE CAC ALLEGES FALSE STATEMENTS

To plead falsity under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the…reasons why…, and if an allegation…is made on information and belief, … all facts on which that belief is formed.'" *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990-991 (9th Cir. 2009), as amended (Feb. 10, 2009). "Averments of fraud must be accompanied by the 'who, what, where, when, and

---

[2] All internal citations and quotations are omitted, and all emphasis is added, unless otherwise indicated.

how' of the misconduct charged." *Tomek v. Apple, Inc*., 636 Fed. App'x 712, 713 (9th Cir. 2016) (quotation omitted).  Once defendants chose to speak, they "were bound to do so in a manner that wouldn't mislead investors." *Berson v. Applied Signal Tech*., 527 F.3d 982, 987 (9th Cir. 2008).

### A.    Defendants misrepresented Canoo's engineering services.

Defendants violated their duty to disclose material, adverse facts that contradicted their positive characterization and assessment of Canoo's engineering services division. *See Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1006 (9th Cir. 2002) (omissions actionable when "create[ing] an impression of a state of affairs that differs in a material way from the one that actually exists"); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992) ("Rule 10b-5 imposes a duty to disclose material facts…necessary to make disclosed statements, whether mandatory or volunteered, not misleading.")

Throughout the Class Period, Defendants claimed that Canoo's relationship with Hyundai provided validation for its skateboard platform and that its engineering work would "generate immediate revenues in advance of offering" its first vehicles. ¶¶10, 74, 85, 93, 95.  On August 18, 2020, Kranz expressly said "we are working for companies and we are already making money" from contract engineering. ¶76.  At the time these statements were made, however, Canoo was not preforming any revenue generating contract work.  ¶20 (zero dollars in revenue earned). CW 1 confirms this, stating he/she did not work "with or for Hyundai," was never "involved with Hyundai and never talked to anybody there" and there "definitely wasn't any outsourcing of engineering work" during CW 1's employment. ¶¶169-170.

As late as January 2021, Defendants told investors that Canoo was "in discussions with multiple other blue-chip industry participants" for contract engineering services. ¶93.  Yet, Aquila has admitted that these boasts about Canoo's "current pipeline" for engineering services and its efforts to announce third-party relationships were "aggressive," "presumptuous," "premature," and not "at our standard for representation

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

to the public markets." ¶111.  He likewise acknowledged that hyping contract services so extensively just before publicly de-emphasizing it "was a contradiction." ¶110. According to Aquila, the way Canoo discussed engineering contracts had been "dangerous" and "somewhat misleading." ¶114. These allegations definitively show the contract engineering statements were misleading. *See Yourish v. California Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999) ("a complaint can establish that a statement was false when made by alleging '[a] later statement by the defendant along the lines of 'I knew it all along'''").  Indeed, the strongest inference drawn from all the alleged facts is that Canoo had, in practice, de-emphasized contract engineering prior to the statements.[3]

Despite these allegations, Defendants argue their statements about contract engineering services were not false because they accurately described Canoo's relationship with Hyundai and the Board only approved the deemphasis plan after the statements were made. Motion, p. 7-10.  Defendants' arguments are insufficient.

Even if Defendants disclosed that Canoo's engineering service revenue to date derived from a single performance before the end of the Class Period, that fact alone is not exculpatory. Motion, p. 7. The earliest disclosure of this fact was on November 27, 2020, well after many of the Class Period statements. *Compare* Motion, p. 7 *with* ¶76 (statements on August 18, 2020); ¶85 (statements on September 18, 2020); ¶87 (statements on September 18, 2020 and October 23, 2020). More importantly, Canoo's disclosure that 3Q2020 revenue had been earned in July 2020 did not reveal that no work was being done with or for third parties at the time of the statements, which is the ultimate fact undermining Defendants' claims. *See Miller v. Thane International, Inc.*,

---

[3] Unlike the allegations that merely relied on defendants "sobering revelation" in *Fusion-io* that a prior opportunity could not be completed because it became too expensive," Plaintiff alleges how Defendant Aquila's admissions bore directly on the accuracy and legality of Defendant' Class Period statements and provides further supporting facts demonstrating why the statements were false when made. *See In re Fusion-io, Inc. Sec. Litig.*, No. 13-CV-05368-LHK, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015); *see, e.g.,* ¶¶113, 168-174.

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

519 F.3d 879, 886 (9th Cir. 2008) (statements that are "literally true on their face may nonetheless be misleading when considered in context").

Defendants next argue the Engineering Services statements accurately conveyed Canoo's relationship with Hyundai was effectively over unless further agreements were reached. *See* Motion, p. 7-8. This argument is likewise flawed. On August 18, 2020, Balciunas said:

> **This is a multiple-phase partnership** and we **currently are in the first phase** in **doing some contract engineering work** that leverages our existing technology, but we're tailoring it to Hyundai's specifications. . .. So, **this is a** really great opportunity and **benchmark for the marketplace**, **to have this kind of validation**, especially considering we are much small (sic) company versus Hyundai.

¶144. Kranz repeated the false claim, saying "[Engineering Services] is a phase that already exists today." ¶76. Defendants thus expressly stated Canoo was working for Hyundai during the Class Period, which was false.

Defendants claim a snippet from Balciunas speaking on December 8, 2020 informed investors that Canoo was not actively working with or for Hyundai. Motion, p. 7-8. Balciunas' statement does not go that far. Balciunas said that Canoo had "just completed work," which was not true – the work had been completed in July 2020. Indeed, nothing in his statements conveyed the larger context that no work was being done with or for Hyundai, that Canoo had not done work for Hyundai for almost six months, and that no revenue was being generated by working with any third-party, at the time. *See* ¶122. *see also, In re Vaxart, Inc. Sec. Litig.*, No. 20-CV-05949-VC, 2021 WL 6061518, at *4 (N.D. Cal. Dec. 22, 2021) ("Words, after all, cannot be viewed in complete isolation but must instead be read in light of all the information then available to the market to decide if they conveyed a false or misleading impression.").

Defendants' engineering services statements are analogous to the misrepresentations in *Vaxart.* In *Vaxart,* the defendants published a press release with a sensationalist headline announcing it had been "selected" for inclusion in Operation Warp Speed, but the body of the same press release revealed the "crucial reality" that

the company had not received federal funding. *Id.* at *5. The defendants also "played up the partnership" with a vaccine manufacturer while disclosing in a press release that they only had reached a memorandum of understanding. *Id.* at *2. The court rejected defendants' "literal truth arguments," noting that the context and "manner of presentation" matters. *Id.* at *5. Thus, as in *Vaxart*, even if Defendants' statements conveyed some information, the allegations show they were still materially misleading.

Defendants suggest their Class Period claims that engineering services offered an opportunity to generate $120 million in 2021 revenue were not misleading because "Canoo's Board decided to de-emphasize its engineering services business line months ***after*** the Engineering Services Statements were made." Motion, p. 8. This argument amounts to a dispute about materiality, which should not be resolved on this record.[4] *See SEC v. Mozilo*, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009).

While justifying the shift away from engineering services, Aquila admitted he had "concerns" from the start about whether the proposed engineering services plan drove "the best shareholder value," due to the potential for "IP leakage." ¶¶110, 116-17. Aquila admits he began to analyze these issues "once I invested and then took the Chairmanship," *i.e.,* sometime between July 2020 and October 19, 2021. ¶¶31,110, 185. Aquila concluded that the engineering services contract with Hyundai did not properly value Canoo's IP, "which would have changed the value of that contract significantly." ¶117. Thus, Aquila's "analysis" made him and the other Defendants' "aware of undisclosed facts tending seriously to undermine" the accuracy of their other positive statements regarding the benefits of their engineering services business model but failed to disclose this information to investors. *See Garcia v. J2 Glob., Inc.*, No. 220CV06096FLAMAAX, 2021 WL 1558331, at *16 (C.D. Cal. Mar. 5, 2021).

---

[4] Notably, despite making it a centerpiece of their defense, Defendants never expressly state when the Board approved the plan to de-emphasize the model. *See* ¶107.

11

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

Finally, Aquila's July 2020 investment in Canoo coincides with the immediate drop-off in engineering services revenue generated thereafter. Viewing the allegations in the light most favorable to Plaintiff, this fact shows Defendants possessed this adverse information at the time of the misleading statements. *See, e.g., SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1131-32 (N.D. Cal. 2020) (explaining that the meaning of statements at the pleading stage must be construed in the light most favorable to plaintiff); *Berg v. Popham*, 412 F.3d 1122, 1125 (9th Cir. 2005) (resolving doubt in favor of non-moving party).

## B. Defendants falsely touted the viability of a subscription sales model.

Throughout the Class Period, Defendants praised Canoo's subscription model as an industry changing concept, calling it an "innovative" model and "superior to a lease." ¶151. Balciunas told investors on August 18, 2020 that Canoo's subscription model had "a lot of similarities between" it and "other competitors that offer subscription products in the technology sector" producing profits of 20%. ¶80. On the same day, Defendants reinforced their devotion to the model, with Canoo saying: "we absolutely do not want to pressure people into purchasing vehicles. That is not our Company strategy and that's not our brand[.]" ¶151. Defendants said the subscription model was "highly cash flow generative, yielding positive free cash flow every year after the first year" and that it had been modeled "at the granular level" so that it "can be one of the main drivers of equity value for Canoo in the future." ¶152.

On December 22, 2020, after the Merger was approved by shareholders, Defendants continued their drumbeat of deception, saying "we are committed. . .[to] our go-to-market opportunities[.]" ¶72. As late as January 13, 2021, Defendants told investors the "innovative" subscription model would "significantly reduce [Canoo's] upfront capital investment and eliminate reoccurring fixed costs and overhead that would be required for use to own and operate our own assembly facility." ¶97. But on March 29, 2021, Defendants said the exact opposite when Aquila admitted that the

subscription model by its very nature would create a "big cash hit" (¶113) and that Canoo would "have to raise a lot more capital" under the subscription model. ¶119.[5]

As Aquila acknowledged, however, this information was not new to him. On March 29, 2021, Aquila said "when I came in and took my role and we spent a lot of money analyzing the weight that this will have on the balance sheet." ¶113. Aquila acknowledged "without a doubt" he would have changed the model "based on [his] experience" if had he been "more involved earlier." ¶¶110, 113. Indeed, CW 2 stated the business plan was constantly in flux, even before the Class Period. ¶174. By making these commitments to Canoo's business plan, Defendants misled investors by concealing internal concern about the fundamental viability of the model. *See Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) (duty to disclose changes to a business plan required where a company "hyped a specific plan, thereby inducing investors to believe that alternative[ ] [plans] were excluded."); *Yourish*, 191 F.3d at 996 ("a complaint can establish that a statement was false when made by alleging [a] later statement by the defendant along the lines of 'I knew it all along'").[6]

Defendants' limited defense to these false statements turns primarily on a supposed lack of allegations showing contemporaneous knowledge of these adverse facts undermining Canoo's primary go-to-market strategy because the CAC does not expressly allege the Board approved the decision to alter Canoo's entire business model before January 13, 2021. Motion, p. 8-9; 10-11.  This is a red-herring and irrelevant. The allegations, including Defendants' admissions and statements from confidential

---

[5] These statements unequivocally address the subscription model's capital requirements. *See* Motion, p. 12.

[6] Contrary to Defendants' assertion (*see* Motion, p. 11), the connection between the omitted facts and the false statement is clear – Defendants' positive boasts about the benefits Canoo enjoyed from its contract engineering services were contradicted by the undisclosed facts showing that division provided no benefits at the time. *See, e.g.,* ¶¶95-96. Likewise, claims about the subscription model were misleading by omission of adverse facts indicting substantial doubt the model was viable. *See, e.g.,* ¶¶98-99.

13

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

witnesses, show the subscription model never made financial sense from a balance sheet perspective and Aquila, as Canoo's Executive Chairman in charge of strategy, always had significant, undisclosed doubts about the plan.    The Court should decline Defendants' invitation to determine materiality at this stage. *See Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995) ("Whether an omission is material is a determination that requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."); *Feyko v. Yuhe Int'l, Inc.*, No. CV 11-05511-DDP (PJWx), 2013 WL 816409, at *5 (C.D. Cal. Mar. 5, 2013) ("Materiality is rarely appropriate to decide at the motion to dismiss stage.").[7]

### C.    Defendants' statements are not protected by the safe-harbor.

The Ninth Circuit requires a "stringent showing" before dismissal on the pleadings is warranted under the safe-harbor. *See Livid Holdings Ltd v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005).  The PSLRA's safe harbor "is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). Nor does the safe harbor protection apply to a false statement of fact that is combined with a forward-looking statement. *Id.* Defendants here fail to make even a cursory showing the misstatements are entitled to safe-harbor protection.

Defendants cherry-pick language from the CAC to argue five of the challenged statements are forward-looking. *See* Motion, p. 16-18. Thus, Defendants acknowledge

---

[7] This case is factually distinct from *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *18 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015). Defendants, as top executives, having substantial doubt about the viability of two prongs of Canoo's business model is a far cry from lower-level employees discussing safety issues relating to an experimental drug.

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

most of their statements addressed present operations. But, even if any statements are mixed with projections or opinions, they are actionable:

> In this circuit, a projection or statement of belief may be actionable to the extent that one of the three implied factual assertions is inaccurate: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending the seriously undermine the accuracy of the statement.

*In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1228 (S.D. Cal. 2010). Plaintiff has adequately alleged Defendants were aware of facts, at the time of their misstatements, that seriously undermined the accuracy of their claims.

Fundamentally, this is not a case about failure to execute a business. It is a classic bait and switch scheme in which Defendants sold investors on Canoo's unique go-to-market strategy, while knowingly concealing material facts casting doubt on the viability of that strategy. For this reason, statements such as Canoo's consumer vehicle offerings "will be on subscription" were misleading because it omitted material facts indicating Defendants believed the subscription model was unsustainable. ¶76. Canoo's statements about its projected margins were premised on the implementation of a business strategy that was, at minimum, disapproved by Aquila. ¶¶110,113-114. The same is true for Defendants' statement that they "initially intended" to make vehicles "available to consumers via an innovative subscription business model" just weeks before Canoo publicly abandoned the plan. ¶97. These statements are not "assumptions underlying or relating to a declared objective (*see* Motion, p. 18 *citing Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021)), these are misstatements about the "declared objective" itself. *See Mulderrig v. Amyris, Inc.,* 492 F. Supp. 3d 999, 1022 (N.D. Cal. 2020) ("Where a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement.").

Defendants barely attempt to identify meaningful cautionary language. *See* Motion, p. 16-18. Defendants point only to a warning that "factors that could cause

15

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

actual results to differ include ... the ability of Canoo to **execute** its business model. . .” and subscription revenues “may occur later or not at all.” Motion, p. 16, n. 10.  These generic statements fail to advise investors that Canoo’s incoming Executive Chairman tasked with overseeing the business strategy had significant doubts about the fundamental viability of the business model and was actively working to de-emphasize it.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i) (“meaningful cautionary statements identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement”).  The limited warning that Canoo’s “go-to-market strategy and subscription” constituted a risk focused on execution of the plan, not its abandonment. *See* Motion, p. 17, n. 11.  Moreover, a generic warning issued in January 2021 that Canoo’s “business plans require a significant amount of capital” (*see* Motion, p. 12-13) did not meaningfully advise investors about the true cash requirements of the subscription model, which had been a selling point for the Merger.

Finally, Defendants’ warnings didn’t change during the Class Period despite Defendant Aquila’s ascension to the top levels of leadership and his admission that he drove the shift in business model. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 772-73 (2d Cir. 2010) (“The consistency of the defendants’ language over time despite the new information they received…belies any contention that the cautionary language was tailored to the specific future projection.”); *Asher v. Baxter Int’l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004) (“[T]he cautionary language remains fixed even as the risks changed” “[t]hus this complaint could not be dismissed under the safe harbor”).

### D.    Defendants’ statements are not mere opinions or puffery.

Courts must view the statements within the wider context and circumstances under which they were made. *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). “Even a statement of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because there is a difference between enthusiastic statements amounting to general puffery and opinion-based

LEAD PLAINTIFF’S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

statements that are anchored in misrepresentations of existing facts." *Id.* "What might be innocuous puffery or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); *Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV151343DOCKESX, 2016 WL 4056209, at *9 (C.D. Cal. July 25, 2016) (citing *Casella*, 883 F.2d at 808) Thus, the Court must "exercise great caution" when deeming statements puffery. *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F.Supp.2d 223, 244 (S.D.N.Y.2012).

Viewed in context, Defendants' statements expressing optimism about Canoo's go-to-market strategy and unique market position were meaningful to investors. *See* Motion, p. 13-15. Canoo's representative said "I would encourage people to take a *long hard look at this model*, and if you look at how we modeled this on a *granular level*…" ¶152. The January S-1 indicated that the business plan was supported by "strong underlying financial metrics as compared to a traditional one-time sale model." ¶98. Defendants claimed the business model would reduce necessary upfront capital investment and fixed costs, be "more profitable," "resilient," and provide greater profit margins than a traditional model. *E.g.,* ¶¶ 81-82, 98-99, 159. They described Canoo's model as "highly cash flow generative." ¶152. Defendants also cited polls and indicated its plan was supported by "key trends in consumer preferences," presenting a greater chance of success due to alignment with market conditions. ¶98. Defendants' statements thus are actionable. *Cutler v. Rancher Energy Corp.*, No. SACV 13-00906-DOC, 2014 WL 1153054, at *7 (C.D. Cal. Mar. 11, 2014) (distinguishing puffery from actionable statements based on level of detail and specificity); *see also, Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) ("Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations."); *In re Century 21-RE/MAX Real Est. Advert. Claims Litig.*, 882 F.

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

Supp. 915, 926 (C.D. Cal. 1994) ("Puffery is distinguishable from misdescription or false representations of specific characteristics of a product.").

## V.   DEFENDANTS MADE STATEMENTS WITH SCIENTER

Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144. Deliberate recklessness is "an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *See Schueneman v. Arena Pharms., Inc.,* 840 F.3d 698, 705 (9th Cir. 2016).

A strong inference of scienter exists if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 324 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference. *Id.* "[A] tie goes to the plaintiffs when there are multiple plausible theories[.]" *Eclectic Props. E., LLC v. Marcus & Millichap Co*., 751 F.3d 990, 999 n.8 (9th Cir. 2014). Here, the CAC alleges a strong inference of scienter through admissions, CW statements, motive, an SEC investigation, and the temporal proximity between the statements and the corrective disclosure.

### A.   Defendants' misstatements were made with deliberate recklessness.

The CAC alleges Defendants had access to and/or actual knowledge of undisclosed facts undermining the accuracy of the alleged misstatements. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (finding scienter where defendants "had reasonable grounds to believe material facts existed that were misstated

or omitted"). "[T]hat [] defendants published statements when they knew facts suggesting the statements were inaccurate … is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005).  Importantly, scienter and falsity often can be inferred from the same set of facts and may even be combined into a single analytical inquiry. *In re Netflix, Inc., Sec. Litig.*, 923 F. Supp. 2d 1214, 1219 (N.D. Cal. 2013).  This is particularly true here given the extensive and aggressive nature of the false claims.

The Individual Defendants either knew or were severely reckless in not knowing that Canoo never worked "with or for Hyundai" during the Class Period, that all the engineering work at that time was centered on developing Canoo's own products and that the business model was constantly in flux. ¶¶168-170, 174. Aquila's admissions that he began analyzing the engineering services and subscription models from the start dovetails with his apologies for presumptuous public statements that did not meet the standards for public disclosure.  ¶¶ 110-113.

When Defendants made their Class Period statements, they admittedly were spending "a lot of money analyzing" serious concerns about Canoo's business plan, and, as a result, were in possession of facts seriously calling into question the financial sustainability and economic viability of their original model. ¶¶107-119.  These well-pled allegations show these concerns were held by Aquila from the time he became an investor in July 2020, and he actively worked to change the plan. Throughout the Class Period, Aquila progressed from a proposed board member to ultimately gaining control over Canoo's business strategy, including hiring senior management and making other personnel decisions. ¶31. A reasonable inference drawn from these facts is that Aquila was selected for his roles because his vision for Canoo differed from the stated plan.

As Co-Founder and CEO, and CFO, respectively, Kranz and Balciunus had a part in shaping, or at the least have been fully informed of, these significant fundamental changes to Canoo's operations. That is enough to establish scienter. *See, e.g., In re*

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

*Cadence Design Sys., Inc. Sec. Litig.*, 692 F.Supp.2d 1181, 1192 (N.D. Cal. 2010) ("[T]he inference that [one individual defendant] knew or was reckless regarding the nature of the agreements is incompatible with an inference that the other Individual Defendants lacked scienter."); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) ("it would be absurd to suggest that management was without knowledge of the matter.").

Defendants' contention that the CAC fails to allege the Individual Defendants "made" false statements is baseless. Motion, p. 23-24.  The CAC identifies at least one statement attributed to each Individual Defendant that was made with scienter, which is sufficient to defeat Defendants' group pleading argument.[8] *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1095 (N.D. Cal. 2017) (analyzing statements expressly attributed to speaker).  And, by raising an inference that even one Individual Defendant made a false statement with scienter, the CAC sufficiently pleads Canoo's scienter.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014); *Longo v. OSI Sys., Inc.,* No. CV 17-8841 FMO (SKX), 2021 WL 1232678, at *8 n. 7 (C.D. Cal. Mar. 31, 2021) (officer's "scienter can be imputed to" corporation).[9]

### B.   Defendants obtained material benefits from their fraud.

It is well settled that a violation of §10(b) can be alleged despite an absence of apparent motive. *Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not

---

[8] For this reason, Defendants' reliance on *Wells Fargo,* is misplaced. *See* Motion, p. 23-24. Here, each Individual Defendant made at least one misstatement.

[9] As Canoo's top executives, Kranz and Balciunas indisputably had control over statements attributed to Canoo. ¶¶31-35. Aquila and Balciunas individually signed the January 13, 2021 Form S-1 containing many of the false statements. ¶¶92, 99. Further, the Ninth Circuit has declined to rule on whether it is "possible to plead scienter under a collective theory" (*Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008)), "and district courts within the Ninth Circuit have come out on both sides." *Apollo*, 774 F.3d at 607-08 (courts may "impute scienter to individual defendants in some situations, for example, where. . .a company's public statements [are] so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication"); *M & M Hart Living Tr. v. Glob. Eagle Entm't, Inc.*, 2017 WL 5635424, at *12 (C.D. Cal. Aug. 20, 2017).

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

fatal"). This is particularly true with the lack of insider sales. *See Flynn v. Sientra, Inc.*, No. CV 15-075548 SJO (RAOx), 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016) ("[the] suggestion that the lack of insider stock sales by [the individual defendants] negates scienter is contrary to controlling case law"); *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp*., 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period."). Regardless, the CAC here alleges a coherent reason Defendants would issue misrepresentations.

Defendants' false and misleading statements enabled them to successfully solicit a deadline extension to complete the Merger, obtain shareholder approval of the Merger, and file a shelf registration to comply with the terms of the Merger. ¶¶55-56, 68-73. Initial investors in the SPAC purchased units priced at $10 each. ¶52. When the Merger was completed, the share price nearly doubled. ¶16. After the shelf registration was filed in January 2021, Canoo's shares continued to trade at or above $15, allowing early investors not subject to lock-up provisions to dump shares on public investors entirely unaware that Canoo's entire business model was about to be changed to a riskier, more cash intensive, operation. ¶18. When the truth was disclosed in late March 2021, the price of Canoo stock dropped as low as $8.05, well below the $10 buy-in price that early investors could have received if they had redeemed their shares. ¶123. Thus, it made sense to issue public statements designed to keep Canoo's trading price above $10 per share until completion of the necessary steps to consummate the Merger.

Additionally, the Individual Defendants' employment contracts contained incentives based on Canoo's share price reaching, and remaining at, certain levels. ¶¶201-204. Defendants' false statements caused Canoo's share price to exceed the $18 threshold for several days, and nearly reached the $25 threshold, before the March 29, 2021 conference call. ¶205. While the Individual Defendants did not ultimately receive those payouts, the financial incentive existed at the time the statements were made.

**C.     The CAC contains additional allegations evidencing scienter.**

The SEC investigation and resignations in the same approximate time range contributes to an inference of scienter. *See In re Banc of California Sec. Litig.*, 2017 WL 3972456, at *8 (C.D. Cal. Sep. 6, 2017) (considering resignation that overlapped with an announcement of an SEC investigation as additional pieces of the scienter puzzle); *see also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975–76 (N.D. Cal. 2009) (proximity of defendants' resignation to the financial restatements and investigations into wrongdoing were sufficient to add 'piece[s] to the scienter puzzle' even if defendant left on his own volition).

Also, the close temporal proximity between the false statements and the corrective disclosure bolsters the allegations of fraud. *See Yourish,* 191 F.3d at 997 (temporal proximity between false statement and corrective disclosure can bolster inference of scienter); *Rihn v. Acadia Pharma. Inc.*, No. 15cv00575 BTM (DHB), 2016 WL 5076147, at *9 (S.D. Cal. Sept. 19, 2016) (finding that temporal proximity between statement that company was "on track" to submit an NDA and an admission less than a month later that submission was delayed supported scienter in light of the importance of the drug to the company).

**D.     An inference of scienter is more compelling than Defendants' competing inference.**

"[C]ourts must consider the complaint in its entirety . . .. The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (italics in original). "*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *Killinger*, 542 F.3d at 784. "[T]he Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement . . .." *Id*. Often "the sum is greater than the parts." *In re VeriFone Holdings,*

*Inc. Sec. Litig.*, 704 F.3d 694, 698 (9th Cir. 2012). Taken in the light most favorable to Plaintiffs, as the Court must, the totality of these allegations presents a coherent explanation of Defendants' scheme to mislead investors.

In August 2020, Hennessy Capital faced a deadline to find a private company to take public with sufficient operations to justify at least a $10 per share trading price. ¶52. After nearly 18 months, Hennessy Capital announced it had entered a letter of intent to merge with Canoo. ¶¶40-70. Defendants sold investors on Canoo's purported "unique" go-to-market strategy in the burgeoning EV industry, citing specific analysis and figures supportive of their approach. *See, e.g.,* ¶¶74-101. These statements helped Defendants consummate the Merger and make Canoo a publicly traded company.

Internally, however, the Individual Defendants knew that Canoo never worked "with or for Hyundai" during the Class Period, that all the "engineering" work at that time was centered on developing their own products and that the business model was constantly in flux. ¶¶168-170, 174. Aquila's admissions that he began analyzing the engineering services and subscription models months before the March 29, 2021 earnings calls dovetails with his apologies for presumptuous public statements that were not up to the appropriate public disclosure standards. ¶¶ 110-113.

To accept Defendants' argument, the Court must conclude that Defendants hyped a business model they had no clue they would jettison before finishing their first quarter as a publicly traded company. Such a conclusion is far-fetched and inconsistent with the facts, the law, and Aquila's admissions. *See* ¶111 (Aquila: "So you're again owning the past as much as the present in the future."); ¶113 (Aquila: "And again I apologize to anybody. As a leader, you always own the past before the present or the future.").

## VI. THE CONFIDENTIAL WITNESSES' STATEMENTS ARE RELIABLE.

Contrary to Defendants' assertion (*see* Motion, p. 13-14), the CAC alleges enough particularity "to support the probability that a person in the position occupied by

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

the source would possess the information alleged." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004).

The CAC alleges CW 1 was a head executive of a department between "late 2020 and early 2022" reporting directly to Kranz, and after he resigned, to Aquila. ¶168. CW 1 stated that, due to his/her job responsibilities, CW 1 "would have been aware" of any contract engineering work for outside companies. ¶171. CW 1's stated that, during his/her tenure at Canoo, he/she never worked "with or for" Hyundai, never had any contact with anyone at Hyundai, and that there was no outside engineering work of any kind during that time. ¶¶169-171. This statement is corroborated by the Aquila's apologies and his acknowledgement that Canoo would pursue only its own engineering projects. ¶117. Thus, the allegations identifying CW 1's job, his/her direct relationship with two defendants during the relevant period, along with the "adequate corroborating details" in the CAC, are of "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (finding CW's described with sufficient particularity where complaint alleged job title, job responsibilities, and executive to whom the witness reported).

CW 2 is likewise described by his/her job title and CW 2 reported to Canoo's Business Plan Director, who reported to Kranz. ¶172. CW 2 stated he/she was "heavily involved in developing the initial business plan for production and manufacturing the skateboard platform." ¶173. Canoo acknowledged its "vehicle strategy and [its] go to market and business strategy need to be married from day one[.]" ¶151. CW 2 stated that, before mid-2019, "the subscription model business plan 'changed 180 degrees,' which 'totally change[d] [the] overall balance sheet and cash flow.'" ¶174. These allegations support the probability CW 2 had access to information regarding Canoo's overall business strategy prior to the false statements being made. *see e.g., Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015)

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

(allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period).

## VII.   DEFENDANTS' CONDUCT VIOLATED RULES 10B-5(A) AND (C).

Defendants here completed a bait and switch scheme in violation of SEC Rule 10b-5(a) and (c), which make it unlawful:

(a) To employ any device, scheme. or artifice to defraud, or . . .

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

In *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1101 (2019), the Supreme Court stated "[t]hese provisions capture a wide range of conduct," before adding:

> A 'device,' we have observed, is 'simply [t]hat which is devised, or formed by design'; a 'scheme' is 'a project, plan[,] or program of something to be done,' and an 'artifice' is 'an artful stratagem or trick.' [Aaron v. SEC, 446 U.S. 680], 696, n.13 [1980]. . . . The words 'act' or 'practice' in subsection (c) are similarly expansive. Webster's [Int'l Dictionary (2d ed. 1934)] 25 (defining 'act' as a 'doing' or a 'thing done'). . . .

*see also id*. at 1102 (citing "the Rule's expansive language"). Defendants' argument against scheme liability depends on the absence of adequately alleged false statements. Motion, p. 24.  As set forth above, the CAC adequately alleges misstatements issued in connection with a fraudulent scheme to complete a SPAC merger to the harm of unexpecting public investors.

## VIII.   THE CAC SUFFICIENTLY ALLEGES A §20(A) CLAIM.

By alleging a primary violation of §10(b) and Defendants' control over Canoo, Plaintiff also alleges a control person claim. *See Orexigen*, 899 F.3d at 1018.

## IX.   CONCLUSION

For the foregoing reasons, Defendants Motion should be denied.[10]

---

[10] If the Court is inclined to grant the Motion, Plaintiffs respectfully request leave to amend. See Fed. R. Civ. P. 15(a)(2); *Curry v. Hansen Med., Inc*., No. 5:09-cv05094-JF (HRL), 2011 WL 3741238, at *2 (N.D. Cal. Aug. 25, 2011)

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

Dated: June 17, 2022

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Murielle J. Steven Walsh*
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
600 Third Avenue
20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mjsteven@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue
15th Floor
Los Angeles, California 90024
Telephone: (310) 405 7190
jpafiti@pomlaw.com

**-and-**

**HOLZER & HOLZER, LLC**

Corey D. Holzer (*pro hac vice*)
Marshall P. Dees (*pro hac vice*)
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392 0090
Facsimile: (770) 392 0029
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Co-Lead Counsel for Lead Plaintiff & the Proposed Class*

26
LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Executed on this 17th day of June, 2022.

*/s/ Murielle J. Steven Walsh*

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR