# Exhibit 8

As filed with the Securities and Exchange Commission on November 25, 2020.

Registration No. 333-248923

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

———————

**Amendment No. 2 to**
**Form S-4**
**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

———————

# HENNESSY CAPITAL ACQUISITION CORP. IV

(Exact Name of Registrant as Specified in Its Charter)

———————

| Delaware | 6770 | 83-1476189 |
|---|---|---|
| (Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**3415 N. Pines Way, Suite 204**
**Wilson, Wyoming 83014**
**Telephone: (307) 201-1903**

(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

———————

**Daniel J. Hennessy**
**Chairman and Chief Executive Officer**
**Hennessy Capital Acquisition Corp. IV**
**3415 N. Pines Way, Suite 204**
**Wilson, Wyoming 83014**
**Telephone: (307) 201-1903**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

———————

**Copies to:**

| | | |
|---|---|---|
| **Michael P. Heinz** | **Andrew Wolstan** | **Dave Peinsipp** |
| **Jeffrey N. Smith** | **Canoo Holdings Ltd.** | **Garth Osterman** |
| **Sidley Austin LLP** | **19951 Mariner Avenue** | **Kristin VanderPas** |
| **One South Dearborn Street** | **Torrance, California 90503** | **Cooley LLP** |
| **Chicago, Illinois 60603** | **Tel: (424) 271-2144** | **101 California Street, 5th Floor** |
| **Tel: (312) 853-7000** | | **San Francisco, California 94111** |
| | | **Tel: (415) 693-2177** |

———————

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after this registration statement becomes effective and on completion of the business combination described in the enclosed proxy statement/prospectus.

If the securities being registered on this Form are to be offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐   Accelerated filer ☐   Non-accelerated filer ☒   Smaller reporting company ☒

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided to Section 7(a)(2)(B) of the Securities Act. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer) ☐

Table of Contents

**FREQUENTLY USED TERMS**

In this document:

"Adjournment Proposal" means a proposal to adjourn the special meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if, based upon the tabulated vote at the time of the special meeting, there are not sufficient votes to approve one or more proposals presented to stockholders for vote.

"Anchor Investor" means certain funds and accounts managed by subsidiaries of BlackRock, Inc.

"broker non-vote" means the failure of a Hennessy Capital stockholder, who holds his or her shares in "street name" through a broker or other nominee, to give voting instructions to such broker or other nominee.

"Business Combination" means the transactions described in the Merger Agreement.

"Business Combination Proposal" means the proposal to approve the adoption of the Merger Agreement and the Business Combination.

"Canoo" means Canoo Holdings Ltd., an exempted company incorporated with limited liability in the Cayman Islands.

"Canoo Capital Stock" means Canoo Ordinary Shares and Canoo Preference Shares.

"Canoo Ordinary Shares" means the ordinary shares of Canoo, par value $0.0001 per share.

"Canoo Preference Shares" means the preference shares of Canoo, par value $0.0001 per share, designated as A Series Preference Shares and the preference shares of Canoo, par value $0.0001 per share, designated as A-1 Series Preference Shares, collectively. In August 2020, Canoo (i) conducted a redemption and exchange (the "Share Exchange") of 110,333,333 shares of previous series of Canoo preference shares into 59,326,730 Canoo Preference Shares and (ii) converted $280.5 million aggregate principal amount of existing Canoo convertible notes into 51,006,603 Canoo Preference Shares (together with the Share Exchange, the "Share Rebalance"), in satisfaction of existing Canoo shareholder anti-dilution protections. This proxy statement/prospectus gives effect to the Share Rebalance.

"Charter Proposals" means the separate proposals for amendments to the Existing Charter, which are reflected in the Proposed Charter, the full text of which is attached to this proxy statement/prospectus as *Annex B*.

"Closing" means the consummation of the Business Combination.

"Closing Date" means the date on which the Closing occurs.

"Code" means the Internal Revenue Code of 1986, as amended.

"DGCL" means the Delaware General Corporation Law, as amended.

"Election of Directors Proposal" means the proposal to elect, effective at Closing, seven directors to serve staggered terms on our board of directors until the 2021, 2022 and 2023 annual meetings of stockholders, respectively, and until their respective successors are duly elected and qualified.

"Employee Stock Purchase Plan Proposal" means the proposal to approve and adopt the employee stock purchase plan established to be effective after the Closing of the Business Combination.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended.

"Existing Charter" means Hennessy Capital's Amended and Restated Certificate of Incorporation, dated as of February 28, 2019, as amended by that Amendment to the Amended and Restated Certificate of Incorporation, dated as of August 27, 2020.

"Extension Amendment" means the amendment to Hennessy Capital's certificate of incorporation to extend the date by which Hennessy Capital must consummate an initial business combination from September 5, 2020 to December 31, 2020, which amendment was approved and adopted by Hennessy Capital's stockholders and filed with the Secretary of State of the State of Delaware on August 27, 2020.

2

"First Merger" means the merger of First Merger Sub with and into Canoo.

"First Merger Sub" means HCAC IV First Merger Sub, Ltd., an exempted company incorporated with limited liability in the Cayman Islands.

"Founders" means the Sponsor, Hennessy Capital's officers and Hennessy Capital's directors, each of whom holds shares of HCAC Class B Common Stock.

"GAAP" means U.S. generally accepted accounting principles.

"HCAC Board" means Hennessy Capital's board of directors prior to the Business Combination.

"HCAC Common Stock" means HCAC Class A Common Stock and HCAC Class B Common Stock, collectively.

"HCAC Class A Common Stock" means Hennessy Capital's Class A common stock, par value $0.0001 per share.

"HCAC Class B Common Stock" means Hennessy Capital's Class B common stock, par value $0.0001 per share.

"HCAC Unit" means one share of HCAC Class A Common Stock and three-quarters (3/4) of one redeemable HCAC Warrant.

"HCAC Warrant Agreement" means the warrant agreement, dated as of February 28, 2019, by and between Hennessy Capital and Continental Stock Transfer & Trust Company, governing the outstanding HCAC Warrants.

"HCAC Warrants" means the Private Placement Warrants and the Public Warrants issued under the HCAC Warrant Agreement, with each whole warrant exercisable for one share of HCAC Class A Common Stock at an exercise price of $11.50.

"Hennessy Capital" means Hennessy Capital Acquisition Corp. IV, a Delaware corporation.

"Hennessy Capital Proposals" means the proposals to be voted on at the Hennessy Capital special meeting.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"IPO" means Hennessy Capital's initial public offering of units, consummated on March 5, 2019.

"JOBS Act" means the Jumpstart Our Business Startups Act of 2012, as amended.

"Merger Agreement" means the Merger Agreement, dated as of August 17, 2020, as may be amended from time to time, by and among Hennessy Capital, Canoo, First Merger Sub and Second Merger Sub.

"Mergers" means the First Merger and the Second Merger, collectively.

"Nasdaq" means the Nasdaq Capital Market.

"Nasdaq Proposal" means the proposal to approve, for purposes of complying with the applicable listing rules of the Nasdaq Stock Market, the issuance of shares of HCAC Class A Common Stock to the Canoo equity holders in the Mergers pursuant to the Merger Agreement and to the investors in the private offering of securities to certain investors in connection with the Business Combination.

"New Canoo" means Hennessy Capital immediately following the consummation of the Business Combination and approval of the Proposed Charter.

"New Canoo Board" means New Canoo's board of directors following the consummation of the Business Combination and the election of directors pursuant to Proposal No. 6 — The Election of Directors Proposal.

"New Canoo Common Stock" means, following the consummation of the Business Combination and approval of the Proposed Charter, New Canoo's common stock, par value $0.0001 per share, as authorized under the Proposed Charter.

"PIPE Financing" means the sale of PIPE Shares to the PIPE Investors, for a purchase price of $10.00 per share and an aggregate purchase price of $323,250,000, in a private placement.

"PIPE Investors" means the purchasers of the PIPE Shares.

"PIPE Shares" means an aggregate of 32,325,000 shares of HCAC Class A Common Stock to be issued to PIPE Investors in the PIPE Financing.

"Private Placement" means the sale of the Private Placement Warrants that occurred simultaneously with the completion of the IPO.

"Private Shares" means the shares of HCAC Class B Common Stock.

"Private Placement Warrants" means the warrants to purchase shares of HCAC Class A Common Stock sold in private placements to our Sponsor and our Anchor Investor that occurred simultaneously with the completion of the IPO.

"prospectus" means this prospectus included in the Registration Statement on Form S-4 (Registration No. 333-248923) filed by Hennessy Capital with the SEC.

"Public Shares" means shares of HCAC Class A Common Stock issued as part of the units sold in the IPO.

"Public Stockholders" means the holders of shares of HCAC Class A Common Stock.

"Public Warrants" means the redeemable warrants included in the HCAC Units sold in the IPO, each whole warrant of which is exercisable for one share of HCAC Class A Common Stock, in accordance with its terms.

"SEC" means the U.S. Securities and Exchange Commission.

"Second Merger" means the merger of Surviving Corporation with and into Second Merger Sub.

"Second Merger Sub" means HCAC IV Second Merger Sub, LLC, a Delaware limited liability company.

"Securities Act" means the U.S. Securities Act of 1933, as amended.

"Shareholder Support Agreements" means those Shareholder Support Agreements, dated as of August 17, 2020, by and among Hennessy Capital and certain of Canoo's shareholders.

"Sponsor" means Hennessy Capital Partners IV LLC, a Delaware limited liability company.

"Stock Incentive Plan Proposal" means the proposal to approve and adopt the equity incentive award plan established to be effective after the Closing of the Business Combination

"Surviving Corporation" means the entity surviving the First Merger as a wholly-owned subsidiary of Hennessy Capital.

"Surviving Entity" means the entity surviving the Second Merger as a wholly owned subsidiary of Hennessy Capital.

"Trust Account" means the trust account that holds a portion of the proceeds of the IPO and the concurrent sale of the Private Placement Warrants.

Table of Contents

For more information about the Subscription Agreements, see the section entitled "*Certain Agreements Related to the Business Combination — PIPE Subscription Agreements.*"

**Sponsor Warrant Exchange and Share Cancellation Agreement**

In connection with the execution of the Merger Agreement, on August 17, 2020, Hennessy Capital entered into a Warrant Exchange and Share Cancellation Agreement with the Sponsor (the "Sponsor Warrant Exchange and Share Cancellation Agreement"), which provides that concurrent with, and contingent upon, the consummation of the First Merger, (i) the Sponsor will exchange (the "Sponsor Warrant Exchange") 11,739,394 outstanding Private Placement Warrants for 2,347,879 newly issued shares of HCAC Class B Common Stock (the "New Sponsor Shares"), (ii) the Sponsor will forfeit 2,347,879 shares of HCAC Class B Common Stock to Hennessy Capital for no consideration, and (iii) if at the Closing the sum of (A)(1) the amount of cash available in the Trust Account, less (2) all amounts to be paid by Hennessy Capital pursuant to the exercise of Redemption Rights, plus (B) the amount of gross proceeds received by Hennessy Capital from the PIPE Financing (without, for the avoidance of doubt, taking into account any transaction fees, costs and expenses paid or required to be paid in connection with the Business Combination and the PIPE Financing) is less than $350 million, then 500,000 shares of HCAC Class B Common Stock held by the Sponsor (which shares will automatically convert into shares of HCAC Class A Common Stock at the Effective Time) (the "Vesting Shares") will become unvested and subject to certain vesting conditions. The Vesting Shares will vest upon the occurrence of the $18 Share Price Milestone, subject to equitable adjustment by the HCAC Board, on or before the second anniversary of the Closing.

For more information about the Registration Rights Agreement, see the section entitled "*Certain Agreements Related to the Business Combination — Sponsor Warrant Exchange and Share Cancellation Agreement.*"

**Amended and Restated Registration Rights Agreement**

In connection with the Closing, that certain Registration Rights Agreement, dated February 28, 2019, will be amended and restated, and New Canoo, the Founders, the Anchor Investor (the Founders and Anchor Investor together, the "Existing Holders"), and certain persons and entities receiving HCAC Class A Common Stock pursuant to the Mergers (the "New Holders" and, collectively with the Existing Holders, the "Holders") will enter into the Amended and Restated Registration Rights Agreement, the form of which is attached to this proxy statement/prospectus as *Annex J* (the "A&R Registration Rights Agreement"), at the Closing, pursuant to which the Holders of Registrable Securities (as defined in the A&R Registration Rights Agreement), subject to certain conditions, will be entitled to registration rights. Pursuant to the A&R Registration Rights Agreement, New Canoo will agree that, within 15 business days after the Closing, New Canoo will file with the SEC (at its sole cost and expense) a registration statement registering the resale of the Registrable Securities (the "Resale Registration Statement"), and New Canoo will use its reasonable best efforts to have the Resale Registration Statement declared effective by the SEC as soon as reasonably practicable after the filing thereof. Holders will be granted demand underwritten offering registration rights and piggyback registration rights, subject to certain requirements and customary conditions.

The A&R Registration Rights Agreement further provides that the Existing Holders will be subject to transfer restrictions on certain of their securities for up to one year after the Closing, subject to certain exceptions. The A&R Registration Rights Agreement does not provide for the payment of any cash penalties by New Canoo if it fails to satisfy any of its obligations under the A&R Registration Rights Agreement.

For more information about the A&R Registration Rights Agreement, see the section entitled "*Certain Agreements Related to the Business Combination — Amended and Restated Registration Rights Agreement.*"

**Lock-Up Agreements**

In connection with the Closing, certain existing Canoo shareholders, including all Canoo officers, directors, holders of 3% or more of the outstanding Canoo Shares prior to the Closing and their respective affiliates, which group in the aggregate holds 116,208,232 shares, or 85.2% of the outstanding Canoo Shares prior to the Closing, will agree, subject to certain customary exceptions, not to (a) sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of or agree to dispose of, directly or indirectly, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Exchange Act and the rules and regulations of the SEC promulgated thereunder, any shares of New Canoo Common Stock held by them immediately after the Closing, any shares of New Canoo Common Stock issuable

22

upon the exercise of options to purchase shares of New Canoo Common Stock held by them immediately after the Closing, or any securities convertible into or exercisable or exchangeable for New Canoo Common Stock held by them immediately after the Closing, (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any of such shares of New Canoo Common Stock or securities convertible into or exercisable or exchangeable for New Canoo Common Stock, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise or (c) publicly announce any intention to effect any transaction specified in clause (a) or (b) until 180 days after the Closing.

**Board of New Canoo following the Business Combination**

Upon the Closing, we anticipate that the New Canoo Board will consist of seven members, reclassified into three separate classes, with each class serving a three-year term; except with respect to the election of directors at the special meeting pursuant to Proposal No. 6 — The Election of Directors Proposal, the Class I directors will be elected to an initial one-year term (and three-year terms subsequently), the Class II directors will be elected to an initial two-year term (and three-year terms subsequently) and the Class III directors will be elected to an initial three-year term (and three-year terms subsequently). All of our existing directors of Hennessy Capital, except for Greg Ethridge, our President, Chief Operating Officer and director, have informed us that they will resign from our board of directors upon Closing.

Our board of directors has nominated the following individuals for election at our special meeting pursuant to Proposal No. 6 — The Election of Directors Proposal:

- *Class I Directors*:          and          ;
- *Class II Directors*:          and          ; and
- *Class III Directors*:          ,          and          .

For additional details, see the sections of this proxy statement/prospectus entitled "*Proposal No. 6 — The Election of Directors Proposal*" and "*Management After the Business Combination.*"

**Accounting Treatment of the Business Combination**

The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, Hennessy Capital will be treated as the acquired company and Canoo will be treated as the acquirer for financial statement reporting purposes.

For more information, see the section entitled "*The Business Combination — Accounting Treatment of the Business Combination.*"

**Appraisal or Dissenter's Rights**

No appraisal or dissenter's rights are available to holders of shares of HCAC Common Stock or HCAC Warrants in connection with the Business Combination.

**Hennessy Capital Proposals for Stockholder Approval**

At the special meeting, the Hennessy Capital's stockholders will be asked to separately approve the following proposals:

- The Business Combination Proposal — a proposal to approve the adoption of the Merger Agreement and the Business Combination.
- The Charter Proposals — four proposals to amend Hennessy Capital's Existing Charter:
  - Proposal No. 2 — to increase the authorized shares of our common stock to 500,000,000 shares and authorized shares of preferred stock to 10,000,000;
  - Proposal No. 3 — to require an affirmative vote of 66 2/3% of the outstanding shares of Company common stock to alter, amend, or repeal the proposed bylaws of Hennessy Capital;

23

Table of Contents

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

Certain statements in this proxy statement/prospectus may constitute "forward-looking statements" for purposes of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our, our management team's, Canoo's and Canoo's management team's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intends," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "will," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this proxy statement/prospectus may include, for example, statements about:

- our ability to consummate the Business Combination, or, if we do not consummate the Business Combination, any other initial business combination;

- the expected benefits of the Business Combination;

- the financial and business performance of New Canoo, including financial projections and business metrics and any underlying assumptions thereunder;

- changes in Canoo's strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects and plans;

- Canoo's product development timeline and expected start of production;

- the implementation, market acceptance and success of Canoo's business model;

- Canoo's ability to scale in a cost-effective manner;

- developments and projections relating to Canoo's competitors and industry;

- the impact of health epidemics, including the COVID-19 pandemic, on Canoo's business and the actions Canoo may take in response thereto;

- Canoo's expectations regarding its ability to obtain and maintain intellectual property protection and not infringe on the rights of others;

- expectations regarding the time during which we will be an emerging growth company under the JOBS Act;

- Canoo's future capital requirements and sources and uses of cash;

- Canoo's ability, subsequent to the consummation of the PIPE Financing and the Business Combination, to obtain funding for its future operations;

- Canoo's business, expansion plans and opportunities; and

- the outcome of any known and unknown litigation and regulatory proceedings.

These forward-looking statements are based on information available as of the date of this proxy statement/prospectus, and current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing our views as of any subsequent date, and we do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

You should not place undue reliance on these forward-looking statements in deciding how to grant your proxy or instruct how your vote should be cast or vote your shares on the proposals set forth in this proxy statement/prospectus. As a result of a number of known and unknown risks and uncertainties, our actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include:

- the occurrence of any event, change or other circumstances that could delay the Business Combination or give rise to the termination of the Merger Agreement;

- the outcome of any legal proceedings that may be instituted against Hennessy Capital following announcement of the proposed Business Combination and transactions contemplated thereby;

- the inability to complete the Business Combination due to the failure to obtain approval of the stockholders of Hennessy Capital or to satisfy other conditions to the Closing in the Merger Agreement;

- the ability to obtain or maintain the listing of New Canoo Common Stock on Nasdaq following the Business Combination;

- the risk that the proposed Business Combination disrupts current plans and operations of Canoo as a result of the announcement and consummation of the transactions described herein;

- the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition and the ability of Canoo to grow and manage growth profitably;

- costs related to the Business Combination;

- changes in applicable laws or regulations;

- the effect of the COVID-19 pandemic on Canoo's business;

- the ability of Canoo to execute its business model, including market acceptance of its planned products and services and achieving sufficient production volumes at acceptable quality levels and prices;

- Canoo's ability to raise capital;

- the possibility that Hennessy Capital or Canoo may be adversely affected by other economic, business and/or competitive factors; and

- other risks and uncertainties described in this proxy statement/prospectus, including those under the section entitled "*Risk Factors.*"

38

Table of Contents

**RISK FACTORS**

*The following risk factors will apply to business and operations of New Canoo following the Closing. These risk factors are not exhaustive and investors are encouraged to perform their own investigation with respect to the business, prospects, financial condition and operating results of Canoo and New Canoo's business, prospects, financial condition and operating results following the completion of the Business Combination. You should carefully consider the following risk factors in addition to the other information included or incorporated by reference in this proxy statement/prospectus, including matters addressed in the section entitled "Cautionary Note Regarding Forward-Looking Statements," before deciding how to vote your shares of HCAC Common Stock. Please see the section entitled "Where You Can Find More Information" in this proxy statement/prospectus. We may face additional risks and uncertainties that are not presently known to us, or that we currently deem immaterial, which may also impair New Canoo's business, prospects, financial condition or operating results. The following discussion should be read in conjunction with the consolidated financial statements of Canoo and financial statement of Hennessy Capital and notes thereto included elsewhere in this proxy statement/prospectus.*

### Risks Related to Canoo's Business and Industry

***Canoo is an early stage company with a history of losses, and expects to incur significant expenses and continuing losses for the foreseeable future.***

Canoo incurred a net loss of $77.5 million for the nine months ended September 30, 2020 and has incurred a net loss of approximately $378.1 million since inception through September 30, 2020. Canoo believes that it will continue to incur operating and net losses each quarter until at least the time it expands its contract engineering, which is not expected until 2021, and begins deliveries of its EVs, which are not expected to begin until 2022, and may occur later or not at all. Even if Canoo is able to successfully develop its EVs and attract customers for its subscription service or commercial sales, there can be no assurance that they will be financially successful. Canoo's potential profitability is dependent upon the successful development and successful commercial introduction and acceptance of its EVs, which may not occur.

Canoo expects the rate at which it will incur losses to be significantly higher in future periods as Canoo:

- continues to design, develop, manufacture and market its EVs;

- continues to utilize its third-party partners for design, supply and manufacturing;

- expands its production capabilities, including costs associated with outsourcing the manufacturing of its EVs;

- builds up inventories of parts and components for its EVs;

- manufactures an inventory of its EVs;

- expands its design, development, installation and servicing capabilities;

- increases its sales and marketing activities and develops its distribution infrastructure; and

- increases its general and administrative functions to support its growing operations and to operate as a public company.

Because Canoo will incur the costs and expenses from these efforts before it receives any incremental revenues with respect thereto, Canoo's losses in future periods will be significant. In addition, Canoo may find that these efforts are more expensive than it currently anticipates or that these efforts may not result in revenues, which would further increase Canoo's losses.

***Canoo may be unable to adequately control the costs associated with its operations.***

Canoo will require significant capital to develop and grow its business, including developing and producing its EVs, establishing or expanding design, research and development, production, sales and service facilities and building Canoo's brand. Canoo has incurred and expects to continue incurring significant expenses which will impact its profitability, including research and development expenses (including related to developing and commercializing

39

Canoo's Lifestyle Vehicle, Delivery Vehicle and Sport Vehicle), raw material procurement costs, sales and distribution expenses as Canoo builds its brand and markets its EVs, and general and administrative expenses as Canoo scales its operations, identifies and commits resources to investigate new areas of demand and incurs costs as a public company. In addition, Canoo may incur significant costs servicing and maintaining its EVs, and it expects that the cost to repair and service its EVs will increase over time as the fleet of EVs age. Canoo's ability to become profitable in the future will not only depend on its ability to complete the design and development of its EVs to meet projected performance metrics, identify and investigate new areas of demand and successfully market its EVs and consumer subscription model, but also to sell, whether outright or through subscriptions, its EVs at prices needed to achieve its expected margins and control its costs, including the risks and costs associated with operating, maintaining and financing Canoo's fleet of EVs. If Canoo is unable to efficiently design, develop, manufacture, market, deploy, distribute and service its EVs, Canoo's margins, profitability and prospects would be materially and adversely affected.

***Canoo has yet to achieve positive operating cash flow and, given its projected funding needs, its ability to generate positive cash flow is uncertain.***

Canoo has had negative cash flow from operating activities of $171.5 million and $67.2 million for the years ended December 31, 2019 and 2018, respectively. Canoo may continue to have negative cash flow from operating and investing activities for 2020 as it expects to incur research and development, sales and marketing, and general and administrative expenses and make capital expenditures in its efforts to increase sales, engage in development work and ramp up operations. Canoo's business also will at times require significant amounts of working capital to support the growth of additional platforms. An inability to generate positive cash flow for the near term may adversely affect Canoo's ability to raise needed capital for its business on reasonable terms, diminish supplier or customer willingness to enter into transactions with Canoo, and have other adverse effects that may decrease its long-term viability. There can be no assurance that Canoo will achieve positive cash flow in the near future or at all.

***Canoo's financial results may vary significantly from period to period due to fluctuations in its operating costs, product demand and other factors.***

Canoo expects its period-to-period financial results to vary based on its operating costs and product demand, which Canoo anticipates will fluctuate as the pace at which it continues to design, develop and manufacture new EVs, increase production capacity and establish or expand design, research and development, production, sales and service facilities. Additionally, Canoo's revenues from period to period may fluctuate as it identifies and investigates areas of demand, adjusts volumes and adds new product derivatives based on market demand and margin opportunities, develops and introduces new EVs or introduces existing EVs to new markets for the first time, as well as the introduction of its consumer subscription model. As a result of these factors, Canoo believes that quarter-to-quarter comparisons of its financial results, especially in the short term, are not necessarily meaningful and that these comparisons cannot be relied upon as indicators of future performance. Moreover, Canoo's financial results may not meet expectations of equity research analysts, ratings agencies or investors, who may be focused only on quarterly financial results. If any of this occurs, the trading price of New Canoo Common Stock could fall substantially, either suddenly or over time.

***Canoo's operating and financial results forecast relies in large part upon assumptions and analyses developed by Canoo. If these assumptions or analyses prove to be incorrect, Canoo's actual operating results may be materially different from its forecasted results.***

The projected financial and operating information appearing elsewhere in this proxy statement/prospectus reflect current estimates of future performance and incorporates certain financial and operational assumptions, including the level of demand for Canoo's EVs, the performance of Canoo's EVs, the utilization of the EV fleet, the useable vehicle life, vehicle downtime and related maintenance and repair costs. These assumptions are preliminary and there can be no assurance that the actual results upon which Canoo's assumptions are based will be in line with Canoo's expectations. In addition, whether actual operating and financial results and business developments will be consistent with Canoo's expectations and assumptions as reflected in its forecast depends on a number of factors, many of which are outside Canoo's control, including, but not limited to:

- whether Canoo can obtain sufficient capital to sustain and grow its business;

- Canoo's ability to manage its growth;

- whether Canoo can manage relationships with key suppliers and partners;

40

Table of Contents

- • the ability to obtain necessary regulatory approvals;

- • the timing and costs of new and existing marketing and promotional efforts;

- • competition, including from established and future competitors;

- •  Canoo's ability to retain existing key management, to integrate recent hires and to attract, retain and motivate qualified personnel;

- • the overall strength and stability of domestic and international economies;

- • demand for current products and future derivatives built off of the skateboard platform;

- • regulatory, legislative and political changes; and

- • consumer preferences and spending habits.

Unfavorable changes in any of these or other factors, most of which are beyond Canoo's control, could materially and adversely affect its business, results of operations and financial results.

***Canoo's business plans require a significant amount of capital.*** *In addition, its future capital needs may require Canoo to sell additional equity or debt securities that may dilute its stockholders or introduce covenants that may restrict its operations or its ability to pay dividends.*

Canoo expects its capital expenditures to continue to be significant in the foreseeable future as it expands its business, and that its level of capital expenditures will be significantly affected by customer demand for its EVs. Canoo expects that following the Closing, Canoo will have sufficient capital to fund its currently planned operations for at least the next 12 months. The fact that Canoo has a limited operating history means it has limited historical data on the demand for its EVs. As a result, Canoo's future capital requirements may be uncertain and actual capital requirements may be different from those it currently anticipates. Canoo may need to seek equity or debt financing to finance a portion of its capital expenditures. Such financing might not be available to Canoo in a timely manner or on terms that are acceptable, or at all.

Canoo's ability to obtain the necessary financing to carry out its business plan is subject to a number of factors, including general market conditions and investor acceptance of Canoo's business model. These factors may make the timing, amount, terms and conditions of such financing unattractive or unavailable to Canoo. If Canoo is unable to raise sufficient funds, it will have to significantly reduce its spending, delay or cancel its planned activities or substantially change its corporate structure. Canoo might not be able to obtain any funding, and it might not have sufficient resources to conduct its business as projected, both of which could mean that Canoo would be forced to curtail or discontinue its operations.

In addition, Canoo's future capital needs and other business reasons could require it to sell additional equity or debt securities or obtain a credit facility. The sale of additional equity or equity-linked securities could dilute its stockholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict Canoo's operations or its ability to pay dividends to its stockholders.

If Canoo cannot raise additional funds when it needs or want them, its operations and prospects could be negatively affected.

***Canoo's outstanding loan under the Paycheck Protection Program may not be forgiven, which could adversely affect its financial condition or otherwise subject Canoo to significant legal and reputational costs.***

On July 7, 2020, Canoo entered into a promissory note for loan proceeds received during the second quarter of 2020 in the amount of $7.0 million under the Paycheck Protection Program (the "PPP") that accrues interest at 1.0% per annum and matures on July 7, 2025. The PPP was established as part of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") and provides for loans to qualifying businesses for amounts up to 2.5 times the average monthly payroll expenses of the business, subject to certain limitations. The loans and accrued interest are forgivable after twenty-four (24) weeks so long as the borrower uses the loan proceeds for eligible purposes, including payroll, benefits, rent and utilities. The total amount eligible for forgiveness may be adjusted if, at the time

41

Table of Contents

of the forgiveness application, the borrower does not maintain employment and wage levels. A forgiveness application may be submitted at any time prior to December 31, 2020. During October 2020, Canoo submitted its application for forgiveness of the PPP Loan. Canoo has and intends to continue to use the PPP loan proceeds for purposes consistent with the provisions of the PPP and believes that such usage will meet the criteria established for forgiveness of the loan. Whether forgiveness will be granted and in what amount is subject to an application to, and approval by, the Small Business Administration ("SBA") and may also be subject to further requirements in any regulations and guidelines the SBA may adopt.

In addition, while all or a portion of the PPP loan may be forgiven if the PPP loan is used for qualifying expenses as described in the CARES Act, there is no assurance that Canoo will be able to obtain forgiveness, notwithstanding that it believes it has used the PPP loan for qualifying expenses. The SBA and members of Congress have indicated an intention to provide strong oversight of loans granted under the PPP. If Canoo is audited or reviewed or its records are subpoenaed by the federal government as a result of entering into the PPP loan, it could divert management's time and attention and Canoo could incur legal and reputational costs, and an adverse finding could lead to the requirement to return the PPP loan, which could reduce Canoo's liquidity, or could subject Canoo to fines and penalties.

***Canoo's limited operating history makes evaluating its business and future prospects difficult and may increase the risk of your investment.***

You must consider the risks and difficulties Canoo faces as an early stage company with a limited operating history. If Canoo does not successfully address these risks, its business, prospects, financial condition and operating results will be materially and adversely harmed. Canoo was incorporated in November 2017 and has a very limited operating history on which investors can base an evaluation of its business, prospects, financial condition and operating results. Canoo intends to derive a significant portion of its revenues from its initial vehicle offerings, which are not expected to launch until 2022, and may occur later or not at all. There are no assurances that Canoo will be able to secure future business with customers.

It is difficult to predict Canoo's future revenues and appropriately budget for its expenses, and Canoo has limited insight into trends that may emerge and affect its business. In the event that actual results differ from Canoo's estimates or Canoo adjusts its estimates in future periods, Canoo's operating results and financial position could be materially affected.

***Canoo identified material weaknesses in its internal control over financial reporting. If Canoo is unable to remediate these material weaknesses, or if it identifies additional material weaknesses in the future or otherwise fails to maintain an effective system of internal controls, it may not be able to accurately or timely report its financial condition or results of operations, which may adversely affect Canoo's business and stock price.***

In connection with the preparation and audit of Canoo's consolidated financial statements for the year ended December 31, 2019, material weaknesses were identified in Canoo's internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of its annual or interim consolidated financial statements will not be prevented or detected on a timely basis. These material weaknesses are as follows:

- Canoo did not design and maintain an effective control environment commensurate with its financial reporting requirements. Canoo lacked a sufficient number of professionals with an appropriate level of accounting knowledge, training and experience to appropriately analyze, record and disclose accounting matters timely and accurately. Additionally, the limited personnel resulted in an inability to consistently establish appropriate authorities and responsibilities in pursuit of financial reporting objectives, as demonstrated by, among other things, insufficient segregation of duties in its finance and accounting functions.

- Canoo did not effectively design and maintain controls in response to the risks of a material misstatement in Canoo's financial reporting. Changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting.

These material weaknesses in the design and maintenance of effective controls contributed to the following material weaknesses:

- Canoo did not design and maintain formal accounting policies, processes and controls to analyze, account for and disclose complex transactions, specifically for accounting for convertible notes.

42

Table of Contents

- Canoo did not design and maintain formal accounting policies, procedures and controls to achieve complete, accurate and timely financial accounting, reporting and disclosures, including controls over account reconciliations and journal entries.

- Canoo did not design and maintain effective controls over certain information technology (IT) general controls for information systems that are relevant to the preparation of its financial statements, specifically, with respect to: (i) program change management controls to ensure that IT program and data changes affecting financial IT applications and underlying accounting records are identified, tested, authorized and implemented appropriately; (ii) user access controls to ensure appropriate segregation of duties and that adequately restrict user and privileged access to financial applications, programs, and data to appropriate company personnel; (iii) computer operations controls to ensure that critical batch jobs are monitored and data backups are authorized and monitored, and (iv) testing and approval controls for program development to ensure that new software development is aligned with business and IT requirements. These IT deficiencies did not result in a material misstatement to the financial statements, however, the deficiencies, when aggregated, could impact maintaining effective segregation of duties, as well as the effectiveness of IT-dependent controls (such as automated controls that address the risk of material misstatement to one or more assertions, along with the IT controls and underlying data that support the effectiveness of system-generated data and reports) that could result in misstatements potentially impacting all financial statement accounts and disclosures that would not be prevented or detected. Accordingly, management has determined these deficiencies in the aggregate constitute a material weakness.

These material weaknesses resulted in audit adjustments to convertible debt and interest expense, which were recorded prior to the issuance of our consolidated financial statements as of and for the year ended December 31, 2019. Additionally, these material weaknesses could result in a misstatement of substantially all of Canoo's accounts or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected. Canoo has begun implementation of a plan to remediate these material weaknesses described above. Those remediation measures are ongoing and include the following:

- Hiring additional accounting and IT personnel during 2020, including a new chief financial officer, to bolster its technical reporting, transactional accounting and IT capabilities.

- Designing and implementing controls to formalize roles and review responsibilities to align with Canoo's team's skills and experience and designing and implementing formal controls over segregation of duties.

- Designing and implementing procedures to identify and evaluate changes in Canoo's business and the impact on its internal controls.

- Formally assessing complex accounting transactions and other technical accounting and financial reporting matters including controls over the preparation and review of accounting memoranda addressing these matters.

- Designing and implementing formal processes, policies and procedures supporting Canoo's financial close process, including creating standard balance sheet reconciliation templates and journal entry controls.

- Designing and implementing IT general controls, including controls over change management, the review and update of user access rights and privileges, controls over batch jobs and data backups, and program development approvals and testing.

While Canoo believes these efforts will remediate the material weaknesses, Canoo may not be able to complete its evaluation, testing or any required remediation in a timely fashion, or at all. Canoo cannot assure you that the measures it has taken to date and may take in the future, will be sufficient to remediate the control deficiencies that led to its material weaknesses in internal control over financial reporting or that they will prevent or avoid potential future material weaknesses. The effectiveness of Canoo's internal control over financial reporting is subject to various inherent limitations, including cost limitations, judgments used in decision making, assumptions about the likelihood of future events, the possibility of human error and the risk of fraud. If Canoo is unable to remediate the material weakness, Canoo's ability to record, process and report financial information accurately, and to prepare financial statements within the time periods specified by the forms of the SEC, could be adversely affected which, in turn, to may adversely affect Canoo's reputation and business and the market price of New Canoo Common Stock. In addition, any such failures could result in litigation or regulatory actions by the SEC or other regulatory authorities, loss of investor confidence, delisting of Canoo's securities and harm to Canoo's reputation and financial condition, or diversion of financial and management resources from the operation of Canoo's business.

Table of Contents

***For the year ended December 31, 2019, Canoo's independent registered public accounting firm has included an explanatory paragraph relating to Canoo's ability to continue as a going concern in its report on Canoo's audited financial statements included in this proxy statement/prospectus.***

Canoo's report from their independent registered public accounting firm for the year ended December31, 2019 includes an explanatory paragraph stating that Canoo's recurring losses from operations and cash outflows from operating activities raise substantial doubt about Canoo's ability to continue as a going concern. Canoo's consolidated financial statements do not include any adjustments that may result from the outcome of this uncertainty and do not reflect the transactions contemplated by the Business Combination. If Canoo is unable to obtain sufficient funding, its business, prospects, financial condition and results of operations will be materially and adversely affected and Canoo may be unable to continue as a going concern. If Canoo is unable to continue as a going concern, it may have to liquidate its assets and may receive less than the value at which those assets are carried on its audited financial statements, and it is likely that investors would lose part or all of their investment. Future reports from Canoo's independent registered public accounting firm may also contain statements expressing substantial doubt about its ability to continue as a going concern. If there remains substantial doubt about Canoo's ability to continue as a going concern, investors or other financing sources may be unwilling to provide additional funding to Canoo on commercially reasonable terms, or at all, and Canoo's business may be harmed.

***Canoo's ability to develop and manufacture EVs of sufficient quality and appeal to customers on schedule and on a large scale is unproven and still evolving.***

Canoo's future business depends in large part on its ability to execute its plans to design, develop, manufacture, market, deploy and service its EVs. Canoo expects to outsource the manufacturing of its EVs to a contract manufacturing partner. While this arrangement can lower operating costs, it also reduces Canoo's direct control over production and manufacturing. Such diminished control may have an adverse effect on the quality or quantity of Canoo's EVs, or Canoo's flexibility to respond to changing conditions.

Canoo also plans to retain third-party vendors and service providers to engineer, design and test some of the critical systems and components of Canoo's EVs. While this allows Canoo to draw from such third parties' industry knowledge and expertise, there can be no assurance such systems and components will be successfully developed to Canoo's specifications or delivered in a timely manner to meet Canoo's program timing requirements.

Canoo's continued development and manufacturing of its first volume manufactured EV, the Lifestyle Vehicle and its future EVs are and will be subject to risks, including with respect to:

- the equipment the contract manufacturing partner plans to use being able to accurately manufacture Canoo's EVs within specified design tolerances;

- the compatibility of Canoo's proprietary modular skateboard platform with the Delivery Vehicle, Sport Vehicle and any other future vehicle designs;

- long- and short-term durability of Canoo's EVs to withstand day-to-day wear and tear;

- compliance with environmental, workplace safety and similar regulations;

- engineering, designing and testing and securing delivery of critical systems and components on acceptable terms and in a timely manner;

- delays in delivery of final systems and components by Canoo's suppliers;

- shifts in demand for Canoo's current products and future derivatives built off the skateboard platform;

- Canoo's ability to attract, recruit, hire and train skilled employees;

- quality controls, particularly as Canoo plans to expand its production capabilities;

- delays or disruptions in Canoo's supply chain;

- other delays and cost overruns; and

- Canoo's ability to secure additional funding, if necessary.

44

Table of Contents

*Canoo has no experience to date in high volume manufacture of its EVs.*

Canoo does not know whether its current or future third-party outsourcing partners will be able to develop efficient, automated, low-cost production capabilities and processes and reliable sources of component supply, that will enable Canoo to meet the quality, price, engineering, design and production standards, as well as the production volumes, required to successfully mass market Canoo's EVs. Even if Canoo and its third-party outsourcing partners are successful in developing its high volume production capability and processes and reliably source its component supply, Canoo does not know whether it will be able to do so in a manner that avoids significant delays and cost overruns, including as a result of factors beyond its control such as problems with suppliers and vendors, or force majeure events, or in time to meet Canoo's EV commercialization schedules or to satisfy the requirements of customers and potential customers. Any failure to develop such production processes and capabilities within Canoo's projected costs and timelines could have a material adverse effect on its business, prospects, financial condition and operating results.

*Canoo will depend initially on revenue generated from a single EV model and in the foreseeable future will be significantly dependent on a limited number of models.*

Canoo's business will initially depend substantially on the success of its first vehicle release. Canoo currently expects to add its second model, the Delivery Vehicle, as early as 2023 and expects to add contract engineering revenue in 2021 and 2022, which may occur later or not at all. Historically, automobile customers have come to expect a variety of vehicle models offered in a manufacturer's fleet and new and improved vehicle models to be introduced frequently. In order to meet these expectations as well as evolving areas of market demand and margin opportunities, Canoo plans in the future to introduce on a regular basis new EV models as well as enhance versions of existing vehicle models. The introduction of new EV models on the consumer side may limit customers' willingness to maintain a subscription with respect to older model EVs. To the extent Canoo's product variety and cycles do not meet consumer expectations, or cannot be manufactured on its projected timelines and in line with cost and volume targets, Canoo's future sales may be adversely affected. Given that for the foreseeable future Canoo's business will depend on a limited number of models, to the extent a particular model is not well-received by the market, Canoo's sales volume could be materially and adversely affected. This could have a material adverse effect on Canoo's business, prospects, financial condition and operating results.

*Canoo may fail to attract new customers in sufficient numbers or at sufficient rates or at all or to retain existing customers.*

Canoo must continually add new customers both to replace departing customers and to expand its current customer base. Canoo may not be able to attract new customers in sufficient numbers to do so. Even if Canoo is able to attract new customers to replace departing customers, these new customers may not maintain the same level of commitment. In addition, Canoo may incur marketing or other expenses, including referral fees, to attract new customers, which may further offset revenues from customers. For these and other reasons, Canoo could experience a decline in revenue growth, which could adversely affect its results of operations.

If consumers do not perceive Canoo's product offerings to be of value or Canoo's EV offerings are not favorably received by them, Canoo may not be able to attract and retain customers and customers may fail to renew their subscriptions. If Canoo's efforts to satisfy and retain its existing customers are not successful, it may not be able to attract customers, and as a result, its ability to maintain and/or grow its business will be adversely affected. Customers may cancel Canoo's service for many reasons, including a perception that they do not use the service sufficiently, the need to cut household expenses, competitors provide a better value or experience and customer service issues are not satisfactorily resolved. Customer retention will also be largely dependent on the quality and effectiveness of Canoo's customer service and operations, which may be handled internally by Canoo personnel and also by third-party service providers. Outsourcing of certain customer service and claims administration functions may reduce Canoo's ability to ensure consistency in its overall customer service processes. If Canoo is unable to successfully compete with current and new competitors in both retaining existing customers and attracting new customers, Canoo's business will be adversely affected.

In addition, Canoo's results of operations could be adversely affected by declines in demand for its product offerings or failures to effectively respond to changes in customer demand. Demand for its product offerings may be negatively affected by a number of factors, including geopolitical uncertainty, competition, cybersecurity incidents, decline in Canoo's reputation and saturation in the markets where Canoo operates. Prevailing general and local economic conditions may also negatively affect the demand for Canoo's subscription offering.

45

Table of Contents

***Canoo's business and prospects depend significantly on its ability to build the Canoo brand. Canoo may not succeed in continuing to establish, maintain and strengthen the Canoo brand, and its brand and reputation could be harmed by negative publicity regarding Canoo or its EVs.***

Canoo's business and prospects are heavily dependent on its ability to develop, maintain and strengthen the Canoo brand. If Canoo does not continue to establish, maintain and strengthen its brand, it may lose the opportunity to build a critical mass of customers. Promoting and positioning its brand will likely depend significantly on Canoo's ability to provide high quality EVs and engage with its customers as intended, and Canoo has limited experience in these areas. In addition, Canoo's ability to develop, maintain and strengthen the Canoo brand will depend heavily on the success of its customer development and branding efforts. Such efforts mainly include building a community of online and offline users engaged with the Canoo mobile application and branding initiatives, such automotive shows and events. Such efforts may be non-traditional and may not achieve the desired results. To promote its brand, Canoo may be required to change its customer development and branding practices, which could result in substantially increased expenses, including the need to use traditional media such as television, radio and print. Many consumers value safety and reliability as important factors in choosing a vehicle and may be reluctant to acquire a vehicle from a new and unproven automotive maker. In addition, Canoo's novel technology and design may not align with existing consumer preferences. If Canoo does not develop and maintain a strong brand, its business, prospects, financial condition and operating results will be materially and adversely impacted.

In addition, if incidents occur or are perceived to have occurred, whether or not such incidents are Canoo's fault, Canoo could be subject to adverse publicity. In particular, given the popularity of social media, any negative publicity, whether true or not, could quickly proliferate and harm consumer perceptions and confidence in the Canoo brand. Furthermore, there is the risk of potential adverse publicity related to Canoo's manufacturing or other partners whether or not such publicity related to their collaboration with Canoo. Canoo's ability to successfully position its brand could also be adversely affected by perceptions about the quality of its competitors' vehicles.

In addition, from time to time, Canoo's EVs may be evaluated and reviewed by third parties. Any negative reviews or reviews which compare Canoo unfavorably to competitors could adversely affect consumer perception about its EVs.

***If Canoo fails to manage its growth effectively, it may not be able to design, develop, manufacture, market and launch its EVs successfully.***

Any failure to manage Canoo's growth effectively could materially and adversely affect Canoo's business, prospects, operating results and financial condition. Canoo intends to expand its operations significantly. Canoo expects its future expansion to include:

- expanding the management team;
- hiring and training new personnel;
- forecasting production and revenue;
- controlling expenses and investments in anticipation of expanded operations;
- establishing or expanding design, production, sales and service facilities;
- implementing and enhancing administrative infrastructure, systems and processes; and
- expanding into new markets.

Canoo intends to continue to hire a significant number of additional personnel, including software engineers, design and production personnel and service technicians for its EVs. Because Canoo's EVs are based on a different technology platform than traditional internal combustion engines, individuals with sufficient training in alternative fuel and EVs may not be available to hire, and as a result, Canoo will need to expend significant time and expense training any newly hired employees. Competition for individuals with experience designing, producing and servicing EVs and their software is intense, and Canoo may not be able to attract, integrate, train, motivate or retain additional highly qualified personnel, particularly with respect to software engineers in the Los Angeles, California area. The failure to attract, integrate, train, motivate and retain these additional employees could seriously harm Canoo's business, prospects, financial condition and operating results.

46

Table of Contents

*Canoo may experience significant delays in the design, production and launch of its EVs, which could harm its business, prospects, financial condition and operating results.*

Canoo's EVs are still in the development and testing phase, and deliveries of the Lifestyle Vehicle, Delivery Vehicle and Sport Vehicle are not expected to begin until 2022, 2023 and 2025, respectively, and may occur later or not at all. Any delay in the financing, design, development, production and release of Canoo's EVs, could materially damage Canoo's brand, business, prospects, financial condition and operating results. There are often delays in the design, development, production and release of new vehicles, and to the extent Canoo delays the launch of its EVs, its growth prospects could be adversely affected as it may fail to grow its market share. Canoo will rely on its third-party outsourcing partners to manufacture its EVs at scale, and if they are not able manufacture EVs that meet Canoo's specifications, Canoo may need to expand its manufacturing capabilities, which would cause Canoo to incur additional costs. Furthermore, Canoo relies on third-party suppliers for the provision and development of many of the key components and materials used in its EVs, and to the extent they experience any delays, Canoo may need to seek alternative suppliers. If Canoo experiences delays by its third-party outsourcing partners or suppliers, it could experience delays in delivering on its timelines.

*Increases in costs, disruption of supply or shortage of materials, in particular for lithium-ion battery cells, could harm Canoo's business.*

Canoo and its suppliers may experience increases in the cost of or a sustained interruption in the supply or shortage of materials. Any such increase, supply interruption or shortage could materially and negatively impact Canoo's business, prospects, financial condition and operating results. Canoo and its suppliers use various materials in their businesses and products, including for example lithium-ion battery cells and steel, and the prices for these materials fluctuate. The available supply of these materials may be unstable, depending on market conditions and global demand, including as a result of increased production of EVs by Canoo's competitors, and could adversely affect Canoo's business and operating results. For instance, Canoo is exposed to multiple risks relating to lithium-ion battery cells. These risks include:

- an increase in the cost, or decrease in the available supply, of materials used in the cells;

- disruption in the supply of cells due to quality issues or recalls by battery cell manufacturers; and

-     fluctuations in the value of any foreign currencies in which battery cell and related raw material purchases are or may be denominated against the U.S. dollar.

Canoo's business is dependent on the continued supply of battery cells for the battery packs used in Canoo's EVs. While Canoo believes several sources of the battery cells are available for such battery packs, Canoo has to date not finally sourced or validated a supplier for the cells used in such battery packs and may have limited flexibility in changing cell suppliers once contracted. Any disruption in the supply of battery cells from such suppliers could disrupt production of Canoo's EVs. Furthermore, fluctuations or shortages in petroleum and other economic conditions may cause Canoo to experience significant increases in freight charges and material costs. Substantial increases in the prices for Canoo's materials or prices charged to it, such as those charged by battery cell suppliers, would increase Canoo's operating costs, and could reduce its margins if the increased costs cannot be recouped through increased subscription offering or commercial vehicle sales prices. Any attempts to increase product prices in response to increased material costs could result in cancellations of orders and reservations and therefore materially and adversely affect Canoo's brand, image, business, prospects and operating results.

*If Canoo's EVs fail to perform as expected, Canoo's ability to develop, market and deploy its EVs could be harmed.*

Canoo's EVs may contain defects in design and production that may cause them not to perform as expected or may require repair. Canoo currently has a limited frame of reference by which to evaluate the performance of its EVs upon which its business prospects depend. There can be no assurance that Canoo will be able to detect and fix any defects in its EVs. Canoo may experience recalls in the future, which could adversely affect Canoo's brand and could adversely affect its business, prospects, financial condition and operating results. Canoo's EVs may not perform consistent with customers' expectations or consistent with other vehicles which may become available. Any product defects or any other failure of Canoo's EVs and software to perform as expected could harm Canoo's reputation and result in adverse publicity, lost revenue, delivery delays, product recalls, negative publicity, product liability claims and significant warranty and other expenses and could have a material adverse impact on Canoo's business, prospects, financial condition and operating results. Additionally, problems and defects experienced by other electric consumer vehicles could by association have a negative impact on perception and customer demand for Canoo's EVs.

47

Table of Contents

***Canoo's consumer subscription model is different from the predominant current distribution model for automobile manufacturers, which makes evaluating its business, operating results and future prospects difficult. In addition, a subscription model has never been tested with a consumer vehicle directly from an OEM and is a novel approach to car offerings. This model may never achieve the level of market acceptance necessary to achieve profitability.***

Canoo's consumer subscription model is a distinct approach to automotive sales and is one of the first of its kind in the industry. Canoo plans to offer customers direct access to its EVs rather than selling or leasing its EVs through dealerships. This model of vehicle distribution is relatively new and unproven, and subjects Canoo to substantial risk if this model requires significant expenditures and provides for slower expansion than the traditional dealer franchise system. For example, Canoo will not be able to utilize long established sales channels developed through a franchise system to increase its sales volume. Moreover, Canoo will be competing with companies with well-established distribution channels. Canoo's success will depend in large part on its ability to effectively develop its own sales channels and marketing strategies. In addition, as the EV ages, consumers may be unwilling to pay the same subscription price as they are for a new vehicle, and if Canoo is forced to discount its subscription prices, it may limit Canoo's ability to become profitable. Implementing Canoo's business model is subject to numerous significant challenges, including obtaining permits and approvals from government authorities, and Canoo may not be successful in addressing these challenges. In addition, dealer trade associations may mount challenges to Canoo's consumer subscription model by challenging the legality of Canoo's operations in court and employing administrative and legislative processes to attempt to prohibit or limit Canoo's ability to operate.

As part of its sales and marketing efforts, Canoo must educate customers as to the economical savings of its subscription offering and of EVs in general that Canoo believes they will benefit from during the life of the vehicle. For example, consumers have historically been conditioned to value low-mileage vehicles and may be accustomed to paying lower monthly payments after an initial down payment, and consumer preferences may not adapt to higher mileage vehicles or a subscription model based on an all-inclusive monthly payment. As such, Canoo believes that customers should consider a number of factors when deciding whether to subscribe to its subscription offering, including:

- the total cost of a subscription compared to leasing or ownership of the vehicle over its expected life;

- EV quality, performance and safety;

- the quality and availability of service for the vehicle;

- the range over which EVs may be driven on a single battery charge;

- access to charging stations and related infrastructure costs, and standardization of EV charging systems; and

- electric grid capacity and reliability.

If, in weighing these factors, consumers determine that there is not a compelling reason to switch from the traditional automotive purchasing models or if potential corporate customers determine that there is not a compelling business justification for a subscription to Canoo's EVs, then its subscription model may not develop as expected or may develop more slowly than expected, and Canoo may be required to modify (e.g., by adjusting prices, adjusting included services, etc.) or abandon its planned consumer subscription model, which could adversely affect Canoo's business, prospects, financial condition and operating results.

***Future product recalls could materially adversely affect Canoo's business, prospects, financial condition and operating results.***

Any product recall in the future, whether it involves Canoo's or a competitor's product, may result in negative publicity, damage Canoo's brand and materially adversely affect Canoo's business, prospects, financial condition and operating results. In the future, Canoo may voluntarily or involuntarily, initiate a recall if any of its EVs prove to be defective or noncompliant with applicable federal motor vehicle safety standards. In addition, a safety recall could require Canoo to remove recalled vehicles from its consumer subscription offering until it can enact the recall. If a large number of vehicles are the subject of a recall or if needed replacement parts are not in adequate supply, Canoo may not be able to deploy recalled vehicles for a significant period of time. These types of disruptions could jeopardize Canoo's ability to fulfill existing contractual commitments or satisfy demand for its EVs, and could also result in the loss of business to its competitors. Such recalls also involve significant expense and diversion of management attention and other resources, which could adversely affect Canoo's brand image, as well as Canoo's business, prospects, financial condition and operating results.

48

Table of Contents

*If Canoo is unable to establish and maintain confidence in its long-term business prospects among customers and analysts and within its industry or is subject to negative publicity, then Canoo's financial condition, operating results, business prospects and access to capital may suffer materially.*

Customers may be less likely to subscribe to Canoo's consumer subscription offering or purchase Canoo's commercial EVs if they are not convinced that Canoo's business will succeed or that its service and support and other operations will continue in the long term. Similarly, suppliers and other third parties will be less likely to invest time and resources in developing business relationships with Canoo if they are not convinced that its business will succeed. Accordingly, in order to build and maintain its business, Canoo must maintain confidence among customers, suppliers, analysts, ratings agencies and other parties in its EVs, long-term financial viability and business prospects. Maintaining such confidence may be particularly complicated by certain factors including those that are largely outside of Canoo's control, such as its limited operating history, customer unfamiliarity with its EVs, any delays in scaling production, delivery and service operations to meet demand, competition and uncertainty regarding the future of hybrid electric and EVs, including Canoo's EVs and Canoo's production and sales performance compared with market expectations.

*Canoo has no experience servicing its EVs and its integrated software. If Canoo or its partners are unable to adequately service its EVs, Canoo's business, prospects, financial condition and operating results may be materially and adversely affected.*

Because Canoo does not plan to begin production of its EVs until 2022 at the earliest, it has no experience servicing or repairing its EVs. Servicing EVs is different than servicing vehicles with internal combustion engines and requires specialized skills, including high voltage training and servicing techniques. Canoo plans to partner with a third-party to perform some or all of the servicing on its EVs, and there can be no assurance that Canoo will be able to enter into an acceptable arrangement with any such third-party provider. Although such servicing partners may have experience in servicing other vehicles, they will initially have limited experience in servicing Canoo vehicles. There can be no assurance that Canoo service arrangements will adequately address the service requirements of its customers to their satisfaction, or that Canoo and its servicing partners will have sufficient resources, experience or inventory to meet these service requirements in a timely manner as the volume of EVs Canoo delivers increases. In addition, if Canoo is unable to roll out and establish a widespread service network that complies with applicable laws, customer satisfaction could be adversely affected, which in turn could materially and adversely affect Canoo's reputation and thus its sales, results of operations and prospects.

Canoo's customers will also depend on Canoo's customer support team to resolve technical and operational issues relating to the integrated software underlying Canoo's EVs. In addition, because Canoo expects to include standard vehicle maintenance costs in its consumer subscription fee, Canoo will need to accurately predict service costs and customer usage in order to provide customer support and vehicle maintenance in a cost-effective manner. Customer behavior and usage may result in higher than expected maintenance and repair costs, which may negatively affect Canoo's financial condition and operating results.

As Canoo continues to grow, additional pressure may be placed on Canoo's customer support team or partners, and Canoo may be unable to respond quickly enough to accommodate short-term increases in customer demand for technical support. Canoo also may be unable to modify the future scope and delivery of its technical support to compete with changes in the technical support provided by its competitors. Increased customer demand for support, without corresponding revenue, could increase costs and negatively affect Canoo's operating results. If Canoo is unable to successfully address the service requirements of its customers or establish a market perception that Canoo does not maintain high-quality support, Canoo may be subject to claims from its customers, including loss of revenue or damages, and Canoo's business, prospects, financial condition and operating results may be materially and adversely affected.

*Canoo is highly dependent on the services of its key employees and senior management and, if we are unable to attract and retain key employees and hire qualified management, technical and EV engineering personnel, its ability to compete could be harmed.*

Canoo's success depends, in part, on its ability to retain its key personnel. The unexpected loss of or failure to retain one or more of Canoo's key employees could adversely affect Canoo's business.

Canoo's success also depends, in part, on its continuing ability to identify, hire, attract, train and develop other highly qualified personnel. Experienced and highly skilled employees are in high demand and competition for these employees can be intense, and Canoo's ability to hire, attract and retain them depends on its ability to provide

49

Table of Contents

competitive compensation. Canoo may not be able to attract, assimilate, develop or retain qualified personnel in the future, and its failure to do so could adversely affect Canoo's business, including the execution of its global business strategy. Any failure by Canoo's management team and Canoo's employees to perform as expected may have a material adverse effect on Canoo's business, prospects, financial condition and operating results.

***Canoo's management has limited experience in operating a public company.***

Canoo's executive officers have limited experience in the management of a publicly traded company. Canoo's management team may not successfully or effectively manage its transition to a public company that will be subject to significant regulatory oversight and reporting obligations under federal securities laws. Their limited experience in dealing with the increasingly complex laws pertaining to public companies could be a significant disadvantage in that it is likely that an increasing amount of their time may be devoted to these activities which will result in less time being devoted to the management and growth of the post-combination company. Canoo may not have adequate personnel with the appropriate level of knowledge, experience and training in the accounting policies, practices or internal control over financial reporting required of public companies in the U.S. Canoo is in the process of upgrading its finance and accounting systems to an enterprise system suitable for a public company, and a delay could impact its ability or prevent it from timely reporting its operating results, timely filing required reports with the SEC and complying with Section 404 of the Sarbanes-Oxley Act. The development and implementation of the standards and controls necessary for Canoo to achieve the level of accounting standards required of a public company in the U.S. may require costs greater than expected. It is possible that Canoo will be required to expand its employee base and hire additional employees to support its operations as a public company which will increase its operating costs in future periods.

***Canoo currently relies and will continue to rely on third-party partners to manufacture and warehouse its EVs, and to supply critical components and systems, which exposes it to a number of risks and uncertainties outside its control.***

Canoo currently plans to outsource the manufacturing of its EVs to third-party outsourcing partners and expects to outsource the manufacture of its production EVs to its contract manufacturing partner. If Canoo's third-party outsourcing partners were to experience delays, disruptions, capacity constraints or quality control problems in its manufacturing operations, product shipments could be delayed or rejected or Canoo's customers could consequently elect to change product demand or cancel an underlying subscription. These disruptions would negatively impact Canoo's revenues, competitive position and reputation. In addition, Canoo's third-party outsourcing partners may rely on certain state tax incentives that may be subject to change or elimination in the future, which could result in additional costs and delays in production if a new manufacturing site must be obtained. Further, if Canoo is unable to manage successfully its relationship with its third-party outsourcing partners, the quality and availability of its EVs may be harmed. Canoo's third-party outsourcing partners could, under some circumstances, decline to accept new purchase orders from or otherwise reduce their business with Canoo. If Canoo's third-party outsourcing partners stopped manufacturing Canoo's EVs for any reason or reduced manufacturing capacity, Canoo may be unable to replace the lost manufacturing capacity on a timely and comparatively cost-effective basis, which would adversely impact its operations. In addition, Canoo has not entered into a long-term contract with its contract manufacturing partner. As a result, Canoo is subject to price increases due to availability, and subsequent price volatility, in the marketplace of the components and materials needed to manufacture its EVs. If Canoo's third-party outsourcing partners were to negatively change the pricing and other terms under which it agrees to manufacture for Canoo and Canoo was unable to locate a suitable alternative manufacturer, its manufacturing costs could increase.

Because Canoo outsources the manufacturing of its EVs, the cost, quality and availability of third-party manufacturing operations is essential to the successful production of its EVs. Canoo's reliance on third-party outsourcing partners exposes it to a number of risks which are outside its control, including:

- unexpected increases in manufacturing costs;

-  interruptions in shipments if a third-party outsourcing partner is unable to complete production in a timely manner;

- inability to control quality of finished vehicles;

- inability to control delivery schedules;

Table of Contents

- inability to control production levels and to meet minimum volume commitments to Canoo's customers;

- inability to control manufacturing yield;

- inability to maintain adequate manufacturing capacity; and

- inability to secure adequate volumes of acceptable components at suitable prices or in a timely manner.

The manufacturing facilities of Canoo's third-party outsourcing partners and suppliers and the equipment used to manufacture Canoo's EVs would be costly to replace and could require substantial lead time to replace and qualify for use. The manufacturing facilities of Canoo's third-party outsourcing partners and suppliers may be harmed or rendered inoperable by natural or man-made disasters, including earthquakes, flooding, fire and power outages, or by health epidemics, such as the recent COVID-19 pandemic, which may render it difficult or impossible for Canoo to manufacture its EVs for some period of time. The inability to manufacture Canoo's EVs or the backlog that could develop if the manufacturing facilities of its third-party outsourcing partners and suppliers are inoperable for even a short period of time may result in the loss of customers or harm Canoo's reputation.

Although Canoo promotes ethical business practices and its operations personnel periodically visit and monitor the operations of its third-party outsourcing partners, Canoo does not control its third-party outsourcing partners or its labor and other legal compliance practices, including their environmental, health and safety practices. If Canoo's contract manufacturing partner, or any other third-party outsourcing partner which it may use in the future, violates U.S. or foreign laws or regulations, Canoo may be subjected to extra duties, significant monetary penalties, adverse publicity, the seizure and forfeiture of products that Canoo is attempting to import or the loss of its import privileges. The effects of these factors could render the conduct of Canoo's business in a particular country undesirable or impractical and have a negative impact on Canoo's operating results.

### The automotive market is highly competitive, and Canoo may not be successful in competing in this industry.

Canoo faces intense competition in bringing its EVs to market. Both the automobile industry generally, and the EV segment in particular, are highly competitive, and Canoo will be competing for sales with both EV manufacturers and traditional automotive companies. Many of Canoo's current and potential competitors have significantly greater financial, technical, manufacturing, marketing and other resources than Canoo does and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products, including their EVs. Additionally, Canoo's competitors also have greater name recognition, longer operating histories, larger sales forces, broader customer and industry relationships and other resources than Canoo does. These competitors also compete with Canoo in recruiting and retaining qualified research and development, sales, marketing and management personnel, as well as in acquiring technologies complementary to, or necessary for, Canoo's EVs. Additional mergers and acquisitions may result in even more resources being concentrated in Canoo's competitors. There are no assurances that customers will choose Canoo's EVs over those of its competitors, or over internal combustion engines vehicles. Canoo expects additional competitors to enter the industry as well. In addition, Canoo also competes with companies offering ride-sharing, car-sharing services and other alternatives to car ownership.

Canoo expects competition in its industry to intensify from its existing and future competitors in the future in light of increased demand and regulatory push for alternative fuel and EVs.

### If the market for EVs does not develop as Canoo expects or develops more slowly than it expects, Canoo's business, prospects, financial condition and operating results will be adversely affected.

Canoo's growth is highly dependent upon the adoption by consumers of EVs. The target demographics for Canoo's EVs are highly competitive. If the market for EVs does not develop at the rate or in the manner or to the extent that Canoo expects, Canoo's business, prospects, financial condition and operating results will be harmed. The market for alternative fuels, hybrid and EVs is new and untested and is characterized by rapidly changing technologies, price competition, numerous competitors, evolving government regulation and industry standards and uncertain customer demands and behaviors.

Table of Contents

The market for alternative fuel vehicles is rapidly evolving and as a result, the market for Canoo's EVs could be affected by numerous factors, such as:

- perceptions about EV features, quality, safety, performance and cost;

- perceptions about the limited range over which EVs may be driven on a single battery charge;

- competition, including from other types of alternative fuel vehicles, plug-in hybrid EVs and high fuel-economy internal combustion engine vehicles;

- fuel prices, including volatility in the cost of fossil fuels;

- the timing of adoption and implementation of fully autonomous vehicles;

- government regulations and economic incentives;

- access to charging facilities and related infrastructure costs and standardization of EV charging systems;

- electric grid capacity and reliability; and

- macroeconomic factors.

***If Canoo is unable to contract with a contract manufacturing partner, Canoo would need to develop its own manufacturing facilities, which may not be feasible and, if feasible, would significantly increase its capital expenditures and would significantly delay or inhibit production of its EVs.***

Canoo does not have a definitive agreement with a contract manufacturing partner to commercially manufacture its EV and it may be unable to enter into such agreements with contract manufacturing partners and other key suppliers for manufacturing on terms and conditions acceptable to Canoo. If Canoo is unable to enter into such definitive agreements or is only able to do so on terms that are less commercially favorable to Canoo, it may be unable to timely identify adequate strategic relationship opportunities, or form strategic relationships, and consequently, Canoo may not be able to fully carry out its business plans. There can be no assurance that Canoo would be able to partner with other third parties or establish its own production capacity to meet its needs on acceptable terms, or at all. The expense and time required to complete any transition and to assure that EVs manufactured at facilities of new third-party partners comply with Canoo's quality standards and regulatory requirements would likely be greater than currently anticipated. If Canoo needs to develop its own manufacturing and production capabilities, which may not be feasible, it would significantly increase Canoo's capital expenditures and would significantly delay production of Canoo's EVs. This may require Canoo to attempt to raise or borrow additional money, which may not be successful. Also, it may require Canoo to change the anticipated pricing of its consumer subscription offering, which would adversely affect Canoo's margins and cash flows. Any of the foregoing could adversely affect Canoo's business, results of operations, financial condition and prospects. Accordingly, investors should not place undue reliance on Canoo's statements about its production plans or their feasibility in the timeframe anticipated, or at all. Canoo may not be able to implement its business strategy in the timeframe anticipated, or at all.

***Canoo is dependent on its suppliers, some of which are single or limited source suppliers, and the inability of these suppliers to deliver necessary components of Canoo's EVs at prices and volumes, performance and specifications acceptable to Canoo, could have a material adverse effect on Canoo's business, prospects, financial condition and operating results.***

Canoo relies on third-party suppliers for the provision and development of many of the key components and materials used in its EVs. While Canoo plans to obtain components from multiple sources whenever possible, some of the components used in its EVs will be purchased by Canoo from a single source. Canoo's third-party suppliers may not be able to meet their product specifications and performance characteristics, which would impact Canoo's ability to achieve its product specifications and performance characteristics as well. Additionally, Canoo's third-party suppliers may be unable to obtain required certifications for their products for which Canoo plans to use or provide warranties that are necessary for Canoo's solutions. If Canoo is unable to obtain components and materials used in its EVs from its suppliers or if its suppliers decide to create or supply a competing product, Canoo's business could be adversely affected. Canoo has less negotiating leverage with suppliers than larger and more established automobile manufacturers and may not be able to obtain favorable pricing and other terms. While Canoo believes that it may be able to establish alternate supply relationships and can obtain or engineer replacement components for its single source components, Canoo may be unable to do so in the short term, or at all, at prices or quality levels that are

52

Table of Contents

favorable to Canoo, which could have a material adverse effect on its business, prospects, financial condition and operating results.

***Certain of Canoo's strategic, development and operational arrangements could be terminated or may not ultimately result in the anticipated long-term contract partnership arrangements.***

Canoo has arrangements with strategic, development and operational partners and collaborators. Some of these arrangements are evidenced by non-binding letters of intent, early stage agreements that are used for design and development purposes but will require renegotiation at later stages of development or production or master agreements that have yet to be implemented under separately negotiated statements of work or binding purchase orders, any of which could be terminated or may not result in next-stage contracts or long-term contract arrangements. If these arrangements are terminated or if Canoo is unable to enter into next-stage contracts or long-term operational contracts, its business, prospects, financial condition and operating results may be materially adversely affected.

***Canoo faces regulatory uncertainty in how its consumer subscription model will be interpreted under existing law and Canoo may be required to adjust its consumer business model in those jurisdictions as a result.***

Canoo's subscription model is novel and may be subject to challenge under foreign, federal, state, local or municipal laws or regulatory restrictions in certain jurisdictions. Canoo may be required to seek regulatory or policy changes to clarify uncertainties in existing law or to comply with certain existing state and local laws and regulations regarding advertising, sales, referrals, contract and pricing disclosures, delivery of EVs to consumers, data collection, vehicle tracking, service and repair, recall or other aspects of Canoo's subscription model. If such efforts are not successful, Canoo may be required to adjust its consumer business model in order to comply with laws and significant regulatory restrictions in such jurisdictions or it may be prohibited from operating in such jurisdictions altogether. For customers residing in any jurisdictions in which Canoo will not be allowed to market or directly sell EVs based on its subscription model, Canoo may have to arrange alternate sales and distribution methods or cease sales and marketing efforts altogether in such jurisdictions These workarounds could add significant complexity, and as a result, costs, to Canoo's business.

Canoo expects that it will incur significant costs in defending its right to operate in accordance with its subscription model in many jurisdictions, which subjects Canoo to substantial risk as it may provide for slower and more costly expansion of Canoo's business model than may be possible by utilizing the traditional dealer franchise system. To the extent that efforts to block or limit its operations are successful, or if Canoo is required to comply with regulatory and other requirements applicable to vehicle leasing, franchise laws or rental car services, Canoo's revenue and growth would be adversely affected.

***Canoo's EVs are based on the use of complex and novel steer-by-wire technology that is unproven on a commercial scale.***

Canoo's true steer-by-wire system, specifically, our proprietary architecture in which all steering, braking and throttle function are controllable via a secure, redundant communication framework, is based on complex technology that has not been introduced to the consumer vehicle market. Canoo is not aware of any EV manufacturers utilizing such technology. Given this technology is unproven on a commercial scale, it may not be successful and may not achieve widespread market acceptance among Canoo's prospective customers. This technology must interoperate with other complex EV technology in order to operate as designed and as expected.

Any defects or errors in, or which are attributed to, Canoo's steer-by-wire technology, could result in:

- delayed market acceptance of Canoo's EVs;
- loss of customers or inability to attract new customers;
- diversion of engineering or other resources for remedying the defect or error;
- damage to Canoo's brand or reputation;
- increased service and warranty costs;
- legal action by customers or third parties, including product liability claims; and
- penalties imposed by regulatory authorities.

53

Table of Contents

***Canoo's EVs rely on software and hardware that is highly technical, and if these systems contain errors, bugs or vulnerabilities, or if Canoo is unsuccessful in addressing or mitigating technical limitations in its systems, Canoo's business could be adversely affected.***

Canoo's EVs rely on software and hardware that is highly technical and complex and will require modification and updates over the life of the vehicle. In addition, Canoo's EVs depend on the ability of such software and hardware to store, retrieve, process and manage immense amounts of data. Canoo's software and hardware may contain, errors, bugs or vulnerabilities, and Canoo's systems are subject to certain technical limitations that may compromise Canoo's ability to meet its objectives. Some errors, bugs or vulnerabilities inherently may be difficult to detect and may only be discovered after the code has been released for external or internal use. Errors, bugs, vulnerabilities, design defects or technical limitations may be found within Canoo's software and hardware. Although Canoo attempts to remedy any issues it observes in its EVs as effectively and rapidly as possible, such efforts may not be timely, may hamper production or may not be to the satisfaction of Canoo's customers. Additionally, if Canoo is able to deploy updates to the software addressing any issues but Canoo's over-the-air update procedures fail to properly update the software, Canoo's customers would then be responsible for installing such updates to the software and their software will be subject to these vulnerabilities until they do so. If Canoo is unable to prevent or effectively remedy errors, bugs, vulnerabilities or defects in its software and hardware, Canoo may suffer damage to its reputation, loss of customers, loss of revenue or liability for damages, any of which could adversely affect Canoo's business and financial results.

***Canoo may be subject to risks associated with autonomous driving technology.***

Canoo's EVs are being designed with connectivity for an autonomous hardware suite and will offer some autonomous functionality. Autonomous driving technologies are subject to risks and there have been accidents and fatalities associated with such technologies. The safety of such technologies depends in part on user interaction and users, as well as other drivers on the roadways, may not be accustomed to using or adapting to such technologies. To the extent accidents associated with Canoo's autonomous driving systems occur, Canoo could be subject to liability, negative publicity, government scrutiny and further regulation. Any of the foregoing could materially and adversely affect Canoo's results of operations, financial condition and growth prospects.

Autonomous driving technology is also subject to considerable regulatory uncertainty as the law evolves to catch up with the rapidly evolving nature of the technology itself, all of which are beyond Canoo's control. Canoo's EVs also may not achieve the requisite level of autonomy required for certification and rollout to consumers or satisfy changing regulatory requirements which could require Canoo to redesign, modify or update its autonomous hardware and related software systems.

***The automotive industry and its technology are rapidly evolving and may be subject to unforeseen changes which could adversely affect the demand for Canoo's EVs.***

Canoo may be unable to keep up with changes in EV technology or alternatives to electricity as a fuel source and, as a result, its competitiveness may suffer. Developments in alternative technologies, such as advanced diesel, ethanol, hybrids, fuel cells, or compressed natural gas, or improvements in the fuel economy of the internal combustion engine, may materially and adversely affect Canoo's business and prospects in ways Canoo does not currently anticipate. Any failure by Canoo to successfully react to changes in existing technologies could materially harm its competitive position and growth prospects.

***Canoo may face challenges providing charging solutions for its EVs.***

Canoo has marketed its ability to provide customers with comprehensive charging solutions conveniently accessible using Canoo's mobile application. Canoo has very limited experience in providing charging solutions to customers which is subject to challenges, including:

- the logistics of securing agreements with third-party providers to roll out and support a network of charging solutions in appropriate areas;

- inadequate capacity or over capacity in certain areas, security risks or risk of damage to vehicles, the potential for lack of customer acceptance of Canoo's charging solutions, including the risk that customers may be conditioned to favor or expect proprietary charging solutions;

54

Table of Contents

- access to sufficient charging infrastructure;

- obtaining any required permits, land use rights and filings; and

- the risk that government support for EV and alternative fuel solutions and infrastructure may not continue.

In addition, given Canoo's limited experience in providing charging solutions, there could be unanticipated challenges which may hinder its ability to provide charging solutions or make the provision of charging solutions costlier than anticipated. Any real or perceived limitations of Canoo's planned third-party sourced charging solutions as compared to the propriety charging systems marketed by certain EV manufacturers may result in reduced demand for Canoo's vehicles. To the extent Canoo is unable to meet customer expectations or experience difficulties in providing charging solutions, its reputation and business may be materially and adversely affected.

***The demand for EVs depends, in part, on the continuation of current trends resulting from dependence on fossil fuels. Extended periods of low gasoline or other petroleum-based fuel prices could adversely affect demand for Canoo's EVs, which would adversely affect its business, prospects, financial condition and operating results.***

Canoo believes that much of the present and projected demand for EVs results from concerns about volatility in the cost of gasoline and other petroleum-based fuel, the dependency of the United States on oil from unstable or hostile countries, government regulations and economic incentives promoting fuel efficiency and alternative forms of energy, as well as the belief that climate change results in part from the burning of fossil fuels. If the cost of gasoline and other petroleum-based fuel decreased significantly, the outlook for the long-term supply of oil to the United States improved, the government eliminated or modified its regulations or economic incentives related to fuel efficiency and alternative forms of energy, or if there is a change in the perception that the burning of fossil fuels negatively impacts the environment, the demand for EVs could be reduced, and Canoo's business and revenue may be harmed. In addition, demand for Canoo's offerings may be negative impacted if stay at home orders related to the COVID-19 pandemic persist or are adopted by additional markets.

Gasoline and other petroleum-based fuel prices have been extremely volatile, and Canoo believes this continuing volatility will persist. Lower gasoline or other petroleum-based fuel prices over extended periods of time may lower the perception in government and the private sector that cheaper, more readily available energy alternatives should be developed and produced. If gasoline or other petroleum-based fuel prices remain at deflated levels for extended periods of time, the demand for EVs may decrease, which would have an adverse effect on Canoo's business, prospects, financial condition and operating results.

***The unavailability, reduction or elimination of government and economic incentives due to policy changes or government regulation could have a material adverse effect on Canoo's business, prospects, financial condition and operating results.***

Any reduction, elimination or discriminatory application of government subsidies and economic incentives because of policy changes, the reduced need for such subsidies and incentives due to the perceived success of the EV industry or other reasons may result in the diminished competitiveness of the alternative fuel and EV industry generally or Canoo's EVs. While certain tax credits and other incentives for alternative energy production, alternative fuel and EVs have been available in the past, there is no guarantee these programs will be available in the future. If current tax incentives are not available in the future, Canoo's financial position could be harmed.

***Canoo, its outsourcing partners and its suppliers are subject to substantial regulation and unfavorable changes to, or failure by Canoo, its outsourcing partners or its suppliers to comply with, these regulations could substantially harm Canoo's business and operating results.***

Canoo and its EVs, and motor vehicles in general, as well as Canoo's third-party outsourcing partners and its suppliers are or will be subject to substantial regulation under foreign, federal, state and local laws. Canoo continues to evaluate requirements for licenses, approvals, certificates and governmental authorizations necessary to manufacture, deploy or service its EVs in the jurisdictions in which it plans to operate and intends to take such actions necessary to comply. Canoo may experience difficulties in obtaining or complying with various licenses, approvals, certifications and other governmental authorizations necessary to manufacture, deploy or service its EVs in any of these jurisdictions. If Canoo, its third-party outsourcing partners or its suppliers are unable to obtain or comply with any of the licenses,

55

Table of Contents

approvals, certifications or other governmental authorizations necessary to carry out its operations in the jurisdictions in which they currently operate, or those jurisdictions in which they plan to operate in the future, Canoo's business, prospects, financial condition and operating results could be materially adversely affected. Canoo expects to incur significant costs in complying with these regulations. Regulations related to the electric and alternative energy vehicle industry are evolving and Canoo faces risks associated with changes to these regulations, including but not limited to:

- increased support for other alternative fuel systems, which could have an impact on the acceptance of Canoo's EVs; and

-  increased sensitivity by regulators to the needs of established automobile manufacturers with large employment bases, high fixed costs and business models based on the internal combustion engine, which could lead them to pass regulations that could reduce the compliance costs of such established manufacturers or mitigate the effects of government efforts to promote alternative fuel vehicles.

To the extent the laws change, Canoo's EVs may not comply with applicable foreign, federal, state or local laws, which would have an adverse effect on Canoo's business. Compliance with changing regulations could be burdensome, time consuming and expensive. To the extent compliance with new regulations is cost prohibitive, Canoo's business, prospects, financial condition and operating results would be adversely affected.

***Future changes to regulatory requirements may have a negative impact upon Canoo's business.***

While Canoo's EVs are subject to substantial regulation under federal, state and local laws, Canoo believes that its EVs will be compliance with all applicable laws when they are offered to the public. However, to the extent the laws change, new laws are introduced, or if Canoo introduces new EVs in the future, some or all of its EVs may not comply with applicable international federal, state or local laws. Further, certain federal, state and local laws and industry standards currently regulate electrical and electronics equipment. Although standards for EVs are not yet generally available or accepted as industry standards, Canoo's EVs may become subject to international, federal, state, and local regulation in the future. Compliance with these regulations could be burdensome, time consuming, and expensive.

Canoo's EVs are subject to environmental and safety compliance with various federal and state regulations, including regulations promulgated by the Environmental Protection Agency, the National Highway Traffic and Safety Administration and various state boards, and compliance certification is required for each new model year. The cost of these compliance activities and the delays and risks associated with obtaining approval can be substantial. The risks, delays and expenses incurred in connection with such compliance could be substantial.

In addition, Canoo's EVs involve a novel design and new technology, including side-facing seats and steer-by-wire technology and a street view window, that may not meet existing safety standards or require modification in order to comply with various regulatory requirements. Compliance with regulatory requirements is expensive, at times requiring the replacement, enhancement or modification of equipment, facilities or operations. There can be no assurance that Canoo will be able to maintain its profitability by offsetting any increased costs of complying with future regulatory requirements.

***Developments in alternative technology or improvements in the internal combustion engine may adversely affect the demand for Canoo's EVs.***

Significant developments in alternative technologies, such as battery cell technology, advanced gasoline, ethanol or natural gas, or improvements in the fuel economy of the internal combustion engine, may materially and adversely affect Canoo's business, prospects, financial condition and operating results in ways Canoo does not currently anticipate. Existing and other battery cell technologies, fuels or sources of energy may emerge as customers' preferred alternative to Canoo's EVs. Any failure by Canoo to develop new or enhanced technologies or processes, or to react to changes in existing technologies, could materially delay Canoo's development and introduction of new and enhanced alternative fuel and EVs, which could result in the loss of competitiveness of Canoo's EVs, decreased revenue and a loss of market share to competitors. Canoo's research and development efforts may not be sufficient to adapt to changes in alternative fuel and EV technology. As technologies change, Canoo plans to upgrade or adapt its EVs with the latest technology. However, Canoo's EVs may not compete effectively with alternative systems if Canoo is not able to source and integrate the latest technology into its EVs.

Table of Contents

***Canoo faces significant barriers to manufacture its EVs, and if Canoo cannot successfully overcome those barriers its business will be negatively impacted.***

The EV industry has traditionally been characterized by significant barriers to entry, including the ability to meet performance requirements or industry specifications, acceptance by end users, large capital requirements, investment costs of design and production, long lead times to bring EVs to market from the concept and design stage, the need for specialized design and development expertise, regulatory requirements, establishing a brand name and image and the need to establish sales capabilities. If Canoo is not able to overcome these barriers, its business, prospects, financial condition and operating results will be negatively impacted and Canoo's ability to grow its business will be harmed.

***Canoo's EVs are subject to motor vehicle standards and the failure to satisfy such mandated safety standards would have a material adverse effect on its business and operating results.***

All vehicles sold must comply with international, federal and state motor vehicle safety standards. In the United States, vehicles that meet or exceed all federally mandated safety standards are certified under the federal regulations. Rigorous testing and the use of approved materials and equipment are among the requirements for achieving federal certification. Failure by Canoo to have its EVs satisfy motor vehicle standards would have a material adverse effect on its business and operating results.

***Canoo has been, and may in the future be, adversely affected by health epidemics and pandemics, including the ongoing global COVID-19 pandemic, the duration and economic, governmental and social impact of which is difficult to predict, which may significantly harm Canoo's business, prospects, financial condition and operating results.***

Canoo faces various risks related to public health issues, including epidemics, pandemics and other outbreaks, including the recent pandemic of respiratory illness caused by a novel coronavirus known as COVID-19. The impact of COVID-19, including changes in consumer and business behavior, pandemic fears and market downturns and restrictions on business and individual activities, has created significant volatility in the global economy and led to reduced economic activity. The spread of COVID-19 has also created a disruption in the manufacturing, delivery and overall supply chain of vehicle manufacturers and suppliers, and has led to a global decrease in vehicle sales and usage in markets around the world.

The pandemic has resulted in government authorities implementing numerous measures to try to contain the virus, such as travel bans and restrictions, quarantines, stay-at-home or shelter-in-place orders, and business shutdowns. These measures may adversely impact Canoo's employees and operations and the operations of its suppliers, vendors and business partners, and may negatively impact its sales and marketing activities and the production schedule of its EVs. In addition, various aspects of Canoo's business cannot be conducted remotely, including the testing and manufacturing of its EVs. These measures by government authorities may remain in place for a significant period of time and they are likely to continue to adversely affect Canoo's testing, manufacturing and building plans, sales and marketing activities, business and results of operations.

The spread of COVID-19 has caused Canoo and many of its contractors and service providers to modify their business practices (including employee travel, recommending that all non-essential personnel work from home and cancellation or reduction of physical participation in testing activities, meetings, events and conferences), and Canoo and its contractors and service providers may be required to take further actions as may be required by government authorities or that it determines are in the best interests of its employees, customers, suppliers, vendors and business partners. There is no certainty that such actions will be sufficient to mitigate the risks posed by the virus or otherwise be satisfactory to government authorities. If significant portions of Canoo's workforce or contractors and service providers are unable to work effectively, including due to illness, quarantines, social distancing, government actions or other restrictions in connection with the COVID-19 pandemic, Canoo's operations will be impacted.

The extent to which the COVID-19 pandemic impacts Canoo's business, prospects and results of operations will depend on future developments, which are highly uncertain and cannot be predicted, including, but not limited to, the duration and spread of the pandemic, its severity, the actions to contain the virus or treat its impact and how quickly and to what extent normal economic and operating activities can resume. The COVID-19 pandemic could limit the ability of Canoo's customers, suppliers, vendors and business partners to perform, including third-party suppliers' ability to provide components and materials used in its EVs. Canoo may also experience an increase in the cost of raw

57

Table of Contents

materials used in its commercial production of EVs. Even after the COVID-19 pandemic has subsided, Canoo may continue to experience an adverse impact to its business as a result of COVID-19's global economic impact, including any recession that has occurred or may occur in the future.

Specifically, difficult macroeconomic conditions, such as decreases in per capita income and level of disposable income, increased and prolonged unemployment or a decline in consumer confidence as a result of the COVID-19 pandemic, as well as reduced spending by businesses, could have a material adverse effect on the demand for EVs. Under difficult economic conditions, potential customers may seek to reduce spending by foregoing EVs for other traditional options, and cancel subscription agreements for Canoo's EVs, which could require Canoo to modify or abandon its subscription model. Decreased demand for EVs, particularly in the United States, could negatively affect Canoo's business.

There are no comparable recent events which may provide guidance as to the effect of the spread of COVID-19 and a pandemic, and, as a result, the ultimate impact of the COVID-19 pandemic or a similar health epidemic is highly uncertain and subject to change. Canoo does not yet know the full extent of COVID-19's impact on its business, operations, or the global economy as a whole. However, the effects could have a material impact on Canoo's results of operations, and Canoo will continue to monitor the situation closely.

***Canoo is subject to cybersecurity risks to its operational systems, security systems, infrastructure, integrated software in its EVs and customer data processed by Canoo or third-party vendors.***

Canoo is at risk for interruptions, outages and breaches of its: (a) operational systems, including business, financial, accounting, product development, data processing or production processes, owned by Canoo or its third-party vendors or suppliers; (b) facility security systems, owned by Canoo or its third-party vendors or suppliers; (c) transmission control modules or other in-product technology, owned by Canoo or its third-party vendors or suppliers; (d) the integrated software in Canoo's EVs; or (e) customer data that Canoo processes or its third-party vendors or suppliers process on its behalf. Such incidents could: materially disrupt Canoo's operational systems; result in loss of intellectual property, trade secrets or other proprietary or competitively sensitive information; compromise certain information of customers, employees, suppliers, or others; jeopardize the security of Canoo's facilities; or affect the performance of in-product technology and the integrated software in Canoo's EVs.

Canoo plans to include in-vehicle services and functionality that utilize data connectivity to monitor performance and timely capture opportunities to enhance on-the-road performance and for safety and cost-saving preventative maintenance. The availability and effectiveness of Canoo's services depend on the continued operation of information technology and communications systems. Canoo's systems will be vulnerable to damage or interruption from, among others, physical theft, fire, terrorist attacks, natural disasters, power loss, war, telecommunications failures, viruses, denial or degradation of service attacks, ransomware, social engineering schemes, insider theft or misuse or other attempts to harm Canoo's systems. Canoo intends to use its in-vehicle services and functionality to log information about each vehicle's use in order to aid Canoo in vehicle diagnostics and servicing. Canoo's customers may object to the use of this data, which may increase Canoo's vehicle maintenance costs and harm its business prospects.

Moreover, there are inherent risks associated with developing, improving, expanding and updating Canoo's current systems, such as the disruption of Canoo's data management, procurement, production execution, finance, supply chain and sales and service processes. These risks may affect Canoo's ability to manage its data and inventory, procure parts or supplies or manufacture, deploy, deliver and service its EVs, adequately protect its intellectual property or achieve and maintain compliance with, or realize available benefits under, applicable laws, regulations and contracts. Canoo cannot be sure that these systems upon which it relies, including those of its third-party vendors or suppliers, will be effectively implemented, maintained or expanded as planned. If Canoo does not successfully implement, maintain or expand these systems as planned, its operations may be disrupted, its ability to accurately and timely report its financial results could be impaired, and deficiencies may arise in its internal control over financial reporting, which may impact Canoo's ability to certify its financial results. Moreover, Canoo's proprietary information or intellectual property could be compromised or misappropriated and its reputation may be adversely affected. If these systems do not operate as Canoo expects them to, Canoo may be required to expend significant resources to make corrections or find alternative sources for performing these functions.

58

Table of Contents

***Canoo intends to retain certain personal information about its vehicles, customers, employees or others that, if compromised, could materially adversely affect Canoo's financial performance and results of operations or prospects.***

Canoo plans to collect, store, transmit and otherwise process data from vehicles, customers, employees and others as part of its business and operations, which may include personal data or confidential or proprietary information. Canoo also works with partners and third-party service providers or vendors that collect, store and process such data on its behalf and in connection with its EVs. There can be no assurance that any security measures that Canoo or its third-party service providers or vendors have implemented will be effective against current or future security threats. If a compromise of data were to occur, Canoo may become liable under its contracts with other parties and under applicable law for damages and incur penalties and other costs to respond to, investigate and remedy such an incident. Canoo's systems, networks and physical facilities could be breached or personal information could otherwise be compromised due to employee error or malfeasance, if, for example, third parties attempt to fraudulently induce Canoo's employees or Canoo's customers to disclose information or user names and/or passwords. Third parties may also exploit vulnerabilities in, or obtain unauthorized access to, platforms, systems, networks and/or physical facilities utilized by Canoo's service providers and vendors.

Canoo's EVs contain complex information technology systems and built-in data connectivity to accept and install periodic remote updates to improve or update functionality. Canoo has designed, implemented and tested security measures intended to prevent unauthorized access to its information technology networks, its EVs and related systems. However, hackers may attempt to gain unauthorized access to modify, alter and use such networks, vehicles and systems to gain control of or to change Canoo's EVs' functionality, user interface and performance characteristics, or to gain access to data stored in or generated by the vehicle. A significant breach of Canoo's third-party service providers' or vendors' or its own network security and systems could have serious negative consequences for Canoo's business and future prospects, including possible fines, penalties and damages, reduced customer demand for its EVs and harm to its reputation and brand.

Canoo may not have adequate insurance coverage. The successful assertion of one or more large claims against Canoo that exceeds its available insurance coverage, or results in changes to its insurance policies (including premium increases or the imposition of large deductible or co-insurance requirements), could have an adverse effect on its business. In addition, Canoo cannot be sure that its existing insurance coverage will continue to be available on acceptable terms or that Canoo's insurers will not deny coverage as to any future claim.

***Canoo is subject to evolving laws, regulations, standards, policies, and contractual obligations related to data privacy and security regulations, and its actual or perceived failure to comply with such obligations could harm Canoo's reputation, subject it to significant fines and liability, or otherwise adversely affect its business.***

Canoo is subject to or affected by a number of federal, state and local laws and regulations, as well as contractual obligations and industry standards, that impose certain obligations and restrictions with respect to data privacy and security, and govern Canoo's collection, storage, retention, protection, use, processing, transmission, sharing and disclosure of personal information including that of its employees, customers and others. Most jurisdictions have enacted laws requiring companies to notify individuals, regulatory authorities and others of security breaches involving certain types of data. Such laws may be inconsistent or may change or additional laws may be adopted. In addition, Canoo's agreements with certain customers may require New Canoo to notify them in the event of a security breach. Such mandatory disclosures are costly, could lead to negative publicity, result in penalties or fines, result in litigation, may cause Canoo's customers to lose confidence in the effectiveness of Canoo's security measures and require New Canoo to expend significant capital and other resources to respond to and/or alleviate problems caused by the actual or perceived security breach.

The global data protection landscape is rapidly evolving, and implementation standards and enforcement practices are likely to remain uncertain for the foreseeable future. Canoo may not be able to monitor and react to all developments in a timely manner. For example, California adopted the California Consumer Privacy Act ("CCPA"), which became effective in January 2020. The CCPA establishes a privacy framework for covered businesses, including an expansive definition of personal information and data privacy rights for California residents. The CCPA includes a framework with potentially severe statutory damages and private rights of action. The CCPA requires covered businesses to provide new disclosures to California residents, provide them new ways to opt-out of certain disclosures of personal information, and allow for a new cause of action for data breaches. As Canoo expands its operations, the CCPA may increase Canoo's compliance costs and potential liability. Some observers have noted that the CCPA could mark the beginning of a

59

Table of Contents

trend toward more stringent privacy legislation in the United States. Other states have begun to propose similar laws. Compliance with any applicable privacy and data security laws and regulations is a rigorous and time-intensive process, and Canoo may be required to put in place additional mechanisms to comply with such laws and regulations.

Canoo publishes privacy policies and other documentation regarding its collection, processing, use and disclosure of personal information and/or other confidential information. Although Canoo endeavors to comply with its published policies and other documentation, Canoo may at times fail to do so or may be perceived to have failed to do so. Moreover, despite its efforts, Canoo may not be successful in achieving compliance if Canoo's employees, contractors, service providers or vendors fail to comply with its published policies and documentation. Such failures can subject Canoo to potential local, state and federal action if they are found to be deceptive, unfair, or misrepresentative of its actual practices. Claims that Canoo has violated individuals' privacy rights or failed to comply with data protection laws or applicable privacy notices even if Canoo is not found liable, could be expensive and time-consuming to defend and could result in adverse publicity that could harm its business.

***Canoo is subject to various environmental laws and regulations that could impose substantial costs upon Canoo and cause delays in building its production facilities.***

Canoo's operations are and will be subject to international, federal, state and local environmental laws and regulations, including laws relating to the use, handling, storage, disposal of and human exposure to hazardous materials. Environmental and health and safety laws and regulations can be complex, and Canoo has limited experience complying with them. Moreover, Canoo expects that it will be affected by future amendments to such laws or other new environmental and health and safety laws and regulations which may require Canoo to change its operations, potentially resulting in a material adverse effect on its business, prospects, financial condition and operating results. These laws can give rise to liability for administrative oversight costs, cleanup costs, property damage, bodily injury, fines and penalties. Capital and operating expenses needed to comply with environmental laws and regulations can be significant, and violations may result in substantial fines and penalties, third-party damages, suspension of production or a cessation of Canoo's operations.

Contamination at properties Canoo will own or operate, Canoo formerly owned or operated or to which hazardous substances were sent by Canoo, may result in liability for Canoo under environmental laws and regulations, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, which can impose liability for the full amount of remediation-related costs without regard to fault, for the investigation and cleanup of contaminated soil and ground water, for building contamination and impacts to human health and for damages to natural resources. The costs of complying with environmental laws and regulations and any claims concerning noncompliance, or liability with respect to contamination in the future, could have a material adverse effect on Canoo's financial condition or operating results.

***Changes in tax laws may materially adversely affect Canoo's business, prospects, financial condition and operating results.***

New income, sales, use or other tax laws, statutes, rules, regulations or ordinances could be enacted at any time, and failure to appropriately comply with such tax laws, statutes, rules and regulations could result in sanctions by regulatory agencies, civil money penalties and/or reputational damage, which could adversely affect Canoo's business, prospects, financial condition and operating results. For example, U.S. federal tax legislation enacted in 2017, informally titled the Tax Cuts and Jobs Act (the "Tax Act"), enacted many significant changes to the U.S. tax laws. Future guidance from the Internal Revenue Service (the "IRS") with respect to the Tax Act may affect Canoo, and certain aspects of the Tax Act could be repealed or modified in future legislation. The CARES Act has already modified certain provisions of the Tax Act. In addition, it is uncertain if and to what extent various states will conform to the Tax Act, the CARES Act or any newly enacted federal tax legislation.

***Canoo's ability to use net operating loss carryforwards and other tax attributes may be limited in connection with the Business Combination or other ownership changes.***

The U.S. operating subsidiary of Canoo has incurred losses during its history and does not expect to become profitable in the near future, and may never achieve profitability. To the extent that Canoo's U.S. subsidiaries continue to generate taxable losses, unused losses will carry forward to offset future taxable income, if any, until such unused losses expire, if at all.

60

Under the Tax Act, as modified by the CARES Act, U.S. federal net operating loss carryforwards generated in taxable periods beginning after December 31, 2017, may be carried forward indefinitely, but the deductibility of such net operating loss carryforwards in taxable years beginning after December 31, 2020, is limited to 80% of taxable income. It is uncertain if and to what extent various states will conform to the Tax Act or the CARES Act.

In addition, the net operating loss carryforwards of Canoo's U.S. subsidiaries are subject to review and possible adjustment by the IRS, and state tax authorities. Under Sections 382 and 383 of the Internal Revenue Code of 1986, as amended (the "Code"), these federal net operating loss carryforwards and other tax attributes may become subject to an annual limitation in the event of certain cumulative changes in the ownership of Canoo. An "ownership change" pursuant to Section 382 of the Code generally occurs if one or more stockholders or groups of stockholders who own at least 5% of a company's stock increase their ownership by more than 50 percentage points over their lowest ownership percentage within a rolling three-year period. The ability of Canoo's U.S. subsidiaries to utilize net operating loss carryforwards and other tax attributes to offset future taxable income or tax liabilities may be limited as a result of ownership changes, including potential changes in connection with the Business Combination or other transactions. Similar rules may apply under state tax laws. Canoo has not yet determined the amount of the cumulative change in its ownership resulting from the Business Combination or other transactions, or any resulting limitations on its ability to utilize its net operating loss carryforwards and other tax attributes. If Canoo's U.S. subsidiaries earn taxable income, such limitations could result in increased future income tax liability to Canoo and its future cash flows could be adversely affected. Canoo has recorded a full valuation allowance related to its net operating loss carryforwards and other deferred tax assets due to the uncertainty of the ultimate realization of the future benefits of those assets.

### *Canoo will incur increased costs as a result of operating as a public company, and its management will devote substantial time to new compliance initiatives.*

If Canoo completes the Business Combination and becomes a public company, it will incur significant legal, accounting and other expenses that it did not incur as a private company, and these expenses may increase even more after Canoo is no longer an emerging growth company, as defined in Section 2(a) of the Securities Act. As a public company, Canoo will be subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, as well as rules adopted, and to be adopted, by the SEC and Nasdaq. Canoo's management and other personnel will need to devote a substantial amount of time to these compliance initiatives. Moreover, Canoo expects these rules and regulations to substantially increase its legal and financial compliance costs and to make some activities more time-consuming and costly. The increased costs will increase Canoo's net loss. For example, Canoo expects these rules and regulations to make it more difficult and more expensive for it to obtain director and officer liability insurance and it may be forced to accept reduced policy limits or incur substantially higher costs to maintain the same or similar coverage. Canoo cannot predict or estimate the amount or timing of additional costs it may incur to respond to these requirements. The impact of these requirements could also make it more difficult for Canoo to attract and retain qualified persons to serve on its board of directors, its board committees or as executive officers.

### *Canoo's ability to control costs and liability is dependent on developing sufficient screening criteria for its subscription customers.*

Canoo's ability to realize revenue and reduce liability related to its subscription model is heavily dependent on its ability to effectively screen customers for high risk behavior that could result in liability for Canoo or a customer's ability to timely make payments for a subscription. Canoo has limited experience and lacks sufficient operating history to develop effective customer screening criteria. Canoo may need to rely on third-party service providers to develop effective screening criteria, which will result in additional cost to Canoo. Canoo's screening criteria may also need to be adjusted over time to satisfy requirements under applicable law, from its insurers or from other third-party service providers. Canoo must balance the need to develop effective screening criteria with its need to attract new customers or market to different segments of the consumer public.

### *Insufficient reserves to cover future part replacement needs or other vehicle repair requirements, including any potential software upgrades, could materially adversely affect Canoo's business, prospects, financial condition and operating results.*

Once Canoo begins commercial production of its EVs, it will need to maintain reserves to cover part replacement and other vehicle repair needs, including any potential software upgrades or warranty claims. If Canoo's reserves are inadequate to cover future maintenance requirements on its EVs, Canoo's business, prospects, financial condition and

61

Table of Contents

operating results could be materially and adversely affected. Canoo may become subject to significant and unexpected expenses as well as claims from its customers, including loss of revenue or damages. There can be no assurances that then-existing reserves will be sufficient to cover all claims.

***Canoo's consumer subscriptions are short-term commitments and may result in high customer attrition.***

Canoo expects to initially generate revenues through the sale of subscriptions with short-term commitments and no upfront payment or fees upon termination, and as a result, expects to experience subscription agreement terminations. Canoo's customers may terminate their subscription agreements at any time upon as little notice as 30 days. Customers may cancel their subscriptions for many reasons, including a perception that they do not make sufficient use of Canoo's EVs, that they need to reduce their expenses or that alternative transportation methods or other vehicles may provide better value or a better experience. If it is unable to replace customers who terminate their subscription agreements, or redeploy EVs efficiently enough, Canoo's cash flows may be adversely affected.

***Changes in U.S. trade policy, including the imposition of tariffs and the resulting consequences, could adversely affect Canoo's business, prospects, financial condition and operating results.***

The U.S. government has adopted a new approach to trade policy and in some cases has attempted to renegotiate or terminate certain existing bilateral or multi-lateral trade agreements. It has also imposed tariffs on certain foreign goods, including steel and certain vehicle parts, which have begun to result in increased costs for goods imported into the United States. In response to these tariffs, a number of U.S. trading partners have imposed retaliatory tariffs on a wide range of U.S. products, which makes it more costly for Canoo to export its EVs to those countries. If Canoo is unable to pass price increases on to its customer base or otherwise mitigate the costs, or if demand for its exported EVs decreases due to the higher cost, its operating results could be materially adversely affected. In addition, further tariffs have been proposed by the U.S. and its trading partners and additional trade restrictions could be implemented on a broader range of products or raw materials. The resulting environment of retaliatory trade or other practices could have a material adverse effect on Canoo's business, prospects, financial condition, operating results, customers, suppliers and the global economy.

***Canoo is subject to governmental export and import controls and laws that could subject Canoo to liability if Canoo is not in compliance with such laws.***

Canoo's EVs are subject to export control, import and economic sanctions laws and regulations, including the U.S. Export Administration Regulations, U.S. Customs regulations and various economic and trade sanctions regulations administered by the U.S. Treasury Department's Office of Foreign Assets Control. Exports of Canoo's EVs and technology must be made in compliance with these laws and regulations. If Canoo fails to comply with these laws and regulations, Canoo and certain of its employees could be subject to substantial civil or criminal penalties, including the possible loss of export or import privileges; fines, which may be imposed on Canoo and responsible employees or managers; and, in extreme cases, the incarceration of responsible employees or managers.

In addition, changes to Canoo's EVs, or changes in applicable export control, import, or economic sanctions laws and regulations may create delays in the introduction and sale of Canoo's EVs and solutions or, in some cases, prevent the export or import of Canoo's EVs to certain countries, governments, or persons altogether. Any change in export, import, or economic sanctions laws and regulations, shift in the enforcement or scope of existing laws and regulations, or change in the countries, governments, persons, or technologies targeted by such laws and regulations, could also result in decreased use of Canoo's EVs, as well as Canoo's decreased ability to export or market its EVs to potential customers. Any decreased use of Canoo's EVs or limitation on Canoo's ability to export or market its EVs would likely adverse Canoo's business, financial condition and results of operations.

***Canoo is subject to U.S. and foreign anti-corruption and anti-money laundering laws and regulations. Canoo can face criminal liability and other serious consequences for violations, which can harm its business.***

Canoo is subject to the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.S. domestic bribery statute contained in 18 U.S.C. § 201, the U.S. Travel Act, the USA PATRIOT Act and possibly other anti - bribery and anti-money laundering laws in countries in which Canoo conducts activities. Anti-corruption laws are interpreted broadly and prohibit companies and their employees, agents, contractors and other collaborators from authorizing, promising, offering or providing, directly or indirectly, improper payments or anything else of value to recipients in

62

Table of Contents

the public or private sector. Canoo can be held liable for the corrupt or other illegal activities of its employees, agents, contractors and other collaborators, even if Canoo does not explicitly authorize or have actual knowledge of such activities. Any violations of the laws and regulations described above may result in substantial civil and criminal fines and penalties, imprisonment, the loss of export or import privileges, debarment, tax reassessments, breach of contract and fraud litigation, reputational harm and other consequences.

***Investments in us may be subject to U.S. foreign investment regulations which may impose conditions or limitations on certain investors (including, but not limited to, limits on purchasing Canoo's Capital Stock, or after the Business Combination, New Canoo Common Stock, limits on information sharing with such investors, requiring a voting trust, governance modifications, forced divestiture, or other measures).***

Certain investments that involve the acquisition of, or investment in, a U.S. business may be subject to review and approval by the Committee on Foreign Investment in the United States ("CFIUS"), depending on the structure, beneficial ownership and control of interests in the U.S. business. Investments that result in control of a U.S. business by a foreign person are subject to CFIUS jurisdiction. Significant CFIUS reform legislation, which was fully implemented through regulations that became effective on February 13, 2020, among other things expanded the scope of CFIUS's jurisdiction to investments that do not result in control of a U.S. business by a foreign person but afford certain foreign investors certain information or governance rights in a U.S. business that has a nexus to "critical technologies," "critical infrastructure" and/or "sensitive personal data.". Moreover, other countries continue to strengthen their own foreign investment clearance ("FIC") regimes, and investments and transactions outside of the U.S. may be subject to review by non-U.S. FIC regulators if such investments are perceived to implicate national security policy priorities. Any review and approval of an investment or transaction by CFIUS or another FIC regulator may have outsized impacts on transaction certainty, timing, feasibility, and cost, among other things. CFIUS and other FIC regulatory policies and practices are rapidly evolving, and in the event that CFIUS or another FIC regulator reviews one or more proposed or existing investment by investors in Canoo, there can be no assurances that such investors will be able to maintain, or proceed with, such investments on terms acceptable to such investors. CFIUS or another FIC regulator may seek to impose limitations or restrictions on, or prohibit, investments by such investors (including, but not limited to, limits on purchasing Canoo's Capital Stock, or after the Business Combination, New Canoo Common Stock, limits on information sharing with such investors, requiring a voting trust, governance modifications, or forced divestiture, among other things).

***Canoo may not be able to obtain or agree on acceptable terms and conditions for all or a significant portion of the government grants, loans and other incentives for which it may apply. As a result, Canoo's business, prospects, financial condition and operating results may be adversely affected.***

Canoo anticipates applying for federal and state grants, loans and tax incentives under government programs designed to stimulate the economy and support the production of alternative fuel and EVs and related technologies. Canoo anticipates that in the future there will be new opportunities for it to apply for grants, loans and other incentives from federal, state and foreign governments. Canoo's ability to obtain funds or incentives from government sources is subject to the availability of funds under applicable government programs and approval of Canoo's applications to participate in such programs. The application process for these funds and other incentives will likely be highly competitive. Canoo cannot assure you that it will be successful in obtaining any of these additional grants, loans and other incentives or that Canoo's subscription model will be eligible for certain tax or other economic incentives.

***Canoo and its outsourcing partners and suppliers may rely on complex machinery for Canoo's production, which involves a significant degree of risk and uncertainty in terms of operational performance and costs.***

Canoo and its third-party outsourcing partners and suppliers may rely on complex machinery, for the production and assembly of Canoo's EVs, which will involve a significant degree of uncertainty and risk in terms of operational performance and costs. Canoo's facilities and the facilities of its third-party outsourcing partners and suppliers consist of large-scale machinery combining many components. These components may suffer unexpected malfunctions from time to time and will depend on repairs and spare parts to resume operations, which may not be available when needed. Unexpected malfunctions of these components may significantly affect the intended operational efficiency. Operational performance and costs can be difficult to predict and are often influenced by factors outside of Canoo's control, such as, but not limited to, scarcity of natural resources, environmental hazards and remediation, costs associated with decommissioning of machines, labor disputes and strikes, difficulty or delays in obtaining governmental permits, damages or defects in electronic systems, industrial accidents, fire, seismic activity and natural disasters. Should

63

Table of Contents

operational risks materialize, it may result in the personal injury to or death of workers, the loss of production equipment, damage to production facilities, monetary losses, delays and unanticipated fluctuations in production, environmental damage, administrative fines, increased insurance costs and potential legal liabilities, all which could have a material adverse effect on Canoo's business, prospects, financial condition or operating results.

***If any of Canoo's suppliers become economically distressed or go bankrupt, Canoo may be required to provide substantial financial support or take other measures to ensure supplies of components or materials, which could increase its costs, affect its liquidity or cause production disruptions.***

Canoo expects to purchase various types of equipment, raw materials and manufactured component parts from its suppliers. If these suppliers experience substantial financial difficulties, cease operations, or otherwise face business disruptions, Canoo may be required to provide substantial financial support to ensure supply continuity or would have to take other measures to ensure components and materials remain available. Any disruption could affect's Canoo's ability to deliver EVs and could increase Canoo's costs and negatively affect its liquidity and financial performance.

***Canoo is or may be subject to risks associated with strategic alliances or acquisitions and may not be able to identify adequate strategic relationship opportunities, or form strategic relationships, in the future.***

Canoo has entered into non-binding memoranda of understanding ("MOUs") with certain key suppliers and development partners to form strategic alliances with such third parties, and may in the future enter into additional strategic alliances or joint ventures or minority equity investments, in each case with various third parties for the production of its EVs as well as with other collaborators with capabilities on data and analytics and engineering. There is no guarantee that any of Canoo's MOUs would lead to any binding agreements or lasting or successful business relationships with such key suppliers and development partners. If these strategic alliances are established, they may subject Canoo to a number of risks, including risks associated with sharing proprietary information, non-performance by the third-party and increased expenses in establishing new strategic alliances, any of which may materially and adversely affect Canoo's business. Canoo may have limited ability to monitor or control the actions of these third parties and, to the extent any of these strategic third parties suffers negative publicity or harm to their reputation from events relating to their business, Canoo may also suffer negative publicity or harm to its reputation by virtue of its association with any such third-party.

Strategic business relationships will be an important factor in the growth and success of Canoo's business. However, there are no assurances that Canoo will be able to continue to identify or secure suitable business relationship opportunities in the future or Canoo's competitors may capitalize on such opportunities before Canoo does. Moreover, identifying such opportunities could require substantial management time and resources, and negotiating and financing relationships involves significant costs and uncertainties. If Canoo is unable to successfully source and execute on strategic relationship opportunities in the future, its overall growth could be impaired, and its business, prospects, financial condition and operating results could be materially adversely affected.

When appropriate opportunities arise, Canoo may acquire additional assets, products, technologies or businesses that are complementary to its existing business. In addition to possible stockholder approval, Canoo may need approvals and licenses from relevant government authorities for the acquisitions and to comply with any applicable laws and regulations, which could result in increased delay and costs, and may disrupt Canoo's business strategy if it fails to do so. Furthermore, acquisitions and the subsequent integration of new assets and businesses into Canoo's own require significant attention from Canoo's management and could result in a diversion of resources from Canoo's existing business, which in turn could have an adverse effect on Canoo's operations. Acquired assets or businesses may not generate the financial results Canoo expects. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

***Canoo may need to defend itself against intellectual property infringement claims or misappropriation claims, which may be time-consuming and expensive and, if adversely determined, could limit Canoo's ability to commercialize its EVs.***

Companies, organizations or individuals, including Canoo's competitors, may own or obtain patents, trademarks or other proprietary rights that could prevent or limit Canoo's ability to make, use, develop or deploy its EVs, which could make it more difficult for Canoo to operate its business. Canoo may receive inquiries from patent, copyright

or trademark owners inquiring whether Canoo infringes upon their proprietary rights. Canoo may also be the subject of more formal allegations that Canoo has misappropriated such parties' trade secrets or other proprietary rights. Companies owning patents or other intellectual property rights relating to battery packs, electric motors, fuel cells or electronic power management systems may allege infringement or misappropriation of such rights. In response to a determination that Canoo has infringed upon or misappropriated a third-party's intellectual property rights, Canoo may be required to do one or more of the following:

- cease development, sales or use of its products that incorporate the asserted intellectual property;

- pay substantial damages;

- obtain a license from the owner of the asserted intellectual property right, which license may not be available on reasonable terms or available at all; or

- re-design one or more aspects or systems of its EVs.

A successful claim of infringement or misappropriation against Canoo could materially adversely affect its business, prospects, financial condition and operating results. Even if Canoo is successful in defending against these claims, litigation could result in substantial costs and demand on management resources.

*Canoo's business may be adversely affected if it is unable to protect its intellectual property rights from unauthorized use by third parties.*

Failure to adequately protect Canoo's intellectual property rights could result in Canoo's competitors offering similar products, potentially resulting in the loss of some of Canoo's competitive advantage and a decrease in its revenue, which could adversely affect Canoo's business, prospects, financial condition and operating results. Canoo's success depends, at least in part, on its ability to protect its core technology and intellectual property. To accomplish this, Canoo will rely on a combination of patents, trade secrets (including know-how), employee and third-party nondisclosure agreements, copyrights, trademarks, intellectual property licenses and other contractual rights to establish and protect Canoo's rights in its technology.

The protection of Canoo's intellectual property rights will be important to its future business opportunities. However, the measures Canoo takes to protect its intellectual property from unauthorized use by others may not be effective for various reasons, including the following:

- as noted below, any patent applications Canoo submits may not result in the issuance of patents (and patents have not yet issued to Canoo based on its pending applications);

- the scope of Canoo's patents that may subsequently issue may not be broad enough to protect its proprietary rights;

- Canoo's issued patents may be challenged or invalidated by third parties;

- Canoo's employees or business partners may breach their confidentiality, non-disclosure and non-use obligations to Canoo;

- third parties may independently develop technologies that are the same or similar to Canoo's;

- the costs associated with enforcing patents, confidentiality and invention agreements or other intellectual property rights may make enforcement impracticable; and

- current and future competitors may circumvent or otherwise design around Canoo's patents.

Patent, trademark, copyright and trade secret laws vary throughout the world. Some foreign countries do not protect intellectual property rights to the same extent as do the laws of the U.S. Further, policing the unauthorized use of Canoo's intellectual property rights in foreign jurisdictions may be difficult. Therefore, Canoo's intellectual property rights may not be as strong or as easily enforced outside of the U.S.

Also, while Canoo has registered and applied for trademarks in an effort to protect its investment in its brand and goodwill with customers, competitors may challenge the validity of those trademarks and other brand names in which Canoo has invested. Such challenges can be expensive and may adversely affect Canoo's ability to maintain the goodwill gained in connection with a particular trademark.

65

Table of Contents

*Canoo's patent applications for its proprietary technology, including for its skateboard platform, may not issue, which may have a material adverse effect on Canoo's ability to prevent others from commercially exploiting products similar to Canoo's.*

Canoo cannot be certain that it is the first inventor of the subject matter disclosure or to file a patent application for its proprietary technology, including for its skateboard platform. If another party has filed a patent application to the same or similar subject matter as Canoo has, Canoo may not be entitled to the protection sought by the patent application. Canoo also cannot be certain whether the claims included in a patent application will ultimately be allowed in the applicable issued patent. Further, the scope of protection of issued patent claims is often difficult to determine. As a result, Canoo cannot be certain that the patent applications that it files will issue, or that its issued patents will afford protection against competitors with similar technology. In addition, Canoo's competitors may design around Canoo's issued patents, which may adversely affect Canoo's business, prospects, financial condition and operating results.

*Waitlist reservations for subscriptions to Canoo's service are cancellable.*

Canoo's EVs are still in development and deliveries of the Lifestyle Vehicle, Delivery Vehicle and Sport Vehicle are not expected to begin until 2022, 2023 and 2025, respectively, and may occur later or not at all. As a result, Canoo offers waitlist reservations for its consumer subscription offering that do not require financial commitment and will be cancellable without penalty. Given the anticipated lead times between waitlist reservations and the date of delivery of Canoo's EVs, there is a heightened risk that customers who join Canoo's waitlist may ultimately decide not to convert into binding contracts for Canoo's subscription offering due to potential changes in customer preferences, competitive developments and other factors. As a result, no assurance can be made that reservations will not be cancelled or that reservations will result in the subscription to Canoo's subscription offering, and any such cancellations could harm Canoo's business, prospects, financial condition and operating results.

*Canoo's employees and independent contractors may engage in misconduct or other improper activities, which could have an adverse effect on Canoo's business, prospects, financial condition and operating results.*

Canoo is exposed to the risk that its employees and independent contractors may engage in misconduct or other illegal activity. Misconduct by these parties could include intentional, reckless or negligent conduct or other activities that violate laws and regulations, including production standards, U.S. federal and state fraud, abuse, data privacy and security laws, other similar non-U.S. laws or laws that require the true, complete and accurate reporting of financial information or data. It is not always possible to identify and deter misconduct by employees and other third parties, and the precautions Canoo takes to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting Canoo from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations. In addition, Canoo is subject to the risk that a person or government could allege such fraud or other misconduct, even if none occurred. If any such actions are instituted against Canoo, and Canoo is not successful in defending itself or asserting its rights, those actions could have a significant impact on Canoo's business, prospects, financial condition and operating results, including, without limitation, the imposition of significant civil, criminal and administrative penalties, damages, monetary fines, disgorgement, integrity oversight and reporting obligations to resolve allegations of non-compliance, imprisonment, other sanctions, contractual damages, reputational harm, diminished profits and future earnings and curtailment of Canoo's operations, any of which could adversely affect Canoo's business, prospects, financial condition and operating results.

*Canoo expects the majority of its business to be concentrated in certain targeted jurisdictions, putting it at risk of region-specific disruptions.*

Canoo expects to initially launch its consumer subscription offering in limited jurisdictions. Accordingly, Canoo's business and results of operations are particularly susceptible to adverse economic, regulatory, political, weather and other conditions in other markets that may become similarly concentrated. Further, as compared to Canoo's competitors who operate on a wider geographic scale, any adverse changes or events in its targeted jurisdictions may expose Canoo's business and results of operations to more significant risks.

66

Table of Contents

***Canoo may become subject to product liability claims, including possible class action and derivative lawsuits, which could harm its financial condition and liquidity if it is not able to successfully defend or insure against such claims.***

Product liability claims, even those without merit or those that do not involve Canoo's EVs, could harm Canoo's business, prospects, financial condition and operating results. The automobile industry in particular experiences significant product liability claims, and Canoo faces inherent risk of exposure to claims in the event Canoo's EVs do not perform or are claimed to not have performed as expected. As is true for other EV suppliers, Canoo expects in the future that its EVs will be involved in crashes resulting in death or personal injury. Additionally, product liability claims that affect Canoo's competitors or suppliers may cause indirect adverse publicity for Canoo and its EVs.

A successful product liability claim against Canoo could require Canoo to pay a substantial monetary award. Canoo's risks in this area are particularly pronounced given Canoo has not deployed its EVs for consumer use to date and the limited field experience of Canoo's EVs. Moreover, a product liability claim against Canoo or its competitors could generate substantial negative publicity about Canoo's EVs and business and could have a material adverse effect on Canoo's brand, business, prospects, financial condition and operating results. Canoo may self-insure against the risk of product liability claims for vehicle exposure, meaning that any product liability claims will likely have to be paid from company funds, not by insurance.

***Canoo's EVs make use of lithium-ion battery cells, which have been observed to catch fire or vent smoke and flame.***

The battery packs in Canoo's EVs use lithium-ion cells. On rare occasions, lithium-ion cells can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. While Canoo has taken measures to enhance the safety of its battery designs, a field or testing failure of its EVs could occur in the future, which could subject Canoo to lawsuits, product recalls, or redesign efforts, all of which would be time-consuming and expensive. Also, negative public perceptions regarding the suitability of lithium-ion cells for automotive applications or any future incident involving lithium-ion cells such as a vehicle or other fire, even if such incident does not involve Canoo's EVs, could seriously harm its business.

In addition, Canoo's manufacturing partners and suppliers are expected to store a significant number of lithium-ion cells at their facilities. Any mishandling of battery cells may cause disruption to the operation of such facilities. A safety issue or fire related to the cells could disrupt operations or cause manufacturing delays. Such damage or injury could lead to adverse publicity and potentially a safety recall. Moreover, any failure of a competitor's EV or energy storage product may cause indirect adverse publicity for Canoo and its EVs. Such adverse publicity could negatively affect Canoo's brand and harm its business, prospects, financial condition and operating results.

***Canoo's business may be adversely affected by labor and union activities.***

Although none of Canoo's employees are currently represented by a labor union, it is common throughout the automobile industry generally for many employees at automobile companies to belong to a union, which can result in higher employee costs and increased risk of work stoppages. Canoo may also directly and indirectly depend upon other companies with unionized work forces, such as its manufacturing partners, parts suppliers and trucking and freight companies, and work stoppages or strikes organized by such unions could have a material adverse impact on Canoo's business, financial condition or operating results.

**Risks Related to Hennessy Capital and the Business Combination**

*Unless the context otherwise requires, all references in this "— Risks Related to Hennessy Capital and the Business Combination" section to "we," "us," or "our" refer to Hennessy Capital.*

***Following the consummation of the Business Combination, our only significant asset will be ownership of 100% of the Surviving Entity's membership interests, and we do not currently intend to pay dividends on our common stock and, consequently, your ability to achieve a return on your investment will depend on appreciation in the price of our common stock.***

Following the consummation of the Business Combination, we will have no direct operations and no significant assets other than the ownership of 100% of the Surviving Entity's membership interests. We will depend on Canoo for distributions, loans and other payments to generate the funds necessary to meet our financial obligations, including our expenses as a publicly traded company, and to pay any dividends with respect to our common stock. Applicable state law and contractual restrictions, including in agreements governing the current or future indebtedness of Canoo, as well

Table of Contents

as the financial condition and operating requirements of Canoo, may limit our ability to obtain cash from Canoo. Thus, we do not expect to pay cash dividends on our common stock. Any future dividend payments are within the absolute discretion of our board of directors and will depend on, among other things, our results of operations, working capital requirements, capital expenditure requirements, financial condition, level of indebtedness, contractual restrictions with respect to payment of dividends, business opportunities, anticipated cash needs, provisions of applicable law and other factors that our board of directors may deem relevant. In addition, in the event that the board of directors and stockholders of the Surviving Entity were to approve a sale of all of our direct and indirect interests in Canoo, your equity interest would be in a holding company with no material assets other than those assets and other consideration received in such transaction.

***There can be no assurance that New Canoo Common Stock will be approved for listing on Nasdaq or that New Canoo will be able to comply with the continued listing standards of Nasdaq.***

In connection with the closing of the Business Combination, we intend to list New Canoo's common stock and warrants on Nasdaq under the symbols "CNOO" and "CNOOW," respectively. New Canoo's continued eligibility for listing may depend on the number of Hennessy Capital's shares that are redeemed. If, after the Business Combination, Nasdaq delists New Canoo's shares from trading on its exchange for failure to meet the listing standards, New Canoo and its stockholders could face significant material adverse consequences including:

- a limited availability of market quotations for New Canoo's securities;

- a determination that New Canoo Common Stock is a "penny stock" which will require brokers trading in New Canoo Common Stock to adhere to more stringent rules, possibly resulting in a reduced level of trading activity in the secondary trading market for shares of New Canoo Common Stock;

- a limited amount of analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

***Subsequent to the consummation of the Business Combination, New Canoo may be required to take write-downs or write-offs, or New Canoo may be subject to restructuring, impairment or other charges that could have a significant negative effect on New Canoo's financial condition, results of operations and the price of HCAC Class A Common Stock, which could cause you to lose some or all of your investment.***

Although Hennessy Capital has conducted due diligence on Canoo, this diligence may not reveal all material issues that may be present with Canoo's business. Factors outside of Canoo's and outside of Hennessy Capital's control may, at any time, arise. As a result of these factors, New Canoo may be forced to later write-down or write-off assets, restructure operations, or incur impairment or other charges that could result in New Canoo reporting losses. Even if Hennessy Capital's due diligence successfully identified certain risks, unexpected risks may arise, and previously known risks may materialize in a manner not consistent with Hennessy Capital's preliminary risk analysis. Even though these charges may be non-cash items and therefore not have an immediate impact on New Canoo's liquidity, the fact that New Canoo reports charges of this nature could contribute to negative market perceptions about New Canoo or its securities. In addition, charges of this nature may cause New Canoo to be unable to obtain future financing on favorable terms or at all.

***If the Business Combination's benefits do not meet the expectations of investors or securities analysts, the market price of Hennessy Capital's securities or, following the Closing, New Canoo's securities, may decline. A market for our securities may not continue, which would adversely affect the liquidity and price of our securities.***

If the perceived benefits of the Business Combination do not meet the expectations of investors or securities analysts, the market price of Hennessy Capital's securities prior to the Closing may decline. The market values of New Canoo's securities at the time of the Business Combination may vary significantly from their prices on the date the Merger Agreement was executed, the date of this proxy statement/prospectus, or the date on which Hennessy Capital's stockholders vote on the Business Combination.

Following the Business Combination, the price of our securities may fluctuate significantly due to the market's reaction to the Business Combination and general market and economic conditions. An active trading market for our securities following the Business Combination may never develop or, if developed, it may not be sustained. In addition, following the Business Combination, fluctuations in the price of New Canoo's securities could contribute to

68

Table of Contents

the loss of all or part of your investment. Prior to the Business Combination, there has not been a public market for Canoo's capital stock. Accordingly, the valuation ascribed to Canoo may not be indicative of the price that will prevail in the trading market following the Business Combination. If an active market for New Canoo's securities develops and continues, the trading price of New Canoo's securities following the Business Combination could be volatile and subject to wide fluctuations in response to various factors, some of which are beyond New Canoo's control. Any of the factors listed below could have a material adverse effect on your investment in New Canoo's securities and New Canoo's securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of New Canoo's securities may not recover and may experience a further decline.

Factors affecting the trading price of New Canoo's securities may include:

- actual or anticipated fluctuations in New Canoo's quarterly financial results or the quarterly financial results of companies perceived to be similar to it;

- changes in the market's expectations about New Canoo's operating results;

- success of competitors;

- New Canoo's operating results failing to meet the expectation of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning New Canoo or the transportation industry in general;

- operating and share price performance of other companies that investors deem comparable to New Canoo;

- New Canoo's ability to market new and enhanced products and technologies on a timely basis;

- changes in laws and regulations affecting New Canoo's business;

- New Canoo's ability to meet compliance requirements;

- commencement of, or involvement in, litigation involving New Canoo;

- changes in New Canoo's capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of New Canoo's shares of common stock available for public sale;

- any major change in the New Canoo Board or New Canoo's management;

- sales of substantial amounts of New Canoo's shares of common stock by New Canoo's directors, executive officers or significant stockholders or the perception that such sales could occur; and

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism.

Broad market and industry factors may materially harm the market price of New Canoo's securities irrespective of New Canoo's operating performance. The stock market in general, and Nasdaq in particular, have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of New Canoo's securities, may not be predictable. A loss of investor confidence in the market for retail stocks or the stocks of other companies which investors perceive to be similar to New Canoo could depress New Canoo's share price regardless of New Canoo's business, prospects, financial conditions or results of operations. A decline in the market price of New Canoo's securities also could adversely affect New Canoo's ability to issue additional securities and New Canoo's ability to obtain additional financing in the future.

Table of Contents

*Following the consummation of the Business Combination, New Canoo will incur significant increased expenses and administrative burdens as a public company, which could have an adverse effect on its business, financial condition and results of operations.*

Following the consummation of the Business Combination, New Canoo will face increased legal, accounting, administrative and other costs and expenses as a public company that Canoo does not incur as a private company. The Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), including the requirements of Section 404, as well as rules and regulations subsequently implemented by the SEC, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and the rules and regulations promulgated and to be promulgated thereunder, Public Company Accounting Oversight Board (the "PCAOB") and the securities exchanges, impose additional reporting and other obligations on public companies. Compliance with public company requirements will increase costs and make certain activities more time-consuming. A number of those requirements will require New Canoo to carry out activities Canoo has not done previously. For example, New Canoo will create new board committees and adopt new internal controls and disclosure controls and procedures. In addition, expenses associated with SEC reporting requirements will be incurred. Furthermore, if any issues in complying with those requirements are identified (for example, if the auditors identify a material weakness or significant deficiency in the internal control over financial reporting), New Canoo could incur additional costs rectifying those issues, and the existence of those issues could adversely affect New Canoo's reputation or investor perceptions of it. It may also be more expensive to obtain director and officer liability insurance. Risks associated with New Canoo's status as a public company may make it more difficult to attract and retain qualified persons to serve on the New Canoo Board or as executive officers. The additional reporting and other obligations imposed by these rules and regulations will increase legal and financial compliance costs and the costs of related legal, accounting and administrative activities. These increased costs will require New Canoo to divert a significant amount of money that could otherwise be used to expand the business and achieve strategic objectives. Advocacy efforts by stockholders and third parties may also prompt additional changes in governance and reporting requirements, which could further increase costs.

*New Canoo's failure to timely and effectively implement controls and procedures required by Section 404(a) of the Sarbanes-Oxley Act that will be applicable to it after the Business Combination is consummated could have a material adverse effect on its business.*

Canoo is currently not subject to Section 404 of the Sarbanes-Oxley Act. However, following the consummation of the Business Combination, New Canoo will be required to provide management's attestation on internal controls commencing with Hennessy Capital's annual report for the year ending December 31, 2021 in accordance with applicable SEC guidance. The standards required for a public company under Section 404(a) of the Sarbanes-Oxley Act are significantly more stringent than those required of Canoo as a privately-held company. Management may not be able to effectively and timely implement controls and procedures that adequately respond to the increased regulatory compliance and reporting requirements that will be applicable after the Business Combination. If New Canoo is not able to implement the additional requirements of Section 404(a) in a timely manner or with adequate compliance, it may not be able to assess whether its internal controls over financial reporting are effective, which may subject it to adverse regulatory consequences and could harm investor confidence and the market price of its securities.

*New Canoo will qualify as an "emerging growth company" within the meaning of the Securities Act, and if it takes advantage of certain exemptions from disclosure requirements available to emerging growth companies, it could make New Canoo's securities less attractive to investors and may make it more difficult to compare New Canoo's performance to the performance of other public companies.*

New Canoo will qualify as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the JOBS Act. As such, New Canoo will be eligible for and intends to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies for as long as it continues to be an emerging growth company, including, but not limited to, (a) not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes- Oxley Act, (b) reduced disclosure obligations regarding executive compensation in New Canoo's periodic reports and proxy statements and (c) exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, New Canoo's stockholders may not have access to certain information they may deem important. New Canoo will remain an emerging growth company until the earliest of (i) the last day of the fiscal year in which the market value of HCAC Class A Common Stock that are held by non-affiliates exceeds $700 million as of June 30 of that fiscal year, (ii) the last day of the

70

fiscal year in which it has total annual gross revenue of $1.07 billion or more during such fiscal year (as indexed for inflation), (iii) the date on which it has issued more than $1 billion in non-convertible debt in the prior three-year period or (iv) the last day of the fiscal year following the fifth anniversary of the date of the first sale of HCAC Class A Common Stock in the IPO. Hennessy Capital cannot predict whether investors will find New Canoo's securities less attractive because it will rely on these exemptions. If some investors find New Canoo's securities less attractive as a result of New Canoo's reliance on these exemptions, the trading prices of New Canoo's securities may be lower than they otherwise would be, there may be a less active trading market for New Canoo's securities and the trading prices of New Canoo's securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non- emerging growth companies but any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of New Canoo's financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

***The unaudited pro forma financial information included herein may not be indicative of what New Canoo's actual financial position or results of operations would have been.***

The unaudited pro forma financial information included herein is presented for illustrative purposes only and is not necessarily indicative of what New Canoo's actual financial position or results of operations would have been had the Business Combination been completed on the dates indicated.

***Hennessy Capital's Sponsor, officers and directors have agreed to vote in favor of the Business Combination, regardless of how the Public Stockholders vote.***

Unlike many other blank check companies in which the sponsor, officers and directors agree to vote their founder shares in accordance with the majority of the votes cast by the Public Stockholders in connection with an initial business combination, Hennessy Capital's Sponsor, officers and directors have agreed to vote any shares of HCAC Common Stock owned by them in favor of the Business Combination, including their shares of HCAC Class B Common Stock and any Public Shares purchased after our IPO (including in open market and privately negotiated transactions). As of the record date, our Sponsor, officers and directors beneficially own an aggregate of approximately 17.8% of the outstanding shares of HCAC Common Stock. Accordingly, it is more likely that the necessary stockholder approval will be received than would be the case if such persons agreed to vote their shares of HCAC Common Stock in accordance with the majority of the votes cast by the Public Stockholders.

***Hennessy Capital may not be able to consummate an initial business combination within the required time period, in which case it would cease all operations except for the purpose of winding up and it would redeem the Public Shares and liquidate, in which case the Public Stockholders may only receive $10.10 per share, or less than such amount in certain circumstances, and the Public Warrants will expire worthless.***

The Existing Charter provides that it must complete an initial business combination by December 31, 2020. Hennessy Capital may not be able to complete an initial business combination by such date. If Hennessy Capital has not completed an initial business combination prior to December 31, 2020 (or successfully obtained stockholder approval of an extension prior to such date) it will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the Public Shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to Hennessy Capital to pay its taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding Public Shares, which redemption will completely extinguish the Public Stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption,

71

subject to the approval of Hennessy Capital's remaining stockholders and the HCAC Board, dissolve and liquidate, subject in each case to its obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. In such case, the Public Stockholders may only receive $10.10 per share, and the Public Warrants will expire worthless. In certain circumstances, the Public Stockholders may receive less than $10.10 per share on the redemption of their shares.

***Hennessy Capital's Sponsor, directors, officers, advisors and their affiliates may elect to purchase shares or warrants from Public Stockholders, which may influence the vote on the Business Combination and reduce the public "float" of HCAC Class A Common Stock.***

Hennessy Capital's Sponsor, directors, officers, advisors or their affiliates may purchase Public Shares or Public Warrants or a combination thereof in privately negotiated transactions or in the open market either prior to or following the completion of the Business Combination, although they are under no obligation to do so. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the Trust Account will be used to purchase Public Shares or Public Warrants in such transactions.

Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of Hennessy Capital shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that Hennessy Capital's Sponsor, directors, officers, advisors or their affiliates purchase shares in privately negotiated transactions from Public Stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. The purpose of such purchases could be to vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination. The purpose of any such purchases of Public Warrants could be to reduce the number of Public Warrants outstanding or to vote such warrants on any matters submitted to the warrantholders for approval in connection with the Business Combination. Any such purchases of Hennessy Capital securities may result in the completion the Business Combination, which may not otherwise have been possible. Any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements.

In addition, if such purchases are made, the public "float" of HCAC Class A Common Stock or Public Warrants and the number of beneficial holders of Hennessy Capital securities may be reduced, possibly making it difficult to maintain the quotation, listing or trading of Hennessy Capital securities on a national securities exchange.

***If a stockholder fails to receive notice of Hennessy Capital's offer to redeem the Public Shares in connection with the Business Combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.***

Hennessy Capital will comply with the tender offer rules or proxy rules, as applicable, when conducting redemptions in connection with the Business Combination. Despite Hennessy Capital's compliance with these rules, if a stockholder fails to receive Hennessy Capital's tender offer or proxy materials, as applicable, such stockholder may not become aware of the opportunity to redeem its shares. In addition, proxy materials or tender offer documents, as applicable, that Hennessy Capital will furnish to holders of the Public Shares in connection with the Business Combination will describe the various procedures that must be complied with in order to validly tender or redeem Public Shares. For example, Hennessy Capital may require the Public Stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to Hennessy Capital's transfer agent prior to the date set forth in the tender offer documents mailed to such holders, or up to two business days prior to the vote on the proposal to approve the Business Combination in the event Hennessy Capital distributes proxy materials, or to deliver their shares to the transfer agent electronically. In the event that a stockholder fails to comply with these or any other procedures, its shares may not be redeemed.

***The future exercise of registration rights may adversely affect the market price of our common stock.***

Certain of our shareholders will have registration rights for restricted securities. We are obligated to register certain securities, including all of the shares of HCAC Class B Common Stock held by the Founders and the Anchor Investor, the Private Placement Warrants, shares of HCAC Class A Common Stock received by certain significant

72

Table of Contents

Canoo equity holders as part of the Business Combination and the PIPE Shares. We are obligated to (i) file a resale "shelf" registration statement to register such securities (and any shares of New Canoo Common Stock into which they may be exercised following the consummation of the Business Combination) within 15 business days after of the Closing and (ii) use reasonable best efforts to cause such registration statement to be declared effective by the SEC as soon as reasonably practicable after the filing. Sales of a substantial number of shares of common stock pursuant to the resale registration statement in the public market could occur at any time the registration statement remains effective. In addition, certain registration rights holders can request underwritten offerings to sell their securities. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock.

***Warrants will become exercisable for our common stock, which would increase the number of shares eligible for future resale in the public market and result in dilution to our stockholders.***

Outstanding Public Warrants to purchase an aggregate of 22,511,250 shares of our common stock will become exercisable on the later of 30 days after the completion of the Business Combination or 12 months from the consummation of our IPO. Each warrant entitles the holder thereof to purchase one share of HCAC Class A Common Stock at a price of $11.50 per whole share, subject to adjustment. Warrants may be exercised only for a whole number of shares of HCAC Class A Common Stock. To the extent such warrants are exercised, additional shares of our common stock will be issued, which will result in dilution to the then existing holders of common stock of Canoo and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of our common stock.

***Our Public Stockholders will experience immediate dilution due to the issuance of shares of HCAC Class Common Stock to Canoo equity holders in the Business Combination and may experience additional dilution as a consequence of certain transactions, including the issuance of shares of HCAC common stock in the PIPE Financing. Having a minority share position may reduce the influence that our current stockholders have on the management of Canoo.***

It is anticipated that, following the completion of the Business Combination and assuming (for illustrative purposes) no redemptions of our outstanding public shares beyond the 211,561 shares redeemed in August 2020 in connection with the Extension Amendment, Hennessy Capital's existing stockholders, including our Sponsor, will retain an ownership interest of 15.3% of New Canoo, Canoo equity holders will own 71.5% of our outstanding common stock and the PIPE Investors will own approximately 13.2% of our outstanding common stock. These relative percentages assume that Hennessy Capital receives $323,250,000 in cash proceeds from the PIPE Financing. In addition, if any of Hennessy Capital's stockholders exercise their redemption rights, the ownership interest in Hennessy Capital of Hennessy Capital's Public Stockholders will decrease and the ownership interest in Hennessy Capital of our Founders, including our Sponsor, will increase. To the extent that any of the HCAC Warrants are converted into HCAC Common Stock or any Earnout Shares are issued, current stockholders may experience substantial dilution. Such dilution could, among other things, limit the ability of our current stockholders to influence management of New Canoo through the election of directors following the Business Combination.

***Neither Hennessy Capital nor its stockholders will have the protection of any indemnification, escrow, price adjustment or other provisions that allow for a post-closing adjustment to be made to the total merger consideration in the event that any of the representations and warranties made by Canoo in the Merger Agreement ultimately proves to be inaccurate or incorrect.***

The representations and warranties made by Canoo and Hennessy Capital to each other in the Merger Agreement will not survive the consummation of the Business Combination. As a result, Hennessy Capital and its stockholders will not have the protection of any indemnification, escrow, price adjustment or other provisions that allow for a post-closing adjustment to be made to the total merger consideration if any representation or warranty made by Canoo in the Merger Agreement proves to be inaccurate or incorrect. Accordingly, to the extent such representations or warranties are incorrect, Hennessy Capital would have no indemnification claim with respect thereto and its financial condition or results of operations could be adversely affected.

73

Table of Contents

*We may waive one or more of the conditions to the Business Combination.*

We may agree to waive, in whole or in part, some of the conditions to our obligations to complete the Business Combination, to the extent permitted by the Existing Charter and applicable laws. For example, it is a condition to our obligations to close the Business Combination that certain of Canoo's representations and warranties are true and correct in all respects as of the closing date, except where the failure of such representants and warranties to be true and correct, taken as a whole, does not result in a material adverse effect. However, if our board of directors determines that it is in our stockholders' best interest to waive any such breach, then the board may elect to waive that condition and close the Business Combination. We are not able to waive the condition that our stockholders approve the Business Combination.

*Hennessy Capital's ability to successfully effect the Business Combination and New Canoo's ability to successfully operate the business thereafter will be largely dependent upon the efforts of certain key personnel of Canoo, all of whom Hennessy Capital expects to stay with New Canoo following the Closing. The loss of such key personnel could negatively impact the operations and financial results of the combined business.*

Hennessy Capital's ability to successfully effect the Business Combination and New Canoo's ability to successfully operate the business following the Closing is dependent upon the efforts of certain key personnel of Canoo. Although Hennessy Capital expects key personnel to remain with New Canoo following the Business Combination, there can be no assurance that they will do so. It is possible that Canoo will lose some key personnel, the loss of which could negatively impact the operations and profitability of New Canoo. Furthermore, following the Closing, certain of the key personnel of Canoo may be unfamiliar with the requirements of operating a company regulated by the SEC, which could cause New Canoo to have to expend time and resources helping them become familiar with such requirements.

*The HCAC Board did not obtain a fairness opinion in determining whether or not to proceed with the Business Combination and, as a result, the terms may not be fair from a financial point of view to the Public Stockholders.*

In analyzing the Business Combination, the HCAC Board conducted significant due diligence on Canoo. For a complete discussion of the factors utilized by the HCAC Board in approving the Business Combination, see the section entitled, "*The Business Combination — Hennessy Capital's Board of Directors' Reasons for the Approval of the Business Combination.*" The HCAC Board believes because of the financial skills and background of its directors, it was qualified to conclude that the Business Combination was fair from a financial perspective to its stockholders and that Canoo's fair market value was at least 80% of Hennessy Capital's net assets (excluding any taxes payable on interest earned).

Notwithstanding the foregoing, the HCAC Board did not obtain a fairness opinion to assist it in its determination. Accordingly, the HCAC Board may be incorrect in its assessment of the Business Combination.

*Hennessy Capital does not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for Hennessy Capital to complete the Business Combination with which a substantial majority of Hennessy Capital's stockholders do not agree.*

The Existing Charter does not provide a specified maximum redemption threshold, except that in no event will Hennessy Capital redeem the Public Shares in an amount that would cause its net tangible assets to be less than $5,000,001 upon consummation of the Business Combination and after payment of underwriters' fees and commissions (such that Hennessy Capital is not subject to the SEC's "penny stock" rules). As a result, Hennessy Capital may be able to complete the Business Combination even if a substantial majority of the Public Stockholders do not agree with the Business Combination and have redeemed their shares. In the event the aggregate cash consideration Hennessy Capital would be required to pay for all shares of HCAC Class A Common Stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the Business Combination exceed the aggregate amount of cash available to Hennessy Capital, Hennessy Capital will not complete the Business Combination or redeem any shares, all shares of HCAC Class A Common Stock submitted for redemption will be returned to the holders thereof, and Hennessy Capital instead may search for an alternate business combination.

74

Table of Contents

*Public Stockholders will not have any rights or interests in funds from the Trust Account, except under certain limited circumstances. To liquidate their investment, therefore, Public Stockholders may be forced to sell their Public Shares or Public Warrants, potentially at a loss.*

Public Stockholders will be entitled to receive funds from the Trust Account only upon the earliest to occur of: (i) Hennessy Capital's completion of an initial business combination, and then only in connection with those shares of HCAC Class A Common Stock that such Public Stockholder properly elected to redeem, subject to the limitations described herein, (ii) the redemption of any Public Shares properly submitted in connection with a stockholder vote to amend the Existing Charter (A) to modify the substance or timing of Hennessy Capital's obligation to redeem 100% of the Public Shares if Hennessy Capital does not complete an initial business combination by December 31, 2020 or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) the redemption of the Public Shares if Hennessy Capital is unable to complete an initial business combination by December 31, 2020, subject to applicable law and as further described herein. In no other circumstances will a Public Stockholder have any right or interest of any kind in the Trust Account. Holders of Public Warrants will not have any right to the proceeds held in the Trust Account with respect to the Public Warrants. Accordingly, to liquidate their investment, Public Shareholders may be forced to sell their Public Shares or Public Warrants, potentially at a loss.

*If a stockholder or a "group" of stockholders are deemed to hold in excess of 15% of the issued and outstanding shares of HCAC Class A Common Stock, such stockholder or group will lose the ability to redeem all such shares in excess of 15% of the issued and outstanding shares of HCAC Class A Common Stock.*

The Existing Charter provides that a Public Stockholder, individually or together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to an aggregate of more than 15% of the shares of common stock sold in the IPO without Hennessy Capital's prior written consent. The inability of a stockholder to redeem an aggregate of more than 15% of the shares of common stock sold in the IPO will reduce its influence over Hennessy Capital's ability to consummate its initial business combination and such stockholder could suffer a material loss on its investment in Hennessy Capital if it sells such excess shares in open market transactions. As a result, such stockholders will continue to hold that number of shares exceeding 15% and, in order to dispose of such shares, would be required to sell its shares in open market transaction, potentially at a loss.

*If third parties bring claims against Hennessy Capital, the proceeds held in the Trust Account could be reduced and the per-share redemption amount received by stockholders may be less than $10.10 per share.*

Hennessy Capital's placing of funds in the Trust Account may not protect those funds from third-party claims against Hennessy Capital. Although Hennessy Capital has sought to have all vendors, service providers, prospective target businesses and other entities with which it does business (except its independent registered accounting firm) execute agreements with Hennessy Capital waiving any right, title, interest or claim of any kind in or to any monies held in the Trust Account for the benefit of the Public Stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the Trust Account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against Hennessy Capital's assets, including the funds held in the Trust Account. If any third-party refuses to execute an agreement waiving such claims to the monies held in the Trust Account, Hennessy Capital's management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third-party that has not executed a waiver if management believes that such third-party's engagement would be significantly more beneficial to Hennessy Capital than any alternative. Hennessy Capital is not aware of any product or service providers who have not or will not provide such waiver other than the underwriters of its initial public offering and Hennessy Capital's independent registered public accounting firm.

Examples of possible instances where Hennessy Capital may engage a third-party that refuses to execute a waiver include the engagement of a third-party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with Hennessy Capital and will not seek recourse against the Trust Account for any reason. Upon redemption of the Public Shares, if Hennessy Capital is unable to complete its initial business

75

Table of Contents

combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with its initial business combination, Hennessy Capital will be required to provide for payment of claims of creditors that were not waived that may be brought against Hennessy Capital within the 10 years following redemption. Accordingly, the per-share redemption amount received by Public Stockholders could be less than the $10.10 per share initially held in the Trust Account, due to claims of such creditors. Pursuant to a letter agreement, the Sponsor has agreed that it will be liable to Hennessy Capital if and to the extent any claims by a third-party for services rendered or products sold to us, or a prospective target business with which Hennessy Capital has entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the Trust Account to below the lesser of (i) $10.10 per public share and (ii) the actual amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account, if less than $10.10 per share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third-party or prospective target business who executed a waiver of any and all rights to the monies held in the Trust Account (whether or not such waiver is enforceable) nor will it apply to any claims under Hennessy Capital's indemnity of the underwriters of Hennessy Capital's initial public offering against certain liabilities, including liabilities under the Securities Act. However, Hennessy Capital has not asked the Sponsor to reserve for such indemnification obligations, nor has Hennessy Capital independently verified whether the Sponsor has sufficient funds to satisfy its indemnity obligations and believes that the Sponsor's only assets are securities of Hennessy Capital. Therefore, Hennessy Capital cannot assure you that the Sponsor would be able to satisfy those obligations. None of Hennessy Capital's officers or directors will indemnify Hennessy Capital for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

***Hennessy Capital's directors may decide not to enforce the indemnification obligations of the Sponsor, resulting in a reduction in the amount of funds in the Trust Account available for distribution to the Public Shareholders.***

In the event that the proceeds in the Trust Account are reduced below the lesser of (i) $10.10 per public share and (ii) the actual amount per share held in the Trust Account as of the date of the liquidation of the Trust Account if less than $10.10 per share due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and the Sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, Hennessy Capital's independent directors would determine whether to take legal action against the Sponsor to enforce its indemnification obligations.

While Hennessy Capital currently expects that its independent directors would take legal action on its behalf against the Sponsor to enforce its indemnification obligations to Hennessy Capital, it is possible that Hennessy Capital's independent directors in exercising their business judgment and subject to their fiduciary duties may choose not to do so in any particular instance if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. If Hennessy Capital's independent directors choose not to enforce these indemnification obligations, the amount of funds in the Trust Account available for distribution to the Public Stockholders may be reduced below $10.10 per share.

***Hennessy Capital may not have sufficient funds to satisfy indemnification claims of its directors and executive officers.***

Hennessy Capital has agreed to indemnify its officers and directors to the fullest extent permitted by law. However, Hennessy Capital's officers and directors have agreed to waive any right, title, interest or claim of any kind in or to any monies in the Trust Account and not to seek recourse against the Trust Account for any reason whatsoever. Accordingly, any indemnification provided will be able to be satisfied by Hennessy Capital only if (i) Hennessy Capital has sufficient funds outside of the Trust Account or (ii) Hennessy Capital consummates an initial business combination. Hennessy Capital's obligation to indemnify its officers and directors may discourage stockholders from bringing a lawsuit against its officers or directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against Hennessy Capital's officers and directors, even though such an action, if successful, might otherwise benefit Hennessy Capital and its stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent Hennessy Capital pays the costs of settlement and damage awards against its officers and directors pursuant to these indemnification provisions.

76

***If, after Hennessy Capital distributes the proceeds in the Trust Account to the Public Stockholders, it files a bankruptcy petition or an involuntary bankruptcy petition is filed against Hennessy Capital that is not dismissed, a bankruptcy court may seek to recover such proceeds, and Hennessy Capital and its board may be exposed to claims of punitive damages.***

If, after Hennessy Capital distributes the proceeds in the Trust Account to its stockholders, it files a bankruptcy petition or an involuntary bankruptcy petition is filed against Hennessy Capital that is not dismissed, any distributions received by Hennessy Capital's stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by Hennessy Capital's stockholders. In addition, the HCAC Board may be viewed as having breached its fiduciary duty to its creditors and/or having acted in bad faith, thereby exposing itself and Hennessy Capital to claims of punitive damages, by paying Hennessy Capital's stockholders from the Trust Account prior to addressing the claims of creditors.

***If, before distributing the proceeds in the Trust Account to the Public Stockholders, Hennessy Capital files a bankruptcy petition or an involuntary bankruptcy petition is filed against Hennessy Capital that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of Hennessy Capital's stockholders and the per-share amount that would otherwise be received by Hennessy Capital's stockholders in connection with Hennessy Capital's liquidation may be reduced.***

If, before distributing the proceeds in the Trust Account to the Public Stockholders, Hennessy Capital files a bankruptcy petition or an involuntary bankruptcy petition is filed against Hennessy Capital that is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in Hennessy Capital's bankruptcy estate and subject to the claims of third parties with priority over the claims of Hennessy Capital's stockholders. To the extent any bankruptcy claims deplete the Trust Account, the per-share amount that would otherwise be received by Hennessy Capital's stockholders in connection with Hennessy Capital's liquidation may be reduced.

***Hennessy Capital stockholders may be held liable for claims by third parties against Hennessy Capital to the extent of distributions received by them upon redemption of their shares.***

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of the Trust Account distributed to the Public Stockholders upon the redemption of the Public Shares in the event Hennessy Capital does not complete an initial business combination by December 31, 2020 may be considered a liquidating distribution under Delaware law. If a corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution. However, it is Hennessy Capital's intention to redeem the Public Shares as soon as reasonably possible following December 31, 2020 in the event it does not complete its initial business combination and, therefore, Hennessy Capital does not intend to comply with the foregoing procedures.

Because Hennessy Capital will not be complying with Section 280, Section 281(b) of the DGCL requires Hennessy Capital to adopt a plan, based on facts known to Hennessy Capital at such time that will provide for Hennessy Capital's payment of all existing and pending claims or claims that may be potentially brought against Hennessy Capital within the 10 years following its dissolution. However, because Hennessy Capital is a blank check company, rather than an operating company, and Hennessy Capital's operations are limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from Hennessy Capital's vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. If Hennessy Capital's plan of distribution complies with Section 281(b) of the DGCL, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would likely be barred after the third anniversary of the dissolution. Hennessy Capital cannot assure you that it will properly assess all claims that may be potentially brought against us. As such, Hennessy Capital's stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of Hennessy Capital's stockholders may extend beyond the third anniversary of such date. Furthermore, if the pro rata portion of the Trust Account distributed to the Public Stockholders upon the redemption of the Public Shares in the event Hennessy Capital

77

Table of Contents

does not complete an initial business combination by December 31, 2020 is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful (potentially due to the imposition of legal proceedings that a party may bring or due to other circumstances that are currently unknown), then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution.

***Hennessy Capital's Sponsor, officers and directors have potential conflicts of interest in recommending that stockholders vote in favor of approval of the Business Combination Proposal and approval of the other proposals described in this proxy statement/prospectus.***

When considering the HCAC Board's recommendation that Hennessy Capital's stockholders vote in favor of the approval of the Business Combination Proposal, Hennessy Capital's stockholders should be aware that certain of Hennessy Capital's Sponsor, executive officers and directors have interests in the Business Combination that may be different from or in addition to (and which may conflict with) the interests of Hennessy Capital's stockholders. These interests include:

- the beneficial ownership of the Sponsor and certain of Hennessy Capital's board of directors and officers of an aggregate of 6,631,820 shares of HCAC Class B Common Stock, which were acquired for an aggregate purchase price of $25,000 prior to the IPO, and 11,739,394 Private Placement Warrants, which were acquired for an aggregate purchase price of $11,739,394 simultaneously with the consummation of the IPO, which shares and warrants would become worthless if Hennessy Capital does not complete a business combination within the applicable time period, as the Founders have waived any redemption right with respect to these shares. Such shares and warrants have an aggregate market value of approximately $68.4 million and $16.7 million, respectively, based on the closing price of HCAC Class A Common Stock of $10.31 and Public Warrants of $1.42 on Nasdaq on October 27, 2020, the record date for the special meeting of stockholders. Each of our officers and directors is a member of the Sponsor. Hennessy Capital LLC is the managing member of the Sponsor and has voting and investment discretion with respect to the common stock held by the Sponsor. Daniel J. Hennessy is the manager of Hennessy Capital LLC;

- as compensation for his services rendered to Hennessy Capital prior to the Business Combination, Mr. Ethridge, Hennessy Capital's President and Chief Operating Officer, will receive a $500,000 cash payment upon the successful completion of its initial business combination;

- the anticipated continuation of Greg Ethridge, Hennessy Capital's President, Chief Operating Officer and director, as a director of New Canoo;

- Hennessy Capital SPV II LLC, an entity controlled by Daniel J. Hennessy, has entered into a Subscription Agreement as part of the PIPE Financing for the purchase of 500,000 PIPE Shares for an aggregate purchase price of $5.0 million;

- the continued indemnification of current directors and officers of Hennessy Capital and the continuation of directors' and officers' liability insurance after the Business Combination;

- the fact that our Sponsor, officers and directors will be reimbursed for out-of-pocket expenses incurred in connection with activities on our behalf, such as identifying potential target businesses and performing due diligence on suitable business combinations; and

- the fact that our Sponsor, officers and directors will lose their entire investment in us if an initial business combination is not completed.

These interests may influence Hennessy Capital's directors in making their recommendation that you vote in favor of the Business Combination Proposal, and the transactions contemplated thereby. These interests were considered by the HCAC Board when it approved the Business Combination.

***Concentration of ownership after the Business Combination may have the effect of delaying or preventing a change in control.***

It is anticipated that, following the completion of the Business Combination and assuming (for illustrative purposes) redemptions of approximately 100% of our outstanding public shares, Hennessy Capital's initial stockholders, including our Sponsor, will retain an ownership interest of 15.3% of New Canoo and Canoo equity holders will own 71.5% of our outstanding common stock. As a result, Canoo equity holders may have the ability to determine the

78

Table of Contents

outcome of corporate actions of New Canoo requiring stockholder approval. This concentration of ownership may have the effect of delaying or preventing a change in control and might adversely affect the market price of our common stock. See the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*" for further information.

***We may not be able to complete the PIPE Financing in connection with the Business Combination.***

We may not be able to complete the PIPE Financing on terms that are acceptable to us, or at all. If we do not complete the PIPE Financing, we may not be able to complete the Business Combination. The terms of any alternative financing may be more onerous to New Canoo than the PIPE Financing, and we may be unable to obtain alternative financing on terms that are acceptable to us, or at all. If we do not complete the PIPE Financing, and do not obtain alternative financing, we may not be able to complete the Business Combination. The failure to secure additional financing could have a material adverse effect on the continued development or growth of New Canoo. None of our officers, directors or stockholders is required to provide any financing to us in connection with or after the Business Combination.

***Hennessy Capital may amend the terms of the HCAC Warrants in a manner that may be adverse to holders of Public Warrants with the approval by the holders of at least 65% of the then outstanding HCAC Warrants. As a result, the exercise price of the HCAC Warrants could be increased, the exercise period could be shortened and the number of shares of HCAC Class A Common Stock purchasable upon exercise of an HCAC Warrant could be decreased, all without your approval.***

The HCAC Warrants were issued in registered form under the HCAC Warrant Agreement between Continental Stock Transfer & Trust Company, as warrant agent, and Hennessy Capital. The HCAC Warrant Agreement provides that the terms of the HCAC Warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 65% of the then outstanding HCAC Warrants to make any change that adversely affects the interests of the registered holders of the Public Warrants. Accordingly, Hennessy Capital may amend the terms of the Public Warrants in a manner adverse to a holder if holders of at least 65% of the then outstanding HCAC Warrants approve of such amendment. Although Hennessy Capital's ability to amend the terms of the Public Warrants with the consent of at least 65% of the then outstanding HCAC Warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the HCAC Warrants, convert the HCAC Warrants into cash or stock, shorten the exercise period or decrease the number of shares of HCAC Class A Common Stock purchasable upon exercise of an HCAC Warrant.

***Hennessy Capital may redeem your unexpired warrants prior to their exercise at a time that is disadvantageous to you, thereby making your HCAC Warrants worthless.***

Hennessy Capital has the ability to redeem outstanding HCAC Warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the last reported sales price of HCAC Class A Common Stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which Hennessy Capital gives proper notice of such redemption and provided certain other conditions are met. If and when the HCAC Warrants become redeemable by Hennessy Capital, Hennessy Capital may not exercise its redemption right if the issuance of shares of common stock upon exercise of the HCAC Warrants is not exempt from registration or qualification under applicable state blue sky laws or Hennessy Capital is unable to effect such registration or qualification. Hennessy Capital will use its best efforts to register or qualify such shares of common stock under the blue sky laws of the state of residence in those states in which the HCAC Warrants were offered by Hennessy Capital in its initial public offering. Redemption of the outstanding HCAC Warrants could force you (i) to exercise your HCAC Warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (ii) to sell your HCAC Warrants at the then-current market price when you might otherwise wish to hold your HCAC Warrants or (iii) to accept the nominal redemption price which, at the time the outstanding HCAC Warrants are called for redemption, is likely to be substantially less than the market value of your HCAC Warrants. None of the Private Placement Warrants will be redeemable by Hennessy Capital so long as they are held by the Sponsor, the Anchor Investor or their permitted transferees.

Table of Contents

***There is uncertainty regarding the U.S. federal income tax consequences of the redemption to the holders of HCAC Class A Common Stock.***

There is some uncertainty regarding the U.S. federal income tax consequences to holders of HCAC Class A Common Stock who exercise their redemption rights. The uncertainty of tax consequences relates primarily to the individual circumstances of the taxpayer and include (i) whether the redemption results in a dividend, taxable as ordinary income, or a sale, taxable as capital gain, and (ii) whether such capital gain is "long-term" or "short-term." Whether the redemption qualifies for sale treatment, resulting in taxation as capital gain rather than ordinary income, will depend largely on whether the holder owns (or is deemed to own) any shares of HCAC Class A Common Stock following the redemption, and if so, the total number of shares of HCAC Class A Common Stock held by the holder both before and after the redemption relative to all shares of HCAC Class A Common Stock outstanding both before and after the redemption. The redemption generally will be treated as a sale, rather than a dividend, if the redemption (i) is "substantially disproportionate" with respect to the holder, (ii) results in a "complete termination" of the holder's interest in Hennessy Capital or (iii) is "not essentially equivalent to a dividend" with respect to the holder. Due to the personal and subjective nature of certain of such tests and the absence of clear guidance from the IRS, there is uncertainty as to whether a holder who elects to exercise its redemption rights will be taxed on any gain from the redemption as ordinary income or capital gain. See the section entitled "*Certain U.S. Federal Income Tax Considerations of the Redemption and the Business Combination.*"

***We may issue additional shares of common stock or preferred shares under an employee incentive plan upon or after consummation of the Business Combination, which would dilute the interest of our stockholders.***

Our Existing Charter authorizes the issuance of up to 100,000,000 shares of HCAC Class A Common Stock, par value $0.0001 per share, 10,000,000 shares of HCAC Class B Common Stock, par value $0.0001 per share, and 1,000,000 shares of preferred stock, par value $0.0001 per share. There are currently 34,103,811 and 2,496,250 authorized but unissued shares of HCAC Class A Common Stock and HCAC Class B Common Stock, respectively, available for issuance, which amount takes into account the shares of HCAC Class A Common Stock reserved for issuance upon exercise of outstanding warrants but not the shares of HCAC Class A Common Stock issuable upon conversion of HCAC Class B Common Stock. There are currently no shares of preferred stock issued and outstanding. Shares of HCAC Class B Common Stock are convertible into shares of HCAC Class A Common Stock initially at a one-for-one ratio but subject to adjustment as set forth herein, including in certain circumstances in which we issue HCAC Class A Common Stock or equity-linked securities related to our initial business combination.

We may issue a substantial number of additional shares of common or preferred stock under an employee incentive plan after consummation of the Business Combination (although our Existing Charter provides that we may not issue securities that can vote with common stockholders on matters related to our pre-initial business combination activity). We may also issue shares of HCAC Class A Common Stock upon conversion of the HCAC Class B Common Stock at a ratio greater than one-to-one at the time of our initial business combination as a result of the anti-dilution provisions contained in our Existing Charter. However, our Existing Charter provides, among other things, that prior to our initial business combination, we may not issue additional shares of capital stock that would entitle the holders thereof to (i) receive funds from the Trust Account or (ii) vote on any initial business combination. These provisions of our Existing Charter, like all provisions of our Existing Charter, may be amended with the approval of our stockholders. However, our executive officers and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our Existing Charter (A) to modify the substance or timing of our obligation to redeem 100% of the Public Shares if we do not complete our initial business combination by December 31, 2020 or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity, unless we provide the Public Stockholders with the opportunity to redeem their shares of common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest (which interest will be net of taxes payable), divided by the number of then outstanding Public Shares.

We may issue a substantial number of additional shares of common stock or shares of preferred stock under an employee incentive plan upon or after consummation of the Business Combination. However, our Existing Charter provides that we may not issue any additional shares of capital stock that would entitle the holders thereof to receive

80

Table of Contents

funds from the Trust Account or vote as a class with the Public Shares on an initial business combination. Although no such issuance will affect the per share amount available for redemption from the Trust Account, the issuance of additional common stock or preferred shares:

The issuance of additional shares of common or preferred stock:

- may significantly dilute the equity interest of investors;

-  may subordinate the rights of holders of common stock if preferred stock is issued with rights senior to those afforded our common stock;

-  could cause a change of control if a substantial number of shares of our common stock are issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors; and

-  may adversely affect prevailing market prices for our HCAC Units, HCAC Class A Common Stock and/or HCAC Warrants.

***Our Existing Charter requires, to the fullest extent permitted by law, that derivative actions brought in our name, actions against our directors, officers, other employees or stockholders for breach of fiduciary duty and other similar actions may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel, which may have the effect of discouraging lawsuits against our directors, officers, other employees or stockholders.***

Our Existing Charter requires, to the fullest extent permitted by law, that derivative actions brought in our name, actions against our directors, officers, other employees or stockholders for breach of fiduciary duty and other similar actions may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel except any action (A) as to which the Court of Chancery in the State of Delaware determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), (B) which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, (C) for which the Court of Chancery does not have subject matter jurisdiction, or (D) any action arising under the Securities Act, as to which the Court of Chancery and the federal district court for the District of Delaware will have concurrent jurisdiction. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock will be deemed to have notice of and consented to the forum provisions in our Existing Charter. This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, other employees or stockholders, which may discourage lawsuits with respect to such claims, although our stockholders will not be deemed to have waived our compliance with federal securities laws and the rules and regulations thereunder. However, there is no assurance that a court would enforce the choice of forum provision contained in our Existing Charter. If a court were to find such provision to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, operating results and financial condition.

Our Existing Charter provides that the exclusive forum provision will be applicable to the fullest extent permitted by applicable law. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. As a result, the exclusive forum provision will not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction.

***Because we have no current plans to pay cash dividends on HCAC Class A Common Stock for the foreseeable future, you may not receive any return on investment unless you sell HCAC Class A Common Stock for a price greater than that which you paid for it.***

We may retain future earnings, if any, for future operations, expansion and debt repayment and have no current plans to pay any cash dividends for the foreseeable future. Any decision to declare and pay dividends as a public company in the future will be made at the discretion of the HCAC Board and will depend on, among other things, our results of operations, financial condition, cash requirements, contractual restrictions and other factors that the

81

Table of Contents

HCAC Board may deem relevant. In addition, our ability to pay dividends may be limited by covenants of any existing and future outstanding indebtedness we or our subsidiaries incur. As a result, you may not receive any return on an investment in HCAC Class A Common Stock unless you sell HCAC Class A Common Stock for a price greater than that which you paid for it. See the section entitled "*Ticker Symbol, Market Price, and Dividend Policy.*"

***If, following the Business Combination, securities or industry analysts do not publish or cease publishing research or reports about New Canoo, its business, or its market, or if they change their recommendations regarding New Canoo's securities adversely, the price and trading volume of New Canoo's securities could decline.***

The trading market for New Canoo's securities will be influenced by the research and reports that industry or securities analysts may publish about New Canoo, its business, market or competitors. Securities and industry analysts do not currently, and may never, publish research on New Canoo. If no securities or industry analysts commence coverage of New Canoo, New Canoo's share price and trading volume would likely be negatively impacted. If any of the analysts who may cover New Canoo change their recommendation regarding New Canoo's shares of common stock adversely, or provide more favorable relative recommendations about New Canoo's competitors, the price of New Canoo's shares of common stock would likely decline. If any analyst who may cover New Canoo were to cease coverage of New Canoo or fail to regularly publish reports on it, New Canoo could lose visibility in the financial markets, which in turn could cause its share price or trading volume to decline.

***Anti-takeover provisions contained in the Proposed Charter and bylaws, as well as provisions of Delaware law, could impair a takeover attempt.***

The Proposed Charter and proposed amended and restated bylaws contain provisions that could have the effect of delaying or preventing changes in control or changes in our management without the consent of our board of directors. These provisions include:

- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;

- the exclusive right of our board of directors to elect a director to fill a vacancy created by the expansion of the board of directors or the resignation, death, or removal of a director with or without cause by stockholders, which prevents stockholders from being able to fill vacancies on our board of directors;

- the ability of our board of directors to determine whether to issue shares of our preferred stock and to determine the price and other terms of those shares, including preferences and voting rights, without stockholder approval, which could be used to significantly dilute the ownership of a hostile acquirer;

- a prohibition on stockholder action by written consent, which forces stockholder action to be taken at an annual or special meeting of our stockholders;

- the requirement that a special meeting of stockholders may be called only by the chairperson of the board of directors, the chief executive officer, the board of directors, which may delay the ability of our stockholders to force consideration of a proposal or to take action, including the removal of directors;

- limiting the liability of, and providing indemnification to, our directors and officers;

- controlling the procedures for the conduct and scheduling of stockholder meetings;

- providing for a staggered board, in which the members of the board of directors are divided into three classes to serve for a period of three years from the date of their respective appointment or election;

- granting the ability to remove directors with cause by the affirmative vote of a majority in voting power of the outstanding shares of Company common stock entitled to vote thereon;

- requiring the affirmative vote of at least 66-2/3% of the voting power of the outstanding shares of capital stock of New Canoo entitled to vote generally in the election of directors, voting together as a single class, to amend the proposed amended and restated bylaws or Articles V, VI, VII and VIII of the Proposed Charter; and

82

Table of Contents

- advance notice procedures that stockholders must comply with in order to nominate candidates to the New Canoo Board or to propose matters to be acted upon at a stockholders' meeting, which may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of New Canoo.

These provisions, alone or together, could delay hostile takeovers and changes in control of New Canoo or changes in the New Canoo Board and New Canoo's management.

As a Delaware corporation, we are also subject to provisions of Delaware law, including Section 203 of the DGCL, which prevents some stockholders holding more than 15% of our outstanding common stock from engaging in certain business combinations without approval of the holders of substantially all of New Canoo Common Stock. Any provision of Proposed Charter or bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock and could also affect the price that some investors are willing to pay for our common stock.

***The Subscription Agreements for the PIPE Financing include a jury trial waiver that could limit a PIPE Investor's ability to bring or demand a jury trial in connection with any litigation pursuant to the Subscription Agreements.***

The Subscription Agreements for the PIPE Financing contain a provision pursuant to which the parties waive their respective rights to a trial by jury in connection with any litigation pursuant to the Subscription Agreements. This jury trial waiver does not apply to subsequent secondary purchasers of the shares of HCAC Class A Common Stock issued and sold pursuant to the Subscription Agreements nor does it apply to any of our other stockholders. Further, this jury trial waiver does not apply to the PIPE Investors in respect of any claim or cause of action not in connection with any litigation pursuant to the Subscription Agreements.

If we opposed a jury trial demand based on the jury trial waiver, the appropriate court would determine whether the waiver was enforceable based on the facts and circumstances of that case in accordance with the applicable state and federal law, including in respect of federal securities laws claims. To our knowledge, the enforceability of a contractual pre-dispute jury trial waiver in connection with claims arising under the federal securities laws has not been finally adjudicated by the United States Supreme Court. However, we believe that a contractual pre-dispute jury trial waiver provision is generally enforceable, including under the laws of the New York, which govern our Subscription Agreements.

In determining whether to enforce a contractual pre-dispute jury trial waiver provision, courts will generally consider whether a party knowingly, intelligently and voluntarily waived the right to a jury trial. We believe that this is the case with respect to our Subscription Agreements. Nevertheless, if this contractual pre-dispute jury trial waiver provision is not permitted by applicable law, an action could proceed under the terms of the Subscription Agreements with a jury trial. No condition, stipulation or provision of the Subscription Agreements serves as a waiver by any PIPE Investor or by us of compliance with the federal securities laws.

This waiver of jury trial provision may limit a PIPE Investor's ability to bring or demand a jury trial in connection with any litigation pursuant to the applicable Subscription Agreement, which may discourage lawsuits with respect to such claims. Alternatively, if a court were to find the waiver of jury trial provision contained in the Subscription Agreements to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action, which could harm our business, operating results and financial condition.

***Cyber incidents or attacks directed at us could result in information theft, data corruption, operational disruption and/or financial loss.***

We depend on digital technologies, including information systems, infrastructure and cloud applications and services, including those of third parties with which we may deal. Sophisticated and deliberate attacks on, or security breaches in, our systems or infrastructure, or the systems or infrastructure of third parties or the cloud, could lead to corruption or misappropriation of our assets, proprietary information and sensitive or confidential data. As an early stage company without significant investments in data security protection, we may not be sufficiently protected against such occurrences. We may not have sufficient resources to adequately protect against, or to investigate and remediate any vulnerability to, cyber incidents. It is possible that any of these occurrences, or a combination of them, could have adverse consequences on our business and lead to financial loss.

83

In considering the Business Combination, the HCAC Board concluded that Canoo substantially met the above criteria. In particular, the HCAC Board considered the following positive factors, although not weighted or presented in any order of significance:

- *Favorable Opportunities for Revenue and Earnings Growth Due to Secular Growth Trends in the EV Industry and Canoo's Unique Multi-Pronged Go-to-Market Strategy.* Based on third-party data and industry reports, which Hennessy Capital has not independently verified but believes to be reliable, EVs sales are projected to experience significant growth. According to BloombergNEF, EV sales are expected to increase by 400% between 2020 and 2025. Between 2020 and 2030, EV sales are expected to increase by 15x, and by over 30x in 2040. This is driven by a significant projected increase in the EV share of new car sales from only 3% in 2020 to 10%, 28% and 58% in 2025, 2030 and 2040, respectively, according to BloombergNEF. Canoo has established a multi-faceted go-to-market strategy targeting both business-to-consumer ("B2C") and business-to-business ("B2B") opportunities, substantially expanding its total addressable markets and offering the upside of multiple growth opportunities while diversifying its business and limiting risk exposure to any single source of revenue. Canoo's flexible strategy is uniquely underpinned by its versatile skateboard platform, which minimizes new development expenditures and engineering costs, and can be leveraged to capitalize on demand opportunities for both B2C and B2B applications. Sharing the same core skateboard platform across all vehicle lines also generates significant manufacturing flexibility and efficiencies, while reducing costs, complexity and assembly time.

  - *B2B Engineering and Licensing Opportunities*: Canoo's engineering and technology services business includes consulting and contract engineering work that is in high demand due to the team's unique experience and technical capabilities. Canoo's pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategics and high growth technology companies. Canoo has already received significant interest in its skateboard technology and the Canoo team's expertise in platform engineering, powertrains and vehicle design, as is exemplified by the announcement of an agreement between Canoo and Hyundai Motor Group for the co-development of a future EV platform based on Canoo's modular skateboard technology. In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk the overall business model.

  - *B2B Delivery Vehicle*: Canoo's Delivery Vehicle targets the attractive last-mile delivery market, which is driven by the estimated over $1 trillion and rapidly growing e-commerce market. Many customers are seeking a sustainable and cost-effective delivery solutions for faster fulfillment capabilities. Canoo is uniquely positioned to capitalize on these market trends through an all-electric solution that offers maximized cargo volume in an efficient urban-friendly sized footprint.

  - *B2C Subscriptions:* Canoo's B2C strategy is targeting growing EV demand from consumers with its Lifestyle Vehicle, which it plans to roll out in select U.S. urban markets through a consumer subscription model in 2022 (and to be followed by its more sedan-like Sport Vehicle in later years). The scalable design and modularity of Canoo's skateboard platform reinforces Canoo's ability to introduce a variety of B2C-focused vehicle cabin configurations at lower development costs while accelerating its go-to-market timing. Canoo's initial and future B2C vehicles, built on top of its core skateboard platform, present a strong opportunity to capitalize on significant demand for passenger EVs.

- *Compelling Financial Model with Long-Term Attractive Margin and Cash Flow Generation Potential.* Canoo's subscription-based consumer model deviates from the traditional OEM model of vehicle sales or traditional leases, and can achieve attractive returns by elongating the revenue generation horizon of a single vehicle over the long life of the asset. Under a consumer subscription model, Canoo generates consistent cash flows, an estimated margin of approximately four times that of a one-time sale, and compelling return on equity given the leveragability of the underlying individual vehicle assets (with an estimated advance rate on vehicle bill of materials and production cost in excess of 80% over time and attractive financing terms through the over half a trillion dollar market for automotive financing and securitization). Further, Canoo is much less dependent on new vehicle sales creating a considerably more profitable and resilient business model which is expected to create steady and recurring cash flow. Revenues from traditional sales models of the last-mile delivery vehicles and contract engineering and licensing opportunities also are anticipated by Canoo management to have attractive margins.

107

Table of Contents

**Sponsor Warrant Exchange and Share Cancellation Agreement**

In connection with the execution of the Merger Agreement, on August 17, 2020, Hennessy Capital entered into a Warrant Exchange and Share Cancellation Agreement with the Sponsor (the "Sponsor Warrant Exchange and Share Cancellation Agreement"), which provides that concurrent with, and contingent upon, the consummation of the First Merger, (i) the Sponsor will exchange (the "Sponsor Warrant Exchange") 11,739,394 outstanding Private Placement Warrants for 2,347,879 newly issued shares of HCAC Class B Common Stock (the "New Sponsor Shares"), (ii) the Sponsor will forfeit 2,347,879 shares of HCAC Class B Common Stock to Hennessy Capital for no consideration, and (iii) if at the Closing the sum of (A)(1) the amount of cash available in the Trust Account, less (2) all amounts to be paid by Hennessy Capital pursuant to the exercise of Redemption Rights, plus (B) the amount of gross proceeds received by Hennessy Capital from the PIPE Financing (without, for the avoidance of doubt, taking into account any transaction fees, costs and expenses paid or required to be paid in connection with the Business Combination and the PIPE Financing) is less than $350 million, then 500,000 shares of HCAC Class B Common Stock held by the Sponsor (which shares will automatically convert into shares of HCAC Class A Common Stock at the Effective Time) (the "Vesting Shares") will become unvested and subject to certain vesting conditions. The Vesting Shares will vest upon the occurrence of the $18 Share Price Milestone, subject to equitable adjustment by Hennessy Capital's board of directors, on or before the second anniversary of the Closing, and the Sponsor will be entitled to vote such Vesting Shares and receive dividends and other distributions with respect to such Vesting Shares (to be set aside by Hennessy Capital and paid upon the vestment of the Vesting Shares) while they remain unvested. In the event that after the Closing and prior to the second anniversary of the Closing Date, there is an Acceleration Event (as defined in the Merger Agreement), then the Vesting Shares will immediately vest in full upon the occurrence of such Acceleration Event unless, in the case of an Acceleration Event that is a Change of Control, the value of the consideration to be received by the holders of New Canoo Common Stock in such Change of Control transaction is less than $18.00 per share.

**Amended and Restated Registration Rights Agreement**

In connection with the Closing, that certain Registration Rights Agreement, dated February 28, 2019, will be amended and restated, and the Holders will enter into the Amended and Restated Registration Rights Agreement at the Closing, pursuant to which the Holders of Registrable Securities (as defined in the A&R Registration Rights Agreement), subject to certain conditions, will be entitled to registration rights. Pursuant to the A&R Registration Rights Agreement, New Canoo will agree that, within 15 business days after the Closing, New Canoo will file with the SEC (at its sole cost and expense) a registration statement registering the resale of the Registrable Securities (the "Resale Registration Statement"), and New Canoo will use its reasonable best efforts to have the Resale Registration Statement declared effective by the SEC as soon as reasonably practicable after the filing thereof, but no later than 60 business days after the filing deadline (or 120 days after the filing deadline if the SEC notifies New Canoo that it will "review" the Resale Registration Statement). The A&R Registration Rights Agreement does not provide for the payment of any cash penalties by New Canoo if it fails to satisfy any of its obligations under the A&R Registration Rights Agreement.

The Holders will be granted demand underwritten offering registration rights, subject to certain conditions, including that New Canoo is not obligated to effect more than an aggregate of three underwritten offering or more than two underwritten offerings per year. All of the Holders will be granted unlimited "piggyback" registration rights, subject to certain requirements and customary conditions.

These registration rights will be subject to certain customary limitations, including the right of the underwriters to limit the number of securities to be included in an underwritten offering and New Canoo's right to delay or withdraw a registration statement under certain circumstances. New Canoo will generally be required to bear the registration expenses, other than underwriting discounts and commissions and transfer taxes, associated with any registration and sale of Registrable Securities held by the Holders. Under the A&R Registration Rights Agreement, New Canoo will agree to indemnify the Holders against any losses or damages resulting from any untrue statement or omission or alleged untrue statement or omission of a material fact in any registration statement or prospectus pursuant to which they sell its equity securities, unless such liability arose from their misstatement or omission, and each of the Holders, severally and individually, will agree to indemnify New Canoo against any losses or damages caused by such Holder's material misstatements or omissions in those documents.

137

Table of Contents

The A&R Registration Rights Agreement further provides that, subject to certain customary exceptions, the Existing Holders may sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of or distribute (i) any shares of New Canoo Common Stock acquired in connection with or prior to our IPO for one year following the Closing, (ii) the New Sponsor Shares for 180 days following the Closing, in each case subject to earlier release if (x) the reported last sale price of New Canoo Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the Closing or (y) if New Canoo consummates a liquidation, merger, stock exchange or other similar transaction after the Closing which results in all of New Canoo's stockholders having the right to exchange their shares of common stock for cash, securities or other property.

The A&R Registration Rights Agreement will terminate upon the earlier of (a) ten years following the Closing, (b) the date as of which the Holders cease to hold any Registrable Securities, or (c) the date as of which the Holders are permitted to sell the Registrable Securities under Rule 144 (or any similar provision) under the Securities Act without limitation on the amount of securities sold or the manner of sale and without compliance with the current public reporting requirements set forth under Rule 144(i)(2).

**Lock-Up Agreements**

In connection with the Closing, certain existing Canoo shareholders, including all Canoo officers, directors, holders of 3% or more of the outstanding Canoo Shares prior to the Closing and their respective affiliates, which group in the aggregate holds 116,208,232 shares, or 85.2% of the outstanding Canoo Shares prior to the Closing, will agree, subject to certain customary exceptions, not to (a) sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of or agree to dispose of, directly or indirectly, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Exchange Act and the rules and regulations of the SEC promulgated thereunder, any shares of New Canoo Common Stock held by them immediately after the Closing, any shares of New Canoo Common Stock issuable upon the exercise of options to purchase shares of New Canoo Common Stock held by them immediately after the Closing, or any securities convertible into or exercisable or exchangeable for New Canoo Common Stock held by them immediately after the Closing, (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any of such shares of New Canoo Common Stock or securities convertible into or exercisable or exchangeable for New Canoo Common Stock, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise or (c) publicly announce any intention to effect any transaction specified in clause (a) or (b) until 180 days after the Closing.

138

Table of Contents

*ENGINEERING AND TECHNOLOGY SERVICES*

Canoo's engineering and technology services business covers all the material consulting and contract engineering work that is in high demand due to our team's specialized experience and technical capabilities in EV development. This business offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021. We expect our engineering and technology services business to offer significant growth potential in the future as projected demand grows for EVs and their related technologies, namely in platform/skateboard development, powertrain, battery technologies and power electronics, among other areas, in which we have substantial expertise. In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model.

Canoo's pipeline for engineering services includes EV concept design and engineering services for other OEMs, autonomous driving strategics and high growth technology companies. There is a significant market for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs. Canoo is at a distinct competitive advantage to capitalize on this growing demand. In fact, whereas other new EV entrants are forced to license key technologies and/or outsource primary engineering development to larger OEMs, Canoo has already received significant OEM interest in our skateboard technology and our team's expertise in platform engineering, powertrains and vehicle design, as is exemplified by the announcement of an agreement between Hyundai Motor Group and Canoo for the co-development of a future EV platform based on Canoo's modular skateboard technology.

Contract engineering opportunities serve as concrete points of external validation for our technology and the talent of our team, as well as provide additional sources of revenue and long-term commercial opportunities (such as skateboard and technology licensing) as the relationship matures. Canoo is also in discussions with a number of other partners and expects to be in a position to announce many more partnerships in due course.

Our skateboard platform and its steer-by-wire and centralized computing architecture make Canoo uniquely positioned to take advantage of continuing advancements in autonomous vehicle technology. We are in discussions with some of the most prominent companies pursuing this technology. These potential partnerships provide revenue opportunities as well as the ability to remain at the forefront of innovation in this space, while strengthening ties with future potential industry leaders.

*SKATEBOARD AND TECHNOLOGY LICENSING*

We intend to license our modular, skateboard platform to other automotive manufactures who have need for a versatile purpose-built EV platform that can be easily integrated with multiple different cabin designs, whether designed by Canoo or by potential customers. Skateboard and technology licensing provides the opportunity to utilize Canoo's skateboard platform and other technology to generate additional revenue beyond EV offerings. The dimensions of Canoo's skateboard were deliberately selected to suit the needs of the most common vehicle types. Our skateboard platform, unlike any other on the market today, will offer an "off the shelf" option, adaptable to a wide variety of needs and potential customers.

Licensing of our skateboard platform offers the potential opportunity to anchor other EV programs with our proprietary skateboard technology, potentially generating revenue on a per vehicle fee basis for years to come. We believe that revenue generated from licensing offers an upside opportunity both in the United States as well as globally, in addition to what is forecasted in our current financial model. In addition to licensing our skateboard platform, Canoo is open to the licensing of its advanced powertrain technology.

As needs for EV solutions continue to accelerate, we believe that opportunities to license the skateboard and other technology represent considerable upside for the business. Traditional automotive OEMs that do not have competitive EV technology will either have to dedicate significant resources into developing their own technology or find access to that technology externally. Given the substantial investment required, OEMs may be more inclined to license or co-develop that technology from a new EV entrant like Canoo as the inflection point for EVs is fast approaching and speed to market is critical to meet the growing consumer and regulatory demand. To Canoo's advantage, due to long development timelines for this technology and the uncertain results of in-house development efforts, traditional OEMs may be more likely to look to technology that has been validated and offers a shorter time and lower risk path to market for their own EV offerings. Canoo's modular skateboard platform fulfills each of these requirements.

174

**Canoo Holdings Ltd.**
**Notes to Condensed Consolidated Financial Statements (unaudited)**
**September 30, 2020 and 2019**

**2. Basis of Presentation** (cont.)

**Revenue Recognition**

The Company applies Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers ("ASC 606") which governs how the Company recognizes revenue.

Under ASC 606, the Company recognizes revenue when the Company transfers promised goods or services to customers in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services. The Company recognizes revenue pursuant to the five-step framework contained in ASC 606: (i) identify the contract with a customer; (ii) identify the performance obligations in the contract, including whether they are distinct in the context of the contract; (iii) determine the transaction price, including the constraint on variable consideration; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the Company satisfies the performance obligations.

During 2020, the Company's revenue was derived from the provision of consulting services on a project basis. The Company's fixed price contracts related to these services contain a single performance obligation, which was satisfied in July 2020 when the Company provided the final report to the customer. Revenue for these services was recognized at a point in time, when the project was delivered.

There were no contract liabilities as of September 30, 2020 and December 31, 2019.

**Cost of Revenue, excluding Depreciation and Amortization**

Cost of revenue, excluding depreciation and amortization, includes materials, labor, and other direct costs related to the provision of engineering, development, and design consulting services.

**Fair Value Option**

The Company may elect to report most financial instruments and certain other items at fair value with changes in fair value reported in earnings. The election is made upon the initial recognition of an eligible financial asset, financial liability or firm commitment or when certain specified reconsideration events occur. The fair value election may not otherwise be revoked once an election is made. The changes in fair value are recorded in current earnings.

As discussed in Note 3, "Long-term Debt, Convertible Debt and Redeemable Convertible Preference Shares," on March 23, 2020 the related party convertible debt then outstanding was amended. The amendment was a reconsideration event and the Company elected fair value accounting for the related party convertible debt under ASC 825, *Financial Instruments*, and all future convertible notes issued.

The primary reasons the Company has elected the fair value option are to:

- Reflect economic events in earnings on a timely basis; and

- Address simplification and cost-benefit considerations (e.g., accounting for hybrid financial instruments at fair value in their entirety versus bifurcation of embedded derivatives).

Any change in fair value of the Company's convertible notes subject to the fair value election is recorded in interest expense. Refer to Note 3, "Long-term Debt, Convertible Debt and Redeemable Convertible Preference Shares," for further discussion on the Company's assessment of fair value as of September 30, 2020.

F-33

Annex J

**AMENDED AND RESTATED
REGISTRATION RIGHTS AGREEMENT**

THIS AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT (this "*Agreement*"), dated as of [•], 2020, is made and entered into by and among Canoo Inc., a Delaware corporation formerly known as Hennessy Capital Acquisition Corp. IV (the "*Company*"), Hennessy Capital Partners IV LLC, a Delaware limited liability company (the "*Sponsor*"), each of the undersigned parties that holds Founder Shares (as defined below) and is identified as an "Other Pre-IPO Holder" on the signature pages hereto (collectively, with the Sponsor, the "*Existing Holders*"), and the undersigned parties identified as "New Holders" on the signature pages hereto (collectively, the "*New Holders*") (each of the foregoing parties (other than the Company) and any person or entity who hereafter becomes a party to this Agreement pursuant to Section 5.2 of this Agreement, a "*Holder*" and collectively, the "*Holders*"). Capitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed thereto in the Merger Agreement (as defined below).

**RECITALS**

WHEREAS, each of the Company and the Existing Holders is a party to, and hereby consents to, this amendment and restatement of that certain Registration Rights Agreement, dated February 28, 2019 (the "*Existing Registration Rights Agreement*"), pursuant to which the Company granted the Existing Holders certain registration rights with respect to certain securities of the Company, as set forth therein;

WHEREAS, the Company and the Sponsor have entered into that certain Securities Subscription Agreement, dated as of August 16, 2018, pursuant to which the Sponsor purchased an aggregate of 7,187,500 shares (871,930 of which were subsequently cancelled or forfeited) of the Company's Class B common stock, par value $0.0001 per share ("*Class B Common Stock*"), which were issued in a private placement prior to the closing of the Company's initial public offering;

WHEREAS, in October 2018, the Sponsor subsequently transferred an aggregate of 975,000 shares of Class B Common Stock to the Company's directors and officers;

WHEREAS, on February 28, 2019, in connection with the declaration of an approximate 1.05 to 1 stock split of the shares of Class B Common Stock payable in the form of a dividend of shares of Class B Common Stock by the Company, certain officers and directors of the Company transferred an aggregate of 48,283 shares of Class B Common Stock to the Sponsor and the Anchor Investor waived its right to the stock dividend (the outstanding shares of Class B Common Stock held by each of the Sponsor, certain officers and directors of the Company and the Anchor Investor following such dividend, transfer, and waiver being referred to herein as the "*Founder Shares*");

WHEREAS, the Company and the Sponsor entered into those certain Subscription Agreements, dated February 11, 2019 (the "*Anchor Subscription Agreements*") with HC NCBR Fund or BlackRock Credit Alpha Master Fund L.P. (collectively, the "*Anchor Investor*"), pursuant to which the Sponsor agreed to forfeit to the Company for no consideration and the Anchor Investor agreed to purchase from the Company an aggregate of 871,930 shares of Class B Common Stock for an aggregate purchase price of $3,033, or approximately $0.003 per share;

WHEREAS, on February 28, 2019, the Company and the Sponsor entered into that certain Private Placement Warrants Purchase Agreement, pursuant to which the Sponsor purchased an aggregate of 11,739,394 warrants (the "*Sponsor Private Placement Warrants*") in a private placement transaction occurring simultaneously with the closing of the Company's initial public offering (the "*IPO*");

WHEREAS, pursuant to the Anchor Subscription Agreements, the Anchor Investor purchased 1,842,106 warrants in connection with the Company's initial public offering (the "*Anchor Private Placement Warrants*"; together with the Sponsor Private Placement Warrants, the "*Private Placement Warrants*");

WHEREAS, in order to finance the Company's transaction costs in connection with an intended initial Business Combination (as defined below) the Sponsor or an affiliate of the Sponsor or certain of the Company's officers and directors may loan to the Company funds as the Company may require, of which up to $1,500,000 of such loans may be convertible into warrants ("*Working Capital Warrants*") at a price of $1.00 per warrant;

Table of Contents

**WHEREAS**, the Company, HCAC IV First Merger Sub, Ltd., an exempted company incorporated with limited liability in the Cayman Islands and a wholly-owned subsidiary of the Company, HCAC IV Second Merger Sub, LLC, a Delaware limited liability company and a direct, wholly owned subsidiary of HCAC, and Canoo Holdings Ltd., an exempted company incorporated with limited liability in the Cayman Islands ("*Canoo*"), have entered into that certain Merger Agreement (as may be amended from time to time, the "*Merger Agreement*"), dated as of August 17, 2020, pursuant to which, through a series of mergers at the Closing (as defined below) with HCAC IV First Merger Sub, Ltd. and HCAC IV Second Merger Sub, LLC, Canoo will become a wholly-owned subsidiary of the Company;

**WHEREAS**, pursuant to the transactions contemplated by the Merger Agreement and subject to the terms and conditions set forth therein, the New Holders will receive shares of the Class A common stock, par value $0.0001 per share, of the Company ("*Common Stock*") upon the closing of such transactions (the "*Closing*");

**WHEREAS**, concurrently with the execution of the Merger Agreement, on August 17, 2020, the Company and the Sponsor entered into that Warrant Exchange and Share Cancellation Agreement, pursuant to which the Sponsor has agreed that immediately prior to (and contingent upon) the Closing, and subject to the terms and conditions set forth therein, (a) the Sponsor shall exchange 11,739,394 Sponsor Private Placement Warrants for 2,347,879 newly issued shares of Class B common stock of the Company (the "*New Sponsor Shares*") and (b) the Sponsor shall forfeit an equivalent number (2,347,879) of Founder Shares held by the Sponsor, which shall be cancelled by the Company; and

**WHEREAS**, the Company and all of the Existing Holders desire to amend and restate the Existing Registration Rights Agreement in order to provide the Existing Holders and New Holders certain registration rights with respect to certain securities of the Company, on the terms and conditions set forth in this Agreement; and

**NOW**, **THEREFORE**, in consideration of the representations, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1 <u>Definitions</u>.    The terms defined in this <u>Article I</u> shall, for all purposes of this Agreement, have the respective meanings set forth below:

"*Adverse Disclosure*" shall mean any public disclosure of material non-public information, which disclosure, in the good faith judgment of the Chief Executive Officer or principal financial officer of the Company, after consultation with counsel to the Company, (i) would be required to be made in any Registration Statement or Prospectus in order for the applicable Registration Statement or Prospectus not to contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein (in the case of any prospectus and any preliminary prospectus, in the light of the circumstances under which they were made) not misleading, (ii) would not be required to be made at such time if the Registration Statement were not being filed, and (iii) the Company has a bona fide business purpose for not making such information public.

"*Agreement*" shall have the meaning given in the Preamble.

"*Anchor Investor*" shall have the meaning given in the Recitals.

"*Anchor Private Placement Warrants*" shall have the meaning given in the Recitals.

"*Anchor Subscription Agreements*" shall have the meaning given in the Recitals.

"*Board*" shall mean the Board of Directors of the Company.

"*business day*" means a day, other than a Saturday or Sunday, on which commercial banks in New York, New York or Seattle, Washington are open for the general transaction of business.

"*Canoo*" shall have the meaning given in the Recitals hereto.

"*Class B Common Stock*" shall have the meaning given in the Recitals hereto.

"*Commission*" shall mean the Securities and Exchange Commission.

Annex J-2

Table of Contents

"*Company*" shall have the meaning given in the Preamble.

"*Common Stock*" shall have the meaning given in the Recitals hereto.

"*Company*" shall have the meaning given in the Preamble.

"*Company Underwritten Demand Notice*" shall have the meaning given in subsection 2.1.3.

"*Demanding Holders*" shall have the meaning given in subsection 2.1.3.

"*Effectiveness Deadline*" shall have the meaning given in subsection 2.1.1.

"*Exchange Act*" shall mean the Securities Exchange Act of 1934, as it may be amended from time to time.

"*Existing Holders*" shall have the meaning given in the Preamble hereto.

"*Existing Registration Rights Agreement*" shall have the meaning given in the Recitals hereto.

"*Form S-1 Registration Statement*" shall have the meaning given in subsection 2.1.1.

"*Form S-3 Shelf*" shall have the meaning given in subsection 2.1.1.

"*Founder Shares*" shall have the meaning given in the Recitals hereto and shall be deemed to include the shares of Common Stock issuable upon conversion thereof.

"*Founder Shares Lock-Up Period*" shall mean, with respect to the Founder Shares, from the date hereof until the earlier of (A) one year after the date hereof; (B) the first date the closing price of the Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the date hereof; and (C) the date on which the Company completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of Common Stock for cash, securities or other property.

"*Holders*" shall mean the Existing Holders and the New Holders and any person or entity who hereafter becomes a party to this Agreement pursuant to Section 5.2.

"*Insider Letter*" shall mean that certain letter agreement, dated as of February 28, 2019, by and among the Company, the Sponsor and each of the Company's officers, directors and director nominees.

"*Lock-Up Periods*" shall mean the Founder Shares Lock-Up Period, the New Sponsor Shares Lock-Up Period and the Private Placement Lock-Up Period.

"*Maximum Number of Securities*" shall have the meaning given in subsection 2.1.5.

"*Merger Agreement*" shall have the meaning given in the Recitals hereto.

"*Misstatement*" shall mean an untrue statement of a material fact or an omission to state a material fact required to be stated in a Registration Statement or Prospectus, or necessary to make the statements in a Registration Statement or Prospectus (in the case of the Prospectus, in the light of the circumstances under which they were made) not misleading.

"*New Holders*" shall have the meaning given in the Preamble.

"*New Sponsor Shares*" shall have the meaning given in the Recitals hereto.

"*New Sponsor Shares Lock-Up Period*" shall mean, with respect to the New Sponsor Shares held by the Sponsor or its Permitted Transferees, from the date hereof until the earliest to occur of (A) 180 days after the date hereof; (B) the first date the closing price of the Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the date hereof; and (C) the date on which the Company completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of Common Stock for cash, securities or other property.

Annex J-3

"**Permitted Transferees**" shall mean any person or entity (i) to whom a Holder of Registrable Securities is permitted to transfer such Registrable Securities prior to the expiration of the applicable Lock-Up Period, under the Insider Letter, this Agreement and any other applicable agreement between such Holder and the Company, and to any transferee thereafter and (ii) who agrees to become bound by the transfer restrictions set forth in this Agreement.

"**Piggyback Registration**" shall have the meaning given in subsection 2.2.1.

"**Private Placement Lock-Up Period**" shall mean, with respect to Private Placement Warrants that are held by the initial purchasers of such Private Placement Warrants or their Permitted Transferees, and any of the Common Stock issued or issuable upon the exercise or conversion of the Private Placement Warrants and that are held by the initial purchasers of the Private Placement Warrants or their Permitted Transferees, the period ending 30 days after the date hereof.

"**Private Placement Warrants**" shall have the meaning given in the Recitals hereto.

"**Pro Rata**" shall have the meaning given in subsection 2.1.5.

"**Prospectus**" shall mean the prospectus included in any Registration Statement, as supplemented by any and all prospectus supplements and as amended by any and all post-effective amendments and including all material incorporated by reference in such prospectus.

"**Registrable Security**" shall mean (a) the Founder Shares and the shares of Common Stock issued or issuable upon the conversion of any Founder Shares, (b) the Private Placement Warrants (including any shares of the Common Stock issued or issuable upon the exercise of any such Private Placement Warrants), (c) the New Sponsor Shares, (d) any issued and outstanding share of Common Stock or any other equity security (including the shares of Common Stock issued or issuable upon the exercise of any other equity security) of the Company held by an Existing Holder as of the date of this Agreement, (e) any shares of Common Stock issued or issuable upon the exercise the of Working Capital Warrants, (f) any outstanding shares of Common Stock or any other equity security of the Company held by a New Holder as of the date of this Agreement (including shares transferred to a Permitted Transferee and the shares of Common Stock issued or issuable upon the exercise of any such other equity security) and (g) any other equity security of the Company issued or issuable with respect to any such share of the Common Stock described in the foregoing clauses (a) through (g) by way of a stock dividend or stock split or in connection with a combination of shares, distribution, recapitalization, merger, consolidation or reorganization or other similar event; provided, however, that, as to any particular Registrable Security, such securities shall cease to be Registrable Securities when: (i) a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act and such securities shall have been sold, transferred, disposed of or exchanged in accordance with such Registration Statement; (ii) such securities shall have been otherwise transferred, new certificates or book entry positions for such securities not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent public distribution of such securities shall not require registration under the Securities Act; (iii) such securities shall have ceased to be outstanding; (iv) such securities may be sold without registration pursuant to Rule 144 promulgated under the Securities Act (together with any successor rule promulgated thereafter by the Commission, "**Rule 144**") (but with no volume or other restrictions or limitations thereunder); or (v) such securities have been sold to, or through, a broker, dealer or underwriter in a public distribution or other public securities transaction.

"**Registration**" shall mean a registration effected by preparing and filing a registration statement or similar document in compliance with the requirements of the Securities Act, and the applicable rules and regulations promulgated thereunder, and such registration statement becoming effective.

"**Registration Expenses**" shall mean the out-of-pocket expenses of a Registration, including, without limitation, the following:

(A) all registration and filing fees (including fees with respect to filings required to be made with the Financial Industry Regulatory Authority, Inc.) and any securities exchange on which the Common Stock is then listed;

(B) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel for the Underwriters in connection with blue sky qualifications of Registrable Securities);

(C) printing, messenger, telephone and delivery expenses;

(D) reasonable fees and disbursements of counsel for the Company;

Table of Contents

(E) reasonable fees and disbursements of all independent registered public accountants of the Company incurred specifically in connection with such Registration; and

(F) reasonable fees and expenses of one (1) legal counsel selected by the majority-in-interest of the Demanding Holders initiating an Underwritten Demand to be registered for offer and sale in the applicable Registration.

"***Registration Statement***" shall mean any registration statement that covers the Registrable Securities pursuant to the provisions of this Agreement, including the Prospectus included in such registration statement, amendments (including post-effective amendments) and supplements to such registration statement, and all exhibits to and all material incorporated by reference in such registration statement.

"***Requesting Holder***" shall have the meaning given in subsection 2.1.3.

"***Restricted Securities***" shall have the meaning given in subsection 3.6.1.

"***Rule 144***" shall have the meaning given in the definition of "Registrable Security."

"***Rule 415***" shall have the meaning given in subsection 2.1.1.

"***SEC***" shall mean the United States Securities and Exchange Commission.

"***Securities Act***" shall mean the Securities Act of 1933, as amended from time to time.

"***Sponsor***" shall have the meaning given in the Preamble hereto.

"***Sponsor Private Placement Warrants***" shall have the meaning given in the Recitals hereto.

"***Underwriter***" shall mean a securities dealer who purchases any Registrable Securities as principal in an Underwritten Offering and not as part of such dealer's market-making activities.

"***Underwritten Demand***" shall have the meaning given in subsection 2.1.3.

"***Underwritten Demand Notice***" shall have the meaning given in subsection 2.1.3.

"***Underwritten Registration***" or "***Underwritten Offering***" shall mean a Registration in which securities of the Company are sold to an Underwriter in a firm commitment underwriting for distribution to the public, including an offering and/or sale of Registrable Securities by any Holder in a block trade or on an underwritten basis (whether firm commitment or otherwise) without substantial marketing efforts prior to pricing, including, without limitation, a same day trade, overnight trade or similar transaction, but excluding a variable price reoffer.

"***Working Capital Warrants***" shall have the meaning given in the Recitals hereto.

## ARTICLE II
## REGISTRATIONS

2.1 Shelf Registration.

2.1.1 Initial Registration. The Company shall, as promptly as reasonably practicable, but in no event later than fifteen (15) business days after the consummation of the transactions contemplated by the Merger Agreement, use its reasonable best efforts to file a Registration Statement under the Securities Act to permit the public resale of all the Registrable Securities held by the Holders (and certain other outstanding equity securities of the Company) from time to time as permitted by Rule 415 under the Securities Act (or any successor or similar provision adopted by the Commission then in effect) ("***Rule 415***") on the terms and conditions specified in this subsection 2.1.1 and shall use its reasonable best efforts to cause such Registration Statement to be declared effective as promptly as reasonably practicable after the initial filing thereof, but in no event later than sixty (60) business days following the filing deadline (the "***Effectiveness Deadline***"); provided, that the Effectiveness Deadline shall be extended to one hundred and twenty (120) days after the filing deadline if the Registration Statement is reviewed by, and receives comments from, the Commission. The Registration Statement filed with the Commission pursuant to this subsection 2.1.1 shall be a shelf registration statement on Form S-3 (a "***Form S-3 Shelf***") or, if Form S-3 is not then available to the Company, on Form S-1 (a "***Form S-1 Registration Statement***") or such other form of registration statement as is then available to effect a registration for resale of such Registrable Securities, covering such Registrable Securities,

Table of Contents

and shall contain a Prospectus in such form as to permit any Holder to sell such Registrable Securities pursuant to Rule 415 at any time beginning on the effective date for such Registration Statement. A Registration Statement filed pursuant to this subsection 2.1.1 shall provide for the resale pursuant to any method or combination of methods legally available to, and requested prior to effectiveness by, the Holders. The Company shall use its reasonable best efforts to cause a Registration Statement filed pursuant to this subsection 2.1.1 to remain effective, and to be supplemented and amended to the extent necessary to ensure that such Registration Statement is available or, if not available, that another Registration Statement is available, for the resale of all the Registrable Securities held by the Holders until all such Registrable Securities have ceased to be Registrable Securities. When effective, a Registration Statement filed pursuant to this subsection 2.1.1 (including the documents incorporated therein by reference) will comply as to form in all material respects with all applicable requirements of the Securities Act and the Exchange Act and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any Prospectus contained in such Registration Statement, in the light of the circumstances under which such statement is made).

2.1.2 Form S-3 Shelf. If the Company files a Form S-3 Shelf and thereafter the Company becomes ineligible to use Form S-3 for secondary sales, the Company shall use its reasonable best efforts to file a Form S-1 Registration Statement as promptly as reasonably practicable to replace the shelf registration statement that is a Form S-3 Shelf and have the Form S-1 Registration Statement declared effective as promptly as reasonably practicable and to cause such Form S-1 Registration Statement to remain effective, and to be supplemented and amended to the extent necessary to ensure that such Registration Statement is available or, if not available, that another Registration Statement is available, for the resale of all the Registrable Securities held by the Holders until all such Registrable Securities have ceased to be Registrable Securities.

2.1.3 Underwritten Offering. At any time and from time to time following the effectiveness of the Registration Statement required by subsection 2.1.1 or 2.1.2, any Holder may request to sell all or a portion of their Registrable Securities (a "**Demanding Holder**") in an underwritten offering that is registered pursuant to such Registration Statement (an "**Underwritten Demand**"), provided that such Holder(s) (a) reasonably expect aggregate gross proceeds in excess of $50,000,000 from such Underwritten Offering or (b) reasonably expects to sell all of the Registrable Securities held by such Holder in such Underwritten Offering but in no event less than $10,000,000 in aggregate gross proceeds. All requests for an Underwritten Offering shall be made by giving written notice to the Company (the "**Underwritten Demand Notice**"). Each Underwritten Demand Notice shall specify the approximate number of Registrable Securities proposed to be sold in the Underwritten Offering and the expected price range (net of underwriting discounts and commissions) of such Underwritten Offering. Within five (5) business days after receipt of any Underwritten Demand Notice, the Company shall give written notice of such requested Underwritten Offering (the "**Company Underwritten Demand Notice**") to all other Holders of Registrable Securities (the "**Requesting Holders**") and, subject to reductions consistent with the Pro Rata calculations in Section 2.1.5, shall include in such Underwritten Offering all Registrable Securities with respect to which the Company has received written requests for inclusion therein, within five (5) days after sending the Company Underwritten Demand Notice. The Company shall enter into an underwriting agreement in a form as is customary in Underwritten Offerings of securities by the Company with the managing Underwriter or Underwriters selected by the initiating Demanding Holders with the written consent of the Company (such consent not to be unreasonably withheld, delayed or conditioned) and shall take all such other reasonable actions as are requested by the managing Underwriter or Underwriters in order to expedite or facilitate the disposition of such Registrable Securities. In connection with any Underwritten Offering contemplated by this subsection 2.1.3, subject to Section 3.3 and Article IV, the underwriting agreement into which each Holder and the Company shall enter shall contain such representations, covenants, indemnities and other rights and obligations of the Company and such Holders as are customary in underwritten offerings of securities. Under no circumstances shall the Company be obligated to effect (x) more than an aggregate of three (3) Underwritten Offerings pursuant to an Underwritten Demand by the Holders under this subsection 2.1.3 with respect to any or all Registrable Securities held by such Holders and (y) more than two (2) Underwritten Offerings per year pursuant to this subsection 2.1.3; provided, however, that an Underwritten Offering pursuant to an Underwritten Demand shall not be counted for such purposes unless a Registration Statement that may be available at such time has become effective and all of the Registrable Securities requested by the Requesting Holders and the Demanding Holders to be registered on behalf of the Requesting Holders and the Demanding Holders in such Registration Statement have been sold, in accordance with Section 3.1 of this Agreement.

Annex J-6

Table of Contents

2.1.4 <u>Holder Information Required for Participation in Underwritten Offering</u> At least ten (10) business days prior to the first anticipated filing date of a Registration Statement pursuant to this <u>Article II</u>, the Company shall use reasonable best efforts to notify each Holder in writing (which may be by email) of the information reasonably necessary about the Holder to include such Holder's Registrable Securities in such Registration Statement. Notwithstanding anything else in this Agreement, the Company shall not be obligated to include such Holder's Registrable Securities to the extent the Company has not received such information, and received any other reasonably requested agreements or certificates, on or prior to the fifth business day prior to the first anticipated filing date of a Registration Statement pursuant to this <u>Article II</u>.

2.1.5 <u>Reduction of Underwritten Offering</u>. If the managing Underwriter or Underwriters in an Underwritten Offering, in good faith, advises the Company, the Demanding Holders and the Requesting Holders (if any) in writing that the dollar amount or number of Registrable Securities that the Demanding Holders and the Requesting Holders (if any) desire to sell, taken together with all other Common Stock or other equity securities that the Company desires to sell and the Common Stock, if any, as to which a Registration has been requested pursuant to separate written contractual piggy-back registration rights held by any other stockholders who desire to sell, exceeds the maximum dollar amount or maximum number of equity securities that can be sold in the Underwritten Offering without adversely affecting the proposed offering price, the timing, the distribution method, or the probability of success of such offering (such maximum dollar amount or maximum number of such securities, as applicable, the "***Maximum Number of Securities***"), then the Company shall include in such Underwritten Offering, as follows: (i) first, the Registrable Securities of the Demanding Holders (pro rata based on the respective number of Registrable Securities that each Demanding Holder has requested be included in such Underwritten Registration and the aggregate number of Registrable Securities that the Demanding Holders have requested be included in such Underwritten Registration (such proportion is referred to herein as "***Pro Rata***")) that can be sold without exceeding the Maximum Number of Securities; (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), the Registrable Securities of Requesting Holders (Pro Rata, based on the respective number of Registrable Securities that each Requesting Holder has so requested) exercising their rights to register their Registrable Securities pursuant to <u>subsection 2.1.3</u> hereof, without exceeding the Maximum Number of Securities; and (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the Common Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (iv) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i), (ii) and (iii), the Common Stock or other equity securities of other persons or entities that the Company is obligated to register in a Registration pursuant to separate written contractual arrangements with such persons and that can be sold without exceeding the Maximum Number of Securities.

2.1.6 <u>Underwritten Offering Withdrawal</u>. A majority-in-interest of the Demanding Holders initiating an Underwritten Demand or a majority-in-interest of the Requesting Holders (if any), pursuant to a Registration under <u>subsection 2.1.3</u> shall have the right to withdraw from a Registration pursuant to an Underwritten Offering pursuant to <u>subsection 2.1.3</u> for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of their intention to withdraw from such Registration at least five (5) business days prior to the effectiveness of the Registration Statement filed with the Commission with respect to the Registration of their Registrable Securities pursuant to such Underwritten Offering (or in the case of an Underwritten Registration pursuant to Rule 415, at least five (5) business days prior to the time of pricing of the applicable offering). Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with a Registration pursuant to an Underwritten Offering prior to its withdrawal under this <u>subsection 2.1.6</u>.

2.2 <u>Piggyback Registration</u>.

2.2.1 <u>Piggyback Rights</u>. If the Company proposes to file a Registration Statement under the Securities Act with respect to an offering of equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into, equity securities, for its own account or for the account of stockholders of the Company (or by the Company and by the stockholders of the Company, including, without limitation, pursuant to <u>Section 2.1</u> hereof), other than a Registration Statement (i) filed in connection with any employee stock option or other benefit plan, (ii) for a rights offering or an exchange offer or offering of securities solely to the Company's existing stockholders, (iii) for an offering of debt that is convertible into equity securities of the Company or (iv) for a dividend reinvestment plan, then the Company shall give written notice of such proposed filing to all of the Holders of Registrable Securities as soon as practicable but not less than ten (10) days before the anticipated filing date of such Registration Statement, which

Annex J-7

Table of Contents

notice shall (A) describe the amount and type of securities to be included in such offering, the intended method(s) of distribution, and the name of the proposed managing Underwriter or Underwriters, if any, in such offering, and (B) offer to all of the Holders of Registrable Securities the opportunity to register the sale of such number of Registrable Securities as such Holders may request in writing within five (5) days after receipt of such written notice (such Registration a "*Piggyback Registration*"). The Company shall, in good faith, cause such Registrable Securities to be included in such Piggyback Registration and shall use its reasonable best efforts to cause the managing Underwriter or Underwriters of a proposed Underwritten Offering to permit the Registrable Securities requested by the Holders pursuant to this subsection 2.2.1 to be included in a Piggyback Registration on the same terms and conditions as any similar securities of the Company included in such Registration and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method(s) of distribution thereof. All such Holders proposing to distribute their Registrable Securities through an Underwritten Offering under this subsection 2.2.1 shall enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Underwritten Offering by the Company.

2.2.2 Reduction of Piggyback Registration. If the managing Underwriter or Underwriters in an Underwritten Registration that is to be a Piggyback Registration, in good faith, advises the Company and the Holders of Registrable Securities participating in the Piggyback Registration in writing that the dollar amount or number of the shares of Common Stock that the Company desires to sell, taken together with (i) the shares of Common Stock, if any, as to which Registration has been demanded pursuant to separate written contractual arrangements with persons or entities other than the Holders of Registrable Securities hereunder (ii) the Registrable Securities as to which registration has been requested pursuant to Section 2.2 hereof, and (iii) the shares of Common Stock, if any, as to which Registration has been requested pursuant to separate written contractual piggy-back registration rights of other stockholders of the Company, exceeds the Maximum Number of Securities, then:

(a) If the Registration is undertaken for the Company's account, the Company shall include in any such Registration (A) first, the Common Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to subsection 2.2.1 hereof, Pro Rata, which can be sold without exceeding the Maximum Number of Securities; and (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the Common Stock, if any, as to which Registration has been requested or demanded pursuant to written contractual piggyback registration rights of other stockholders of the Company, which can be sold without exceeding the Maximum Number of Securities;

(b) If the Registration is pursuant to a request by persons or entities other than the Holders of Registrable Securities, then the Company shall include in any such Registration (A) first, the Common Stock or other equity securities, if any, of such requesting persons or entities, other than the Holders of Registrable Securities, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to subsection 2.2.1, Pro Rata, which can be sold without exceeding the Maximum Number of Securities; (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the Common Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (D) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A), (B) and (C), the Common Stock or other equity securities for the account of other persons or entities that the Company is obligated to register pursuant to separate written contractual arrangements with such persons or entities, which can be sold without exceeding the Maximum Number of Securities.

2.2.3 Piggyback Registration Withdrawal. Any Holder of Registrable Securities shall have the right to withdraw from a Piggyback Registration for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of his, her or its intention to withdraw from such Piggyback Registration at least five (5) business days prior to the effectiveness of the Registration Statement filed with the Commission with respect to such Piggyback Registration (or in the case of an Underwritten Registration pursuant to Rule 415, at least five (5) business days prior to the time of pricing of the applicable offering). The Company (whether on its own good faith determination or as the result of a request for withdrawal by persons pursuant to separate written contractual obligations) may withdraw a Registration Statement filed with the Commission in connection with a Piggyback Registration at any time prior to the effectiveness of such Registration Statement. Notwithstanding anything to the

Annex J-8

contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with the Piggyback Registration prior to its withdrawal under this <u>subsection 2.2.3</u>.

    2.2.4 <u>Unlimited Piggyback Registration Rights</u>. For purposes of clarity, any Registration effected pursuant to <u>Section 2.2</u> hereof shall not be counted as a Registration pursuant to an Underwritten Offering effected under <u>subsection 2.1.3</u>.

    2.3 <u>Restrictions on Registration Rights</u>. Notwithstanding anything to the contrary contained herein, the Company shall not be obligated to (but may, at its sole option) (A) effect an Underwritten Offering (i) within sixty (60) days after the closing of an Underwritten Offering or (ii) during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of the filing of, and ending on a date one hundred and twenty (120) days after the effective date of, a Company-initiated Registration and provided that the Company has delivered written notice to the Holders prior to receipt of an Underwritten Demand pursuant to <u>subsection 2.1.3</u> and it continues to actively employ, in good faith, all reasonable best efforts to cause the applicable Registration Statement to become effective or (B) file a Registration Statement (or any amendment thereto) or effect an Underwritten Offering (or, if the Company has filed a shelf Registration Statement and has included Registrable Securities therein, the Company shall be entitled to suspend the offer and sale of Registrable Securities pursuant to such Registration Statement) for a period of up to forty-five (45) days (i) if the Holders have requested an Underwritten Demand and the Company and the Holders are unable to obtain the commitment of Underwriters to firmly underwrite the offer; or (ii) in the good faith judgment of the Board such Underwritten Offering would be materially detrimental to the Company and the Board concludes as a result that it is essential to defer the filing of such Registration Statement at such time, <u>provided</u> that in each case of (i) and (ii) the Company shall furnish to such Holders a certificate signed by the Chairman of the Board stating that in the good faith judgment of the Board it would be materially detrimental to the Company for such Registration Statement to be filed in the near future and that it is therefore essential to defer the filing of such Registration Statement and <u>provided</u>, <u>further</u>, that the Company shall not defer its obligation in this manner more than once in any 12 month period.

    2.4 <u>Waiver</u>. Notwithstanding anything in this Agreement to the contrary, unless the Company is notified in writing to the contrary by the Anchor Investor, (A) each Anchor Investor hereby waives any and all rights (i) to receive notice of any Underwritten Offering as provided for in this <u>Section 2</u> or (ii) to participate in any such Underwritten Offering, and (B) the Company hereby agrees not to notify any Anchor Investor of any Underwritten Offering or provide any Anchor Investor with any information relating thereto.

**ARTICLE III**
**COMPANY PROCEDURES**

    3.1 <u>General Procedures</u>. If the Company is required to effect the Registration of Registrable Securities, the Company shall use its reasonable best efforts to effect such Registration to permit the sale of such Registrable Securities in accordance with the intended plan of distribution thereof, and pursuant thereto the Company shall, as expeditiously as possible:

    3.1.1 prepare and file with the Commission within fifteen (15) business days a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective and remain effective until all Registrable Securities covered by such Registration Statement have been sold;

    3.1.2 prepare and file with the Commission such amendments and post-effective amendments to the Registration Statement, and such supplements to the Prospectus, as may be reasonably requested by any Holder or any Underwriter of Registrable Securities or as may be required by the rules, regulations or instructions applicable to the registration form used by the Company or by the Securities Act or rules and regulations thereunder to keep the Registration Statement effective until all Registrable Securities covered by such Registration Statement are sold in accordance with the intended plan of distribution set forth in such Registration Statement or supplement to the Prospectus;

    3.1.3 prior to filing a Registration Statement or the Prospectus, or any amendment or supplement thereto, furnish without charge to the Underwriters, if any, and each Holder of Registrable Securities included in such Registration, and such Holder's legal counsel, copies of such Registration Statement as proposed to be filed, each amendment and supplement to such Registration Statement (in each case including all exhibits thereto and

Annex J-9

Table of Contents

documents incorporated by reference therein), the Prospectus included in such Registration Statement (including each preliminary Prospectus), and such other documents as the Underwriters and each Holder of Registrable Securities included in such Registration or the legal counsel for any such Holders may request in order to facilitate the disposition of the Registrable Securities owned by such Holders;

3.1.4 prior to any Underwritten Offering of Registrable Securities, use its reasonable best efforts to (i) register or qualify the Registrable Securities covered by the Registration Statement under such securities or "blue sky" laws of such jurisdictions in the United States as any Holder of Registrable Securities included in such Registration Statement (in light of their intended plan of distribution) may request and (ii) take such action necessary to cause such Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be necessary or advisable to enable the Holders of Registrable Securities included in such Registration Statement to consummate the disposition of such Registrable Securities in such jurisdictions; provided, however, that the Company shall not be required to qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify or take any action to which it would be subject to general service of process or taxation in any such jurisdiction where it is not then otherwise so subject;

3.1.5 cause all such Registrable Securities to be listed on each securities exchange or automated quotation system on which similar securities issued by the Company are then listed;

3.1.6 provide a transfer agent or warrant agent, as applicable, and registrar for all such Registrable Securities no later than the effective date of such Registration Statement;

3.1.7 advise each seller of such Registrable Securities, promptly after it shall receive notice or obtain knowledge thereof, of the issuance of any stop order by the Commission suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceeding for such purpose and promptly use its reasonable best efforts to prevent the issuance of any stop order or to obtain its withdrawal if such stop order should be issued;

3.1.8 at least five (5) days prior to the filing of any Registration Statement or Prospectus or any amendment or supplement to such Registration Statement or Prospectus or any document that is to be incorporated by reference into such Registration Statement or Prospectus, furnish a copy thereof to each seller of such Registrable Securities and its counsel, including, without limitation, providing copies promptly upon receipt of any comment letters received with respect to any such Registration Statement or Prospectus;

3.1.9 notify the Holders at any time when a Prospectus relating to such Registration Statement is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes a Misstatement, and then to correct such Misstatement as set forth in Section 3.4 hereof;

3.1.10 permit a representative of the Holders (such representative to be selected by a majority of the participating Holders), the Underwriter(s), if any, and any attorney or accountant retained by such Holders or Underwriter(s) to participate, at each such person's own expense, in the preparation of the Registration Statement, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such representative, Underwriter, attorney or accountant in connection with the Registration; provided, however, that any such representative or Underwriter enters into a confidentiality agreement, in form and substance reasonably satisfactory to the Company, prior to the release or disclosure of any such information; and provided further, the Company may not include the name of any Holder or Underwriter or any information regarding any Holder or Underwriter in any Registration Statement or Prospectus, any amendment or supplement to such Registration Statement or Prospectus, any document that is to be incorporated by reference into such Registration Statement or Prospectus, or any response to any comment letter, without the prior written consent of such Holder or Underwriter and providing each such Holder or Underwriter a reasonable amount of time to review and comment on such applicable document, which comments the Company shall include unless contrary to applicable law;

3.1.11 obtain a "cold comfort" letter from the Company's independent registered public accountants in the event of an Underwritten Registration which the participating Holders may rely on, in customary form and covering

Annex J-10

such matters of the type customarily covered by "cold comfort" letters as the managing Underwriter may reasonably request, and reasonably satisfactory to a majority-in-interest of the participating Holders;

3.1.12 on the date the Registrable Securities are delivered for sale pursuant to such Registration, obtain an opinion and negative assurance letter, dated such date, of counsel representing the Company for the purposes of such Registration, addressed to the Holders, the placement agent or sales agent, if any, and the Underwriter(s), if any, covering such legal matters with respect to the Registration in respect of which such opinion is being given as the Holders, placement agent, sales agent, or Underwriter(s) may reasonably request and as are customarily included in such opinions and negative assurance letters, and reasonably satisfactory to a majority in interest of the participating Holders;

3.1.13 in the event of any Underwritten Offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing Underwriter of such offering;

3.1.14 make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months beginning with the first day of the Company's first full calendar quarter after the effective date of the Registration Statement which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any successor rule promulgated thereafter by the Commission);

3.1.15 if the Registration involves the Registration of Registrable Securities involving gross proceeds in excess of $50,000,000, use its reasonable best efforts to make available senior executives of the Company to participate in customary "road show" presentations that may be reasonably requested by the Underwriter(s) in any Underwritten Offering; and

3.1.16 otherwise, in good faith, cooperate reasonably with, and take such customary actions as may reasonably be requested by the Holders, in connection with such Registration.

3.2 <u>Registration Expenses</u>. Except as otherwise provided herein, the Registration Expenses of all Registrations shall be borne by the Company. It is acknowledged by the Holders that the Holders shall bear all incremental selling expenses relating to the sale of Registrable Securities, such as Underwriters' commissions and discounts, brokerage fees, Underwriter marketing costs and, other than as set forth in the definition of "Registration Expenses," all reasonable fees and expenses of any legal counsel representing any Holder.

3.3 <u>Requirements for Participation in Underwritten Offerings</u> No person or entity may participate in any Underwritten Offering for equity securities of the Company pursuant to a Registration initiated by the Company hereunder unless such person or entity (i) agrees to sell such person's or entity's securities on the basis provided in any underwriting arrangements approved by the Company and (ii) completes and executes all customary questionnaires, powers of attorney, indemnities, lock-up agreements, underwriting agreements and other customary documents as may be reasonably required under the terms of such underwriting arrangements.

3.4 <u>Suspension of Sales; Adverse Disclosure</u>. Upon receipt of written notice from the Company that a Registration Statement or Prospectus contains a Misstatement, each of the Holders shall forthwith discontinue disposition of Registrable Securities until it has received copies of a supplemented or amended Prospectus correcting the Misstatement (it being understood that the Company hereby covenants to prepare and file such supplement or amendment as soon as practicable after the time of such notice), or until it is advised in writing by the Company that the use of the Prospectus may be resumed. If the filing, initial effectiveness or continued use of a Registration Statement in respect of any Registration at any time would require the Company to make an Adverse Disclosure or would require the inclusion in such Registration Statement of financial statements that are unavailable to the Company for reasons beyond the Company's control, the Company may, upon giving prompt written notice of such action to the Holders, delay the filing or initial effectiveness of, or suspend use of, such Registration Statement for the shortest period of time, but in no event more than forty-five (45) days, determined in good faith by the Company to be necessary for such purpose. In the event the Company exercises its rights under the preceding sentence, the Holders agree to suspend, immediately upon their receipt of the notice referred to above, their use of the Prospectus relating to any Registration in connection with any sale or offer to sell Registrable Securities. The Company shall immediately notify the Holders of the expiration of any period during which it exercised its rights under this <u>Section 3.4</u>.

3.5 <u>Reporting Obligations</u>. As long as any Holder shall own Registrable Securities, the Company, at all times while it shall be a reporting company under the Exchange Act, covenants to file timely (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof

Annex J-11

Table of Contents

pursuant to Sections 13(a) or 15(d) of the Exchange Act. The Company further covenants that it shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell shares of the Common Stock held by such Holder without registration under the Securities Act within the limitation of the exemptions provided by Rule 144, including providing any legal opinions. Upon the request of any Holder, the Company shall deliver to such Holder a written certification of a duly authorized officer as to whether it has complied with such requirements.

3.6 Lock-Up Restrictions.

3.6.1 During the applicable Lock-Up Periods, none of the Existing Holders shall offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of or distribute any shares of Common Stock that are subject to an applicable Lock-Up Period or any securities convertible into, exercisable for, exchangeable for or that represent the right to receive shares of Common Stock that are subject to an applicable Lock-Up Period, whether now owned or hereinafter acquired, that is owned directly by such Existing Holder (including securities held as a custodian) or with respect to which such Existing Holder has beneficial ownership within the rules and regulations of the Commission (such securities that are subject to an applicable Lock-Up Period, the "*Restricted Securities*"), other than any transfer to an affiliate of an Existing Holder or to a Permitted Transferee, as applicable. The foregoing restriction is expressly agreed to preclude each Existing Holder, as applicable, from engaging in any hedging or other transaction with respect to Restricted Securities which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of the Restricted Securities even if such Restricted Securities would be disposed of by someone other than such Existing Holder. Such prohibited hedging or other transactions include any short sale or any purchase, sale or grant of any right (including any put or call option) with respect to any of the Restricted Securities of the applicable Existing Holder, or with respect to any security that includes, relates to, or derives any significant part of its value from such Restricted Securities.

3.6.2 Each Existing Holder hereby represents and warrants that it now has and, except as contemplated by this subsection 3.6.2 for the duration of the applicable Lock-Up Period, will have good and marketable title to its Restricted Securities, free and clear of all liens, encumbrances, and claims that could impact the ability of such Existing Holder to comply with the foregoing restrictions Each Existing Holder agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of any Restricted Securities during the applicable Lock-Up Period.

## ARTICLE IV
## INDEMNIFICATION AND CONTRIBUTION

4.1 Indemnification.

4.1.1 The Company agrees to indemnify, to the extent permitted by law, each Holder of Registrable Securities, its officers and directors and each person who controls such Holder (within the meaning of the Securities Act) against all losses, claims, damages, liabilities and expenses (including attorneys' fees) caused by any untrue or alleged untrue statement of material fact contained in any Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are caused by or contained in any information furnished in writing to the Company by such Holder expressly for use therein. The Company shall indemnify the Underwriters, their officers and directors and each person who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to the indemnification of the Holder.

4.1.2 In connection with any Registration Statement in which a Holder of Registrable Securities is participating, such Holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or Prospectus and, to the extent permitted by law, shall indemnify the Company, its directors and officers and agents and each person who controls the Company (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses (including without limitation reasonable attorneys' fees) resulting from any untrue statement of material fact contained in the Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto

Annex J-12

or any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by such Holder expressly for use therein; The Holders of Registrable Securities shall indemnify the Underwriters, their officers, directors and each person who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to indemnification of the Company. For the avoidance of doubt, the obligation to indemnify under this Section 4.1.2 shall be several, not joint and several, among the Holders of Registrable Securities, and the total liability of a Holder under this Section 4.1.2 shall be in proportion to and limited to the net proceeds received by such Holder from the sale of Registrable Securities pursuant to such Registration Statement.

4.1.3 Any person entitled to indemnification herein shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any person's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel (plus local counsel) for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

4.1.4 The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling person of such indemnified party and shall survive the transfer of securities.

4.1.5 If the indemnification provided under Section 4.1 hereof from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by, or relates to information supplied by, such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action; provided, however, that the liability of any Holder under this subsection 4.1.5 shall be limited to the amount of the net proceeds received by such Holder in such offering giving rise to such liability. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in subsections 4.1.1, 4.1.2 and 4.1.3 above, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. The parties hereto agree that it would not be just and equitable if contribution pursuant to this subsection 4.1.5 were determined by Pro Rata allocation or by any other method of allocation, which does not take account of the equitable considerations referred to in this subsection 4.1.5. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this subsection 4.1.5 from any person who was not guilty of such fraudulent misrepresentation.

Annex J-13

**ARTICLE V**
**MISCELLANEOUS**

5.1 <u>Notices</u>. Any notice or communication under this Agreement must be in writing and given by (i) deposit in the United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, (ii) delivery in person or by courier service providing evidence of delivery, or (iii) transmission by hand delivery, facsimile or electronic mail Each notice or communication that is mailed, delivered, or transmitted in the manner described above shall be deemed sufficiently given, served, sent, and received, in the case of mailed notices, on the third business day following the date on which it is mailed and, in the case of notices delivered by courier service, hand delivery, facsimile or electronic mail, at such time as it is delivered to the addressee (with the delivery receipt or the affidavit of messenger) or at such time as delivery is refused by the addressee upon presentation. Any notice or communication under this Agreement must be addressed, if to the Company, to: Canoo Inc., Attention: Ulrich Kranz & Andrew Wolstan, 19951 Mariner Avenue, Torrance, CA 90503 with a copy to Cooley LLP, Attention: Dave Peinsipp, Kristin Vanderpas, Garth Osterman and Dave Young, 101 California Street, 5th Floor, San Francisco, CA 94111, and, if to any Holder, at such Holder's address or contact information as set forth in the Company's books and records. Any party may change its address for notice at any time and from time to time by written notice to the other parties hereto, and such change of address shall become effective thirty (30) days after delivery of such notice as provided in this <u>Section 5.1</u>.

5.2 <u>Assignment; No Third Party Beneficiaries</u>.

5.2.1 This Agreement and the rights, duties and obligations of the Company and the Holder of Registrable Securities, as the case may be, hereunder may not be assigned or delegated by the Company or the Holders of Registrable Securities, as the case may be, in whole or in part, except in connection with a transfer of Registrable Securities by such Holder to a Permitted Transferee but only if such Permitted Transferee agrees to become bound by the transfer restrictions set forth in this Agreement.

5.2.2 Prior to the expiration of any Lock-Up Period, no Holder subject to any such Lock-Up Period may assign or delegate such Holder's rights, duties or obligations under this Agreement, in whole or in part, in violation of the applicable Lock-Up Period, except in connection with a transfer of Registrable Securities by such Holder to a Permitted Transferee but only if such Permitted Transferee agrees to become bound by the transfer restrictions set forth in this Agreement.

5.2.3 This Agreement and the provisions hereof shall be binding upon and shall inure to the benefit of each of the parties and its successors and the permitted assigns of the Holders, which shall include Permitted Transferees.

5.2.4 This Agreement shall not confer any rights or benefits on any persons that are not parties hereto, other than as expressly set forth in this Agreement and <u>Section 5.2</u> hereof.

5.2.5 No assignment by any party hereto of such party's rights, duties and obligations hereunder shall be binding upon or obligate the Company unless and until the Company shall have received (i) written notice of such assignment as provided in <u>Section 5.1</u> hereof and (ii) the written agreement of the assignee, in a form reasonably satisfactory to the Company, to be bound by the terms and provisions of this Agreement (which may be accomplished by an addendum or certificate of joinder to this Agreement). Any transfer or assignment made other than as provided in this <u>Section 5.2</u> shall be null and void.

5.3 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts (including facsimile or PDF counterparts), each of which shall be deemed an original, and all of which together shall constitute the same instrument, but only one of which need be produced.

5.4 <u>Governing Law; Venue</u>. NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT MAY BE EXECUTED BY ANY OF THE PARTIES HERETO, THE PARTIES EXPRESSLY AGREE THAT (I) THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK AS APPLIED TO AGREEMENTS AMONG NEW YORK RESIDENTS ENTERED INTO AND TO BE PERFORMED ENTIRELY WITHIN NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS OF SUCH JURISDICTION AND (II) THE VENUE FOR ANY ACTION TAKEN WITH RESPECT TO THIS AGREEMENT SHALL BE ANY STATE OR FEDERAL COURT IN NEW YORK COUNTY IN THE STATE OF NEW YORK.

5.5 <u>Amendments and Modifications</u>. Upon the written consent of the Company and the Holders of at least a majority in interest of the Registrable Securities at the time in question, compliance with any of the provisions, covenants and conditions set forth in this Agreement may be waived, or any of such provisions, covenants or conditions may be amended or modified; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, (a) any amendment hereto or waiver hereof that adversely affects either the Existing Holders as a group or the New Holders as a group, as the case may be, in a manner that is materially adversely different from the New Holders or the Existing Holders, respectively, shall require the consent of at least a majority-in-interest of the Registrable Securities held by such Existing Holders or a majority-in-interest of the Registrable Securities held by the New Holders, as applicable, at the time in question so affected; <u>provided</u>, <u>further</u>, that notwithstanding the foregoing, any amendment hereto or waiver hereof that adversely affects one Holder or group of affiliated Holders, solely in its capacity as a holder of the shares of capital stock of the Company, in a manner that is materially different from the other Holders (in such capacity) shall require the consent of the Holder or group of affiliated Holders so affected and (b) any amendment hereto or waiver hereof that adversely affects the rights of any Anchor Investor shall require the consent of such entity. No course of dealing between any Holder or the Company and any other party hereto or any failure or delay on the part of a Holder or the Company in exercising any rights or remedies under this Agreement shall operate as a waiver of any rights or remedies of any Holder or the Company. No single or partial exercise of any rights or remedies under this Agreement by a party shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder or thereunder by such party.

5.6 <u>Other Registration Rights</u>. The Company represents and warrants that no person, other than a Holder of Registrable Securities, has any right to require the Company to register any securities of the Company for sale or to include such securities of the Company in any Registration filed by the Company for the sale of securities for its own account or for the account of any other person. Further, the Company represents and warrants that this Agreement supersedes any other registration rights agreement or agreement with similar terms and conditions and in the event of a conflict between any such agreement or agreements and this Agreement, the terms of this Agreement shall prevail.

5.7 <u>Term</u>. This Agreement shall terminate upon the earlier of (i) the tenth anniversary of the date of this Agreement and (ii) the date as of which (A) all of the Registrable Securities have been sold or disposed of or (B) the Holders of all Registrable Securities are permitted to sell the Registrable Securities under Rule 144 (or any similar provision) under the Securities Act without limitation on the amount of securities sold or the manner of sale and without compliance with the current public reporting requirements set forth under Rule 144(i)(2). The provisions of <u>Section 3.5</u> and <u>Article IV</u> shall survive any termination.

5.8 <u>Entire Agreement</u>. This Agreement constitutes the entire understanding and agreement between the parties as to the matters covered herein and supersedes and replaces any prior understanding, agreement or statement of intent, in each case, written or oral, of any and every nature with respect thereto.

[*Signature Page Follows*]

Annex J-15

Table of Contents

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed as of the date first written above.

**COMPANY:**

**CANOO INC.**, a Delaware corporation

By: _____

    Name:

    Title:

**SPONSOR:**

**HENNESSY CAPITAL PARTNERS IV LLC,**
a Delaware limited liability company

By:  Hennessy Capital LLC, its managing member

By: _____

    Name: Daniel J. Hennessy

    Title: Manager

**OTHER PRE-IPO HOLDERS:**

**HC NCBR FUND**

By: _____

    Name:

    Title:

**BLACKROCK CREDIT ALPHA MASTER FUND L.P.**

By: _____

    Name:

    Title:

_____

Name: Greg Ethridge

_____

Name: Nicholas A. Petruska

_____

Name: Bradley Bell

[*Signature Page to Amended and Restated Registration Rights Agreement*]

Annex J-16

Table of Contents

Name: Richard Burns

Name: Juan Carlos Mas

Name: Gretchen W. McClain

Name: James F. O'Neil III

Name: Peter Shea

**NEW HOLDERS:**

[•]:

By: _____

    Name:

    Title:

[•]:

By: _____

    Name:

    Title:

[*Signature Page to Amended and Restated Registration Rights Agreement*]

Annex J-17

Exhibit 10.15

CANOO HOLDINGS LTD.
19951 Mariner Avenue
Torrance, CA 90503

November 25, 2020

Anthony Aquila
2126 Hamilton Drive
Suite 260
Argyle, Texas, 76226
Re: Executive Chairman Agreement
Dear Tony:

On behalf of Canoo Holdings, Ltd. (the "Company"), we would like to formally confirm our offer to you to serve as Executive Chairman (Executive Chairman") of the Board of Directors of the Company (the "Board"). We are very excited about this opportunity and the value that you can bring to the Company in this role. This letter agreement (this "Agreement") sets forth the terms and conditions of your appointment as Executive Chairman of the Board.

1. **Term:** The term of this Agreement (the "Term") and your services as Executive Chairman of the Board will commence on the first date that both of the following have occurred: (i) you are duly appointed as a member of the Board; and (ii) the transactions described in the Merger Agreement, dated as of August 17, 2020, as may be amended from time to time, by and among Hennessy Capital Acquisition Corp. IV, a Delaware corporation (" HCAC"), HCAC IV First Merger Sub, Ltd., an exempted company incorporated with limited liability in the Cayman Islands, HCAC IV Second Merger Sub, LLC, a Delaware limited liability company, and the Company (the "Merger") have been consummated, and will continue until the Termination Date. The "Termination Date" means the earliest of (a) your voluntary resignation from the Board upon at least thirty (30) days of advanced written notice to the Board, (b) your failure to be re-elected to the Board by Company shareholders at the Company's third annual general meeting following consummation of the Merger, (c) a vote of no-confidence by a majority of the Board, and (d) December 31, 2023.

2. **Duties:** During the Term, you will have the duties, authorities and responsibilities commensurate with the duties, authorities and responsibilities of an Executive Chairman of a company the size and nature of the Company. Without limiting the foregoing, you will be responsible for: (a) providing entrepreneurial leadership to the Company's senior executives; (b) leading the development and execution of the Company's long-term strategy and product and business roadmap to be developed by you, the Company's senior executive team and the Board (the "Product and Business Roadmap"), including, without limitation, product development and innovation, acquisitions, dispositions and other strategic partnerships and initiatives; (c) capital raising to support the Product Roadmap; (d) mentoring senior management; (e) building and developing relationships with important external stakeholders, including, without limitation, oversight of investors relations, public relations and media strategy; and (f) reviewing the performance of management in meeting the Product Roadmap and other annual and long-term goals and objectives. You will also have the authority typically associated with the most senior executive of the Company, with authority over the senior management team of the Company, including, without limitation, all hiring and other personnel decisions. You will have exclusive control over the manner and means of your performance of your duties, including the choice of place and time of your performance.

Anthony Aquila
Page 2
November 25, 2020

3. **Location**: The Company will promptly establish the Office of the Chairman in the Dallas, Texas metropolitan area, which will serve as your primary work location during the Term (the "Dallas Center"). The Company will ensure that the Dallas Center is sufficiently staffed with personnel, designated by you in accordance with the Company's general employment terms, to support you in your capacity as Executive Chairman. The Company also understands that you may work from your Jackson Hole, Wyoming residence. The Company will pay and be responsible for office rent, personnel costs and benefits for the staff associated with the Dallas Center; other expenses and costs shall be reimbursable provided they are reasonable and necessary and qualify as business expenses in accordance with Canoo Inc.'s business expense reimbursement policy. The Executive Chairman will supervise the Dallas Center and its staff. All such payment and reimbursements for expenses shall be approved by the Board.

4. **Compensation Generally:** Except with respect to the vesting commencement dates for the Equity Awards set forth below, each of which shall be as set forth in **Exhibit A** hereto, effective upon the date of signing of this Agreement, but retroactive to August 17, 2020, the Company will provide you the following payments and benefits:

   a) Annual Fee. During the Term, the Company will pay you an annual fee of $500,000 ("Fee"), payable in advance in equal quarterly installments (with payment for any pro-rated quarter made with the payment for the following quarter), with such payment to occur no later than 30 days following the commencement of the applicable calendar quarter.

   b) Private Company Equity Award. Contingent upon the approval of the Board, you will be granted incentive equity compensation pursuant to the terms of the Company's 2018 Share Option and Grant Plan (the "Private Company EIP") covering approximately 1,619,816 ordinary shares of the Company ("Ordinary Shares") (the final number of Ordinary Shares will be an amount equal to 2,000,000 Shares (as defined below) following the effective date of the Merger), the material terms of which are set forth on **Exhibit A** hereto (the "Private Company Equity Award").

   c) Public Company Equity Award. As soon as practicable following the commencement of the Term and contingent upon (i) the approval of the Board and the effectiveness of a Form S-8 Registration Statement that registers the shares of common stock of the new public parent company to be granted under the new public parent company 2020 Equity Incentive Plan (the "Public Company EIP") and (ii) your eligibility to receive a grant pursuant to the terms of the Public Company EIP as of the date of grant, you will be granted incentive equity awards covering 1,000,000 shares of common stock of Canoo Inc. (each, a "Share"), pursuant to the standard forms of award agreement thereunder, the material terms of which are set forth on **Exhibit A** hereto (the "Public Company Equity Award" and collectively with the Private Company Equity Award, the "Equity Awards").

   d) The Annual Fee as well as the Equity Awards are subject to reasonable adjustment by the Board in case the scope of your duties is reduced by Board resolution.

   e) Benefits and Perquisites. During the Term, you will be entitled to any other benefits and perquisites generally available to members of the Board.

Anthony Aquila
Page 3
November 25, 2020

f) <u>Business Expenses</u>. The Company will reimburse you for reasonable and customary business expenses, including travel expenses, in accordance with Canoo Inc.'s business expense reimbursement policy (and upon completion of the Merger, the then applicable policy). All such expenses to be approved by the Board. In addition, the Company will reimburse you for

   (i)   air travel expenses for either, at the option of Company, (x) first class airfare or (y) the lower of (1) a base rate of $8,000 per hour, excluding fees and expenses (e.g. landing, ramp, segment, crew, government and other fees and taxes) <u>and</u> (2) a fully-loaded rate of $10,000 per hour, excluding such incidental fees and expenses, in each case, for the business use of your private jet, subject to appropriate adjustments for increased costs;

   (ii)  executive housing in Los Angeles, California, with any expense reimbursement taxable to you made on a fully grossed up basis; and

   (iii) all expenses as indicated under Section 3 above incurred in connection with the Dallas Center (and other locations approved by the Board). Such payments shall be made on a monthly basis.

g) <u>Directors and Officers Insurance</u>. You will be indemnified to the greatest extent provided to any director or officer of the Company and you will be covered under the Company's directors' and officers' liability insurance both during and, while potential liability exists, after the Term. Notwithstanding anything in this Agreement or in the Company's governing documents to the contrary, but subject to applicable law, you will have no liabilities to the Company, its subsidiaries or its affiliates for any acts or omissions taken by you, unless determined by a court of competent jurisdiction in a final, non-appealable judgment or order that any such claim is solely the result of your gross negligence or willful misconduct (an "<u>Excluded Claim</u>"). The Company will, to the extent legally permissible, indemnify, defend and hold you harmless from and against any and all claims, investigations, demands, or proceedings (a "<u>Proceeding</u>") arising from or related in any manner, except for any Proceeding arising in whole or in part from your negligence or willful misconduct, to the activities and duties contemplated by this Agreement or your service as Executive Chairman and, subject to a customary undertaking to repay such expenses if you are ultimately determined not be entitled to indemnity, will advance upon demand all defense costs and expenses relating to any Proceeding. The provisions of this Section 4(e) are not exclusive so that you will additionally be eligible for indemnity, contribution and advancement of expenses in accordance with the terms of any other arrangement with the Company or its affiliates.

5. **Code Section 409A**. The intent of the parties is that payments and benefits under this Agreement be exempt from or comply with Code Section 409A and the regulations and guidance promulgated thereunder (collectively, "<u>Code Section 409A</u>") and, accordingly, to the maximum extent permitted, this Agreement will be interpreted to be in compliance therewith. For purposes of Code Section 409A, your right to receive any installment payments pursuant to this Agreement will be treated as a right to receive a series of separate and distinct payments. To the extent that reimbursements (including tax reimbursements) or other in-kind benefits under this Agreement constitute "nonqualified deferred compensation" for purposes of Code Section 409A, (i) all such expenses or other reimbursements hereunder will be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by you, (ii) any right to such reimbursement or in-kind benefits will not be subject to liquidation or exchange for another benefit, and (iii) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year will in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year. Notwithstanding any other provision of this Agreement to the contrary, in no event will any payment under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

Anthony Aquila
Page 4
November 25, 2020

6.  **Confidentiality Agreement.** You will be expected to sign and comply with the Company's standard form of nondisclosure agreement for non-employee service providers.

7.  **Independent Contractor Relationship.**

    a)  Independent Contractor. Your relation to the Company under this Agreement is that of an independent contractor. Nothing in this Agreement is intended or should be construed to create a partnership, joint venture, or employer-employee relationship between you and the Company. You agree that you will take no position with respect to, or on any tax return or application for benefits, or in any proceeding directly or indirectly involving the Company, that is inconsistent with your being an independent contractor (and not an employee) of the Company. Without limiting the generality of the foregoing , the subsequent provisions of this Section 7 shall apply to you in connection with your independent contractor relationship with the Company.

    b)  Benefits and Contributions. You are not entitled to or eligible for any benefits that the Company may make available to its employees, such as group insurance, profit-sharing, or retirement benefits. Because you are an independent contractor, the Company will not withhold or make payments for social security, make unemployment insurance or disability insurance contributions, or obtain workers' compensation insurance on your behalf. If, the foregoing notwithstanding, you are reclassified as an employee of the Company, or any affiliate of the Company, by the U.S. Internal Revenue Service, the U.S. Department of Labor, or any other federal or state agency as the result of any administrative or judicial proceeding, you agree that you will not, as the result of such reclassification, be entitled to or eligible for, on either a prospective or a retrospective basis, any employee benefits under any plans or programs established or maintained by the Company.

    c)  Taxes. You are solely responsible for filing all tax returns and submitting all payments as required by any federal, state, or local tax authority arising from the payments and benefits to you under this Agreement, and agree to do so in a timely manner. If applicable, the Company will report the payments and benefits paid or provided to you under this Agreement by filing Form 1099-MISC with the Internal Revenue Service as required by law. You hereby agree to defend, indemnify and hold the Company harmless from and against all claims, damages, losses and expenses, penalties, including reasonable fees and expenses of attorneys and other professionals and other costs of litigation, incurred by the Company related to or arising out of your failure to comply with your tax filing obligations in connection with receipt of the payments and benefits under this Agreement..

    d)  Compliance with Laws. You will comply with all applicable federal, state, or local laws governing self-employed individuals, including laws requiring the payment of taxes, such as income and employment taxes, and social security, disability, and other contributions.

Anthony Aquila
Page 5
November 25, 2020

8. **Entire Agreement:** This Agreement constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersedes all prior understandings and agreements, including any terms sheets, whether oral or written, between you and the Company or any predecessor entities.

9. **Governing Law**: The provisions of this Agreement will be governed by and construed in accordance with the laws of the state of Texas (excluding any conflict of law rule or principle that would refer to the laws of another jurisdiction). EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING HEREUNDER. The Company will reimburse all costs or expenses (including, without limitation, reasonable attorneys' fees) you incur in connection with any dispute with the Company regarding this Agreement or your service as Executive Chairman that is not subject to advancement under Section 4(e) or otherwise if you substantially prevail on any issue related to such dispute.

10. **Counterparts; Signature Transmission**: This Agreement may be executed on separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement. Signatures transmitted by facsimile or electronic mail will be binding as evidence of each party's agreement to be bound by the terms of this Agreement.

11. **Third Party Beneficiaries; Assignment**: This Agreement will be binding upon you and the Company and will inure to the benefit of you and the Company, and, in each case, the parties' respective heirs, personal and legal representatives, successors and permitted assigns. You may not assign your rights and obligations under this Agreement, and any such assignment will be null and void.

12. **Severability**: The provisions of this Agreement will be deemed severable, and the invalidity or unenforceability of any one or more of the provisions hereof will not affect the validity or enforceability of the other provisions of this Agreement.

13. **Notices**: For purposes of this Agreement, notices and all other communications provided for in this Agreement will be in writing and will be deemed to have been duly given (a) on the date of delivery, if delivered by hand, (b) on the date of transmission, if delivered by confirmed electronic mail, (c) on the first business day following the date of deposit, if delivered by guaranteed overnight delivery service, or (d) on the fourth business day following the date delivered or mailed by United States registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

> If to you:
>
> > At the address (or to the email address) shown in the books and records of the Company
>
> If to the Company:
>
> > Board of Directors
> > Canoo Holdings Ltd.
> > 19951 Mariner Avenue
> > Torrance, CA 90503

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address will be effective only upon receipt.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Anthony Aquila
Page 6
November 25, 2020

       If you decide to accept the terms of this Agreement, and I hope you will, please signify your acceptance by signing and dating the enclosed copy of this Agreement. Should you have anything that you wish to discuss, please do not hesitate to contact us. This Agreement will be effective immediately upon the full execution of this Agreement by the parties below.

Very truly yours,

CANOO HOLDINGS LTD.

By:    /s/ Foster Chiang

Name: Foster Chiang

Title:  Director

Acknowledgement

By signing this Agreement, I hereby represent and warrant that I have had the opportunity to seek the advice of independent legal counsel or other advice as I deem appropriate before signing and have done so. I sign this Agreement voluntarily. I have read, understand and voluntarily agree to perform the services on the terms and conditions set out above.

ANTHONY AQUILA

/s/ Anthony Aquila

DATED: November 25, 2020

**EXHIBIT A**

**Terms of Equity Award**

- Award Type:

  Private Company Equity Award (1,619,816): Approximately 809,908 Ordinary Shares (50% of the Private Company Equity Award) granted in the form of performance-based restricted stock units ("Private Company PSUs") and 809,908 Ordinary Shares (50% of the Private Company Equity Award) granted in the form of time-based restricted stock units ("Private Company RSUs" and collectively with the Private Company PSUs, the "Private Company Awards"). The Company will settle the Private Company PSUs and RSUs no later than March 15th of the year following the year of vesting.

  Public Company Equity Award (1,000,000): 500,000 Shares (50% of the Public Company Equity Award) granted in the form of PSUs ("Public Company PSUs"), and 500,000 Shares (50% of the Public Company Equity Award) granted in the form of time-based restricted stock units ("Public Company RSUs") and collectively with the Public Company PSUs, the "Public Company Awards"). The Company will settle the Public Company PSUs and RSUs no later than March 15th of the year following the year of vesting.

- Vesting:

  Private Company Equity Awards

  *Private Company PSUs*: 25% of the Private Company PSUs will vest on the first anniversary of October 19, 2020 (the "Private Vesting Commencement Date"), and the remaining 75% will vest on the third anniversary of the Private Vesting Commencement Date based on performance achievement at each vesting date. Performance will be based on the goals set forth in the Product and Business Roadmap. The terms of the Private Company PSUs will provide for the delivery of an additional 100% of the target number of shares subject to the Private Company PSUs for exceeding such goals and a discount of 50% of the target number of shares subject to the Private Company PSUs for failing to achieve such goals, as well as a threshold level of performance, below which 0% of the Private Company PSUs will vest.

  *Private Company RSUs*: One-third of the Private Company RSUs will vest on each of the first through third anniversaries of the Private Vesting Commencement Date.

  Public Company Equity Awards

  *Public Company PSUs*: 25% of the Public Company PSUs will vest on the first anniversary of the commencement of the Term (the "Start Date"), and the remaining 75% will vest on the third anniversary of the Start Date based on achievement at each vesting date. Performance will be based on the goals set forth in the Product and Business Roadmap. The terms of the Public Company PSUs will provide for the delivery of an additional 100% of the target number of shares subject to the Public Company PSUs for exceeding such goals and a discount of 50% of the target number of shares subject to the Public Company PSUs for failing to achieve such goals, as well as a threshold level of performance, below which 0% of the Public Company PSUs will vest.

  *Public Company RSUs*: One-third of the Public Company RSUs will vest on each of the first through third anniversaries of the Start Date.

A-1