POMERANTZ LLP
Jennifer Pafiti (SBN 282890)
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York  10016
Telephone:  (212) 661-1100
jpafiti@pomlaw.com
jalieberman@pomlaw.com
mjsteven@pomlaw.com

*Co-Lead Counsel for Lead Plaintiff & the Proposed Class*

— additional counsel on signature page —

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAMUEL BLAKE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CANOO INC., TONY AQUILA, ULRICH KRANZ, and PAUL BALCIUNAS,<br><br>Defendants. | **Case No. 2:21-CV-02873-FMO-JPR** (**Consolidated**)<br><br>Case No. 2:21-CV-02879-FMO-JPR<br><br>Case No. 2:21-CV-03080-FMO-JPR<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................2

    A.    Background ..................................................................................................2

    B.    Defendants Deliberately Misrepresented Canoo as Uniquely Positioned to Capture Market Share of the Electric Vehicle Sector ...................................3

    C.    Defendants Continued to Tout Canoo's Unique Business Model After the Merger's Approval ...................................................................................5

    D.    Defendants Reveal Dramatic Changes to Canoo's Unique Business Model During Canoo's First Public Earnings Call.........................................................5

    E.    The SEC Announced an Investigation Into Canoo's SPAC Merger ...........6

III.   STANDARD OF REVIEW ...................................................................................7

IV.   THE CAC ALLEGES FALSE STATEMENTS .....................................................8

    A.    Defendants Misrepresented Canoo's Engineering Services ........................8

    B.    Defendants Falsely Touted the Viability of a Subscription Sales Model ...12

    C.    Defendants' Statements Are Not Protected By the Safe-Harbor ...............13

    D.    Defendants' Statements Are Not Mere Opinions Or Puffery ....................15

    E.    The Alleged Misstatements are Attributable to Canoo and the Individual Defendants................................................................................................16

V.    DEFENDANTS MADE STATEMENTS WITH SCIENTER ............................18

    A.    Plaintiff Adequately Alleges That Defendants Had Access to and/or Knowledge of Material Undisclosed Facts ...................................................19

    B.    SEC Investigations and Executive Resignations .......................................20

C.    Temporal Proximity Between the Misrepresentations and Corrective Disclosure ..................................................................................................21

D.    Defendants Were Motivated to Defraud ......................................................21

E.    The Inference of Scienter is More Compelling than Defendants' Competing Inference ......................................................................................................22

VI.    THE CONFIDENTIAL WITNESSES' STATEMENTS ARE RELIABLE ........23

VII.    DEFENDANTS' CONDUCT VIOLATED RULES 10B-5(A) AND (C) ...........24

VIII.    THE CAC SUFFICIENTLY ALLEGES A §20(A) CLAIM ...............................25

IX.    CONCLUSION....................................................................................................25

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC*,
446 U.S. 680 (1980)..................................................................................................25

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) ...................................................................................15

*Berson v. Applied Signal Tech.*,
527 F.3d 982 (9th Cir. 2008) .....................................................................................8

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) .....................................................................................8

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ...................................................................................16

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) .....................................................................18

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) .....................................................................18

*Craig Frazier Design, Inc. v. Zimmerman Agency LLC*,
2010 WL 3790656 (N.D. Cal. Sep. 27, 2010) ...........................................................7

*Curry v. Hansen Med., Inc.*,
2011 WL 3741238 (N.D. Cal. Aug. 25, 2011) .......................................................25

*Cutler v. Rancher Energy Corp.*,
2014 WL 1153054 (C.D. Cal. Mar. 11, 2014)..........................................................16

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ...................................................................................19

*Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .....................................................................................24

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ...................................................................................11

iii
LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

*Feyko v. Yuhe Int'l, Inc.*,
   2013 WL 816409 (C.D. Cal. Mar. 5, 2013)........................................................11

*Flynn v. Sientra, Inc.*,
   2016 WL 3360676 (C.D. Cal. June 9, 2016) ......................................................22

*Friedman v. Endo Int'l PLC*,
   2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) .......................................................13

*Garcia v. J2 Glob., Inc.*,
   2021 WL 1558331 (C.D. Cal. Mar. 5, 2021)......................................................19

*Glazer Cap. Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) .............................................................................17

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ...............................................................................8

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ...........................................................................19

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ...............................................................................7

*In re Banc of California Sec. Litig.*,
   2017 WL 3972456 (C.D. Cal. Sep. 6, 2017) ......................................................20

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   692 F. Supp. 2d 1181 (N.D. Cal. 2010)..............................................................20

*In re Century 21-RE/MAX Real Est. Advert. Claims Litig.*,
   882 F. Supp. 915 (C.D. Cal. 1994) ....................................................................16

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ...........................................................................23

*In re Fusion-io, Inc. Sec. Litig.*,
   2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ......................................................20

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005).................................................................19

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ...........................................................................17

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ..................................................................14, 18

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)............................................................14

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009)..............................................................20

*In re Vaxart, Inc. Sec. Litig.*,
  576 F. Supp. 3d 663 (N.D. Cal. 2021)..............................................................10

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ...........................................................................22

*In re Volkswagen* "*Clean Diesel*" *Mktg., Sales Pracs., & Prods. Liab.
  Litig.*, 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) .............................................21

*In re Volkswagen "Clean Diesel" Mktg., Sales Practs., & Prods. Liab.
  Litig.*,
  2017 WL 3058563 (N.D. Cal. July 19, 2017) ..................................................17

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
  282 F. Supp. 3d 1074 (N.D. Cal. 2017)............................................................17

*In re Zoom Sec. Litig.*,
  2022 WL 484974 (N.D. Cal. Feb. 16, 2022) ..............................................17, 20

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)....................................................................................16, 17

*Johnson v. Knapp*,
  2009 WL 764521 (C.D. Cal. Mar. 16, 2009).......................................................7

*Kendall v. Odonate Therapeutics, Inc.*,
  2021 WL 3406271 (S.D. Cal. Aug. 4, 2021).......................................................8

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) .......................................................................7, 25

*Kovtun v. VIVUS, Inc.*,
  2012 WL 4477647 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v.
  VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015)................................................11

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

*Livid Holdings Ltd v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ...............................................................................13

*Longo v. OSI Sys., Inc.*,
  2021 WL 1232678 (C.D. Cal. Mar. 31, 2021)......................................................17

*Lorenzo v. Sec. & Exch. Comm'n*,
  139 S. Ct. 1094 (2019)....................................................................................24, 25

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
  2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) .....................................................17

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) ...............................................................................7

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020)..................................................................14

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014)..............................................................15, 23

*Murphy v. Am. Gen. Life Ins. Co.*,
  74 F. Supp. 3d 1267 (C.D. Cal. 2015) ....................................................................7

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West
  Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ...........................................................................2, 22

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ..........................................................................16, 17

*Patterson v. Hennessy*,
  2022 WL 2208893 (D. Del. June 21, 2022) ....................................................11, 12

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ..........................................................................20, 22

*Salameh v. Tarsadia*,
  726 F.3d 1124 (9th Cir. 2013) ................................................................................7

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) .................................................................................15

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)................................................................18, 19, 22

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .....................................17

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2016 WL 4056209 (C.D. Cal. July 25, 2016).....................................16

*Yourish v. California Amplifier*,
    191 F.3d 983 (9th Cir. 1999) ........................................................20, 21

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ................8

*Zwick Partners, LP v. Quorum Health Corp.*,
    2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) .................................17

**Statutes**

15 U.S.C. §78u-4(b)(2) ..............................................................................18

15 U.S.C. §78u-5(c)(1)(A)(i) .....................................................................15

Private Securities Litigation Reform Act of 1995 .......................................8, 18, 22

Securities Exchange Act of 1934 ...............................................................25

**Rules and Regulations**

17 C.F.R. § 240.10b-5.............................................................................8, 24

Fed. R. Civ. P. 12(b)(6).................................................................................7

Fed. R. Civ. P. 15(a)(2)...............................................................................25

**Other Authorities**

Webster's Int'l Dictionary (2d ed. 1934)....................................................25

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

Lead Plaintiff Vladi Shaulov respectfully submits this opposition to Defendants' Motion to Dismiss Lead Plaintiff's Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 101-1) (the "Motion").

## I. INTRODUCTION

This action arises from a "bait and switch" that Defendants[1] orchestrated when taking Canoo public via its merger with HCAC, a special purpose acquisition company ("SPAC"). To convince investors to approve the Merger, Defendants sold Canoo's three-prong business model consisting of: (1) its then-existing contract engineering services activity that was generating "immediate" pre-sale revenue; (2) its subscription sales model that "de-risked" the business and was superior to competitors' lease-based models; and (3) future business to business sales. Defendants highlighted Canoo's supposed partnership with Hyundai as a key validation of its electric vehicle ("EV") platform. On December 21, 2020, HCAC investors approved the Merger. Less than a month later, Defendants commenced a shelf-offering, claiming a "$120 million" engineering services pipeline and reaffirming the model.

On March 29, 2021, Defendants suddenly announced Canoo had "de-emphasized" its contract engineering division, jettisoned its subscription sales model, and revealed that the Hyundai deal was dead. Investors had no warning of any of these facts, and Canoo's stock price cratered as a result. Significantly, Aquila admitted that Canoo's prior statements between August 18, 2020 and March 29, 2021 (the "Class Period"), were "premature," "aggressive," "presumptuous" and did not meet the "standard of representation to the public markets."

---

[1] As used herein, "¶__" and "¶¶__-__" refer to paragraphs in the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 85) (the "CAC"). "Defendants" refers to Canoo Inc., ("Canoo" or the "Company"); Hennessy Capital Acquisition Corp. IV ("Hennessy Capital" or "HCAC"); then Chairman and now CEO Tony Aquila ("Aquila"); former CEO Ulrich Kranz ("Kranz"); and former CFO Paul Balciunas ("Balciunas"). ¶¶29-33, 37. Unless otherwise noted, all citations are omitted and all emphasis has been added.

Defendants' Motion fails to meaningfully counter Plaintiff's well-pled allegations. In a kitchen-sink approach, the Motion seeks to distract from the allegations by focusing on irrelevant and extraneous points, while stating in conclusory terms what, in Defendants' view, is missing from the CAC. Defendants are wrong on both the facts and the law, and their Motion should be denied.

## II.   STATEMENT OF FACTS

### A.   Background

HCAC became a publicly traded SPAC on March 5, 2019. ¶¶4, 30. As a shell corporation, the SPAC's purpose was to merge with a private company such that the resulting business combination would be publicly traded. ¶47. HCAC faced a September 2020 deadline to complete a merger before it would be required to cash out its investors at roughly their initial investment. ¶54. A month before the deadline, HCAC filed a Definitive Proxy Statement requesting its shareholders extend the deadline to complete the merger and announcing it had identified an acquisition target (the "Merger"). ¶¶5, 55. The target, Canoo, was an EV manufacturer that purportedly developed a modular "skateboard" platform that could be modified for commercial and consumer markets. ¶¶42-46.

The Merger was subject to shareholder approval. ¶¶56, 61. On August 18, 2020, HCAC filed with the SEC a Schedule 14A (the "Proxy Statement"), setting forth the details of the proposed transaction and encouraging investors to vote in favor of it. ¶61. The Proxy Statement was accompanied by a *joint* press release issued by Canoo and HCAC announcing the Merger, in which Defendants touted the business combination and highlighted Canoo's supposed partnership with Hyundai, and an investor presentation detailing the business and proposed transaction, which was presented later that same day during a *joint* investor conference call. ¶¶61, 74, 76; *see also* Aug. 18, 2020 Joint Press Release, ECF No. 102-13, Defs.' Ex. 13; Investor Presentation, ECF No. 102-5, Defs.' Ex. 5; Aug. 18, 2020 Joint Investor Conference Call Tr., ECF No. 102-4, Defs.' Ex. 4.

On August 25, 2020, in support of the Merger, HCAC and Canoo issued another press release on Form 8-K announcing, among other things, nominees to serve on Canoo's Board of Directors, including Aquila and Kranz. ¶62. The press release included a statement from Aquila hyping the Company's business model and crediting Canoo's current management and business approach as reasons he invested in Canoo. *Id.*

During the Class Period, the Individual Defendants all held leadership roles within Canoo: Kranz served as CEO, Balciunas served as CFO, and Aquila was a large investor tapped to first serve as Chairman of the Board beginning October 19, 2020, and Executive Chairman and Director starting December 21, 2020. ¶¶31-33. As Executive Chairman of Canoo, Aquila was responsible for developing and executing its "long-term strategy and product and business roadmap" and had strong influence over Canoo's direction. ¶31.

### B. Defendants Deliberately Misrepresented Canoo as Uniquely Positioned to Capture Market Share of the Electric Vehicle Sector

The August 18, 2020 joint press release announcing the Merger said Canoo would rely on a "unique business model" based on three revenue streams: providing engineering services to other vehicle makers; offering vehicles to consumers via a subscription service; and selling "last-mile" delivery vehicles to businesses. ¶¶74, 76. Defendants touted Canoo's supposed partnership with Hyundai to provide engineering services and co-develop an EV platform that "validate[d] Canoo's technology." ¶¶74, 77. Canoo claimed the revenue generated by those services would "reduce the Company's overall execution risk." ¶77; *see* ¶80 (describing unique profit margin profile). Defendants represented the subscription model as consumer-friendly and overall better for Canoo's bottom line. ¶¶80-81. The joint press release and accompanying investor presentation, which was filed with the SEC, said the consumer subscription service would be superior to leasing since it would be "more profitable and resilient" than selling new vehicles. ¶¶81-82 (subscription model creates "consistent cash flow and strong ROE").

Defendants held a joint conference call with investors to accompany their investor

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

presentation on August 18, 2020 (¶¶144, 151) and pitched Canoo's ability to generate an immediate revenue stream through its engineering consulting contracts. ¶¶76-77. Kranz stressed the fundamental aspect of Canoo's three streams of revenue, claiming with regard to its engineering services business that "we *are working* for companies and we *are already making* money with the first revenue stream," and he continued to hype their subscription-based consumer vehicle service business, claiming it would be "available when we launch our first vehicle, our lifestyle vehicle, by 2022." ¶76. Balciunas likewise misleadingly stated "we *currently are in the first phase* of doing some contract engineering work" (¶144) and described the benefits of a subscription-based business model, saying "for us to be able to achieve a 20% operating profit is far greater than what you see in the traditional automotive OEM business model" which he claimed "highlight[s] the power of a subscription business model with this figure being a fully-burdened margin." ¶80. Balciunas also stated that third-party engineering contracts provided important validation of Canoo's technology, saying: "This is something that we are incredibly proud of, *to have this partnership with a world-class OEM like Hyundai. . . this is a really great opportunity and benchmark for the marketplace, to have this kind of validation*, especially considering that we are much smaller company versus Hyundai." ¶144. Later in the same call, Balciunas represented that Canoo expected to generate $120 million in the first two years, claiming "*this is just [from its] Engineering Services*" and that "in 2023 is when the delivery vehicle comes to market and we begin selling that product, and then revenue grows as volumes ramp up." ¶145. HCAC incorporated this exact language from Canoo's presentation in its Form S-4 SEC filing on September 18, 2020.

In its September 18, 2020 Form S-4 (the "September S-4"), Canoo continued to claim its contract engineering pipeline was "supportive of a projected $120 million of revenue in 2021[,]" and expected it to offer "significant growth potential in the future." ¶¶64-65, 85. The September S-4 also reiterated Defendants' supposed contract with

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

Hyundai that they claimed provided "further validation of Canoo's technical leadership and external confidence in its commercial prospects," and Defendants continued to tout Canoo's engineering contracts and services. ¶¶64-66. These false claims were repeated in October and November amendments to the September S-4.

### C. Defendants Continued to Tout Canoo's Unique Business Model After the Merger's Approval

On December 21, 2020, HCAC shareholders approved the Merger and Canoo became publicly traded. ¶70. On January 13, 2021, Canoo filed a Registration Statement on Form S-1 (the "January S-1") announcing a shelf offering for the sale of more than 24 million shares, which was signed by Aquila and Balciunas. ¶¶17, 92. The January S-1 again hyped Canoo's engineering contract services and agreement with Hyundai to "co-develop a future EV platform . . . for which the intellectual property developed will be jointly owned by us and Hyundai[.]" ¶93. It continued to claim that its "current pipeline in this area is supportive of a projected $120 million of revenue in 2021. ¶95. The January S-1 also stated Canoo was "in discussions with multiple other blue-chip industry participants" and portrayed its contract engineering work as a core business segment to generate immediate revenue. ¶¶93, 95. Defendants' January S-1 also touted Canoo's subscription model as "reduc[ing] the barriers to entry for consumers looking to drive an EV, while also providing [Canoo] with a distinct opportunity for recuring revenue and a unique profit margin profile," claiming they expected a "significant majority" of revenue to derive from consumer subscriptions. ¶98. Canoo claimed its unique manufacturing approach, which purportedly reduced risks and capital expenditures by utilizing contract manufacturing, would "significantly reduce our up-front capital investment and eliminate the recurring fixed costs and overhead that would be required." ¶97.

### D. Defendants Reveal Dramatic Changes to Canoo's Unique Business Model During Canoo's First Public Earnings Call

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

On March 29, 2021, Canoo announced its fourth quarter and full year 2020 financial results and hosted an earnings conference call. ¶¶102-103. Unexpectedly, Aquila led the call. After first informing investors that then CFO Balciunas had suddenly resigned, Aquila dropped several unexpected bombshells.

Aquila first revealed the Company's plan to "de-emphasize" its contract engineering services line. ¶¶107-108. He admitted that the dramatic shift in focus "was a contradiction[.]" ¶110. Aquila also conceded earlier claims Canoo would have partnerships by end of fourth quarter were "aggressive" and not "at our standard of representation to the public markets." ¶111. Aquila also admitted Defendants' prior statements were "dangerous" and "could be somewhat misleading." ¶114. Finally, Aquila revealed that the partnership with Hyundai was effectively over. ¶¶115, 117.

Aquila also unexpectedly announced that Canoo deemphasized the subscription model. ¶¶113, 119. Aquila cited the strain a subscription system would have on the balance sheet for the dramatic shift, noting that it amounted to a "probably 80% change in the business model," with "sub 20% of our sales will be in the [subscription] category." ¶113. Instead of using the less capital-intensive third-party manufacturing strategy to produce its vehicles, Aquila also signaled a shift towards Canoo building its own factories and handling production in-house. ¶132. Finally, Aquila confirmed that Canoo's previously issued guidance was no longer valid, acknowledging that investors were shown "a different model." ¶114.

Analysts skewered Canoo for these "significant" and wide-ranging changes that gutted Canoo's risk analysis, with some analysts slashing target prices by more than half. *See, e.g.*, ¶¶130-141.  On March 30, 2020, in the wake of the disastrous investor call, Canoo's stock price fell by $2.50 per share, or more than 20%, on heavy trading volume. ¶ 216.  On March 31, 2021, Canoo filed its annual report for 2020 on Form 10-K, sending its stock price down to $8.05 per share. ¶¶122-23.

**E.    The SEC Announced an Investigation Into Canoo's SPAC Merger**

On May 17, 2021, Canoo disclosed that it was subject to a wide-ranging SEC investigation relating to, among other things, the Merger and Canoo's "operations, business model, revenues, revenue strategy, customer agreements, earnings and other related topics, along with the recent departures of the Company's officers." ¶175.

## III.    STANDARD OF REVIEW

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Salameh v. Tarsadia*, 726 F.3d 1124, 1129 (9th Cir. 2013). "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Rule 12(b)(6) dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support one." *Murphy v. Am. Gen. Life Ins. Co*., 74 F. Supp. 3d 1267, 1287 (C.D. Cal. 2015) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)).

On a 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s] them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig*., 868 F.3d 784, 793 (9th Cir. 2017). "[T]he purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to decide its merits[.]" *Craig Frazier Design, Inc. v. Zimmerman Agency LLC*, 2010 WL 3790656, at *6 (N.D. Cal. Sep. 27, 2010). Defendants cannot insert their own version of the facts in place of a complaint's particularized allegations. *See Johnson v. Knapp*, 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009). The Court's analysis is confined to the complaint and any materials that are properly subject to judicial notice or incorporation by reference. *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018). The Court must not decide disputed facts asserted in SEC filings or conference calls transcripts or otherwise allow a defendant to introduce external evidence to quarrel with well pled facts. *Id*. at 1002.

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

## IV.   THE CAC ALLEGES FALSE STATEMENTS

Under the PSLRA, a complaint pleads falsity if it "specif[ies] each statement alleged to have been misleading, the…reasons why…, and if an allegation…is made on information and belief, … all facts on which that belief is formed.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990-991 (9th Cir. 2009), *as amended* (Feb. 10, 2009). When defendants choose to speak, they must "do so in a manner that wouldn't mislead investors." *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008).

### A.   Defendants Misrepresented Canoo's Engineering Services

Defendants violated their duty to disclose material, adverse facts that contradicted their positive characterization and assessment of Canoo's engineering services division. [2] *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (omissions actionable when "create[ing] an impression of a state of affairs that differs in a material way from the one that actually exists"); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992) ("Rule 10b-5 imposes a duty to disclose material facts…necessary to make disclosed statements, whether mandatory or volunteered, not misleading.").

On August 18, 2020, Kranz expressly said "we are working for companies and we are already making money" from contract engineering. ¶76. Throughout the Class Period, Defendants claimed that Canoo's relationship with Hyundai provided validation for its skateboard platform and that its engineering work would "generate immediate revenues in advance of offering" its first vehicles. ¶¶10, 74, 85, 93, 95. As late as January 2021, Defendants told investors that Canoo was "in discussions with multiple other blue-chip industry participants" for contract engineering services.  ¶93.

---

[2] Defendants are off base in arguing the "formulaic" manner employed by the CAC to explain the false and misleading nature of their statements is deficient as a "matter of law." Mot. at 11-12. While often repeated, the reason the omissions rendered the statements false is expressly stated for each instance. *See, e.g.*, ¶78 (explaining omitted facts resulted in efforts to alter subscription sales model); ¶79 (explaining omitted facts resulted in overstating of financial viability of contract engineering); ¶124 (noting adverse market reaction to unexpected change in business model).  Courts in this Circuit regularly deny motions to dismiss complaints with similar structure. *See, e.g.*, *Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *5 (S.D. Cal. Aug. 4, 2021) (analyzing over 40 documents containing statements alleged to be misleading due to the same omitted facts).

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

At the time of these statements, however, Canoo was not performing any contract engineering work or generating resulting revenue. Canoo only generated revenue in July 2020 and that contract was completed well before the Class Period began. ¶20. CW 1, whose job would have required collaborating with Hyundai if any relationship existed at the time, states that CW 1 did not work "with or for Hyundai," CW 1 was never "involved with Hyundai and never talked to anybody there" and there "definitely wasn't any outsourcing of engineering work" during CW 1's employment. ¶¶169-170. Aquila has admitted that these boasts about Canoo's "current pipeline" for engineering services and its efforts to announce third-party relationships were "aggressive," "presumptuous," "premature," and not "at our standard for representation to the public markets." ¶111. He likewise acknowledged that hyping contract services so extensively just before publicly de-emphasizing the model "was a contradiction." ¶110. According to Aquila, the way Canoo discussed engineering contracts had been "dangerous" and "somewhat misleading." ¶114.

Defendants argue that because they disclosed that Canoo's engineering service revenue was recognized in July and resulted from a single performance contract it cannot form the basis of a false statement. But Defendants disclosed this fact months after the contract was satisfied (and for the first time) on November 27, 2020, and then repeated this disclosure periodically during the remainder of the Class Period. Mot. at 7. The timing of the disclosure supports—not undercuts—Plaintiff's claim. The subsequent disclosure of third quarter 2020 revenue resulting from completion of a single contract obligation served to bolster Defendants' ongoing narrative crafted in August 2020 that Canoo was currently work for "companies" and was "already making money." This disclosure, in context, served to obscure the true nature of their business and its long-term prospects; at the time the statements were made, no revenue was being generated and no substantive relationship with Hyundai existed. ¶76 (statements on August 18, 2020); ¶85 (statements on September 18, 2020); ¶87 (statements on September 18, 2020 and October 23, 2020).

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

It was not until March 29, 2021 that investors learned the revenue was a one-off event and not indicative of an ongoing relationship with a key partner or an indicator of a reliable revenue generating business segment.[3] ¶20; *see also* ECF No. 102-2, Defs.' Ex. 2, at 8 (showing no revenue from 4Q2020).

Indeed, Defendants' argument that the disclosure of third quarter engineering revenue halfway through the fourth quarter is even weaker than a similar argument rejected in *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021). In *Vaxart*, the defendants published a press release with a sensationalist headline announcing it had been "selected" for inclusion in Operation Warp Speed, but the body of the same press release revealed the "crucial reality" that the company had not received federal funding. *Id.* at 672. The defendants also "played up the partnership" with a vaccine manufacturer while disclosing in a press release that they only had reached a memorandum of understanding. *Id.* at 668. The court rejected defendants' arguments its press release was "literally true," noting that the context and "manner of presentation" matters. *Id.* at 672. Thus, as in *Vaxart*, even if Defendants' statements conveyed some information, the allegations show they were still materially misleading.

The Court should decline Defendants' repeated invitation to dismiss the CAC because the statements were made, according to them, before the Board formally approved the changes and there was thus nothing to disclose.[4] Mot. at 8, 11, 22-23. Defendants told investors that Canoo was "working for companies" as of August 18, 2020

---

[3] Defendants argue the Engineering Services statements accurately conveyed that Canoo's relationship with Hyundai was effectively over unless further agreements were reached. *See* Mot. at 10, n.5. However, on August 18, 2020, Balciunas said:

> **This is a multiple-phase partnership** and we **currently are in the first phase** in **doing some contract engineering work** that leverages our existing technology, but we're tailoring it to Hyundai's specifications. . . . So, **this is a** really great opportunity and **benchmark for the marketplace**, **to have this kind of validation**, especially considering we are much small (sic) company versus Hyundai.

¶144. Kranz repeated the false claim, saying "[Engineering Services] is a phase that already exists today." ¶76. Defendants thus expressly stated Canoo was working for Hyundai during the Class Period, which was false.

[4] Notably, despite making it a centerpiece of their defense, Defendants never expressly state when the Board approved the plan to de-emphasize the model. *See* ¶107.

10

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

which was not true—and continued to foster the impression that current operations were successfully progressing towards generating "***immediate revenues*** in advance of offering our first vehicle and ***our current pipeline*** in this area is supportive of a projected $120 million of revenue in 2021." ¶¶76-77, 85, 95.  The fact that Canoo was not working "***for***" Hyundai or any other "***companies***", that it was not generating revenue, that the individual tasked with deciding Canoo's strategic road map had commenced a costly analysis to verify his doubts about the viability of the business model, cannot be said to be immaterial as a matter of law. *See Fecht v. Price Co.*, 70 F.3d 1078, 1080 (9th Cir. 1995) ("Whether an omission is material is a determination that requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."); *Feyko v. Yuhe Int'l, Inc.*, 2013 WL 816409, at *5 (C.D. Cal. Mar. 5, 2013) ("Materiality is rarely appropriate to decide at the motion to dismiss stage.")).[5]

Defendants' reliance on a recent report and recommendation in the related shareholder derivative action, *Patterson v. Hennessy*, 2022 WL 2208893, (D. Del. June 21, 2022) ("*Patterson*"), is misplaced. First, *Patterson* addresses whether a majority of Canoo's Board "knowingly disseminated or permitted misleading statements" to excuse the plaintiff's failure to make a pre-suit demand. *Id.* at *3. Here, the CAC is focused on the scienter of specific executives, not the entire Board. *Patterson* expressly declined to consider whether Aquila faced a substantial likelihood of liability. *Id.* Neither Kranz nor Balciunas's potential culpability is even discussed. *See generally*, *id.*

Second, *Patterson* addressed only two statements contained in the January S-1 and noted that the plaintiff's theory of Board-level fault "depends entirely on his assertion that Canoo had in fact abandoned its engineering and technology services business prior to

---

[5] In contrast to the situation in *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *18 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom. Ingram v. VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015), the CAC alleges that top executives had substantial doubt about the viability of two prongs of Canoo's business model, as compared to the lower-level employees discussing safety issues relating to an experimental drug in *Kovtun*.

filing the S-1 registration statement[.]" *Id.* at *4. The only allegations submitted by the plaintiff of board-level knowledge was the fact that Canoo had no engineering revenue in 4Q 2020. *Id.* Here, the CAC has additional support: (1) Aquila's admissions and (2) allegations attributable to former employees describing the true nature of Canoo's third-party engineering operations. The CAC also focuses on many more false and misleading statements occurring over several months. These factors were not addressed in *Patterson*.

### B. Defendants Falsely Touted the Viability of a Subscription Sales Model

Throughout the Class Period, Defendants praised Canoo's subscription model as an industry changing concept, calling it an "innovative" model and "superior to a lease." ¶151. Balciunas told investors on August 18, 2020 that Canoo's subscription model had "a lot of similarities between" it and "other competitors that offer subscription products in the technology sector" producing 20% profit margins. ¶80. Defendants said the subscription model was "highly cash flow generative, yielding positive free cash flow every year after the first year" and that it had been modeled "at the granular level" so that it "can be one of the main drivers of equity value for Canoo in the future." ¶152. This cashflow positive model was enabled by Canoo's "asset-lite" plan to outsource manufacturing, which itself was subsidized by third-party contract engineering revenues. ¶¶97, 132. The inter-connected model, it was claimed, would attract consumers otherwise hesitant to purchase EVs, thus creating an opening into the highly competitive market, while offsetting the adverse impact the subscription model would otherwise create on Canoo's books. ¶¶95, 97-98, 151, 133-140. Defendants emphasized their devotion to the plan, saying: "we absolutely do not want to pressure people into purchasing vehicles. That is not our Company strategy and that's not our brand[.]" ¶151.

On December 22, 2020, after the Merger was approved, Defendants continued their drumbeat of deception, saying "we are committed. . .[to] our go-to-market opportunities[.]" ¶72. As late as January 13, 2021, Defendants told investors the "innovative" subscription model would "significantly reduce [Canoo's] upfront capital investment and eliminate

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

reoccurring fixed costs and overhead that would be required for us to own and operate our own assembly facility." ¶97. But, on March 29, 2021, Defendants said the exact opposite when Aquila admitted that the subscription model would create a "big cash hit" (¶113) because, absent contract engineering services revenue, Canoo would be required to "raise a lot more capital" and bring manufacturing in-house.  ¶119.[6]

Aquila acknowledged this information was known during the Class Period but concealed from investors, stating on March 29, 2021 that "*when I came in and took my role* and we spent a lot of money analyzing the weight that this will have on the balance sheet." ¶113. Aquila acknowledged "without a doubt" he would have changed the plan[7] "based on [his] experience" if had he been "more involved earlier." ¶¶110, 113.[8] Defendants misled investors by touting their commitment to his business model while concealing the ongoing internal analysis as to its fundamental viability. *See Friedman v. Endo Int'l PLC*, 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) (duty to disclose changes to a business plan required where a company "'hyped' a specific plan, thereby inducing investors to believe that alternative[ ] [plans] were excluded.").

### C.    Defendants' Statements Are Not Protected By the Safe-Harbor

The Ninth Circuit requires a "stringent showing" before dismissal on the pleadings is warranted under the safe-harbor. *See Livid Holdings Ltd v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005). The PSLRA's safe harbor "is not designed to protect companies and their officials when they knowingly make a materially false or

---

[6] Defendants' statements regarding the viability of Canoo's subscription model expressly implicate the capital requirements of such a plan. *See* Mot. at 12; ¶98 (noting subscription model provides Canoo with a "unique profit margin profile").

[7] Aquila's admission referred to both the "sequence of top hats and use cases." ¶113. The order in which EV designs, *i.e.*, "sequence of top hats," were developed was tied to the business model, and by admitting he would have altered the sequence from the start, Aquila admits that he would have developed top hats for B2B sales initially rather than the consumer-focused subscription model top hats.

[8] Defendants attempt to change the meaning of what Aquila admitted by suggesting he "joined" Canoo in October 2020. Mot. at 11. In reality, Aquila "came in" to Canoo in July 2020 when he provided the Company with rescue capital. Soon afterwards, Aquila's candidacy for the Board was announced in August 2020, and he assumed the role of Chairman in October 2020. ¶185.

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

misleading statement about current or past facts." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). Nor does the safe harbor protect a false statement of present fact that is combined with a forward-looking statement. *Id.*

Defendants identify only five of the challenged statements as supposedly forward-looking, thereby conceding that most of their statements addressed presently existing facts. *See, e.g.*, Mot. at 16-18.[9] But, even if any statements are mixed with projections or opinions, they are actionable:

> In this circuit, a projection or statement of belief may be actionable to the extent that one of the three implied factual assertions is inaccurate: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending the seriously undermine the accuracy of the statement.

*In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1228 (S.D. Cal. 2010). Plaintiff has adequately alleged Defendants were aware of facts, at the time of their misstatements, that seriously undermined the accuracy of their claims.

This is not a case about failure to execute a business plan. Defendants sold investors on Canoo's unique go-to-market strategy, while knowingly concealing material facts indicating substantial doubt as to its viability. *See* ¶¶110, 113-114. These statements are not "assumptions underlying or relating to a declared objective" (Mot. at 18), these are misstatements about the "declared objective" itself. *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1022 (N.D. Cal. 2020) ("Where a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement.").

In addition, Defendants point only to boilerplate warnings that "factors that could cause actual results to differ include. . .the ability of Canoo to *execute* its business model. . ." and subscription revenues "may occur later or not at all." Mot. at 16 n.10.

---

[9] For example, it cannot be credibly argued that Balciunus' statement that "we *are working* for companies and we *are already making money*" is forward-looking. ¶76.

14

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

These generic statements fail to advise investors that Canoo's business strategy had been seriously questioned by Aquila since Day 1 and systematically dismantled by him once he had control. *See* 15 U.S.C. §78u-5(c)(1)(A)(i) ("meaningful cautionary statements identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement"). Canoo's limited warnings regarding its "go-to-market strategy and subscription," at most, described an execution risk associated with the plan, not abandonment of the plan itself. *Cf.* Mot. at 17 n.11. The generic warning issued in January 2021 that Canoo's "business plans require a significant amount of capital" (Mot. at 12-13) did not advise investors that the true cash requirements of the subscription model, which had been a selling point for the Merger, would lead to its abandonment.

Significantly, Defendants' warnings did not change during the Class Period despite Aquila's ascension to the top levels of leadership and his admission that he drove the shift in Canoo's business model. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 772-73 (2d Cir. 2010) ("The consistency of the defendants' language over time despite the new information they received…belies any contention that the cautionary language was 'tailored to the specific future projection.'"); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir. 2004) ("[T]he cautionary language remain[s] fixed even as the risks changed" "[t]hus this complaint could not be dismissed under the safe harbor").

### D.  Defendants' Statements Are Not Mere Opinions Or Puffery

"Even a statement of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). "What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a

representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); *Turocy v. El Pollo Loco Holdings, Inc.*, 2016 WL 4056209, at *9 (C.D. Cal. July 25, 2016).

Viewed in context, Defendants' statements expressing optimism about Canoo's go-to-market strategy and unique market position were meaningful to investors. *See* Mot. at 13-15. The January S-1 indicated that the business plan was supported by "strong underlying financial metrics as compared to a traditional one-time sale model." ¶98. Defendants claimed the business model would reduce necessary upfront capital investment and fixed costs, be "more profitable," "resilient," and provide greater profit margins than a traditional model, distinguishing Canoo from competitors in concrete, objective terms. *E.g.*, ¶¶81-82, 97-98, 159. They described Canoo's model as "highly cash flow generative." ¶152. Defendants also cited polls and indicated their plan was supported by "key trends in consumer preferences," and presented their plan as having a greater chance of success due to alignment with market conditions. ¶98. Defendants' statements are actionable. *See Cutler v. Rancher Energy Corp.*, 2014 WL 1153054, at *7 (C.D. Cal. Mar. 11, 2014) (distinguishing puffery from actionable statements based on level of detail and specificity); *see also*, *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) ("Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations."); *In re Century 21-RE/MAX Real Est. Advert. Claims Litig.*, 882 F. Supp. 915, 926 (C.D. Cal. 1994) ("Puffery is distinguishable from misdescription or false representations of specific characteristics of a product.").

### E.    The Alleged Misstatements are Attributable to Canoo and the Individual Defendants

Relying on *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141-44 (2011), Defendants argue vaguely that they are not "makers" of "statements they did not make or were in corporate SEC filings." *See* Mot. at 23-24. But as they concede, the CAC identifies misstatements made by Kranz, Balciunas and Aquila in press releases, investor presentations and conference calls with market participants, in which they each

16

touted, among other things, Canoo's engineering services and subscription-based business model. *E.g.*, ¶¶76-83; *see In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1095 (N.D. Cal. 2017) (analyzing statements expressly attributed to speaker). Aquila and Balciunas also signed the January 13, 2021 Form S-1 containing many of the false statements. ¶¶92, 99. And, by raising an inference that even one Individual Defendant made a false statement with scienter, the CAC sufficiently pleads Canoo's scienter. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014); *Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *8 n.7 (C.D. Cal. Mar. 31, 2021) (officer's "scienter can be imputed to" corporation); *In re Zoom Sec. Litig.*, 2022 WL 484974, at *4 (holding that plaintiff adequately pled scienter as to CEO, which was sufficient to show scienter as to corporate defendant).[10]

Moreover, as its top executives, Kranz and Balciunas indisputably had control over statements attributed to Canoo. ¶¶31-35. "After *Janus*, courts have consistently held that corporate officers who sign a document on behalf of the corporation 'make' the statements in those documents." *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *3 (M.D. Tenn. Apr. 19, 2018). But "even without a signature, a corporate official makes a statement if the official 'actually participated in and had authority over the [corporation's] filing process.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Practs., & Prods. Liab. Litig.*, 2017 WL 3058563, at *8 (N.D. Cal. July 19, 2017). Even middle-management level defendants are routinely found to be "makers" of statements for their area of responsibility. *See, e.g.*, *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *12 (C.D. Cal. Apr. 12, 2016) (vice president of compliance was a "maker" of the statements about compliance because "it is reasonable to infer that the statements at issue were

_____

[10] Further, the Ninth Circuit has declined to rule on whether it is "possible to plead scienter under a collective theory" (*Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008)), "and district courts within the Ninth Circuit have come out on both sides." *Apollo*, 774 F.3d at 607-08 (courts may "impute scienter to individual defendants in some situations, for example, where. . .a company's public statements [are] so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication"); *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2017 WL 5635424, at *12 (C.D. Cal. Aug. 20, 2017).

initially made by Defendant [] or at least with his advice and consent"); *see also City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 362, 374-75 (S.D.N.Y. 2012) (finding executive vice president in charge of the division liable for misconduct); *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 416-17 (S.D.N.Y. 2011). Here, Kranz, Aquila and Balciunas, as founders, officers and directors of Canoo, controlled the content of the Company's press releases announcing the Merger Agreement with HCAC and touting its proposed benefits. Moreover, without their approval no Merger, a deal that would value Canoo at $2.4 billion, could occur.

The Individual Defendants also made statements in SEC Filings signed by HCAC. Mot. at 23-24. The September S-4 and its subsequent amendments, though filed by HCAC, attributes Canoo with direct responsibility over many of the relevant statements. *See* Declaration of Murielle J. Steven Walsh, Exhibit A.[11]

## V.   DEFENDANTS MADE STATEMENTS WITH SCIENTER

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). The "required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144.

A strong inference of scienter exists if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing

---

[11] Canoo also directed investors and shareholders to HCAC's SEC filings, including the "registration statement on Form S-4" a "proxy statement" and "other relevant materials with the SEC in connection with the business combination." ECF No. 102-13, Defs.' Ex. 13 at 10. Moreover, security holders were "urged" by Canoo to read all the relevant SEC filings when they were made available "before making any voting decision with respect to the proposed business combination because they will contain important information about the business combination and the parties to the business combination." *Id.*

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

inferences"—the inference need only be equally plausible to any non-culpable inference. *Id.* "[A] tie goes to the plaintiffs when there are multiple plausible theories[.]" *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

### A.    Plaintiff Adequately Alleges That Defendants Had Access to and/or Knowledge of Material Undisclosed Facts

The CAC alleges Defendants had access to and/or actual knowledge of undisclosed facts undermining the accuracy of the alleged misstatements. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (finding scienter where defendants "had reasonable grounds to believe material facts existed that were misstated or omitted"). This is "classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005). Here, at the time Defendants were making statements to investors about their business plan, they were spending "a lot of money analyzing" serious concerns about this very plan, which severely undercuts Defendants' positive statements to the market. ¶¶107-119. Aquila admittedly had "concerns" from the start about the engineering services line. ¶¶110, 116-17. Aquila began to analyze these issues "once [he] invested and then took the Chairmanship," *i.e.*, sometime between July 2020 and October 19, 2020. ¶¶31, 110, 185. Aquila concluded that the engineering services contract with Hyundai did not properly value Canoo's IP, "which would have changed the value of that contract significantly." ¶117. Thus, Aquila's "analysis" demonstrates he and the other Defendants were "aware of undisclosed facts tending seriously to undermine" the accuracy of their other positive statements regarding the benefits of their engineering services business. *See Garcia v. J2 Glob., Inc.*, 2021 WL 1558331, at *16 (C.D. Cal. Mar. 5, 2021). Indeed, Aquila's July 2020 investment in Canoo coincides with the immediate drop-off in engineering services revenue generated thereafter.

Aquila's admissions that he had concerns about the stated business model from the start dovetails with his apologies for presumptuous public statements that did not meet the standards for public disclosure. ¶¶110-113. Courts in this circuit have held that similar

apologies constitute compelling evidence of scienter.[12] *See In re Zoom Sec. Litig.*, 2022 WL 484974, *3-4 (finding CEO's apology for misuse of term, coupled with allegations regarding his role and knowledge of issue supported scienter); *see also Yourish v. California Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999) (finding "a complaint can establish that a statement was false when made by alleging [a] later statement by the defendant along the lines of 'I knew it all along'"). Kranz and Balciunas, as Co-Founder and CEO, and CFO, respectively, would at the least have been fully informed of these significant fundamental changes to Canoo's operations.

Similarly, the other Individual Defendants either knew or were severely reckless in not knowing Canoo never worked "with or for Hyundai" during the Class Period and that all the engineering work was centered on developing Canoo's products, while publicly representing full commitment to a business model that was constantly in flux. ¶¶168-170, 174. Any suggestion to the contrary flies in the face of common sense. *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192 (N.D. Cal. 2010) ("[T]he inference that [one individual defendant] knew or was reckless regarding the nature of the agreements is incompatible with an inference that the other Individual Defendants lacked scienter."); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) ("it would be 'absurd' to suggest that management was without knowledge of the matter.").

### B.    SEC Investigations and Executive Resignations

The SEC investigation and executive resignations in the same approximate time range contributes to an inference of scienter. *See In re Banc of California Sec. Litig.*, 2017 WL 3972456, at *8 (C.D. Cal. Sep. 6, 2017) (considering resignation that overlapped with an announcement of an SEC investigation as additional pieces of the scienter puzzle); *see also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (proximity of defendants' resignation to  financial restatements and investigations  were

---

12 Unlike defendants' "sobering revelation" in *Fusion-io* that a prior opportunity could not be completed because it became "too expensive," Aquila's admissions speak directly to the accuracy and legality of the Class Period statements.  *See In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015); *see, e.g.*, ¶¶113, 168-174.

additive "piece[s] to the scienter puzzle" even if defendant left on his own volition). This is particularly true given Aquila's apology and admissions. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 66281, at \*14-15 (N.D. Cal. Jan. 4, 2017) (resignations combined with apologies evidenced scienter).

## C.    Temporal Proximity Between the Misrepresentations and Corrective Disclosure

Defendants made their last false statements on January 13, 2021 and announced the complete abandonment of two of the three prongs of Canoo's business model approximately two months later, on March 29, 2021. ¶¶92-101, 106. The close temporal proximity between the false statements and the corrective disclosure increases the inference that the statements were false when made. *See Yourish*, 191 F.3d at 997 (temporal proximity between false statement and corrective disclosure can bolster inference of scienter).

## D.    Defendants Were Motivated to Defraud

It was critical for Defendants to obtain shareholder approval of the merger; otherwise, the SPAC would have unwound thus dooming HCAC's 18-plus month effort and leaving Canoo in a precarious position. Defendants' misrepresentations enabled them to successfully effectuate and complete the Merger. ¶¶55-56, 68-73. Although the SPAC was initially priced at $10 per share, the share price nearly doubled upon the Merger's completion. ¶16. After the shelf registration in January 2021, Canoo's shares continued to trade at or above $15, allowing early investors not subject to lock-up provisions to dump shares on public investors entirely unaware that Canoo's entire business model was about to be changed to a riskier, more cash intensive, operation. ¶¶18-19. When the truth was disclosed in late March 2021, Canoo stock fell as low as $8.05, well below the $10 buy-in price that early investors could have received if they had redeemed their shares. ¶123. Defendants were thus motivated to issue the alleged misstatements to keep Canoo's trading price above $10 per share and consummate the Merger.

Moreover, the Individual Defendants' employment contracts contained incentives based on Canoo's share price reaching, and remaining at, certain levels. ¶¶201-204. Defendants' false statements caused Canoo's share price to exceed the $18 threshold for several days, and nearly reached the $25 threshold, before the March 29, 2021 conference call. ¶205. While the Individual Defendants did not ultimately receive those payouts, the financial incentive existed at the time the statements were made.

Though the CAC alleges motive, it is not required in order to sufficiently plead a securities violation. *Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"). This is particularly true as to Defendants' arguments centered on the lack of insider sales. *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016) ("[the] suggestion that the lack of insider stock sales by [the individual defendants] negates scienter is contrary to controlling case law"); *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.").

### E.     The Inference of Scienter is More Compelling than Defendants' Competing Inference

"[C]ourts must consider the complaint in its entirety. . . . The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *Killinger*, 542 F.3d at 784. "*Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement . . . ." *Id*. Often, "the sum is greater than the parts." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 698 (9th Cir. 2012).

The CAC's allegations, construed in the light most favorable to Plaintiff, present a coherent and compelling explanation of Defendants' scheme to mislead investors. In

August 2020, HCAC faced a deadline to take public a private company with sufficient operations to justify at least a $10 per share trading price. ¶¶5, 52. After nearly 18 months, HCAC announced it had entered a letter of intent to merge with Canoo, which reported no revenue at the time. ¶¶54-57. Defendants sold investors on Canoo's purported "unique" go-to-market strategy in the burgeoning EV industry, citing specific analysis and figures supportive of their approach. *See, e.g.*, ¶¶74-101. Defendants could not have consummated the Merger or brought Canoo public without making these statements. Yet they knew all along, that Canoo never worked "with or for Hyundai" during the Class Period, and that all the "engineering" work was centered on developing their own products. ¶¶168-170, 174. Aquila's admissions make clear that Canoo's publicly stated business model was not true or accurate, which is why he apologized for "presumptuous" statements that were not up to public disclosure standards. ¶¶110-113.

To accept Defendants' argument, the Court would have to accept their version of the facts—that Defendants had no clue they would jettison their business model until the corrective disclosure on March 29, 2021. Such a conclusion is far-fetched and inconsistent with the facts. *See* ¶111 (Aquila: "So you're again owning the past as much as the present and the future."); ¶113 (Aquila: "And again I apologize to anybody. As a leader, you always own the past before the present or the future.").

## VI.    THE CONFIDENTIAL WITNESSES' STATEMENTS ARE RELIABLE

"Where plaintiffs rely on both confidential witnesses and on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). "The Ninth Circuit has held that numbering the confidential witnesses and describing the witnesses' job description and responsibilities constitutes a 'large degree of specificity,' especially where the witnesses' exact title is used." *Mulligan*, 36 F. Supp. 3d at 962. The CAC meets this standard.

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

The CAC describes CW 1's job as "head executive of a department at Canoo between late 2020 and early 2022" reporting directly to Kranz and later Aquila who, as part of his/her job responsibilities, "would have been aware" of any contract engineering work for outside companies. ¶¶168, 171. These allegations are sufficient to show CW 1 was responsible for aspects of Canoo's contract engineering services, thus placing CW 1 "in a position to know" that during CW 1's tenure, "[a]ll of [Canoo's] engineering was for our own product," that CW 1 never worked "with or for" Hyundai, never had any contact with anyone at Hyundai, and that there was no outside engineering work of any kind during that time. ¶¶169-171. Providing further corroborating details regarding CW 1's role at Canoo is not required by the Ninth Circuit standard and would eliminate any possibility of CW 1 remaining anonymous given CW 1's high ranking employment.

The CAC likewise adequately describes CW 2's responsibilities demonstrating personal knowledge of the impact changes to Canoo's business plan had on vehicle development. ¶¶172-174. Defendants contend CW 2's role in engineering is unconnected to Canoo's sales strategy (Mot. at 14), but as Canoo acknowledged in August 2020, its "vehicle strategy and [its] go to market and business strategy need to be married from day one[.]" ¶151. Finally, that CW 2 left Canoo in mid-2019 (Mot. at 14) does not mean the allegations are irrelevant. Canoo's frequent pre-Class Period shifts in its business are consistent with allegations showing substantial doubt as to its public Class Period model, which was abandoned without warning. *See, e.g.*, *Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period").

## VII.   DEFENDANTS' CONDUCT VIOLATED RULES 10B-5(A) AND (C)

Defendants here completed a bait and switch scheme in violation of SEC Rule 10b-5(a) and (c). *See* 17 C.F.R. § 240.10b-5.  In *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1101 (2019), the Supreme Court stated "[t]hese provisions capture a wide range of conduct," before adding:

> A 'device,' we have observed, is 'simply [t]hat which is devised, or formed by design'; a 'scheme' is 'a project, plan[,] or program of something to be done,' and an 'artifice' is 'an artful stratagem or trick.' [Aaron v. SEC, 446 U.S. 680], 696, n.13 [1980]. . . . The words 'act' or 'practice' in subsection (c) are similarly expansive. Webster's [Int'l Dictionary (2d ed. 1934)] 25 (defining 'act' as a 'doing' or a 'thing done'). . . .

*see also id*. at 1102 (citing "the Rule's expansive language"). Defendants' argument against scheme liability depends on the absence of adequately alleged false statements. Mot. at 24. As set forth above, the CAC adequately alleges misstatements issued in connection with a fraudulent scheme to complete a SPAC merger.

## VIII. THE CAC SUFFICIENTLY ALLEGES A §20(A) CLAIM

By alleging a primary violation of §10(b) and Defendants' control over Canoo, Plaintiff also alleges a control person claim. *See Orexigen*, 899 F.3d at 1018.

## IX. CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.[13]

Dated: August 18, 2022

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Murielle J. Steven Walsh*
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
600 Third Avenue
20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mjsteven@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue
15th Floor
Los Angeles, California 90024
Telephone: (310) 405 7190
jpafiti@pomlaw.com

---

[13] If the Court is inclined to grant the Motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Curry v. Hansen Med., Inc*., 2011 WL 3741238, at *2 (N.D. Cal. Aug. 25, 2011). The Court has already found that additional statements not included in the CAC are open to interpretation. *See, e.g.*, ECF No. 100 at 3. Thus, amendment would not be futile.

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

**-and-**

**HOLZER & HOLZER, LLC**

Corey D. Holzer (*pro hac vice*)
Marshall P. Dees (*pro hac vice*)
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392 0090
Facsimile: (770) 392 0029
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Co-Lead Counsel for Lead Plaintiff & the Proposed Class*

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Executed on this 18th day of August, 2022.

*/s/ Murielle J. Steven Walsh*

LEAD PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
Consol. Case No. 2:21-CV-02873-FMO-JPR