POMERANTZ LLP
Jennifer Pafiti (SBN 282890)
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
jpafiti@pomlaw.com
jalieberman@pomlaw.com
mjsteven@pomlaw.com

*Co-Lead Counsel for Lead Plaintiff & the Proposed Class*

— additional counsel on signature page —

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAMUEL BLAKE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CANOO INC., TONY AQUILA, ULRICH KRANZ, and PAUL BALCIUNAS,<br><br>Defendants. | **Case No. 2:21-CV-02873-FMO-JPR (<u>Consolidated</u>)**<br>Case No. 2:21-CV-02879-FMO-JPR<br>Case No. 2:21-CV-03080-FMO-JPR<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

I. INTRODUCTION ..... 1
II. JURISDICTION AND VENUE ..... 5
III. PARTIES ..... 6
A. Plaintiff ..... 6
B. Defendants ..... 6
IV. BACKGROUND ..... 8
A. Legacy Canoo ..... 8
B. Hennessy Capital Acquisition Corp. ..... 9
C. The Merger ..... 10
V. DEFENDANTS' PRE-CLASS PERIOD STATEMENTS MISLED INVESTORS ABOUT THE BENEFITS OF CANOO'S GO-TO-MARKET STRATEGY. ..... 13
A. Defendants issued false and misleading statements in connection with announcing the Merger. ..... 13
B. Defendants issued false and misleading proxy statements in seeking shareholder approval of the Merger. ..... 17
VI. DEFENDANTS ISSUED FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ..... 21
VII. THE TRUTH ABOUT CANOO'S OPERATIONS IS REVEALED, AND THE PRICE OF THE COMPANY'S SECURITIES DECLINES PRECIPITOUSLY 27
VIII. MEDIA, ANALYSTS, COMMENTATORS. AND REGULATORS REACTED HARSHLY TO DEFENDANTS' ADMISSIONS ..... 32
IX. ADDITIONAL INDICIA OF SCIENTER ..... 36
A. Aquila benefited substantially from the completion of the Merger. ..... 36
B. Defendants Aquila, Kranz and Balciunas were eligible for stock incentive awards based on Canoo's stock price performance. ..... 39
X. LOSS CAUSATION ..... 40
XI. CLASS ACTION ALLEGATIONS ..... 42
XII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ..... 44
XIII. STATUTORY SAFE HARBOR INAPPLICABLE ..... 47

COUNT I......48
COUNT II......52
PRAYER FOR RELIEF......53
JURY TRIAL DEMANDED......54

Lead Plaintiff Vladi Shaulov ("Lead Plaintiff" or "Shaulov"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's Consolidated Amended Class Action Complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys. This investigation included, among other things: (1) reports and documents filed by Canoo with the U.S. Securities & Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Canoo and its business; (3) press releases, news articles, transcripts, and other public statements issued by or about Canoo, its business, and the Defendants; (4) consultations with experts; and (5) other publicly available information concerning Canoo, its business, and the allegations contained herein.

## I. INTRODUCTION

1. This is a federal securities class action brought individually and on behalf of all other persons and entities who purchased or otherwise acquired publicly traded Canoo, Inc. ("Canoo" or the "Company") common stock and/or warrants from December 21, 2020, through and including March 29, 2021, (the "Class Period"), seeking to recover damages pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder (the "Class").

2. Throughout the Class Period, Defendants deceived investors by touting a unique business plan that distinguished Canoo from its competitors to complete a merger and then promptly abandoned that plan during Canoo's first quarter as a public company because of known but previously concealed doubts about the viability of Canoo's go-to-market strategy.

3. On August 18, 2020, Hennessy Capital Acquisition Corp. IV ("Hennessy" or "HCAC"), a special purpose acquisition company ("SPAC") announced to investors that it had entered into a Merger Agreement with Canoo, which would result in Canoo becoming a publicly traded company (the "Merger").

4. The deal valued Canoo at $2.4 billion. The Merger required an affirmative vote from HCAC shareholders to be approved.

5. In support of the Merger, Hennessy filed a Form 8-K with the Securities and Exchange Commission ("SEC") touting the proposed benefits of the business combination. Many statements contained in the Form 8-K were, as Defendants later admitted, "presumptuous," "premature," and too "aggressive," creating a false and misleading impression about Canoo's operations and prospects.

6. Beginning with the August 18, 2020 announcement of the Merger and continuing through a series of amended preliminary proxy statements and shelf offering documents, Defendants described Canoo's "three phases of revenue streams," along with its innovative technology, as its distinguishing features.

7. Defendants stated that Canoo's first revenue stream was a "Subscription-based Model," whereby Canoo "members" would pay "a single monthly fee" with "no upfront payment" that would allow members to "enjoy the benefits of an all-inclusive experience that, in addition to your own canoo [1] vehicle includes maintenance, warranty, registration and access to insurance and vehicle charging." Defendants claimed that the subscription model resulted in greater operating margins than its competitors and created an opportunity for Canoo to sell electric vehicles to consumers who wanted to utilize the technology but were apprehensive of taking on substantial financial commitments associated with traditional car purchases/leases.

[1] Canoo's general vehicle design is referred to as "canoo."

8. Defendants represented that the second revenue stream came from Canoo's "Engineering Services," which Defendants described as "all the material consulting and contract engineering work that is in high demand due to our team's specialized experience and technical capabilities in EV development." Defendants explained that "Canoo's pipeline for engineering services includes EV concept design and engineering services for other original equipment manufacturers ("OEMs"). Defendants claimed Canoo's engineering services "offer[ed] a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021[.]"

9. In addition, Defendants told investors that Canoo's third revenue stream was the Company's business-to-business sales ("B2B") which Defendants claimed allowed Canoo to "leverage its modular skateboard with its existing powertrain, electrical architecture and thermal system to produce B2B delivery vehicles for the last mile delivery segment. These customers may include retailers, large corporations, logistics companies, or fleet managers, among others."

10. Defendants' public statements omitted material adverse facts known by them at the time the statements were made to investors about Canoo's business plan. Defendant Tony Aquila ("Aquila"), who was named Chairman of the Board on or about October 19, 2020 and began serving as Executive Chairman and Director on or about December 21, 2020, was tasked with "develop[ing] and execut[ing] the Company's long-term strategy and product and business roadmap." Aquila, however, had undisclosed "concerns" about the ability of the engineering services division to provide a meaningful return on investment and also held doubts about the viability of the subscription model. Canoo began to analyze these issues "once [Aquila] invested and then took the Chairmanship," *i.e.*, between July 2020 and October 19, 2020. During that time, Canoo had commenced a "deep dive" into the business model and

was spending "a lot of money analyzing" issues with the plans that underpinned Canoo's entire go-to-market strategy. Aquila would later admit that, had he "been here from day 1 . . . [he] would have" focused on commercial sales and not the subscription models that Canoo emphasized as the basis of its go-to-market strategy.

11. On December 21, 2020, without knowledge of Canoo's privately held concerns or its "deep dive," HCAC shareholders voted to approve the Merger. The combined company's common stock and warrants began trading on the NASDAQ on December 22, 2020.

12. On January 13, 2021, Canoo announced a shelf offering for the sale of up to 24,353,356 shares of common stock consisting largely of stock held by insiders and early investors. Documents in support of the offering were filed just days after Canoo completed its fourth quarter of 2020. The shelf offering documents contained the same false and misleading statements about Canoo's business plan and go-to-market strategy issued in connection with the Merger, which omitted any reference to the recently completed "deep dive" into the viability of the business model.

13. On March 29, 2021, after the markets closed, Canoo conducted its first public conference call to discuss its quarterly results. Notably, the call was conducted by Defendant Aquila. Neither Defendant Ulrich Kranz ("Kranz"), a co-founder of legacy Canoo and the Company's Chief Executive Officer ("CEO") nor Defendant Paul Balciunas ("Balciunas"), who served as Canoo's Chief Financial Officer (the "CFO"), participated on the conference call.

14. On the March 29, 2021 conference call, Defendant Aquila informed investors for the first time that Canoo would not operate as described in prior public statements. Defendant Aquila stated that, after conducting a "deep dive," Canoo decided to "deemphasize the originally stated contract engineering services line" due to concerns about "IP leakage" and the lack of return on investment from the segment. Canoo, in fact, had generated zero dollars from its engineering services line in 4Q2020

and did not expect to generate any further revenue from the line other than what was reported from 3Q2020.

15. Canoo also revealed during the March 29, 2021 call that it was moving away from its "membership model" because significantly weighting its business to subscription users created "a big cash hit" that was detrimental to efforts to bring its vehicles to market. Moreover, Canoo would not rely solely on contract manufacturers going forward. Instead, Canoo revealed it intended to build a "mega microfactory" to build certain of its products, thereby jettisoning the "asset-light, low-cost, flexible manufacturing strategy" that had served as another key distinguishing characteristic of Canoo's go-to-market strategy. These disclosures represented an about-face turn from the business strategy that Defendants touted throughout the Class Period.

16. The price of Canoo stock plummeted after the March 29, 2021 call as investors and analysts alike came to understand the impact of Canoo's dramatic shift in business strategy. Canoo stock, which traded at $12.46 when the markets opened on March 29, 2021, fell to $9.64 at the market's open on March 30, 2021, reaching a low that day of $8.52.

17. As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act"), *codified as amended*, 15 U.S.C. §§ 78j(b), 78t(a), and pursuant to the rules and regulations duly promulgated thereunder, including SEC Rule 10b–5, *codified as amended*, 17 C.F.R. § 240.10b–5.

19. This Court has exclusive subject-matter jurisdiction of all claims asserted herein pursuant to Section 27 of the '34 Act, *codified as amended*, 15 U.S.C. § 78aa (for violations of the Exchange Act), and original subject-matter jurisdiction of all

claims asserted herein pursuant to 28 U.S.C. § 1331 because this is a case or controversy arising under federal law.

20. Venue lies in the Central District of California pursuant to Section 27 of the '34 Act, 15 U.S.C. § 78aa, because Defendants transact business in this District and because the Company's principal place of business is and at all relevant times was located at 19951 Mariner Avenue, Torrance, California 90503, which is situated within this District. Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(d) because many of the acts and transactions that constitute the violations of law complained of in this Amended Complaint, including the dissemination to the public of materially false or misleading statements, occurred or emanated from within this District.

21. In connection with the acts, omissions, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, the facilities of the national securities markets, and interstate telephonic and digital communications systems.

## III. PARTIES

### A. Plaintiff

22. Lead Plaintiff Vladi Shaulov a/k/a Vladi Chaoulov ("Lead Plaintiff") is an Israeli citizen domiciled in Cyprus. Lead Plaintiff purchased the Company's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures alleged herein.

### B. Defendants

23. Canoo Inc. ("Canoo") is a Delaware corporation, with its principal executive offices located within this District, at 19951 Mariner Avenue, Torrance, California 90503. Canoo's securities trade, and at all relevant times after December 22,

2020 traded, in an efficient market on the NASDAQ under the ticker symbol "GOEV" (common shares) and "GOEVW" (warrants).

24. Defendant Aquila is the current CEO and Chairman of Canoo. Through his investment vehicle Aquila Family Ventures ("AFV") Partners, LLP, Aquila was an early investor in Canoo. Defendant Aquila was named Chairman of the Board on or about October 19, 2020 and began serving as Executive Chairman and Director on or about December 21, 2020. Effective April 30, 2021, Aquila became CEO.

25. Defendant Kranz was Co-Founder and the CEO of Canoo Holdings until the Merger, when he became the Company's CEO-in-Charge.

26. Defendant Balciunas served as Chief of Finance and Corporate Development of Canoo Holdings until the Merger, when he became Canoo's CFO until his resignation from the Company effective April 2, 2021.

27. All references to the "Individual Defendants" in this Consolidated Amended Class Action Complaint are to Aquila, Kranz, and Balciunas, jointly and severally.

28. The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

29. The Company is liable for the acts of its executives, directors, officers, and agents at common law and under the doctrine of *respondeat superior* because all the wrongful acts and omissions complained of in this Consolidated Second Amended Class Action Complaint were carried out during and within the scope of each such person's employment. The scienter of the Company's executives, directors, officers, and agents is similarly imputed to the Company under established agency principles.

30. All references to the "Defendants" in this Consolidated Second Amended Class Action Complaint are to Canoo, Aquila, Kranz, and Balciunas, jointly and severally.

## IV. BACKGROUND

### A. Legacy Canoo

31. Canoo, previously known as EVelozcity Inc., was founded by Defendant Kranz and non-party Stefan Krause. On November 7, 2017, EVelozcity Inc. incorporated in Delaware.

32. Beginning in November 2017, Canoo's predecessor entity, also called Canoo, Inc. (f/n/a EVelozcity Inc.), operated as a private mobile technology company developing electric vehicles. Canoo was working on a concept for an electric vehicle ("EV") platform called a "skateboard." The skateboard's highly modular design enabled Canoo to design customized models for multiple vehicle programs in commercial and consumer markets.

33. On or about September 24, 2019, Canoo debuted its first subscription only electric model called the "canoo." According to a TechCrunch article: "The company intends to go to market with an entirely new business model by providing customers with its cars for a monthly subscription fee."

### B. Hennessy Capital Acquisition Corp.

34. Hennessy, a/k/a HCAC, was incorporated in Delaware on or about August 6, 2018 as a special purpose acquisition corporation, (a "SPAC"). A SPAC is a shell or "blank check" company formed for the sole purpose of raising money through a public offering to eventually acquire one or more companies. SPACs have become magnets for fraud and have caused great concern among U.S. regulators and investors.[2]

35. On February 11, 2019, Hennessy commenced a $300 million initial public offering and filed its registration statement with the SEC.

36. On February 28, 2019, the SEC declared Hennessy's February 11, 2019 registration statement to be effective.

37. On March 5, 2019, Hennessy issued a press release, announcing that it had closed its IPO of 30,015,000 units at an offering price of $10.00 per unit, resulting in gross proceeds of $300,150,000. Simultaneously with the closing of the IPO, Hennessy sold 13,581,500 warrants at a price of $1.00 per private placement warrant in a private placement, generating an additional $13,581,500 in proceeds.

38. Despite having no commercial operations of its own, Hennessy raised $313,731,500. Hennessy indicated it would use the proceeds to identify and complete an "initial business combination" with the target entity operating "in the industrial, infrastructure solutions and value-added distribution sectors in the United States." After the business combination was complete, the new company's stock would be publicly traded without many of the investor safeguards associated with traditional initial public offerings.

---

[2] *See, e.g.*, John Coates, Acting Director, Div. of Corp. Fin., U.S. Sec. & Exch. Comm'n, *SPACs, IPOs and Liability Risk* (2021) (https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws).

39. Hennessy's IPO documents obligated it to complete a business combination by September 5, 2020 or provide investors with redemption rights – *i.e.*, an opportunity to cash out the initial investment for roughly the investment price.

**C. The Merger**

40. On August 5, 2020, Hennessy filed a Definitive Proxy Statement urging its shareholders vote to extend the merger deadline to December 31, 2020.

41. On August 6, 2020, Hennessy filed with the SEC a proxy statement setting a date of August 27, 2020 for a "Special Meeting" and told investors that it had "entered into a letter of intent with a prospective target for an initial business combination in the electric vehicle (EV) and advanced mobility sector." The August 6, 2020 proxy statement asked shareholders to vote to amend the Company's Charter "to extend the date by which the Company has to consummate a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses (a 'business combination'), from September 5, 2020 to December 31, 2020."

42. On August 17, 2020, less than one month before the Underwriting Agreement and Trust Indenture required Hennessy to dissolve and distribute 100% of the assets in the Trust Account to its Public Shareholders, Hennessy and Canoo signed a Merger Agreement and Plan of Reorganization (the "Merger Agreement").

43. On August 18, 2020, Hennessy announced the Merger by filing with the SEC a Schedule 14A setting forth the details of the proposed transaction. The proxy statement was accompanied by a Form 425, which set forth additional information about the purposed Merger and an investor presentation that was filed with the SEC by Hennessy on Form 8-K.

44. On August 25, 2020, Canoo and Hennessy issued a press release on Form 8-K announcing nominees for Canoo's Board of Directors in the event the Merger was approved. Defendants Aquila and Kranz were among the nominees.

45. On August 27, 2020, the Hennessy filed with the SEC a Form 8-K announcing that it received shareholder approval to extend the date by which the Company must consummate a business combination from September 5, 2020 to December 31, 2020.

46. As detailed herein, prior to him officially joining the Company, Defendant Aquila was an early investor in Canoo, which gave him significant early influence at the Company. Defendant Aquila became Canoo's Chairman of the Board on or about October 19, 2020 and began serving as Executive Chairman and Director on or about December 21, 2020. From day one, Aquila had serious concerns about the financial viability of the Company's proposed business model, and in particular, the subscription model that the Defendants had been touting so heavily.

47. Canoo's management commenced a "deep dive" into the viability of the business plan in or about September 2020, which cost Canoo millions of dollars and significant resources.

48. On September 18, 2020, Hennessy filed with the SEC its Form S-4 requesting the Company's stakeholders vote in favor of the Merger. The September 2020 Form S-4 described the unique characteristics of Canoo's go-to-market strategy but omitted any reference to Aquila's concern or the ongoing "deep dive" into the viability of Canoo go-to-market strategy.

49. On October 27, 2020, Hennessy filed an amendment to the September 2020 Form S-4 and again touted Canoo's the three revenue streams and unique subscription model but omitted any reference to Aquila's concern or the ongoing "deep dive" into the viability of Canoo go-to-market strategy.

50. On November 27, 2020, Hennessy filed an amendment to the October 2020 Form S-4 and again touted Canoo's the three revenue streams and unique subscription model. The November 2020 Form S-4 described the unique characteristics of Canoo's

go-to-market strategy but omitted any reference to Aquila's concern or the ongoing "deep dive" into the viability of the Company's go-to-market strategy.

51. On December 4, 2020, Hennessy filed with the SEC a Prospectus in connection with the Merger (the "Definitive Proxy Statement"), which was declared effective the same day. The Definitive Proxy Statement described the unique characteristics of Canoo's go-to-market strategy but omitted any reference to Aquila's concern or the ongoing "deep dive" into the viability of the Company's go-to-market strategy.

52. On December 21, 2020, Hennessy and Canoo announced that, at a Special Meeting on the same date, Hennessy's stockholders voted to approve the stockholder proposals necessary to complete the Merger, which closed the same day. The Company also announced Hennessy would change its name to "Canoo Inc."

53. On December 22, 2020, Canoo filed a Form 8-K which referred investors to the description of the Business Combination included in the final prospectus and definitive proxy statements, dated December 4, 2020, in the section entitled *Proposal No. 1—The Business Combination Proposal'* beginning on page 100 of the Proxy Statement/Prospectus.

54. On January 13, 2021, Canoo filed a preliminary prospectus on Form S-1 (the "Preliminary Prospectus"). The Preliminary Prospectus described the unique characteristics of Canoo's go-to-market strategy but omitted any reference to Aquila's concern or the ongoing "deep dive" into the viability of the Company's go-to-market strategy.

55. On January 25, 2021, Canoo filed its definitive prospectus on Form 424b3 for the issuance of common stock upon the exercise of certain warrants (the "Prospectus). The Prospectus described the unique characteristics of Canoo's go-to-market strategy but omitted any reference to Aquila's concern or the ongoing "deep dive" into the viability of the Company's go-to-market strategy.

56. On March 29, 2021, investors would learn that Canoo's operations would be dramatically different than the concept upon which the Merger was justified. The price of Canoo's stock would fall dramatically on the revelation.

## V. DEFENDANTS' PRE-CLASS PERIOD STATEMENTS MISLED INVESTORS ABOUT THE BENEFITS OF CANOO'S GO-TO-MARKET STRATEGY.

### A. Defendants issued false and misleading statements in connection with announcing the Merger.

57. On August 18, 2020, Hennessy issued a press release announcing that it had entered into a merger agreement with Canoo Holdings Ltd., which would result in Canoo becoming a publicly traded company.

58. In the August 18, 2020 press release, Defendant Kranz is quoted as saying:[3]

> ***Today marks an important milestone of Canoo's effort to reinvent the … go-to-market model of the electric vehicle industry. … [W]***e believe our subscription model will transform the consumer ownership experience.

59. The August 18, 2020 press release further stated:

> This lifestyle vehicle . . . has been purposefully developed for a subscription business model.
>
> ****
>
> ***Canoo's consumer go-to-market strategy capitalizes on changing consumer preferences to deliver a month-to-month, commitment-free, subscription-based business model***. ... This go-to-market model is designed to . . . also enhance[] lifetime vehicle revenue and margin to shareholders.

60. On August 18, 2020, Canoo held a conference call with investors to discuss the proposed Merger. On the August 18, 2020 call, Defendant Kranz described Canoo's go-to-market strategy model as follows:

---

[3] All emphasis added.

> We have three phases of revenue streams. In the first phase, we call it Engineering Services. ***This is a phase that already exists today***. So, ***we are working for companies and we are already making money with the first revenue stream***. ... The B2B services . . . is our third revenue stream. This will be a vehicle introduced in 2023. ... Three different revenue streams give us very good flexibility, and ***it makes also sure that we can really tap into different areas to be profitable***.

61. On the August 18, 2020 call, Defendant Balciunas described the engineering services revenue stream as follows:

> [Contract engineering] is the first phase of revenue that we have. ***This is a very important part of our overall strategy*** and it's a great way for us to pool revenues early and de-risk the Company's strategy as a whole.

62. On the August 18, 2020 call, Defendant Balciunas described Canoo's efforts to provide third-party contract engineer services to Hyundai by stating:

> This is something that we are incredibly proud of, to have this partnership with a world-class OEM like Hyundai. This is a multiple-phase partnership and ***we currently are in the first phase in doing some contract engineering work that leverages our existing technology***, but we're tailoring it to Hyundai's specifications. ***With the potential opportunity to move forward into future phases,*** we would then be drilling into specific componentry and also doing simulations and tests on software, and then ultimately the final phase could potentially be delivering hard assets that could be tested and validated in the real world. So, ***this is a really great opportunity and benchmark for the marketplace***, to have this kind of validation, especially considering that we are a much smaller company versus Hyundai.

63. On the August 18, 2020 conference call, Defendant Balciunas explained how and why the benefits of a subscription-based business model impacted expected profit margins and how it created Canoo's competitive advantage, saying:

> Looking at our margin, our target rate is approximately 40% for the subscription business. As we look at other competitors that offer subscription products in the technology sector, we see that this margin is very similar and there's a lot of similarities between our model and their model, even though at initial glance it may appear to be very different. ... ***Because depreciation is such a fundamental part of our business***, think about it like a rental car business, ***for us to be able to achieve a 20% operating profit is far greater than what you see in the traditional automotive OEM business***

> ***model*** where that margin is closer to 5% to 10%. So***, it really does highlight the power of a subscription business model with this figure being a fully-burdened margin.***

64. In a presentation accompanying the August 18, 2020 call, Canoo reiterated that engineering services was a core component of Canoo's business model.

65. The presentation accompanying the August 18, 2020 call further emphasized that the subscription model was a foundational aspect of Canoo's business model and specifically detailed how the subscription-based model would be "more profitable & resilient" for Canoo. Canoo represented that engaging customers through a subscription plan made the Company "less dependent on new vehicle sales" because of the "consistent cash flow and strong ROE" over the vehicle's life. The model reportedly produced a "Total Lifetime Margin" of 37% over a 12-year subscription period.

66. On August 25, 2020, Defendants filed with the SEC a press release on Form 8-K announcing nominees for Canoo's Board of Directors, including Kranz and Aquila. In the August 25, 2020 press release, Defendant Aquila expressed his approval of Canoo's business plan, stating:

> We have looked at many of the EV opportunities in the market and have decided to put our support and industry track record behind Ulli and the Canoo team. ***We believe that this platform is uniquely positioned to meet the rapidly growing needs of the entire EV mobility and logistics ecosystem with a multigenerational platform approach***.

67. The statements in ¶¶58-66 false and misleading statement because, as Defendant Aquila would later admit, he had substantial undisclosed concerns about the viability of Canoo's business plan, saying "Had I been here from day 1, … I [would] have changed the sequence of top hats and use cases I would have went after" – meaning he would have focused on commercial sales, which they are shifting to, and not on Lifestyle vehicles, as the initial launch product. Moreover, Aquila said: "[O]nce I invested and then I took the chairmanship, we started the analysis."

68. On September 15, 2020, Defendants Krantz and Balciunas participated in the RBC Capital Markets Global Industrials conference (the "RBC Conference"). During the RBC Conference, Defendant Krantz stated:

> We have three phases of revenue, so three different revenue streams. The first one is what we call engineering. ***This is a revenue stream that we make money already today***. We are working for several companies. One of the companies is Hyundai. The second revenue stream is when we launch our consumer vehicle, our lifestyle vehicle that will be available in Q2 2022. ***This vehicle will be available for subscription only.*** And the third revenue stream is what we call B2B. This is when we launch our last mile delivery vehicle, a commercial vehicle. This vehicle will be for sale only. So ***these are three different revenue streams that gives us a big flexibility to really attract different customers and when it comes to our subscription model***.

69. During the September 15, 2020 RBC Conference, Defendant Balciunas also stated:

> So as we think about the big trends that are moving the marketplace, you do see a big shift from ownership to more usership models and ***you see a lot of subscription models and we really wanted to apply this to the automotive space. This is something that we've been focused on very much since day one.***

70. The statements in ¶¶68-69 were false and/or misleading because Defendants affirmatively represented to investors that they were pursuing a specific business model and/or "go-to market strategy" even though they knew that, at the time the statements were made, there was an ongoing "deep dive" investigating serious concerns about the viability of this model. Defendants continued to assure investors that Canoo was committed to pursuing the model and used this purported plan to sell investors on their merger despite the substantial, ongoing, and costly effort to evaluate the fundamental aspects of Canoo's business plan. The deep dive ultimately confirmed that the "math" behind the subscription model did not support its financial viability and that the initial go-to-market strategy focusing on engineering services did not properly value IP. Defendants continued to assure investors that Canoo was committed to pursuing the model and used this purported plan to sell investors on their merger

despite the substantial, ongoing, and costly effort to evaluate the fundamental aspects of Canoo's business plan.

### B. Defendants issued false and misleading proxy statements in seeking shareholder approval of the Merger.

71. Defendants issued a series of false and misleading statements in connection with soliciting shareholder votes in favor of the Merger. The preliminary proxy statements were issued on September 18, 2020, October 23, 2020, and November 27, 2020.

72. On December 4, 2020, Canoo filed its prospectus on Form 424b3 with the SEC, which was declared effective the same day (the "Definitive Proxy Statement"). The Definitive Proxy Statement contained and repeated many of the false and misleading statements made in the preliminary proxy statements.

73. Specifically, the Definitive Proxy Statement emphasized the importance of the three revenue streams to Canoo's business model:

> Canoo has established a multi-faceted go-to-market strategy targeting both B2B and B2C channels, substantially expanding its total addressable markets and avenues for growth, while diversifying its business and revenue profile. ***Our flexible strategy is uniquely underpinned by our versatile skateboard platform, which minimizes new development expenditures and engineering costs.*** Canoo's expert team and groundbreaking skateboard platform have enabled us to pursue a diversified business model that is initially centered around three core pillars: contract engineering and skateboard/technology licensing (B2B), commercial vehicle sales (B2B) and direct to consumer vehicle subscriptions (B2C). ***Having multiple sources of revenue for our business offers greater diversification through exposure to distinct end markets to maximize the value created by the research and development efforts undertaken to develop Canoo's skateboard and EV technology.***

74. The Definitive Proxy Statement listed nine specific reasons investors should vote in favor of the Merger, including the following statements regarding the importance of the three revenue streams to Canoo's go-to-market strategy:

> *Favorable Opportunities for Revenue and Earnings Growth Due to Secular Growth Trends in the EV Industry and*

> *Canoo's Unique Multi-Pronged Go-to-Market Strategy.* ***Canoo has established a multi-faceted go-to-market strategy*** targeting both business-to-consumer ("B2C") and business-to-business ("B2B") opportunities enabled by its versatile skateboard platform, ***substantially expanding its total addressable markets and providing the upside of multiple growth opportunities while diversifying its business and limiting risk exposure to any single source of revenue.***

75. The Definitive Proxy Statement also included the following statement in support of the Merger regarding the impact the subscription model would have on Canoo's long-term operations:

> *Compelling Financial Model with Long-Term Attractive Margin and Cash Flow Generation Potential.* ***Canoo's subscription-based consumer model can elongate the revenue generation horizon of a single vehicle over 12 years, resulting in a compelling return on equity, recurring and consistent cash flow and an estimated margin of approximately four times that of a one-time sale***. As a result, Canoo's projected operating profit margin of ~20% compares favorably to the traditional automotive OEM business model with margins closer to 5% or 10% historically.

76. The Definitive Proxy Statement included the following statement regarding the importance of utilizing third-party manufacturing:

> *Capital Light, Flexible and Cost Effective Manufacturing Strategy.* ***Canoo plans to utilize an asset-light, low-cost, flexible manufacturing strategy by outsourcing its vehicle production operations to a world-class vehicle contract manufacturing partner***, enabling Canoo to avoid funding certain significant capital investments and to minimize the fixed costs and overhead that would be required for Canoo to own and operate its own manufacturing facility.

77. The Definitive Proxy Statement listed certain additional information considered by HCAC in concluding that the Merger met the criteria for a suitable business combination, including:

> *B2B Engineering and Licensing Opportunities:* … Canoo has already received significant interest in its skateboard technology and the Canoo team's expertise in platform engineering, powertrains and vehicle design, as is exemplified by the announcement of an agreement between Canoo and Hyundai Motor Group for the co-development of a future EV platform based on Canoo's modular skateboard technology. In addition to providing external commercial validation of

> Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk the overall business model.
>
> ****
>
> *B2C Subscriptions:* Canoo's B2C strategy is targeting growing EV demand from consumers with its Lifestyle Vehicle, which it plans to roll out in select U.S. urban markets through a consumer subscription model in 2022 (and to be followed by its more sedan-like Sport Vehicle in later years).

78. The Definitive Proxy Statement touted Canoo's engineering services, stating:

> ***This [engineering] business offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021***. We expect our engineering and technology services business to offer significant growth potential in the future as projected demand grows for EVs and their related technologies. . . . . In addition to providing external commercial validation of Canoo's technical capabilities, ***these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model***.
>
> ... There is a significant market for contract engineering services among legacy OEMs who lack the expertise to develop an electric powertrain at the pace needed to capitalize on the rising regulatory requirements and global demand for EVs. ***Canoo is at a distinct competitive advantage to capitalize on this growing demand. ...***
>
> ***Contract engineering opportunities ... provide*** additional sources of revenue and ***long-term commercial opportunities*** (such as skateboard and technology licensing) as the relationship matures.

79. The Definitive Proxy Statement described Canoo's subscription model as follows:

> ***Both Canoo's Lifestyle Vehicle and its Sport Vehicle are initially intended to be made available to consumers via an innovative subscription business model***. ... ***Canoo plans to utilize an asset-light, flexible manufacturing strategy by outsourcing our direct vehicle production operations to a world-class vehicle contract manufacturing partner*** for our initial vehicle programs. In doing so, Canoo will significantly reduce its up-front capital investment and eliminate the

> recurring fixed costs and overhead that would be required for Canoo to own and operate our own assembly facility.

80. The Definitive Proxy Statement contained the following statement about the fundamental nature of the subscription model to Canoo's go-to-market strategy:

> In addition, ***importantly***, ***the vehicles required for many of these applications***, particularly in ride-sharing, ***will benefit*** from the attributes already engineered into Canoo's Lifestyle Vehicle, ***because it . . . is purpose-built for Canoo's subscription model*** which includes ease of refurbishment and cleaning[.]

81. The Definitive Proxy Statement specifically explained to investors how and why the subscription model benefitted Canoo, stating:

> By reducing the commitment required for a typical car purchase or lease***, we believe the subscription model will help reduce the barriers to entry for consumers looking to drive an EV, while also providing Canoo with a distinct opportunity for recurring revenue and a unique profit margin profile.*** We believe ***this model is supported by a number of key trends in consumer preferences and strong underlying financial metrics*** as compared to a traditional one-time sale model.

82. The Definitive Proxy Statement also explained the interconnected nature of the subscription model and outsourcing manufacturing, and the resulting benefits, stating:

> ***Canoo's subscription business further benefits from its asset-light model that focuses on partnership with third parties for elements of the business that are capital intensive or require development of extended expertise; this reduces up front capital expenditure and improves the quality of the product offering to consumers.*** As a result of these factors Canoo believes its subscription program can potentially generate consistent cash flow and strong return on equity over the lifetime of the Lifestyle Vehicle. ***In addition, by owning the vehicles, Canoo has upside potential not available in traditional models.*** We will have a long-lived asset in our Canoo EVs, which have been specifically designed to last under a subscription model and been professionally maintained and had continuous capital invested in their maintenance and repair. Whether it is putting older vehicles into rideshare models or alternative subscription packages, ***there is further upside in our model by utilizing our durable, high quality, older EVs***.

83. The Definitive Proxy Statement contained the following statements emphasizing Canoo's long-term commitment to the subscription model:

> ***We will continue to evaluate our consumer product offerings for the subscription model and will efficiently allocate capital accordingly to market needs in order to increase penetration levels and satisfy consumer preferences***. ... In addition, the Company's asset-light contract manufacturing model allows Canoo to prioritize on its product competencies and provides flexibility to pursue a wide fan of growth opportunities, including developing new vehicles or expanding into new market segments.

84. The statements in ¶¶71-83 were false and/or misleading because Defendants affirmatively represented to investors that they were pursuing a specific business model and/or "go-to market strategy" even though they knew that, at the time the statements were made, there was an ongoing "deep dive" investigating serious concerns about the viability of this model. Defendants continued to assure investors that Canoo was committed to pursuing the model and used this purported plan to sell investors on their merger despite the substantial, ongoing, and costly effort to evaluate the fundamental aspects of Canoo's business plan. The deep dive ultimately confirmed that the "math" behind the subscription model did not support its financial viability and that the initial go-to-market strategy focusing on engineering services did not properly value IP. Defendants continued to assure investors that Canoo was committed to pursuing the model and used this purported plan to sell investors on their merger despite the substantial, ongoing, and costly effort to evaluate the fundamental aspects of Canoo's business plan.

## VI. DEFENDANTS ISSUED FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

85. On December 21, 2020, Canoo announced that its business combination with Canoo Holdings Ltd. had been completed and that the combined Company's common stock and warrants would trade on the NASDAQ beginning on December 22, 2020.

86. Commenting on the Public Merger, Defendant Aquila stated:

> On behalf of all of us at Canoo, ***we are committed and excited about our go-to-market opportunities*** and to bring both consumers and businesses the benefits of our platform.

87. On December 22, 2020, Canoo filed with the SEC a Form 8-K, which referred investors to the Definitive Proxy Statement for a description of the Business Combination. As set forth in §V above, the Definitive Proxy Statement contained the same false and misleading statements that omitted material information necessary to adequately inform investors about Canoo, its operations, and its go-to-market strategy. These false and misleading statements, to which investors were specifically referred, cause Canoo's stock to trade at artificially inflated prices.

88. On January 13, 2021, Canoo filed the Preliminary Prospectus with the SEC, signed by Defendants Aquila and Balciunas, for a shelf offering of Canoo stock. The Preliminary Prospectus repeated many of the same false and misleading statements contained in the Definitive Proxy Statement.

89. Specifically, the Preliminary Prospectus reiterated Canoo's commitment to, and the benefits of, its subscription model.

> ***Both the Lifestyle Vehicle and the Sport Vehicle are initially intended to be made available to consumers via an innovative subscription business model***. … We plan to utilize ***an asset-light, flexible manufacturing strategy by outsourcing our direct vehicle production operations*** to a world-class vehicle contract manufacturing partner for our initial vehicle programs. In doing so, ***we will significantly reduce our up-front capital investment and eliminate the recurring fixed costs and overhead that would be required for us to own and operate our own assembly facility***.

90. The January 13, 2021 Prospectus specifically highlighted how Canoo's business model would be distinct from competitors in the marketplace: "Our consumer subscription model is a distinct approach to automotive sales and is one of the first of

its kind in the industry. We plan to offer customers direct access to our EVs rather than selling or leasing our EVs through dealerships…"

91. The January 13, 2021 Prospectus further elaborated on the importance of Canoo's "innovative" subscription model as follows:

> **Revenue**
>
> During 2020, our revenue has been derived from the provision of engineering, development and design consulting services on a project basis. Once we reach commercialization and commence production of our EVs, ***we expect that the significant majority of our revenue will be derived from our consumer subscription program for our Lifestyle Vehicle and Sport Vehicle, as well as sales of our Multi-Purpose Delivery Vehicle.***

92. The January 13, 2021 Prospectus also indicated that Canoo was "continu[ing] to…establish our consumer subscription model and scale our operations to meet anticipated demand" and further explained how the subscription model would benefit the Company. Canoo described current actions it was taking to support the business model:

> Subscription is a direct-to-consumer, transparent alternative to leasing or buying a vehicle, ***that will help reduce the barriers to entry for consumers*** looking to try their first EV, while also ***providing us with a distinct opportunity for recurring revenue, a unique profit margin profile and compelling return on equity***.

93. Finally, the January 13, 2021 Prospectus proffered specific metrics purportedly demonstrating how Canoo's business model was tailored to market preferences, created "attractive financial returns," and supported the viability of a subscription model. In particular, the Prospectus stated:

> **Subscription Offerings**

> ***Both our Lifestyle Vehicle and our Sport Vehicle are initially intended to be made available to consumers via an innovative subscription business model.*** … In other words, consumers are increasingly interested in EV technology, but long-term commitments (or other hurdles like sizable down payments) remain a significant barrier to entry. ***By reducing the commitment required for a typical car purchase or lease, we believe the subscription model will help reduce the barriers to entry for consumers looking to drive an EV, while also providing us with a distinct opportunity for recurring revenue and a unique profit margin profile***. We believe ***this model is supported by a number of key trends in consumer preferences and strong underlying financial metrics*** as compared to a traditional one-time sale model.

94. The January 13, 2021 Prospectus claimed Canoo's subscription model was a reimagined form of leasing, stating: "our subscription program is designed to cater to modern consumer preferences, offering a flexible usage agreement and seamless digital experience in return for a single, all-inclusive monthly fee with no hidden costs, no down payment and no long-term financial commitment."

95. The January 13, 2021 Prospectus also highlighted financial opportunities that the subscription program afforded Canoo, stating:

> **Canoo Subscription**
>
> ***Our Lifestyle Vehicle is initially intended to be offered to consumers through our subscription offering.*** …
>
> ****
>
> Our subscription business further benefits from ***our asset-light model that focuses on partnership with third parties*** for elements of the business that are capital intensive or require development of extended expertise; this reduces up front capital expenditure and improves the quality of the product offering to consumers. As a result of these factors we believe ***our subscription program can potentially generate consistent***

> ***cash flow and strong return on equity over the lifetime of the Lifestyle Vehicle. In addition, by owning the vehicles, we have upside potential not available in traditional models. We will have a long-lived asset in our EVs, which have been specifically designed to last under a subscription model and been professionally maintained and had continuous capital invested in their maintenance and repair.*** Whether it is putting older vehicles into rideshare models or alternative subscription packages, ***there is further upside in our model by utilizing our durable, high quality, older EVs.***

96. The January 13, 2021 Prospectus touted the unique advantages that Canoo's fully integrated model provided:

> In addition, ***the Company's asset-light contract manufacturing model allows us to prioritize on our product competencies and provides flexibility to pursue a wide fan of growth opportunities,*** including developing new vehicles or expanding into new market segments.

97. Moreover, the January 13, 2021 Prospectus further described how Canoo's skateboard technology and business plan were married to each other and specifically tailored to capitalize on market opportunities:

> We have established a multi-faceted go-to-market strategy targeting both B2B and B2C opportunities, substantially expanding our total addressable markets and access to growth avenues, while diversifying our business and revenue profile. ***Our flexible strategy is uniquely underpinned by our versatile skateboard platform, which minimizes new development expenditures and engineering costs, and can be leveraged to capitalize on demand opportunities for both B2B and B2C applications by more efficiently allocating capital to meet market demand.***

98. The January 13, 2021 Prospectus also extolled the purported financial benefits of Canoo's engineering services business segment, stating:

> ***Our engineering and technology services business … offers a unique opportunity to generate immediate revenues*** in

> advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021. … In addition to providing external commercial validation of our technical capabilities, ***these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model.***

99. The January 13, 2021 Prospectus further explained why Canoo's model provided distinct competitive advantages: "[h]aving multiple sources of revenue for our business offers greater diversification through exposure to distinct end markets to maximize the value created by the research and development efforts undertaken to develop our skateboard and EV technology."

100. The January 13, 2021 Prospectus contrasted Canoo's plan with more traditional models to demonstrate how the synergy of the Company's skateboard and business plan created superior opportunities for Canoo and more attractive options for consumers, stating:

> We have lowered the cost of bringing new vehicles to market by leveraging our proprietary architecture in order to reduce the vehicle's bill of materials and simplify manufacturing processes, ultimately translating to more attractive pricing for our customers and a wider addressable target market in both the mid- and premium- tiers of the B2C as well as the B2B market ***with the ability to efficiently allocate capital to meet current and evolving areas of demand and margin opportunities.***

101. The January 13, 2021 Prospectus further distinguished Canoo's business plan from its competitors, stating:

> ***We believe outsourcing manufacturing will significantly reduce overall risk and expect to benefit from flexibility to scale volumes to match demand levels***. Outsourcing vehicle production will also enable us to focus on our core competencies and benefit from a leading global contract manufacturer's expertise and efficiency, ***avoiding the***

***common pitfalls faced by other automotive startups in making the transition from vehicle engineering and development to full volume manufacturing operations.***

102. The statements in ¶¶89-101 were false and/or misleading because Defendants affirmatively represented to investors that they were pursuing a specific business model and/or "go-to market strategy" even though they knew that, at the time the statements were made, there was an ongoing "deep dive" investigating serious concerns about the viability of this model. Defendants continued to assure investors that Canoo was committed to pursuing the model and used this purported plan to sell investors on their merger despite the substantial, ongoing, and costly effort to evaluate the fundamental aspects of Canoo's business plan. The deep dive ultimately confirmed that the "math" behind the subscription model did not support its financial viability the initial go-to-market strategy did not properly value IP. Defendants continued to assure investors that Canoo was committed to pursuing the model and used this purported plan to sell investors on their merger despite the substantial, ongoing, and costly effort to evaluate the fundamental aspects of Canoo's business plan.

103. On January 25, 2021, Canoo filed its definitive prospectus on Form 424b3 for the issuance of common stock upon the exercise of certain warrants, which contained each of the false or misleading statements regarding Canoo's core operations, business model, and viability made in the January 13, 2021 Prospectus.

## VII. THE TRUTH ABOUT CANOO'S OPERATIONS IS REVEALED, AND THE PRICE OF THE COMPANY'S SECURITIES DECLINES PRECIPITOUSLY

104. On March 29, 2021, the Company announced its fourth quarter and full year financial results for 2020. The Company reported no engineering services revenue during the fourth quarter of 2020, after having reported $2.55 million in engineering services revenue during the first nine months of 2020.

105. Also on March 29, 2021, the Company held a conference call to discuss its financial results for the Company's fiscal fourth quarter and full year 2020.

106. The March 29, 2021 call commenced with Defendant Aquila providing prepared remarks. Neither Defendant Kranz nor Defendant Balciunas participated. Defendant Aquila announced that Defendant Balciunas, who served as the CFO of Canoo following the close of the Merger, had resigned, effective April 2, 2021.

107. The shocking revelations did not end with the executive turmoil. Defendant Aquila informed investors for the very first time what Defendants already knew – that Canoo was deemphasizing its engineering and technology services line of business, abandoning its subscription model, and that its arrangement with Hyundai was over. Specifically, during the March 29, 2021 call, Defendant Aquila revealed that the Company would no longer focus on its engineering services line, stating, "Due to the expansion of our derivatives and the best return on capital, it was decided by our Board to de-emphasize the originally stated contract engineering services line[.]"

108. Securities analysts present during the call were quick to point out that the Company's decision to "deemphasize the originally stated contract engineering services line" contradicted the strategy that Defendants touted in soliciting investors' approval of the SPAC merger.

109. For example, analyst Craig Irwin of ROTH Capital Partners stated, "So I would acknowledge that these are significant surprises on the call today, and that's not ideal after a SPAC – the IPO process. So I just wanted to underline that." Irwin inquired:

> [Y]ou talked about how engineering IP broadens your TAM [i.e., Total Addressable Market], but then you announced that you're deemphasizing your engineering services. Can you help us resolve that and maybe give us a little bit more color about why you would deemphasize engineering given that the original story was it would subsidize the development and broaden the partner opportunity with potentially multiple hats under license?

110. Defendant Aquila replied to Irwin as follows:

> I would say that from a Company perspective, ***it was a contradiction***. . . . ***Just $25 million, it would yield us***, we at the Board really feel like the best thing to do is to accelerate our derivatives and focus our talent on creating IP for the Company.
>
> . . . And from my perspective, ***if I had been more involved earlier, certainly, once I invested and then took the Chairmanship, we started the analysis. I had concerns about this***. . . . And we'll continue to look at things, but to be a contract engineering house is just really not going to drive the best shareholder value.

111. Analyst Steve Sakanos of Cronos Capital asked the following question:

> [D]uring the course of the year, you stated a couple of times that you had under discussion with some OEMs and possibly the contract manufacturer. You said that there are going to be some announcements by the end of Q4. I'm just wondering what happened that changed all of that?

112. In response, Defendant Aquila conceded that Defendants' prior statements failed to comply with disclosure standards applicable to a publicly traded company:

> ***So you're again owning the past as much as the present in the future***. . . . ***I think that [Defendants Kranz and Balciunas] were focused on maybe a little more aggressive than I would be in their statements***. ***I think more maturity of this team would not be that presumptuous***. We only announced what is contracted. But yes, I think they had the opportunities ***but they weren't at our standard of representation to the public markets.***
>
> ***
>
> And then ***with respect to contract manufacturing again we wouldn't make an announcement***. Again, this comes back to having an experienced public company here to be careful of the statements you make. So again, ***I think it was a little premature.***

113. Analyst John Murphy of Bank of America asked:

> Is there just too much opportunity on the commercial side and you're kind of putting [B2C] sort of back burner or is this subscription model still in play? Because I know that was part of the story before.

114. In response, Defendant Aquila apologized for failing to disclose to investors material adverse facts about the financial viability of the subscription model, stating:

> ***[W]hen I came in and took my role and we spent a lot of money analyzing the weight that this will have on the balance sheet. . . . And so you can only have a certain percentage of your business on membership. Otherwise, you've got a big cash hit that starts to develop on you as you can probably imagine***.
>
> … ***Had I been here from day 1, …I [would] have changed the sequence*** of top hats and use cases I would have went after based on my experience, ***without a doubt.***
>
> ****
>
> ... ***And again I apologize to anybody***. As a leader, you always own the past before the present or the future. And so I take everyone's comments in all three categories.

115. During the March 29, 2021 call, Defendant Aquila also discussed the impact the operational changes would have on Canoo's financial outlook, stating as follows:

> [A]t this point, it doesn't make sense to give guidance until we complete the work that we have started. . . . And so we will be step-by-step building this and ***we will be delivering information as it is known and contracted, not based on light rev reservation models***. ***I think that's dangerous. I think this could be somewhat misleading***.
>
> And so typical of any leadership change, different standard comes in. . . ***Certainly do acknowledge your point, Craig, that you got, so to speak, as you mentioned, showed a different model*** . . .
>
> ***
>
> [C]ertainly I wanted to get ahead of this and ***explain to you how this really is going to work and how to build a profitable company***, which we've done in the past. And we intend to do here. But hey, ***we understand the situation it puts you in, and we will work closely to rectify that so you can understand very clearly where we're going***.

116. Moreover, during the March 29, 2021 call, Defendant Aquila did not correct an analyst who stated, "the Hyundai arrangement, the original one, which I am assuming that's now off the table."

117. During the March 29, 2021 call, analyst Joseph Spak of RBC Capital Markets asked:

> You mentioned IP leakage as one of the potential problems with that arrangement. . . . Do you think there was any IP related, [ph] obviously, Hyundai coming out with their own electric vehicle platforms as well?"

118. Defendant Aquila responded:

> . . .So I think the Company just like any adolescent company is it's [sic] learning, its way and all of us go through it. ***But it factored in contract manufacturing based on the labor of engineers, not based on the value of IP, which would change the value of that contract significantly.*** . . .
>
> ***So it's kind of caused us to say, hey, let's put that on hold, we have so much demand for our three derivatives, let's get all that work done, and then let's look at if there partnerships*** [sic]. Partnerships can work in this industry but ***contract manufacturing work is, as you know, is not the best business line to be in***. And so was there some leakage? Well, I'll leave it to you to make that decision. ***But obviously, I'm not a big fan of doing that type of business***.

119. Defendant Aquila acknowledged on the March 29, 2021 call that the problem with the go-to-market strategy of focus on consumer subscription rather than commercial sales was "just math[.]"

120. On the March 29, 2021 call, in response to a question about focusing on "the subscription model" in the future, Defendant Aquila unequivocally stated:

> No, it's a ratio issue, Joe. ***We're going to focus on something sub 20% of our sales will be in category***. We just—***otherwise, we got to have to raise a lot more capital***, as you know, ***because you're going to have to see this on your books, and then you're going to have all this accounting mark to market.***

121. Following the March 29, 2021 corrective disclosure, the price of Canoo stock fell from its close at $11.80 on March 29, 2021 to low of $8.11 on March 30, 2021, reflecting the change in Canoo's go-to-market strategy.

## VIII. MEDIA, ANALYSTS, COMMENTATORS. AND REGULATORS REACTED HARSHLY TO DEFENDANTS' ADMISSIONS

122. The March 29, 2021 call revealed the drastic, unexpected shift in the Company's core operating model away from what investors were previously told. Media and analyst reports in the wake of the earnings call demonstrate the market's swift, adverse reaction to these revelations.

123. On March 29, 2021, for example, *The Verge* published an article that further noted Canoo was abandoning the "subscription model" it had touted:

> Aquila said Canoo will now focus more on making and selling its own vehicles to commercial operators. . . . ***Canoo will focus even less on the idea of selling its electric van to consumers through a subscription model—the original pitch when the startup broke cover in 2018.***
>
> ***Aquila has previously spoken about focusing more on selling to fleet operators and small businesses as opposed to customers, though it wasn't until Monday that he explained just how far he is willing to take that strategy shift.*** To wit, Canoo quietly uploaded a new investor presentation to its investor relations website on Monday that no longer mentions Hyundai.

124. *The Verge* article also addressed how Canoo was now retreating from prior public statements and pointed out that Defendant Aquila conceded that certain of those statements were "presumptuous" and "premature," stating as follows:

> ***When pressed on the startup's previous claims about this part of its business, Aquila—who invested $35 million into Canoo before the SPAC merger—pointed to its prior leadership. Aquila said they were "a little more aggressive" than he would've been with some of their public statements, and that talk of potential partnerships was "presumptuous."***
>
> "You've got to be careful with statements you make. So, you know, again, ***I think it was a little premature***," he [*i.e.*, Defendant Aquila] said.

****

> ***Aquila said he believes the refocused business will help "protect" the intellectual property Canoo has developed, and that the original deal with Hyundai didn't factor in the value of that IP.*** When one analyst asked if Aquila thinks Hyundai misappropriated any of Canoo's IP, Aquila said "well I'll leave it to you to make that decision."

125. On March 30, 2021, ROTH Capital Partners issued a report titled "GOEV: 4Q20 Results Were OK; ***Complete Change in Direction Is Not***; DG to Neutral" (the "ROTH Capital Report"). The ROTH Capital Report no longer recommended buying Canoo stock and was "downgrading shares of Canoo to Neutral (from Buy) given a hard pivot in the business model and a rest on operations, which are clearly still ongoing."

126. The ROTH Capital Report further criticized the business model shift, stating: "A hard pivot in the business model brings confusion with deemphasis of both eng'g services and the B2C subscription model." As a result, the ROTH Capital lowered its target price from $30 to only $12.

127. On April 4, 2021, *The Bangkok Post* published an article titled "EV Companies Went Public With Big Plans. They're Quickly Hitting Snags," which stated as follows:

> On March 29, aspiring electric car and truck maker ***Canoo Inc. told investors it was abandoning or scaling back numerous key aspects of the strategy laid out when it raised $630 million last year.***
>
> * * *
>
> Canoo boasted to investors of its "innovative subscription business model" in which it would lease vehicles directly to consumers a month at a time.
>
> * * *
>
> Canoo intends to move away from its plan to engineer car components for other companies, he said, as the practice "is just really not going to drive the best shareholder value."
>
> Finally, Mr. Aquila said Canoo now plans eventually to make its own factories. ***That emphasis reflects a departure from its prior approach, which the company called an "asset-light,***

> ***flexible manufacturing strategy" that relied on third-party manufacturers.***

128. On April 20, 2021, Bank of America ("BoA") issued an analyst report titled, "Paddling its own Canoo, while business model remains very much in flux" (the "BoA Report"), which detailed "three recent and significant shifts" that Canoo made, namely: "1) De-emphasis of Engineering services; 2) De-emphasis of subscription program; 3) Plan to now manufacture in-house, as well as use a contract manufacturer." BoA reviewed the plan in unfavorable terms:

> In our view, ***GOEV's two-pronged market approach of B2C and B2B may be a greater challenge to successfully execute versus peers with more targeted strategies***. ***We continue to have the most skepticism around the B2C business,*** where GOEV's Lifestyle/Sport Vehicles may be more novelty product than those with durable demand***, and that its (even limited) subscription program may introduce significant operational/financial hiccups (volatile fleet usage, dynamic monthly pricing, unanticipated maintenance/repair, depreciation/residual accounting, etc.).*** (emphasis added)

129. According to the BoA Report, "***[T]he change introduces further risk around the company's ability to execute in a timely fashion***." BoA also noted that Canoo's new manufacturing plan would have significant consequences on the level of capital Canoo needed to execute its business plan and alter the volume of vehicles that Canoo could produce over the next few years, materially deviating from what Defendants previously told investors. Specifically, BoA concluded as follows:

> [a]s a result, what appeared to be a more asset-light business model by using a contract manufacturing (similar to peer FSR) has now shifted more towards a capital-intensive manufacturing model (more like peers RIDE and TSLA, and even incumbent OEMs).

130. The BoA report reiterated the multiple benefits Defendants touted when justifying their plan to rely on contract manufacturing:

> GOEV's contract manufacturing setup has allowed the company to reach a beta version of its vehicle not only faster than competitors, but also ***with significantly less capital***

> ***deployed***. Additionally, GOEV has highlighted the following key benefits of its contract manufacturing relationship:
>
> - ***Reduced cash and capital requirements***
> - Ability to plug into existing manufacturing systems
> - Ability to quickly scale volumes up/down based on demand
> - Leverage existing manufacturing know-how and process
> - Reduced overcapacity and production risk

131. On June 17, 2021, Richard E. Loran of Cohen Milstein Sellers & Toll PLLC summarized the negative reaction of the market and analysts in an article titled, "What the SPAC?! Blank-Check Explosion Draws New Regulatory Scrutiny":

> The August 18, 2020 news release announcing the planned merger said Canoo would rely on a "unique business model" based on three revenue streams[.]
>
> The news release and accompanying presentation, which was filed with the SEC, said ***the consumer subscription service would be especially important, since it would be "more profitable and resilient" than selling new vehicles***. In later public statements, the Canoo team continued to stress the three revenue streams. The company also touted a February 2020 agreement to provide contract engineering services to Hyundai Motor Group as an example of its experience and potential in that area.
>
> ***But in its first post-merger earnings call on March 29, 2021, Canoo abruptly changed course***, announcing the departure of its CFO, saying it would "deemphasize" the contract engineering services, and casting doubt on the future of the subscription service.
>
> ****
>
> Asked to explain the shift, Aquila pointed to ***the inexperience of the prior leadership team, which had been "a little more aggressive" and "presumptuous" than advisable in its public statements about business prospects and didn't meet "our standard of representation to the public markets."***
>
> ***"This comes back to having an experienced public company team," Aquila said, referring to statements about potential engineering contracts with other manufacturers. "You've got to be careful of the statements you make."***

> Well, yes. Canoo's stock price fell 21% the next day. (emphasis added)

132. In its 10-Q for its first quarter of 2021, Canoo disclosed that it was subject to an SEC investigation, stating as follows:

> [O]n April 29, 2021, the SEC's Division of Enforcement advised that it has opened an investigation related to, among other things, HCAC's initial public offering and merger with the Company, the Company's operations, business model, revenues, revenue strategy, customer agreements, earnings and other related topics, along with the recent departures of the Company's officers.

133. According to its latest 10-Q filed on November 9, 2022, the SEC investigation remains ongoing.

## IX. ADDITIONAL INDICIA OF SCIENTER

134. The allegations in this Section are in addition to, expressly incorporate by reference, do not supplant, and are intended to be construed together with all of the other allegations in this pleading giving rise to the plausible inference that, with the intent to defraud, manipulate, or deceive investors in connection with their purchases or sales of the Company's securities: (1) Defendants made the statements alleged to be materially false or misleading; (2) Defendants employed a device, scheme, or artifice; or (3) Defendants engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

### A. Aquila benefited substantially from the completion of the Merger.

135. In June 2019, Aquila founded AFV Partners, which he described as "an affirmative low-leverage capital vehicle that invests in long-term mission critical software, data and technology businesses," and Aquila has served since its founding as Chairman and CEO.

136. Canoo is of particular importance to AFV Partners. According to AFV Partners' website:

> Canoo is currently one of AFV's significant investments. Tony initially agreed to provide rescue capital to the company in July 2020. This was followed by his participation in the PIPE. His investments in Canoo were based on his assessment of the company's competitive advantage: its industry unique focus on proprietary engineering and technology. In preparations for the SPAC merger, Tony was asked to join the board and, effective with the completion of the merger and de-SPAC with Hennessy Capital Acquisition Corp. IV in December 2020, became its Chairman.

137. AFV Partners and Aquila have substantially grown their holdings of Company stock following their initial involvement in July 2020. According to Company filings:

> In August 2020, the $100M Notes, the $15M Notes and the $115M Notes were converted into 41,207,011 Canoo Preference Shares. No principal or interest was paid on the $100M Notes, the $15M Notes or the $115M Notes.

138. Aquila, through AVF Partners' fully owned subsidiary AFV Partners SPV-4 LLC ("AFV 4"), also participated in the Subscription Agreement with Hennessy Capital, which allowed AFV 4 to obtain 3.5 million PIPE shares for an aggregate purchase price of $35.0 million.

139. On December 22, 2020, Defendant Aquila filed a Form 3, disclosing his initial statement of beneficial ownership of Canoo securities, stating that he directly owned 35,000 shares of Canoo common stock.

140. That same day, Defendant Aquila filed a Form 4, disclosing he directly controlled 35,000 shares of Canoo common stock, while maintaining a pecuniary interest in 12,359,387 shares of Canoo common stock indirectly through AFV 4 (which consisted of 8,859,387 shares acquired pursuant to the Merger Agreement and 3.5 million shares purchased through the PIPE financing for $10 per share).

141. On December 30, 2020, Defendant Aquila filed an amended Form 4, which showed an increase to 1,038,828 shares of Canoo common stock acquired on December 21, 2021, including "1,003,828 shares subject to Restricted Stock Units that vest through October 19, 2023."

142. On December 31, 2020, AFV 4 filed with the SEC a Schedule 13D, which indicated that AFV 4 held 13,359,387 shares of Canoo. The Form 13D adds to the explanation of Aquila's holdings, saying the 1,038,838 were "acquired prior to the closing of the Transactions." At this time, Aquila controlled 5.7% of Canoo's common stock.

143. On January 25, 2021, Canoo filed its Shelf Registration. According to the Shelf Registration, Aquila and AFV-4 collectively held 15,333,504, which consisted of:

> (i) 35,000 shares of Common Stock held by Tony Aquila; (ii) 1,003,828 shares of Common Stock subject to RSUs held by Tony Aquila that vest through October 19, 2023; (iii) the contingent right held by Tony Aquila to receive 172,086 Earnout Shares; (iv) 12,359,387 shares of Common Stock held by AFV 4; and (v) the contingent right held by AFV 4 to receive 759,375 Earnout Shares.

144. On April 22, 2021, Canoo announced that Aquila would replace Defendant Kranz as Canoo's CEO upon Kranz's resignation effective April 30, 2021.

145. On April 23, 2021, Aquila filed a Form 4 indicating that on April 21, 2021 he received two million shares of Performance-Based Restrict Stock Units, which were to vest "Upon Issuer's Common Stock achieving certain specified prices per share."

146. On May 18, 2021, Defendant Aquila filed a Form 4 indicating that on May 14, 2021 he received three installments of RSU, each in the amount of 2,000,000, subject to vesting based on the performance of Canoo stock. The filing also indicated that AFV Partners had received an option to purchase from DD Global Holding 2.4 million shares of Canoo for $5.83 per share, and an option to purchase from Remarkable Views Consultants LLC 1.2 million shares of Canoo for $5.83. According

to later filings, the options to purchase these shares were granted "for no consideration." Following the transaction, according to the Schedule 13D/A, Aquila controlled 15,959,387 shares of Canoo, amounting to 6.7% of the total shares outstanding.

### B. Defendants Aquila, Kranz and Balciunas were eligible for stock incentive awards based on Canoo's stock price performance.

147. According to Annex I of the Merger Agreement, each of the legacy investors, including each Individual Defendant, was to receive certain "earnout" payments conditioned upon certain public share price milestones within specified timeframes.

148. The first tranche of five million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $18 per share for any 20 trading days within any consecutive 30 trading-day period on or before December 21, 2022. Alternatively, the first tranche of five million Earnout Shares will issue in the event of a change in control on or before December 21, 2022, if the per-share consideration in such a transaction equals or exceeds $18.

149. The second tranche of five million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $25 per share for any 20 trading days within any consecutive 30-day period on or before December 21, 2024. Alternatively, the second tranche of five million Earnout Shares will issue in the event of a change in control on or before December 21, 2024, if the per-share consideration in such a transaction equals or exceeds $25.

150. The third tranche of five million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $30 per share for any 20 trading days within any consecutive 30-day trading period on or before December 21, 2025. Alternatively, the third tranche of five million Earnout Shares will issue in the

event of a change in control on or before December 21, 2025, if the per-share consideration in such a transaction equals or exceeds $30.

151. Immediately following the Merger, Canoo's stock reached an artificially inflated price exceeding $18 for several days and nearly reached $25, getting to a high of $24.90 on December 22, 2020, but the price did not remain above the price points for the required number of days for Earnout shares to vest. Still, the Individual Defendants continue to be eligible to receive Earnouts based on share price targets being obtained in the future.

## X. LOSS CAUSATION

152. Prior to and during the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities and operated as a fraud or deceit on Class Period purchases of the Company's common stock by failing to disclose and by misrepresenting the adverse facts detailed herein.

153. Lead Plaintiff and Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions (prior to and during the Class Period) purchased the Company's securities at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased the Company's securities at the artificially inflated prices at which they traded during the Class Period.

154. As alleged in more detail *supra* §VII, the truth regarding Defendants' fraud was revealed in a series of corrective disclosures and/or materializations of concealed risk that occurred on March 29 and 30, 2021. On March 29, 2021, the price of Canoo's common stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited the Canoo common stock. It was not until the corrective disclosure and/or materialization of concealed risk on March 30, 2021 that the full truth

was known to the market, such that there was no longer any artificial inflation in the price of Canoo common stock attributable to the fraud.

155. The decline in the price of Canoo common stock during this period is directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions prior to and during the Class Period.

156. As a result of their purchases of the Company's securities during the Class Period, Lead Plaintiff and other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused the Company's common shares to trade at artificially inflated levels throughout the Class Period and, in certain instances, caused inflation in the Company's stock price.

157. By concealing from investors the adverse facts detailed herein, Defendants presented a false and misleading picture of the Company's business. As the truth about the Company and the extent of the fraud were revealed to the market, the price of the Company's securities fell significantly. This decline removed the artificial inflation from the price of the Company's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

158. Moreover, the market for the Company's securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' misstatements and material omissions, as alleged herein, the Company's common stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased the Company's securities relying upon the integrity of the market relating to the Company's common stock and suffered economic losses as a direct and proximate result thereof.

159. Defendants' disclosures on March 29, 2021, and the related news coverage reporting on the Company's representations about its business model were a

foreseeable consequence of, and within the zone of the risk concealed by, Defendants' misrepresentations and omissions.

160. Moreover, the March 29, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market, in that they revealed that Defendants' prior misstatements and/or omissions touting the Company's business model were false and misleading at the time that they were made.

161. As a direct and proximate result of these corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of the Company's common stock declined by $0.66 (or 5.3%) per share, to close at $11.80 per share on March 29, 2021.

162. On March 30, 2021, the Company's stock price continued to fall in response to the news, falling by another $2.50 (or 21.2%) per share, to close at $9.30 per share on March 30, 2021, on heavy trading volume.

163. The declines in the Company's common stock price on March 29 and 30, 2021 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors. The timing and magnitude of the Company's common stock price declines evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the losses incurred by Lead Plaintiff and other Class members were caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

## XI. CLASS ACTION ALLEGATIONS

164. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and who were damaged upon the revelation of the alleged corrective

disclosures. Excluded from the Class are (i) Defendants; (ii) members of the immediate family of any Defendant who is a natural person; (iii) any person who was an officer or director of the Company during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

165. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, its transfer agent(s), or its domestic depositary(ies), and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

166. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

167. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigations. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

168. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Defendants' acts and omissions as alleged herein violated the federal securities laws;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, prospects, and management of the Company;

(c) whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

169. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

170. To the extent Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material to a reasonable investor;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e) Lead Plaintiff and other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g) as a regulated issuer, the Company filed periodic public reports with the SEC and the NASDAQ;

(h) the Company regularly communicated with public investors via established market communication mechanisms, including *inter alia* regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i) the Company was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Roth Capital Partners, RBC Capital Markets, Cowen, Loop Capital, and Collers Securities, and other financial, tech and automotive website all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

171. As a result of the foregoing, the markets for the Company's securities were open, well-developed, and efficient at all relevant times, and promptly digested current

information regarding the Company from publicly available sources and reflected such information in the Company's securities price(s). Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information relating to the Company. Under these circumstances, all persons and entities who or which purchased or otherwise acquired the Company's securities during the Class Period suffered similar injuries through their purchase of the Company's securities at artificially inflated prices and thus, the presumption of reliance applies.

172. During the Class Period, the artificial inflation of the Company's securities was caused by the material misrepresentations and/or omissions particularized herein, causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated and maintained at artificially inflated levels at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

173. The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to misjudge the value of the Company's common stock. The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to purchase the Company's securities at artificially inflated prices.

174. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

175. To the extent Defendants concealed or improperly failed to disclose material facts with respect to the Company's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Defendants were obligated to disclose, but failed to disclose, material facts with respect to the Company's business operations and financial prospects, so that "positive proof of reliance is not a prerequisite to recovery." *Id.*

## XIII. STATUTORY SAFE HARBOR INAPPLICABLE

176. The PSLRA's statutory safe harbor concerning forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading herein relate to historical (*i.e.*, then-existing) facts or conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

177. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

178. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. §§ 78u-5(c)(2)(A)(i)–(ii). Defendants failed both to identify certain oral

statements as forward-looking and to include the cautionary language prescribed by the PSLRA.

179. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, the Company was engaged in a deep dive examining the viability of the purported go-to-market strategy creating a risk that the plan would be materially altered, which risk materialized upon the announcement on March 29, 2021 of the dramatic shift in Canoo's business plans.

180. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each such statement was made, the speaker had actual knowledge, or recklessly disregarded the risk, that the forward-looking statement was materially false or misleading; or, the false forward-looking statement was authorized or approved by an executive officer of the Company who knew, or recklessly disregarded the risk, that the statement was false when made.

## COUNT I

### For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 (Against All Defendants)

181. Lead Plaintiff repeats, realleges, and incorporates by reference each and every allegation heretofore pleaded as if fully set forth herein.

182. This Count is asserted against Defendants and arises under Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and pursuant to SEC Rule 10b-5, *codified as amended*, 17 C.F.R. § 240.10b-5.

183. During the Class Period, Defendants utilized the means or instrumentalities of interstate commerce, including but not limited to the mails, the Internet, and the facilities of the NASDAQ, to engage in a plan, scheme, conspiracy, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiff and other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

184. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence, and which did influence, the market for the Company's securities Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

185. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions

alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully, consciously, or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

186. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers, directors, and officers of the Company, the Individual Defendants had first-hand knowledge of the details of the actual state of the Company's internal affairs.

187. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the Company's statements. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company's actual business and financial condition, which were concealed by Defendants, Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

188. During the Class Period, the Company's securities were listed and actively traded on and in an efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true market value of the Company's securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein, to the injury of Lead Plaintiff and the other Class members.

189. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated both Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, *codified as amended*, 17 C.F.R. § 240.10b-5.

190. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements to the investing public.

191. By reason of the foregoing, Lead Plaintiff and the other members of the Class are entitled to recover money damages from Defendants, and each of them, for Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934,

*codified as amended*, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, *codified as amended*, 17 C.F.R. § 240.10b-5.

## COUNT II

### For Violations of Section 20(a) of the Securities Exchange Act of 1934 (Against the Individual Defendants)

192. Lead Plaintiff repeats, realleges, and incorporates by reference each and every allegation heretofore pleaded as if fully set forth herein.

193. This Count is asserted against the Individual Defendants and arises under and pursuant to Section 20(a) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a).

194. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, the Individual Defendants knew, or had access to or possession of, the adverse non-public information about the Company's misstatements and omissions alleged herein.

195. As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty, but failed, to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

196. By reason of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause or permit the Company to engage in the wrongful acts and omissions complained

of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a). In this capacity, the Individual Defendants participated in the unlawful conduct alleged herein, which artificially inflated the market price of the Company's securities.

197. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts, omissions, and other conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities, acts, and omissions which constitute the primary violations of the federal securities laws alleged elsewhere herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a). In this capacity, the Individual Defendants participated in the unlawful conducted alleged herein, which artificially inflated the market price of the Company's securities.

198. By reason of the foregoing, the Individual Defendants are liable in money damages to Lead Plaintiff and the other members of the Class for the Company's primary violations of the federal securities laws alleged elsewhere herein, pursuant to Section 20(a) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a).

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays relief and judgment, as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class Representative on behalf of the Class;

B. Requiring Defendants, and each of them, to pay damages sustained by Lead Plaintiff and other members of the Class by reason of the acts, omissions, and transactions alleged herein, in an amount to be proven at trial;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs and expenses; and incurred in investigating, bringing, and maintaining this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all issues so triable in this Action.

Dated: March 10, 2023

Respectfully submitted,

**POMERANTZ LLP**

By: *<u>/s/ Murielle J. Steven Walsh</u>*
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mjsteven@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**HOLZER & HOLZER, LLC**

By: *<u>/s/ Corey D. Holzer</u>*
Corey D. Holzer (*pro hac vice*)
Marshall P. Dees (*pro hac vice*)
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Co-Lead Counsel for Lead Plaintiff & the Proposed Class*