POMERANTZ LLP
Jennifer Pafiti (SBN 282890)
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
jpafiti@pomlaw.com
jalieberman@pomlaw.com
mjsteven@pomlaw.com

*Co-Lead Counsel for Lead Plaintiff & the Proposed Class*

— additional counsel on signature page —

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SAMUEL BLAKE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CANOO INC., TONY AQUILA, ULRICH KRANZ, and PAUL BALCIUNAS,<br><br>Defendants. | **Case No. 2:21-CV-02873-FMO-JPR** **(<u>Consolidated</u>)**<br>Case No. 2:21-CV-02879-FMO-JPR<br>Case No. 2:21-CV-03080-FMO-JPR<br><br>**CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1
II. SUMMARY OF THE CLAIMS ..... 2
III. JURISDICTION AND VENUE ..... 7
IV. PARTIES ..... 8
A. Plaintiff ..... 8
B. Defendants ..... 8
V. BACKGROUND ..... 9
A. Legacy Canoo ..... 9
B. Hennessy Capital Acquisition Corp. ..... 10
VI. THE MERGER AND DEFENDANTS' FRAUDULENT SCHEME ..... 11
VII. DEFENDANTS' PRE-CLASS PERIOD STATEMENTS MISLED INVESTORS ABOUT CANOO'S GO-TO-MARKET STRATEGY AND ITS ENGINEERING PIPELINE ..... 14
A. Defendants issued false and misleading statements in connection with the roadshow promoting the proposed Merger. ..... 14
B. Defendants issued false and misleading statements to obtain shareholder votes for approval of the Merger. ..... 17
VIII. DEFENDANTS ADOPTED PREVIOUSLY ISSUED FALSE AND MISLEADING STATEMENTS AND MADE ADDITIONAL FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ..... 21
IX. THE TRUTH ABOUT CANOO'S OPERATIONS IS REVEALED, AND THE PRICE OF ITS SECURITIES PRECIPITOUSLY DECLINES ..... 26
X. MEDIA, ANALYSTS, COMMENTATORS, AND REGULATORS REACTED HARSHLY TO DEFENDANTS' ADMISSIONS ..... 30
XI. ADDITIONAL INDICIA OF SCIENTER ..... 32
A. The SEC's investigation revealed detailed information about Defendants' fraud. ..... 32
1. The SEC Order details Defendants' intentional concealment of material facts contradicting Canoo's public statements. ..... 34
2. The SEC Action describes Kranz's and Balciunas' direct roles in concealing adverse material facts from investors. ..... 35

3. Krantz's undisclosed compensation arrangement motivated him to ensure the Merger closed. ....................................................37

B. Aquila had contemporaneous access to the undisclosed information that caused Canoo's statement to be false and misleading and personally benefited from the Merger closing. ....................................................38

C. Aquila, Kranz and Balciunas were eligible for stock incentive awards based on Canoo's stock price performance. ....................................................39

D. Canoo's admissions in the Trade Secrets Action confirm the timing and extent of the "deep dive." ....................................................40

XII. LOSS CAUSATION ....................................................41

XIII. CLASS ACTION ALLEGATIONS ....................................................43

XIV. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ....................................................45

XV. STATUTORY SAFE HARBOR INAPPLICABLE ....................................................48

COUNT I ....................................................49

COUNT II ....................................................53

PRAYER FOR RELIEF ....................................................54

JURY TRIAL DEMANDED ....................................................55

Lead Plaintiff Vladi Shaulov ("Lead Plaintiff" or "Shaulov"), individually and on behalf of all other persons similarly situated, brings this Consolidated Third Amended Complaint against Canoo Inc., Tony Aquila, Ulrich Kranz, and Paul Balciunas (collectively, "Defendants"), and alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys including analyzing, reviewing and/or consulting with: (1) reports and documents filed by Canoo with the U.S. Securities & Exchange Commission ("SEC"); (2) reports by analysts concerning Canoo; (3) press releases, news articles, transcripts, and other public statements issued by or about Canoo and/or the Defendants; (4) financial experts; (5) the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and Desist Order issued August 4, 2020 (the "SEC Order"); (6) the litigation captioned *Securities and Exchange Commission v. Kranz and Balciunas*, Case No. 23-cv-06332 (C.D. Cal.) (the "SEC Action"); (7) the litigation captioned *Canoo Technologies, Inc. v. Harbinger Motors, Inc., et al.*, Case No. 22-cv-9309 (C.D. Cal.) (the "Trade Secrets Action"); and (8) other publicly available information concerning Canoo, its business, and the allegations contained herein.

## I. INTRODUCTION

1. This is a federal securities class action brought individually and on behalf of all other persons and entities who purchased or otherwise acquired publicly traded Canoo, Inc. ("Canoo" or the "Company") common stock and/or warrants from December 21, 2020 through and including March 29, 2021 (the "Class Period"), seeking to recover damages pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder (the "Class").

2. Defendants' post-Class Period admissions, as substantiated by the SEC's findings following a lengthy fact investigation, demonstrate that Defendants issued materially false and misleading statements as part of a purposefully orchestrated scheme in connection with Canoo's merger with a special purpose acquisition company (a "SPAC"), Hennessy Capital Acquisition Corp. IV ("Hennessy" or "HCAC") (the "Merger"), and a post-Merger shelf offering of Canoo stock.

3. Defendants deceived investors by touting Canoo's unique three-pronged business plan that supposedly de-risked its go-to-market strategy and distinguished it from competitors while concealing known, material, adverse facts undermining the viability of the plan and causing Canoo stock to trade at artificially inflated prices.

4. Investors learned of the fraud only after Defendants' objectives were achieved. On March 29, 2021, Canoo announced its first financial results as a public company and informed investors it had abandoned the previously hyped go-to-market strategy in favor of a different, more capital-intensive plan.

5. Canoo's stock price collapsed on the news, falling more than 25% as investors learned they had been deceived.

## II. SUMMARY OF THE CLAIMS

6. By spring 2020, Canoo's cash on hand was low, and it entered a low cash burn mode for several months to preserve operating capital.

7. In July 2020, Defendant Tony Aquila ("Aquila"), who would later become Canoo's Chief Executive Officer and Chairman of its Board, provided Canoo with "rescue capital" to prop up the cash poor Canoo.

8. On August 18, 2020, Hennessy announced the proposed Merger with Canoo. If completed, the Merger would raise hundreds of millions of dollars for cash strapped Canoo and allow it to become a publicly traded company, thereby giving Defendants – who controlled Canoo – access to more capital-raising options and creating

liquidity for their substantial stock holdings. The Merger, which valued Canoo at $2.4 billion, required the approval of Hennessy shareholders.

9. Between August 18, 2020 and December 4, 2020, Defendants issued a series of public statements in support of the Merger. Aquila later admitted many of these claims were "presumptuous," "premature," too "aggressive," and were not "at our standard of representation to the public markets." The SEC conducted a lengthy investigation into the Merger and concluded many of the same statements were false and misleading in violation of federal securities laws, leading to the entry of the SEC Order and the initiation (and proposed settlement) of the SEC Action.

10. The false and misleading statements issued by Defendants frequently emphasized that Canoo had a then-existing revenue stream from its "Engineering Services," which it described as "all the material consulting and contract engineering work that is in high demand due to our team's specialized experience and technical capabilities in EV development." Defendants claimed Canoo's Engineering Services pipeline "offer[ed] a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021[.]" Defendants told investors that 2022 Engineering Services revenue was projected to be $250 million and, because this revenue would be generated before any vehicles reached the market, the cash would be available to fund go-to-market efforts.

11. Defendants made these claims about the Engineering Services pipeline despite knowing by mid-August 2020 that the pipeline was unlikely to produce any revenue in either 2021 or 2022. And by early December 2020, both customers identified internally as sources of the projected Engineering Services revenue had communicated to Defendants that they were pulling the plug on potential deals, while the remaining efforts to partner with third parties were being canceled or paused, resulting in internal revenue forecasts being adjusted to $0 expected Engineering Services revenue in 2021.

12. In filings and discussions in support of the Merger, Defendants also misled investors by emphasizing that Canoo planned to offer its first vehicles and generate future revenue through a "Subscription-based Model," whereby Canoo "members" would pay "a single monthly fee" with "no upfront payment," which would allow members to "enjoy the benefits of an all-inclusive experience that, in addition to your own canoo[1] vehicle, includes maintenance, warranty, registration and access to insurance and vehicle charging." Defendants claimed the subscription model, along with the use of third-party manufacturers, would produce greater operating margins than its competitors and created an opportunity for Canoo to sell electric vehicles to consumers who wanted to utilize the technology but were apprehensive of the burdens of traditional car purchases/leases.

13. By September 2020, however, Canoo had commenced a "deep dive" into the business model and was spending "a lot of money analyzing" issues with Canoo's entire go-to-market strategy. Aquila later acknowledged that he held serious concerns about the plan from the start and admitted that if he had "been here from day 1 . . . [he] would have" focused first on commercial sales and not the subscription model that Canoo emphasized. As Aquila explained during a March 29, 2021 earnings conference call, a subscription-based model required significant capital, otherwise a "big cash hit" would develop, and the absence of Engineering Services revenue made the plan far riskier.

14. Defendants also told investors in connection with the Merger and shelf offering that Canoo's third revenue stream was business-to-business sales ("B2B"), but Defendants claimed it would be at least a couple years before revenue was expected to be generated by the B2B. When Canoo announced its new business model at the end of the Class Period, however, B2B sales were expected to be the first source of revenue.

15. The Class Period begins on December 21, 2020 when, without knowledge of Canoo's failed Engineering Services pipeline or the privately held concerns underpinning the undisclosed "deep dive" into Canoo's go-to-market strategy, Hennessy

[1] Canoo's general vehicle design is referred to as "canoo."

shareholders voted to approve the Merger, and Canoo's common stock and warrants began trading on the NASDAQ. Canoo raised $629 million in gross proceeds from the Merger and the related PIPE financing transaction, and the price of Canoo stock immediately rose on the open market as investors were keen to tap into Canoo's falsely described business opportunity.

16. On December 21, 2020, Canoo issued a press release quoting Aquila as saying, "we are committed and excited about our go-to-market opportunities," and on December 22, 2020, Canoo filed a Form 8-K with the SEC that referred investors to the specific pages of the previously issued Merger documents that falsely described Canoo's de-risked, multi-phase, go-to-market strategy.

17. On January 13, 2021, less than a month after going public and less than two weeks after completing its fourth quarter 2020, Canoo announced a shelf offering for the sale of up to 24,353,356 shares of common stock consisting largely of stock held by insiders and early investors. The documents supporting the shelf offering contained the same false and misleading statements about Canoo's business plan and go-to-market strategy issued in connection with the Merger.

18. On March 29, 2021, after the markets closed, Canoo conducted its first public conference call to discuss its quarterly results. Surprisingly, the call was conducted by Aquila. Neither Defendant Ulrich Kranz ("Kranz"), Canoo's Chief Executive Officer ("CEO"), nor Defendant Paul Balciunas ("Balciunas"), Canoo's Chief Financial Officer (the "CFO"), participated in the conference call.

19. On the March 29, 2021 conference call, Aquila informed investors for the first time that Canoo would not operate as described in prior public statements. Aquila stated that, after conducting a "deep dive," Canoo decided to "deemphasize the originally stated contract engineering services line" due to concerns about "IP leakage" and the lack of return on investment from the effort. Investors were shocked to learn that, despite pre-Merger claims that the Engineering Services revenue stream "exists today," Canoo

had generated zero dollars from that stream in the fourth quarter of 2020 and it did not expect it to generate any revenue in the near term.

20. Canoo also revealed during the March 29, 2021 call that it was dumping its "membership model" because relying on subscription users created "a big cash hit" that was detrimental to efforts to bring its vehicles to market. Moreover, Canoo announced that as part of the shift away from subscriptions it would not rely principally on contract manufacturers going forward, as it previously claimed. Instead, Canoo revealed it intended to build a "mega microfactory" to manufacture certain of its parts, thereby jettisoning the "asset-light, low-cost, flexible manufacturing strategy" that had served as a key element of Canoo's de-risked go-to-market strategy.

21. With this shift in business plan, the risks associated with the Engineering Services pipeline and the undisclosed "deep dive" materialized when Aquila announced the change. Aquila profusely apologized for prior misleading statements issued by Defendants, going so far as to acknowledge previous investor communications did not comply with the standards applicable to public companies.

22. The price of Canoo stock plummeted after the March 29, 2021 call as investors and analysts alike revalued Canoo's business. Canoo stock, which traded at $12.46 when the markets opened on March 29, 2021, fell to $9.64 at the market's open on March 30, 2021 and reached a low that day of $8.52.

23. On April 29, 2021, the SEC announced it was investigating Canoo and its merger with Hennessy.

24. On March 30, 2023, Canoo announced it had reached a settlement in principle with the SEC for alleged violations of federal securities laws.

25. On August 4, 2023, the SEC Order became public, and the SEC Action was filed. The SEC Order and the allegations contained in the SEC Action confirmed that Defendants' claims about Canoo's Engineering Services pipeline were lies as the two main expected contributors to that pipeline had pulled out of discussions by December

2020 and prior to the Class Period Canoo's internal documents reflected an expectation of $0 in Engineering Services revenue in 2021, the $120 million previously claimed.

26. As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and recoverable damages.

## III. JURISDICTION AND VENUE

27. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "'34 Act"), *codified as amended*, 15 U.S.C. §§ 78j(b), 78t(a), and pursuant to the rules and regulations duly promulgated thereunder, including SEC Rule 10b–5, *codified as amended*, 17 C.F.R. § 240.10b–5.

28. This Court has exclusive subject matter jurisdiction of all claims asserted herein pursuant to Section 27 of the '34 Act, *codified as amended*, 15 U.S.C. § 78aa (for violations of the Exchange Act), and original subject matter jurisdiction of all claims asserted herein pursuant to 28 U.S.C. § 1331 because this is a case or controversy arising under federal law.

29. Venue lies in the Central District of California pursuant to Section 27 of the '34 Act, 15 U.S.C. § 78aa, because Defendants transact business in this District and because the Company's principal place of business is, and at all relevant times was, located at 19951 Mariner Avenue, Torrance, California 90503, which is situated within this District. Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b)–(d) because many of the acts and transactions that constitute the violations of law complained of in this Amended Complaint, including the dissemination to the public of materially false or misleading statements, occurred or emanated from within this District.

30. In connection with the acts, omissions, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, the facilities of the

national securities markets, and interstate telephonic and digital communications systems.

## IV. PARTIES

### A. Plaintiff

31. Lead Plaintiff Vladi Shaulov a/k/a Vladi Chaoulov ("Lead Plaintiff") is an Israeli citizen domiciled in Cyprus. Lead Plaintiff purchased the Company's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosures alleged herein.

### B. Defendants

32. Canoo is a Delaware corporation, with its principal executive offices located within this District at 19951 Mariner Avenue, Torrance, California 90503. Canoo's securities trade, and at all relevant times after December 21, 2020 traded, in an efficient market on the NASDAQ under the ticker symbol "GOEV" (common shares) and "GOEVW" (warrants).

33. Aquila is the current CEO and Chairman of Canoo. Through his investment vehicle, Aquila Family Ventures Partners, LLP ("AFV Partners"), Aquila was a pre-Merger investor in Canoo. Aquila was named Canoo's Chairman of the Board on or about October 19, 2020, and began serving as its Executive Chairman and Director on or about December 21, 2020. Effective April 30, 2021, Aquila became CEO.

34. Kranz was Co-Founder and the CEO of Canoo Holdings until the Merger, when he became the Company's CEO-in-Charge.

35. Balciunas served as Chief of Finance and Corporate Development of Canoo Holdings until the Merger, when he became Canoo's CFO until his resignation from the Company effective April 2, 2021.

36. All references to the "Individual Defendants" in this Consolidated Amended Class Action Complaint are to Aquila, Kranz, and Balciunas, jointly and severally.

37. The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

38. Canoo is liable for the acts of its executives, directors, officers, and agents at common law and under the doctrine of *respondeat superior* because all the wrongful acts and omissions complained of in this Consolidated Third Amended Class Action Complaint were carried out during and within the scope of each such person's employment. The scienter of the Company's executives, directors, officers, and agents is similarly imputed to Canoo under established agency principles.

39. All references to the "Defendants" in this Consolidated Third Amended Class Action Complaint are to Canoo, Aquila, Kranz, and Balciunas, jointly and severally.

## V. BACKGROUND

### A. Legacy Canoo

40. Founded by Kranz and non-party Stefan Krause in November 2017, Canoo's predecessor entity operated as a private technology company developing electric vehicles. Canoo was working on a concept for an electric vehicle platform called a "skateboard." The skateboard's modular design enabled Canoo to design customized models for multiple vehicle programs in commercial and consumer markets.

41. On or about September 24, 2019, Canoo debuted its first model called the "canoo." According to a contemporaneous *TechCrunch* article: "The company intends to go to market with an entirely new business model by providing customers with its cars for a monthly subscription fee."

**B. Hennessy Capital Acquisition Corp.**

42. Hennessy was incorporated in Delaware on or about August 6, 2018, as a SPAC. A SPAC is a shell, or "blank check" company, formed for the sole purpose of raising money through a public offering to eventually acquire one or more companies. SPACs have become magnets for fraud and raise great concern among U.S. regulators and investors.[2]

43. On February 11, 2019, Hennessy commenced a $300 million initial public offering and filed its registration statement with the SEC. On February 28, 2019, the SEC declared Hennessy's February 11, 2019 registration statement to be effective.

44. On March 5, 2019, Hennessy issued a press release, announcing that it had closed its IPO of 30,015,000 units at an offering price of $10.00 per unit, resulting in gross proceeds of $300,150,000. Simultaneously with the closing of the IPO, Hennessy sold 13,581,500 warrants at a price of $1.00 in a private placement, generating an additional $13,581,500 in proceeds.

45. Hennessy indicated it would use the proceeds to identify and complete an "initial business combination" with the target entity operating "in the industrial, infrastructure solutions and value-added distribution sectors in the United States."

[2] *See, e.g.*, John Coates, Acting Director, Div. of Corp. Fin., U.S. Sec. & Exch. Comm'n, *SPACs, IPOs and Liability Risk* (2021) (https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws).

46. Hennessy's IPO documents obligated it to complete a business combination by September 5, 2020, or provide investors with redemption rights – *i.e.*, an opportunity to cash out their initial investment for roughly the investment price.

## VI. THE MERGER AND DEFENDANTS' FRAUDULENT SCHEME

47. In August 2020, investor interest in electric vehicle manufacturers was exceedingly high, and many startup electric vehicle companies were racing to the market via SPACs. For example, on March 3, 2020, a proposed SPAC merger between Nikola and VectoIQ Acquisition Corp was announced; on July 13, 2020, a proposed SPAC merger between Fisker Inc. and Spartan Energy Acquisition was announced; and on August 3, 2020, a proposed SPAC merger between Lordstown Motors and Diamond Peak was announced. At the same time, Tesla was experiencing a run up in its stock price from $46 per share on May 1, 2020 to $100 per share on July 31, 2020 before reaching a per share high of $232.20 on December 30, 2020.[3]

48. On August 6, 2020, Hennessy filed with the SEC a proxy statement setting a date of August 27, 2020 for a "Special Meeting" and told investors that it had "entered into a letter of intent with a prospective target for an initial business combination in the electric vehicle (EV) and advanced mobility sector." The August 6, 2020 proxy statement requested shareholders vote to extend the deadline to complete a merger from September 5, 2020 to December 31, 2020, which Hennessy shareholders approved.

49. On August 17, 2020, less than one month before the Hennessy was required to dissolve and distribute 100% of its assets to shareholders, Hennessy and Canoo signed a Merger Agreement and Plan of Reorganization (the "Merger Agreement").

50. On August 18, 2020, Hennessy announced the Merger by filing with the SEC a Schedule 14A setting forth the details of the proposed transaction. The proxy statement was accompanied by a Form 425, which set forth additional information about the

[3] Tesla stock prices reflect a 5:1 stock split completed on August 31, 2020.

proposed Merger and included an investor presentation that was filed with the SEC by Hennessy on Form 8-K. The filings described Canoo's three-pronged, phased go-to-market strategy as "de-risked" and "asset light" and emphasized that the then-existing Engineering Services pipeline was supportive of hundreds of millions of dollars in revenue before Canoo's vehicles even reached customers.

51. According to the SEC Order, by mid-August 2020 Canoo's discussions with the two companies that it was relying on to justify all of its expected Engineering Services revenue were facing substantial obstacles, with one potential customer claiming the proposed work was too costly and would be "barely acceptable" even if costs could be shared by other parties, while its other potential customer had "paused" its potential project because the scope of required work had expanded and Canoo's proposal "no longer made sense[.]"

52. In or about September 2020, Aquila, who was an early investor in Canoo and would become its Executive Chairman approximately one month later, caused Canoo to commence a multi-million dollar "deep dive" into the viability of the stated business plan. Aquila initiated the "deep dive" because, as he later revealed, he had serious concerns about Canoo's proposed business plan, including the subscription model, which had been touted so heavily in connection with selling the Merger to shareholders.

53. On September 18, 2020, Hennessy – apparently unaware of these adverse developments and relying on information provided by Canoo – filed with the SEC its Form S-4 requesting the Hennessy shareholders vote in favor of the Merger. The September 2020 Form S-4 described the unique characteristics of Canoo's de-risked, multi-phase go-to-market strategy but omitted any reference to the collapse of Canoo's Engineering Services pipeline or Aquila's other concerns as reflected in the ongoing "deep dive" into the viability of Canoo's go-to-market strategy.

54. On October 27, 2020 and November 27, 2020, Hennessy filed amendments to the September 2020 Form S-4, which contained the same false and misleading statements about Canoo's go-to-market strategy.

55. On December 4, 2020, Hennessy filed with the SEC a prospectus on Form 424B3 in connection with the Merger (the "Definitive Proxy Statement"). The Definitive Proxy Statement again described the unique characteristics of Canoo's de-risked, multi-phase go-to-market strategy and touted its Engineering Services pipeline but omitted any reference to the ongoing "deep dive" or the collapse of the Engineering Services pipeline. According to the SEC Order, at or around this time Canoo also began to pause or cancel the preliminary negotiations with any remaining potential engineering service partners, and by December 14, 2020 had updated an internal projection to reflect $0 in expected revenue from Engineering Services in 2021.

56. On December 21, 2020 – the start of the Class Period – Hennessy and Canoo announced that Hennessy's stockholders had voted to approve the stockholder proposals necessary to complete the Merger, which closed the same day, and Canoo stock began trading on the NASDAQ.

57. On December 21, 2020, Aquila told investors that "we are committed and excited about our go-to-market opportunities," and on December 22, 2020, Canoo filed a Form 8-K which referred investors to the Definitive Proxy Statement's description of the Business Combination in the section entitled *"Proposal No. 1—The Business Combination Proposal"* beginning on page 100, thereby expressly adopting the false and misleading statements contained therein.

58. After the closing, Defendants were obligated by the Merger Agreement to commence a shelf offering allowing insiders and early investors to sell shares.

59. On January 13, 2021, Canoo filed a preliminary prospectus on Form S-1 (the "Preliminary Prospectus") in support of the shelf offering. The Preliminary Prospectus

contained the many of the same false and misleading statements about Canoo's go-to-market strategy found in the Definitive Proxy Statement.

60. On January 25, 2021, Canoo filed its definitive prospectus on Form 424B3 for the issuance of common stock upon the exercise of certain warrants (the "Definitive Prospectus"). The Definitive Prospectus again falsely described the characteristics of Canoo's de-risked, multi-phase go-to-market strategy but omitted any reference to the collapse of Canoo's Engineering Services pipeline or the conclusion of the "deep dive."

61. On March 29, 2021, investors learned that Canoo's operations would be dramatically different than the go-to-market strategy presented to investors in support of the Merger and shelf offering due to the collapse of the Engineering Services pipeline and the materialization of the risks associated with the "deep dive." The price of Canoo's stock fell dramatically on the revelations.

## VII. DEFENDANTS' PRE-CLASS PERIOD STATEMENTS MISLED INVESTORS ABOUT CANOO'S GO-TO-MARKET STRATEGY AND ITS ENGINEERING PIPELINE

### A. Defendants issued false and misleading statements in connection with the roadshow promoting the proposed Merger.

62. On August 18, 2020, Hennessy issued a press release announcing that it had entered into a merger agreement with Canoo Holdings Ltd., which would result in Canoo becoming a publicly traded company.

63. On August 18, 2020, Canoo held a conference call with investors to discuss the proposed Merger, a transcript of which was filed with the SEC the same day.

64. On the August 18, 2020 call, Kranz described Canoo's go-to-market strategy model as follows:[4]

> We have three phases of revenue streams. In the first phase, we call it Engineering Services. ***This is a phase that already exists today***. So, ***we are working for companies and we are already making money with the first revenue stream***. ... The second

[4] All emphasis added to indicate the false and misleading portions of the statements.

> revenue stream is a B2C. ... This is a consumer vehicle and ***it will be on subscription***. The B2B services . . . is our third revenue stream. This will be a vehicle introduced in 2023. ... Three different revenue streams give us very good flexibility, and ***it also makes sure that we can really tap into different areas to be profitable***.

65. On the August 18, 2020 call, Balciunas described the Engineering Services revenue stream as follows:

> ***[T]his is the first phase of revenue that we have. This is a very important part of our overall strategy and it's a great way for us to pool revenues early and de-risk the Company's strategy as a whole***.

66. On the August 18, 2020 call, Balciunas described the Engineering Services pipeline as follows:

> ***Currently in our pipeline, we have $120 million of projected revenue in 2021, which consists of a couple of projects that are in the advanced stages of negotiation***. Overall, we have seven projects in our pipeline and they range from designing new top hats to doing engineering work on our existing skateboard platform, to potentially doing skateboard licensing in the future, ***which is a significant revenue upside opportunity for us, but also this could potentially reduce our overall costs through economies of scale***.

67. On the August 18, 2020 conference call, Balciunas explained how and why the benefits of a subscription-based business model impacted expected profit margins and created a competitive advantage for Canoo, stating:

> Looking at our margin, our target rate is approximately 40% for the subscription business. … ***[F]or us to be able to achieve a 20% operating profit is far greater than what you see in the traditional automotive OEM business model*** where that margin is closer to 5% to 10%. So***, it really does highlight the power of a subscription business model with this figure being a fully-burdened margin.***

68. In a presentation accompanying the August 18, 2020 call, Canoo reiterated that Engineering Services was a core component of Canoo's business model and that Canoo had ***"$120 million of projected revenue in 2021E***" attributable to its pipeline of projects. It specifically called out—among others—"Delivery Contract Engineering" for an "European Auto OEM" and "Contract Engineering & Vehicle Sales" for a "Tech Strategic."

69. The presentation accompanying the August 18, 2020 call consistently emphasized Engineering Services, claiming the revenue stream was part of a "***multi-phased approach to generating revenue***" with the ability to generate revenue "***today***."

70. In the presentation accompanying the August 18, 2020 call, Canoo further touted that it had a "***phased, de-risked go-to-market strategy resulting in immediate revenues***" and that Engineering Services would "***generate revenue that reduces the Company's overall execution risk***."

71. The presentation materials showed, and Balciunas confirmed during his comments on the August 18, 2020 call, the importance of the Engineering Services revenue to de-risking Canoo's strategy. Canoo expected to incur significant capital expenditures in 2021 and 2022 amounting to $128 million and $175 million, respectively, relating to the launch of its first two vehicles. The projected Engineering Services revenue was expected to offset risks associated with those capital expenditures.

72. In an August 25, 2020 press release, Aquila expressed his approval of Canoo's business plan and its top executives, stating:

> We have looked at many of the EV opportunities in the market and have decided to put our support and industry track record behind Ulli and the Canoo team. ***We believe that this platform is uniquely positioned to meet the rapidly growing needs of the entire EV mobility and logistics ecosystem with a multigenerational platform approach***.

73. On September 15, 2020, Krantz and Balciunas participated in an RBC Capital Markets Global Industrials conference (the "RBC Conference"). During the RBC Conference, Krantz stated:

> We have three phases of revenue, so three different revenue streams. The first one is what we call engineering. ***This is a revenue stream that we make money already today***. We are working for several companies. One of the companies is Hyundai. The second revenue stream is when we launch our consumer vehicle, our lifestyle vehicle that will be available in Q2 2022. ***This vehicle will be available for subscription only.*** And the third revenue stream is what we call B2B. This is when we launch our last mile delivery vehicle, a commercial vehicle. This vehicle will be for sale only. ***So these are three different revenue streams that gives us a big flexibility to really attract***

> ***different customers and when it comes to our subscription model.***

74. In presentation materials provided at the RBC Conference, Canoo touted its "***near-term revenue generating business, with significant contract revenue expected in 2021***" and noted its use of third-party manufacturers was a "***low-execution risk manufacturing strategy***" with "***low capex requirements***."

75. The statements in ¶¶64-74 were false and/or misleading because Defendants affirmatively represented to investors that they were pursuing a specific business model and "go-to market strategy," even though they knew but failed to disclose that: (1) by mid-August 2020, the immediate revenue from Engineering Services was unlikely to be realized because discussions with the European Auto OEM and Tech Strategic indicated that the projects were unlikely to produce revenue in 2021 and 2022; (2) from "day one," Aquila harbored serious concerns about the viability of Canoo's publicly stated go-to-market strategy, which lead to a costly "deep dive" into the entire go-to-market strategy.

**B. Defendants issued false and misleading statements to obtain shareholder votes for approval of the Merger.**

76. On September 18, 2020, October 23, 2020, and November 27, 2020, Hennessy issued a series of preliminary proxies (collectively, the "Preliminary Proxies") that contained false and misleading statements in support of the Merger.

77. On December 4, 2020, Hennessy, relying on information provided directly by Canoo, filed the Definitive Proxy Statement. The Definitive Proxy Statement repeated and expanded on the false and misleading statements made in the Preliminary Proxies.

78. Specifically, the Definitive Proxy Statement emphasized the importance of Canoo's unique business model:

> ***Canoo has established a multi-faceted go-to-market strategy targeting both B2B and B2C channels, substantially expanding its total addressable markets and avenues for growth, while diversifying its business and revenue profile***. ... Having multiple sources of revenue for our business offers greater diversification through exposure to distinct end markets to maximize the value created by the research and development

efforts undertaken to develop Canoo's skateboard and EV technology.

79. The Definitive Proxy Statement listed nine specific reasons investors should vote in favor of the Merger, including the following statements regarding the importance of Canoo's go-to-market strategy:

> *Favorable Opportunities for Revenue and Earnings Growth Due to Secular Growth Trends in the EV Industry and Canoo's Unique Multi-Pronged Go-to-Market Strategy.*
>
> ***Canoo has established a multi-faceted go-to-market strategy*** targeting both business-to-consumer ("B2C") and business-to-business ("B2B") opportunities enabled by its versatile skateboard platform, ***substantially expanding its total addressable markets and providing the upside of multiple growth opportunities while diversifying its business and limiting risk exposure to any single source of revenue.***

80. The Definitive Proxy Statement explained that Canoo's business model, including Engineering Services, met Hennessy's criteria for a suitable business combination, stating:

> *B2B Engineering and Licensing Opportunities:* … ***In addition to providing external commercial validation of Canoo's technical capabilities, these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk the overall business model.***
>
> ****
>
> *B2C Subscriptions:* Canoo's B2C strategy is targeting growing EV demand from consumers with its Lifestyle Vehicle***, which it plans to roll out in select U.S. urban markets through a consumer subscription model in 2022*** (and to be followed by its more sedan-like Sport Vehicle in later years).

81. The Definitive Proxy Statement touted Canoo's Engineering Services pipeline, stating:

> ***This [Engineering Service] business offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021***.
>
> ****

> ***Contract engineering opportunities … provide additional sources of revenue and long-term commercial opportunities*** (such as skateboard and technology licensing) as the relationship matures.

82. The Definitive Proxy Statement included the following statement in support of the Merger regarding the impact the subscription model would have on Canoo's long-term profitability:

> *Compelling Financial Model with Long-Term Attractive Margin and Cash Flow Generation Potential.*
>
> ***Canoo's subscription-based consumer model can elongate the revenue generation horizon of a single vehicle over 12 years, resulting in a compelling return on equity, recurring and consistent cash flow and an estimated margin of approximately four times that of a one-time sale***. As a result, Canoo's projected operating profit margin of ~20% compares favorably to the traditional automotive OEM business model with margins closer to 5% or 10% historically.

83. The Definitive Proxy Statement included the following statement regarding the importance of utilizing third-party manufacturing to the overall capital requirements of Canoo's go-to-market strategy:

> *Capital Light, Flexible and Cost Effective Manufacturing Strategy*.
>
> ***Canoo plans to utilize an asset-light, low-cost, flexible manufacturing strategy by outsourcing its vehicle production operations to a world-class vehicle contract manufacturing partner***, enabling Canoo to avoid funding certain significant capital investments and to minimize the fixed costs and overhead that would be required for Canoo to own and operate its own manufacturing facility.

84. The Definitive Proxy Statement described how Canoo's use of third-party manufacturers was important to the go-to-market strategy, stating:

> ***Canoo plans to utilize an asset-light, flexible manufacturing strategy by outsourcing our direct vehicle production operations to a world-class vehicle contract manufacturing partner*** for our initial vehicle programs. In doing so, Canoo will significantly reduce its up-front capital investment and eliminate the recurring fixed costs and overhead that would be required for Canoo to own and operate our own assembly facility.

85. The Definitive Proxy Statement stated Canoo's vehicles were designed specifically for the subscription model, which it claimed produced synergies:

> In addition, ***importantly*, *the vehicles required for many of these applications***, particularly in ride-sharing, ***will benefit*** from the attributes already engineered into Canoo's Lifestyle Vehicle, ***because it . . . is purpose-built for Canoo's subscription model*** which includes ease of refurbishment and cleaning[.]

86. The Definitive Proxy Statement specifically explained to investors how and why the subscription model benefitted Canoo, stating:

> By reducing the commitment required for a typical car purchase or lease***, we believe the subscription model will help reduce the barriers to entry for consumers looking to drive an EV, while also providing Canoo with a distinct opportunity for recurring revenue and a unique profit margin profile.*** We believe ***this model is supported by a number of key trends in consumer preferences and strong underlying financial metrics*** as compared to a traditional one-time sale model.

87. The Definitive Proxy Statement explained the interconnected nature of the subscription model and third-party manufacturing, and the resulting benefits, stating:

> ***Canoo's subscription business further benefits from its asset-light model that focuses on partnership with third parties for elements of the business that are capital intensive or require development of extended expertise; this reduces up front capital expenditure and improves the quality of the product offering to consumers.*** As a result of these factors Canoo believes its subscription program can potentially generate consistent cash flow and strong return on equity over the lifetime of the Lifestyle Vehicle. ***In addition, by owning the vehicles, Canoo has upside potential not available in traditional models.*** We will have a long-lived asset in our Canoo EVs, which have been specifically designed to last under a subscription model and been professionally maintained and had continuous capital invested in their maintenance and repair.

88. The Definitive Proxy Statement contained the following statements emphasizing Canoo's long-term commitment to the subscription model:

> ***We will continue to evaluate our consumer product offerings for the subscription model and will efficiently allocate capital accordingly to market needs in order to increase penetration levels and satisfy consumer preferences***. ... In addition, the Company's asset-light contract manufacturing model allows

> Canoo to prioritize on its product competencies and provides flexibility to pursue a wide fan of growth opportunities, including developing new vehicles or expanding into new market segments.

89. The statements in ¶¶78-88 were false and/or misleading because they affirmatively represented to investors that Canoo had a robust Engineering Services pipeline and the Company was committed to a specific "go-to market strategy," even though Defendants knew but failed to disclose that: (1) revenue from Engineering Services was unlikely because, by October 2020, the Tech Strategic told Canoo the scope of the required work had expanded and the proposal no longer made sense, forcing Canoo to place the project on "hold"; (2) in November 2020, after rejecting several proposals from Canoo, the European Auto OEM told Canoo the project was "unworkable"; and (3) Canoo was several months into a costly "deep dive" into serious concerns about the viability of Canoo's publicly stated go-to-market strategy, which ultimately confirmed that the "math" behind the model did not support its viability, particularly in the absence of any Engineering Services revenue.

## VIII. DEFENDANTS ADOPTED PREVIOUSLY ISSUED FALSE AND MISLEADING STATEMENTS AND MADE ADDITIONAL FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

90. On December 21, 2020, Canoo announced that the Merger had been completed and that Canoo's common stock and warrants would trade on the NASDAQ. Canoo's stock price opened the day trading at $19.20.

91. In a press release announcing the Merger's closing issued the same day, Aquila stated:

> On behalf of all of us at Canoo, ***we are committed and excited about our go-to-market opportunities*** and to bring both consumers and businesses the benefits of our platform.

92. On December 22, 2020, Canoo filed with the SEC a Form 8-K, which incorporated by reference the Definitive Proxy Statement for a description of the Business Combination. As set forth in §VII(B) above, the Definitive Proxy Statement

contained false and misleading statements that omitted material information necessary to adequately inform investors about Canoo, its operations, and its go-to-market strategy.

93. On December 22, 2020, Canoo's stock price rose to a high of $24.90.

94. When Defendants made statements the statements in ¶¶91-92 reiterating Canoo's commitment to the three-pronged business plan described in the Definitive Proxy Statement, they knew but failed to disclose that: (1) before December 2020, the European Auto OEM and Tech Strategic had told Canoo the projects were "unworkable" and "no longer made sense," respectively; (2) by early December 2020, Canoo had begun to pause or cancel negotiations with the remaining potential Engineering Services partners; (3) a slide deck attached to a December 14, 2020 internal Budget Review meeting showed "$0M expected revenue during 2021"; and (4) Canoo had completed, or would soon complete, a costly "deep dive" into serious concerns about the viability of Canoo's publicly stated go-to-market strategy, which showed that the "math" behind the model did not support its viability, particularly in the absence of any Engineering Services revenue.

95. These false and misleading statements, along with those issued before the Class Period, caused Canoo's stock to trade at artificially inflated prices.

96. On January 13, 2021, Canoo filed with the SEC a preliminary prospectus on Form S-1 (the "January 13, 2021 Prospectus") for the required shelf offering of Canoo stock. The January 13, 2021 Prospectus was signed by Aquila and Balciunas.

97. The January 13, 2021 Prospectus repeated many of the same false and misleading statements contained in the Definitive Proxy Statement.

98. For instance, the January 13, 2021 Prospectus specifically stated:

> [Engineering Services] offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and ***our current pipeline in this area is supportive of a projected $120 million of revenue in 2021***. We expect our engineering and technology services business to ***offer significant growth potential in the future*** as projected demand grows for EVs. . . . In addition to providing external commercial validation of our technical capabilities, ***these contract***

> ***engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model*.**

99. The January 13, 2021 Prospectus indicated that the Company's Engineering and Technology Services business segment was healthy, stating: "***We are in advanced discussions with several parties regarding the licensing of our skateboard and other technology***."

100. The January 13, 2021 Prospectus reiterated Canoo's commitment to, and the benefits of, its subscription model and third-party manufacturing, stating:

> ***Both the Lifestyle Vehicle and the Sport Vehicle are initially intended to be made available to consumers via an innovative subscription business model***. … We plan to utilize ***an asset-light, flexible manufacturing strategy by outsourcing our direct vehicle production operations*** to a world-class vehicle contract manufacturing partner for our initial vehicle programs. In doing so, ***we will significantly reduce our up-front capital investment and eliminate the recurring fixed costs and overhead that would be required for us to own and operate our own assembly facility***.

101. The January 13, 2021 Prospectus also indicated that Canoo was "***continu[ing] to…establish our consumer subscription model and scale our operations to meet anticipated demand***," and explained how the subscription model would benefit the Company, stating:

> Subscription is a direct-to-consumer, transparent alternative to leasing or buying a vehicle, ***that will help reduce the barriers to entry for consumers*** looking to try their first EV, while also ***providing us with a distinct opportunity for recurring revenue, a unique profit margin profile and compelling return on equity***.

102. The January 13, 2021 Prospectus claimed Canoo's business model was supported by trends and metrics with "attractive financial returns," stating:

> **Subscription Offerings**
>
> By reducing the commitment required for a typical car purchase or lease, we believe the subscription model will help reduce the barriers to entry for consumers looking to drive an EV, ***while also providing us with a distinct opportunity for recurring revenue and a unique profit margin profile***. We believe ***this model is supported by a number of key trends in***

> ***consumer preferences and strong underlying financial metrics*** as compared to a traditional one-time sale model.

103. The January 13, 2021 Prospectus also highlighted financial opportunities that the subscription program afforded Canoo, stating:

> **Canoo Subscription**
>
> ***Our Lifestyle Vehicle is initially intended to be offered to consumers through our subscription offering.*** …
>
> ****
>
> ***Our subscription business further benefits from our asset-light model that focuses on partnership with third parties*** for elements of the business that are capital intensive or require development of extended expertise; this reduces up front capital expenditure and improves the quality of the product offering to consumers. As a result of these factors we believe ***our subscription program can potentially generate consistent cash flow and strong return on equity over the lifetime of the Lifestyle Vehicle. In addition, by owning the vehicles, we have upside potential not available in traditional models. We will have a long-lived asset in our EVs, which have been specifically designed to last under a subscription model and been professionally maintained and had continuous capital invested in their maintenance and repair.*** Whether it is putting older vehicles into rideshare models or alternative subscription packages, ***there is further upside in our model by utilizing our durable, high quality, older EVs.***

104. The January 13, 2021 Prospectus touted the unique advantages that Canoo's fully integrated model provided:

> In addition, ***the Company's asset-light contract manufacturing model allows us to prioritize on our product competencies and provides flexibility to pursue a wide fan of growth opportunities,*** including developing new vehicles or expanding into new market segments.

105. The January 13, 2021 Prospectus further described how Canoo's skateboard technology and business plan were married to each other and specifically tailored to capitalize on market opportunities:

> ***We have established a multi-faceted go-to-market strategy*** targeting both B2B and B2C opportunities, substantially expanding our total addressable markets and access to growth avenues, while diversifying our business and revenue profile. ***Our flexible strategy is uniquely underpinned by our versatile skateboard platform, which minimizes new development expenditures and engineering costs, and can be leveraged to***

> ***capitalize on demand opportunities for both B2B and B2C applications by more efficiently allocating capital to meet market demand.***

106. The January 13, 2021 Prospectus extolled the purported financial benefits of Canoo's Engineering Services, stating:

> ***Our engineering and technology services business … offers a unique opportunity to generate immediate revenues*** in advance of the offering of our first vehicles and ***our current pipeline in this area is supportive of a projected $120 million of revenue in 2021***. … In addition to providing external commercial validation of our technical capabilities, ***these contract engagements establish an attractive strategic pipeline for future business opportunities and de-risk our overall business model.***

107. The January 13, 2021 Prospectus contrasted Canoo's go-to-market strategy with more traditional models to demonstrate how the synergy of its skateboard and business plan created superior opportunities for Canoo and consumers, stating:

> ***We have lowered the cost of bringing new vehicles to market by*** leveraging our proprietary architecture in order to reduce the vehicle's bill of materials and ***simplify manufacturing processes***, ultimately translating to more attractive pricing for our customers and a wider addressable target market in both the mid- and premium- tiers of the B2C as well as the B2B market ***with the ability to efficiently allocate capital to meet current and evolving areas of demand and margin opportunities.***

108. The January 13, 2021 Prospectus further distinguished Canoo's go-to-market strategy from its competitors, stating:

> ***We believe outsourcing manufacturing will significantly reduce overall risk and expect to benefit from flexibility to scale volumes to match demand levels***. Outsourcing vehicle production will also enable us to focus on our core competencies and benefit from a leading global contract manufacturer's expertise and efficiency, ***avoiding the common pitfalls faced by other automotive startups in making the transition from vehicle engineering and development to full volume manufacturing operations.***

109. The statements in ¶¶98-108 were false and/or misleading because they affirmatively represented to investors that Canoo had a robust Engineering Services pipeline and the Company was committed to a specific "go-to market strategy," even

though Defendants knew but failed to disclose that: (1) the immediate revenue from Engineering Services, which was a critical element of Canoo's supposed phased, de-risked, asset-light go-to-market strategy, would not be generated because the Engineering Services pipeline had collapsed and internal forecasts relating to Canoo's Engineering Services pipeline had been reduced to $0; (2) Canoo had completed its costly "deep dive" into serious concerns about the viability of Canoo's publicly stated go-to-market strategy, which showed that the "math" behind the model did not support its financial viability, particularly in the absence of any Engineering Services revenue.

110. On January 25, 2021, Canoo filed the Definitive Prospectus for the issuance of common stock upon the exercise of certain warrants, which contained each of the false or misleading statements regarding Canoo's core operations, business model, and viability made in the January 13, 2021 Prospectus.

## IX. THE TRUTH ABOUT CANOO'S OPERATIONS IS REVEALED, AND THE PRICE OF ITS SECURITIES PRECIPITOUSLY DECLINES

111. On March 29, 2021, Canoo announced its fourth quarter and full year financial results for 2020. Canoo reported no engineering services revenue during the fourth quarter of 2020, after having reported $2.55 million in engineering services revenue during the first nine months of 2020.

112. Also on March 29, 2021, Canoo held a conference call to discuss its financial results for Canoo's fiscal fourth quarter and full year 2020.

113. The March 29, 2021 call commenced with Aquila providing prepared remarks. Neither Kranz nor Balciunas participated. Aquila announced that Balciunas had resigned, effective April 2, 2021, and blamed Kranz's absence on COVID protocols.

114. Analysts noted that with Balciunas' departure, along with the earlier departure of Canoo's former Head of Corporate Strategy Alex Marcinkowski, "the two gentleman that sold the PIPE" were no longer with Canoo, which was going to raise concerns with institutional investors.

115. The shocking revelations did not end with the executive turmoil. Aquila informed investors that Canoo was dramatically altering its go-to-market strategy.

116. In prepared remarks, Aquila stated: "it was decided by our Board to deemphasize the original stated contract engineering services line."

117. In prepared remarks, Aquila further stated that "we will move forward on our mega microfactory[.]"

118. In prepared remarks, Aquila also indicated a shift away from a focus on bringing Canoo's first vehicle to market via a subscription model, describing instead the benefits of focusing first on B2B sales.

119. Securities analysts on the call were quick to point out that Canoo's decision raised serious issues with investors' ability to understand and value Canoo properly.

120. For example, analyst Craig Irwin of ROTH Capital Partners stated, "So I would acknowledge that these are significant surprises on the call today, and that's not ideal after a SPAC – the IPO process. So I just wanted to underline that." Irwin then inquired:

> [Y]ou talked about how engineering IP broadens your TAM [i.e., Total Addressable Market], but then you announced that you're deemphasizing your engineering services. ***Can you help us resolve that and maybe give us a little bit more color about why you would deemphasize engineering given that the original story was it would subsidize the development and broaden the partner opportunity*** with potentially multiple hats under license?

121. Aquila replied to Irwin as follows:

> I would say that from a Company perspective, ***it was a contradiction***. . . . ***Just $25 million, [Engineering Services] would yield us***, we at the Board really feel like the best thing to do is to accelerate our derivatives and focus our talent on creating IP for the Company.
>
> . . . And from my perspective, ***if I had been more involved earlier, certainly, once I invested and then took the Chairmanship, we started the analysis. I had concerns about this***. . . . And we'll continue to look at things, but to be a contract engineering house is just really not going to drive the best shareholder value.

122. Analyst Steve Sakanos of Cronos Capital asked the following question:

> [D]uring the course of the year, you stated a couple of times that you had under discussion with ***some OEMs and possibly the contract manufacturer***. ***You said that there are going to be some announcements by the end of Q4***. I'm just wondering what happened that changed all of that?

123. In response, Aquila conceded that Defendants' prior statements about Canoo's commitment to, and progress on, its go-to-market strategy failed to comply with disclosure standards applicable to a publicly traded company:

> ***So you're again owning the past as much as the present and the future***. . . . ***I think that [Kranz and Balciunas] were focused on maybe a little more aggressive than I would be in their statements***. ***I think more maturity of this team would not be that presumptuous***. We only announced what is contracted. But yes, I think they had the opportunities ***but they weren't at our standard of representation to the public markets.***
>
> ***
>
> And then ***with respect to contract manufacturing again we wouldn't make an announcement***. Again, this comes back to having an experienced public company here to be careful of the statements you make. So again, ***I think it was a little premature.***

124. Raising the issue of Canoo's shift away from its subscription model to B2B sales, analyst John Murphy of Bank of America asked:

> Is there just too much opportunity on the commercial side and you're kind of putting [B2C] sort of back burner or ***is this subscription model still in play? Because I know that was part of the story before***.

125. In response, Aquila apologized for failing to disclose to investors material adverse facts about the financial viability of the subscription model, stating:

> ***[W]hen I came in and took my role and we spent a lot of money analyzing the weight that this will have on the balance sheet***. . . . ***And so you can only have a certain percentage of your business on membership. Otherwise, you've got a big cash hit that starts to develop on you as you can probably imagine***.
>
> … ***Had I been here from day 1, … I [would] have changed the sequence*** of top hats and use cases I would have went after based on my experience, ***without a doubt.***

****

> ... ***And again I apologize to anybody***. As a leader, you always own the past before the present or the future. And so I take everyone's comments in all three categories.

126. In response to a follow-up question regarding the shift away from consumer (*i.e.*, subscription) to commercial (*i.e.*, B2B), Aquila stated:

> [W]hat I would tell you is ***we are concentrating on commercial*** and, if you will, kind of the mobility professional user that bringing to EV market is healthy, which is kind of a hybrid of consumer and commercial. And ***so that's where we're focusing our efforts on first***.

127. During the March 29, 2021 call, Aquila also discussed changes to the way Canoo would present its financial guidance, stating:

> [A]t this point, it doesn't make sense to give guidance until we complete the work that we have started. . . . And so we will be step-by-step building this and ***we will be delivering information as it is known and contracted, not based on light rev reservation models***. ***I think that's dangerous. I think this could be somewhat misleading***.
>
> And so typical of any leadership change, different standard comes in . . . ***Certainly do acknowledge your point, Craig, that you got, so to speak, as you mentioned, showed a different model*** . . .
>
> ***
>
> [C]ertainly I wanted to get ahead of this and ***explain to you how this really is going to work and how to build a profitable company***, which we've done in the past. And we intend to do here. But hey, ***we understand the situation it puts you in, and we will work closely to rectify that so you can understand very clearly where we're going***.

128. During the March 29, 2021 call, Aquila responded to a question from analyst Joseph Spak of RBC Capital Markets regarding what led to the shift away from Canoo's previous emphasis on Engineering Services, saying:

> So I think the Company just like any adolescent company is it's [sic] learning, its way and all of us go through it. ***But it factored in contract manufacturing based on the labor of engineers, not based on the value of IP, which would change the value of that contract significantly.*** . . .

> ***So it's kind of caused us to say, hey, let's put that on hold, we have so much demand for our three derivatives, let's get all that work done, and then let's look at if there partnerships*** [sic]. Partnerships can work in this industry but ***contract manufacturing work is, as you know, is not the best business line to be in***. And so was there some leakage? Well, I'll leave it to you to make that decision. ***But obviously, I'm not a big fan of doing that type of business***.

129. Aquila acknowledged on the March 29, 2021 call that the problem with the go-to-market strategy of focusing on consumer subscription rather than commercial sales was "just math[.]" In response to a question about focusing on "the subscription model" in the future, Aquila unequivocally stated:

> ***No,*** it's a ratio issue, Joe. ***We're going to focus on something sub 20% of our sales will be in category***. We just—***otherwise, we got to have to raise a lot more capital***, as you know, ***because you're going to have to see this on your books, and then you're going to have all this accounting mark to market.***

130. Moreover, during the March 29, 2021 call, Aquila did not challenge an analyst who stated, "the Hyundai arrangement, the original one, which I am assuming that's now off the table."

131. Following the March 29, 2021 corrective disclosure, the price of Canoo stock fell from its close at $11.80 on March 29, 2021 to low of $8.11 on March 30, 2021.

## X. MEDIA, ANALYSTS, COMMENTATORS, AND REGULATORS REACTED HARSHLY TO DEFENDANTS' ADMISSIONS

132. The March 29, 2021 call revealed the drastic, unexpected shift in the Company's core operating model away from what investors were previously told. Media and analyst reports in the wake of the earnings call demonstrate the market's swift, adverse reaction to these revelations.

133. On March 30, 2021, ROTH Capital Partners issued a report titled "GOEV: 4Q20 Results Were OK; ***Complete Change in Direction Is Not***; DG to Neutral" (the "ROTH Capital Report"). The ROTH Capital Report no longer recommended buying

Canoo stock and was "downgrading shares of Canoo to Neutral (from Buy) given a hard pivot in the business model and a reset on operations, which are clearly still ongoing."

134. The ROTH Capital Report further criticized the business model shift, stating: "***A hard pivot in the business model brings confusion with deemphasis of both eng'g services and the B2C subscription model.***" As a result, ROTH Capital lowered its target price from $30 to only $12.

135. On April 4, 2021, *The Bangkok Post* published an article titled "EV Companies Went Public With Big Plans. They're Quickly Hitting Snags," which stated as follows:

> On March 29, aspiring electric car and truck maker ***Canoo Inc. told investors it was abandoning or scaling back numerous key aspects of the strategy laid out when it raised $630 million last year.***
>
> * * *
>
> Finally, Mr. Aquila said Canoo now plans eventually to make its own factories. ***That emphasis reflects a departure from its prior approach, which the company called an "asset-light, flexible manufacturing strategy" that relied on third-party manufacturers.***

136. On April 20, 2021, Bank of America ("BoA") issued an analyst report titled, "Paddling its own Canoo, while business model remains very much in flux" (the "BoA Report").

137. According to the BoA Report, "***[T]he change introduces further risk around the company's ability to execute in a timely fashion***." BoA also noted that Canoo's new manufacturing plan would negatively impact Canoo's capital needs:

> As a result, what appeared to be a more asset-light business model by using a contract manufacturing (similar to peer FSR) has now shifted more towards a capital-intensive manufacturing model (more like peers RIDE and TSLA, and even incumbent OEMs).

138. On August 18, 2023, Canoo announced its financial results for the quarterly period ended June 30, 2023, which showed that Canoo had not generated ***any*** revenue as

a public company. Canoo stock traded for as little as $0.43 per share on August 21, 2023 following the earnings announcement.

## XI. ADDITIONAL INDICIA OF SCIENTER

139. The allegations in this Section are in addition to, expressly incorporate by reference, do not supplant, and are intended to be construed together with all of the other allegations in this pleading giving rise to the plausible inference that, with the intent to defraud, manipulate, or deceive investors in connection with their purchases or sales of Canoo's securities: (1) Defendants made the statements alleged to be materially false or misleading; (2) Defendants employed a device, scheme, or artifice; or (3) Defendants engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

### A. The SEC's investigation revealed detailed information about Defendants' fraud.

140. In its 10-Q for its first quarter of 2021, Canoo disclosed that it was subject to an SEC investigation, stating as follows:

> [O]n April 29, 2021, the SEC's Division of Enforcement advised that it has opened an investigation related to, among other things, [Hennessy's] initial public offering and merger with the Company, the Company's operations, business model, revenues, revenue strategy, customer agreements, earnings and other related topics, along with the recent departures of the Company's officers.

141. On March 30, 2023, Canoo filed a 10-K Annual Report with the Securities and Exchange Commission ("SEC") stating that (1) Canoo had agreed to a settlement in principle with the SEC to resolve claims alleged under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as well as Sections 13(a) and 14(a) of the Exchange Act and Rules 13a-11 and 14a-9 promulgated thereunder; (2) in reaching the Settlement, Canoo did not admit to the SEC's findings regarding those claims; (3) the SEC's investigation into one of Canoo's

former senior executives is ongoing; (4) the SEC believed Canoo was liable for the alleged wrongful conduct of its former senior executives; and (5) the Settlement would not be final until approved by a majority of the Commissioners of the SEC.

142. On March 30, 2023, Canoo conducted a conference call to discuss its fourth quarter and full year 2022 results. Aquila made the following statement about the expected timing related to SEC approval of the settlement:

> Our agreement with the [SEC] staff still needs to be approved by the commission itself, ***something we hope will happen in the next few weeks***. This ends a significant chapter from the company's past management and paves the way for us to focus entirely on the work of our refounding.

143. On May 15, 2023, Canoo conducted a conference call to discuss its first quarter 2023 results. Aquila made the following statement about the expected timing related to SEC approval of the settlement:

> As disclosed in our Q4 2022 filing, we reached a settlement with the staff of the SEC and we continue to wait for the final approval of the settlement by the commission, ***which we hope to see in the coming quarter*** (*i.e.*, June 30, 20220).

144. Months later, on August 4, 2023, the SEC Order was released on the SEC's website. The SEC's findings, which were reached following a multi-year investigation into Canoo and based on the Agency's review of confidential internal Company documents, set forth a clear pattern of intentional misconduct by Defendants designed to mislead investors. While the SEC Order included details substantiating the SEC's conclusion that Canoo issued false and misleading statements between August 2020 through March 2021 relating to Engineering Services revenue and its go-to-market strategy, the SEC also announced the filing of individual charges against Defendants Kranz and Balciunas for misconduct related to nearly $1 million in undisclosed executive compensation and improper bonuses. The SEC announced a settlement of the claims against Kranz and Balciunas the same day.

### 1. The SEC Order details Defendants' intentional concealment of material facts contradicting Canoo's public statements.

145. The SEC Order detailed the pertinent facts relating to the issuance of false and misleading statements during the Class Period, including:

- Between June and December 2020, Canoo developed and used a "Business Development Pipeline" which listed third parties Canoo could potentially generate revenue from (¶8);[5]
- In July 2020, Canoo began to associate revenue projections with the Engineering Services pipeline of $120 million in 2021 and $250 million in 2022 (¶9);
- Contemporaneous non-public documents and communications indicated that revenue was expected to be derived almost exclusively from potential partnerships with two third-party companies: a European car maker referred to as an "European Auto OEM" and a tech-focused company referred to as a "Tech Strategic" (¶9);
- At the time, Canoo maintained an Excel spreadsheet titled "Canoo Operating Model" in which Canoo attributed $100 million of its 2021 revenue to the European Auto OEM and $20 million to the Tech Strategic, and attributed $230 million of 2022 revenue to the European Auto OEM and $20 million to the Tech Strategic (¶10);
- By mid-August 2020, significant hurdles with both potential third-party arrangements made it unlikely either would produce revenue in 2021 or 2022, including: (1) statements from the European Auto OEM to Canoo that the work proposed project was too costly and would be "barely acceptable" even if costs could be shared by other parties; and (2) statements from the Tech Strategic informing Canoo the potential project would be paused

[5] Citations in §XI(A)(1) to "¶" are to the SEC Order.

because the scope of the required work had expanded and Canoo's proposal no longer made sense such that the Tech Strategic was considering other companies to partner with (¶12);

- By October 2020, Canoo's spreadsheet showed the Tech Strategic project was on "hold," and by November 2020 Tech Strategic was continuing to reject Canoo's proposals while the European Auto OEM had told Canoo a project was "unworkable" (¶12);
- Discussions with third parties about other potential Engineering Services projects were not advanced and none supported the publicly stated revenue projections, and by early December 2020 those alternative third-party arrangements began to be paused or cancelled (¶¶13-14); and
- On December 14, 2020, Canoo held an internal Budget Review meeting, which included a slide that stated Canoo would have "$0M expected revenue during 2021" (¶15).

146. The SEC Order thereafter identifies many of the statements contained in §§VII-VIII, *infra*, as false and misleading, including repeated claims relating to the revenue-generating potential of Engineering Services (¶¶16-19), because discussions and negotiations with any potential Engineering Services partner had effectively ended by early December 2020 (¶20).

147. According to the SEC Order, Canoo failed to communicate this information to Hennessy despite being obligated both legally and contractually to do so (¶21).

### 2. The SEC Action describes Kranz's and Balciunas' direct roles in concealing adverse material facts from investors.

148. On August 4, 2023, the same day the SEC Order was issued, the SEC filed a complaint in the Central District of California captioned *Securities and Exchange Commission v. Kranz and Balciunas*, Case No. 23-cv-06332 (the "SEC Action").

149. In the SEC Action, the SEC's allegations repeat many of the findings contained in the SEC Order, particularly with regard to the lack of any reasonable basis to present Engineering Services revenue projections of $120 million in 2021 and $250 million in 2022.

150. In addition to allegations against Canoo, the SEC Action details Kranz's and Balciunas' individual responsibility for issuing false and misleading statements, including:

- Kranz and Balciunas were responsible for Canoo's engineering services "pipeline" of potential projects and associated revenue projections (¶22);[6]
- Kranz was the primary contact for several of Canoo's potential revenue-generating business partners, and his expertise with those relationships was key to the development of the pipeline (¶22);
- In July 2020, Kranz and Balciunas received an email from the European Auto OEM stating Canoo's proposed work was too costly and would be "barely acceptable" even if the costs could be shared by other parties (¶23);
- In August 2020, a representative of the Tech Strategic informed Kranz via phone that the proposed project was being paused, and Balciunas received an email stating the same (¶25);
- Kranz and Balciunas received notice between July and November 2020 of the European Auto OEM's repeated rejections of Canoo's proposal, which culminated in November 2020 when Canoo was told the project was "unworkable," either directly from the European Auto OEM or from a junior Canoo employee (¶¶23-24); and
- Kranz and Balciunas participated in email conversations in early December 2020 in which it was confirmed that Canoo had paused or cancelled

[6] Citations in §XI(A)(2)-(3) to "¶" are to the SEC Action, Dkt. No. 1.

negotiations with certain other potential Engineering Services customers (¶26-27).

151. The SEC Action also alleges Kranz and Balciunas helped prepare a presentation in support of the Merger that was filed with the SEC on August 18, 2020, which contained false and misleading statements (¶¶29-31).

152. The SEC Action also alleges Kranz and Balciunas were involved in preparing the July 2020 Canoo Operating Model that formed the basis for the false and misleading statements contained in the Preliminary Proxy Statements, Definitive Proxy Statement, Preliminary Prospectus, and Definitive Prospectus, about Canoo's engineering services pipeline and revenue projections and both knew that the documents would be filed with the SEC (¶¶34-37).

**3. Krantz's undisclosed compensation arrangement motivated him to ensure the merger closed.**

153. According to the SEC Action, on November 19, 2019, Kranz secretly signed an agreement to be paid $1 million to remain in his role at Canoo, with one of the initial owners explaining to Kranz "[w]e will honor our words to pay you" so that you "do your best in helping the company complete the SPAC." (¶42).

154. According to the SEC Action, between October 22 and 29, 2020, the two Initial Owners wired Kranz $915,048, which he concealed from investors and Hennessy despite being obligated to disclose the payment by both Item 402 of Regulation S-K and the Merger Agreement (¶¶43-45, 49-50).

155. The SEC Action alleges Kranz's concealment of his compensation and the negative Engineering Services information operated as a fraud upon investors (¶¶50-56).

156. The SEC Action alleges Balciunas received a bonus of $7,500 in connection with the completion of the Merger (¶71).

157. On August 4, 2023, the same day the SEC Action was filed, the SEC issued a press release announcing it had settled charges against Kranz and Balciunas for

"making inaccurate revenue projections[.]" Subject to court approval, Kranz will be barred from serving as an officer or director of a publicly traded company and will pay a $125,000 civil penalty. Balciunas similarly agreed to a two-year officer director ban and a $50,000 penalty.

**B. Aquila had contemporaneous access to the undisclosed information that caused Canoo's statement to be false and misleading and personally benefited from the Merger closing.**

158. In June 2019, Aquila founded AFV Partners, which he described as "an affirmative low-leverage capital vehicle that invests in long-term mission critical software, data and technology businesses," and Aquila has served since its founding as Chairman and CEO.

159. In July 2020, Aquila provided rescue capital to Canoo. AFV Partners' website has said that "Canoo is currently one of AFV's significant investments."

160. On or about October 19, 2020, Aquila was named Chairman of Canoo's Board and began serving as its Executive Chairman and Director on or about December 21, 2020, where he was tasked with "develop[ing] and execut[ing] the Company's long-term strategy and product and business roadmap." He became CEO on April 22, 2021.

161. As a result of his responsibilities overseeing Canoo's roadmap and its long-term strategy, Aquila would have access to, and a duty to be aware of, Canoo's high level internal documents and communications showing the Engineering Services pipeline had collapsed by early December 2020 and would have been fully aware of the extent and purpose of the "deep dive," given its importance to the future of Canoo.

162. Yet, Aquila expressed support for Canoo's publicly touted go-to-market strategy, and he expressly adopted Canoo's false and misleading statements issued prior to the Merger. Aquila then repeated those false and misleading statements in connection with a shelf offering in January 2021.

163. Aquila was financially motivated to further the scheme to omit material information from investors to facilitate completion of the Merger. On December 22, 2020, Aquila filed a Form 4, disclosing he directly controlled 35,000 shares of Canoo common stock, while maintaining a pecuniary interest in 12,359,387 shares of Canoo common stock indirectly through AFV Partners (which consisted of 8,859,387 shares acquired pursuant to the Merger Agreement and 3.5 million shares purchased through the PIPE financing for $10 per share). Failure to complete the Merger would have left these investments substantially impaired and illiquid.

**C. Aquila, Kranz and Balciunas were eligible for stock incentive awards based on Canoo's stock price performance.**

164. According to Annex I of the Merger Agreement, each of the legacy investors, including each Individual Defendant, was to receive certain "earnout" payments conditioned upon certain public share price milestones within specified time frames.

165. The first tranche of five million Earnout Shares would issue if the share price of the Company's common securities reached or exceeded $18 per share for any 20 trading days within any consecutive 30 trading-day period on or before December 21, 2022. Alternatively, the first tranche of five million Earnout Shares would issue in the event of a change in control on or before December 21, 2022, if the per-share consideration in such a transaction equaled or exceeded $18.

166. The second tranche of five million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $25 per share for any 20 trading days within any consecutive 30-day period on or before December 21, 2024. Alternatively, the second tranche of five million Earnout Shares will issue in the event of a change in control on or before December 21, 2024, if the per-share consideration in such a transaction equals or exceeds $25.

167. The third tranche of five million Earnout Shares will issue if the share price of the Company's common securities reaches or exceeds $30 per share for any 20 trading

days within any consecutive 30-day trading period on or before December 21, 2025. Alternatively, the third tranche of five million Earnout Shares will issue in the event of a change in control on or before December 21, 2025, if the per-share consideration in such a transaction equals or exceeds $30.

168. Immediately following the Merger, Canoo's stock reached an artificially inflated price exceeding $18 for several days and nearly reached $25, getting to a high of $24.90 on December 22, 2020, but the price did not remain above the price points for the required number of days for Earnout shares to vest. Still, the Individual Defendants continued to be eligible to receive Earnouts based on share price targets being obtained in the future.

### D. Canoo's admissions in the Trade Secrets Action confirm the timing and extent of the "deep dive."

169. In the initial Complaint filed by Canoo in the Trade Secrets Action [Dkt. No. 1], Canoo provides allegations that describe the "deep dive" as follows:

> In September through December 2020, and in conjunction with Canoo's exploration of the Skateboard Business Plan, Canoo spent tens of millions of dollars to engage a world-leading business consulting firm to analyze EV markets, business opportunities, market penetration strategies, customer interests, competitors, market demand, and a general assessment of Canoo's relative competitiveness in the EV space, and its Skateboard Business Plan particularly.

170. In the Amended Complaint filed by Canoo in the Trade Secrets Action [Dkt. No. 96], Canoo provides allegations that describe it receiving "several reports" from a consulting firm containing "detailed analysis regarding":

> (i) Canoo's competitive position within the EV market, (ii)customer wants and needs in different market segments, (iii) potential competitors in different market segments, (iv) Canoo's advantages and disadvantages vis-à-vis its actual and potential competitors within each market segment, and (v) various market penetration strategies (like selling its Skateboard Technology as a standalone product versus selling a full vehicle versus offering a monthly subscription model).

171. These allegations precisely align with Aquila's post-Class Period admission that, "when I came in and took my role and we spent a lot of money analyzing the weight that this will have on the balance sheet," a process which he referred to as a "deep dive," and provide specific information about the impetus for the analysis, when the "deep dive" commenced, what was analyzed, and how the information was conveyed to Canoo.

## XII. LOSS CAUSATION

172. Prior to and during the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities and operated as a fraud or deceit on Class Period purchases of the Company's common stock by failing to disclose and by misrepresenting the adverse facts detailed herein.

173. Lead Plaintiff and Class members unknowingly, and in reliance upon Defendants' materially false or misleading statements and/or omissions (prior to and during the Class Period), purchased the Company's securities at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased the Company's securities at the artificially inflated prices at which they traded during the Class Period.

174. As alleged in more detail *supra* §IX, the truth regarding Defendants' fraud was revealed in a series of corrective disclosures and/or materializations of concealed risk that occurred after the markets closed on March 29, 2021.

175. As a direct and proximate result of these corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, the price of the Company's common stock declined by $0.66 (or 5.3%) per share, to close at $11.80 per share on March 29, 2021.

176. On March 30, 2021, the first trading day following the corrective disclosure, Canoo's common stock opened at $9.64 and fell to a daily low of $8.52 as the artificial

inflation caused by Defendants' unlawful conduct exited the Canoo common stock before closing $9.30.

177. The decline in the price of Canoo common stock during this period is directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions prior to and during the Class Period.

178. As a result of their purchases of the Company's securities during the Class Period, Lead Plaintiff and other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused the Company's common shares to trade at artificially inflated levels throughout the Class Period and, in certain instances, caused inflation in the Company's stock price.

179. By concealing from investors the adverse facts detailed herein, Defendants presented a false and misleading picture of the Company's business. As the truth about the Company and the extent of the fraud were revealed to the market, the price of the Company's securities fell significantly. This decline removed the artificial inflation from the price of the Company's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

180. Moreover, the market for the Company's securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' misstatements and material omissions, as alleged herein, the Company's common stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased the Company's securities relying upon the integrity of the market relating to the Company's common stock and suffered economic losses as a direct and proximate result thereof.

181. Defendants' disclosures on March 29, 2021, and the related news coverage reporting on the Company's representations about its business model were a foreseeable

consequence of, and within the zone of the risk concealed by, Defendants' misrepresentations and omissions.

182. Moreover, the March 29, 2021 disclosures revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market, in that they revealed that Defendants' prior misstatements and/or omissions touting the Company's business model were false and misleading at the time that they were made.

183. As a direct and proximate result of these corrective disclosures and/or materialization of the foreseeable risks concealed by Defendants' fraud, on March 30, 2021, the Company's stock price fell in response to the news, falling by $2.50 (or 21.2%) per share, to close at $9.30 per share on March 30, 2021, on heavy trading volume.

184. The declines in the Company's common stock price on March 29 and 30, 2021 were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors. The timing and magnitude of the Company's common stock price declines evidences the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the losses incurred by Lead Plaintiff and other Class members were caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

## XIII. CLASS ACTION ALLEGATIONS

185. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"), and who were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are (i) Defendants; (ii) members of the immediate family of any Defendant who is a natural person; (iii) any person who was an officer or

director of the Company during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

186. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, its transfer agent(s), or its domestic depositary(ies), and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

187. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

188. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigations. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

189. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Defendants' acts and omissions as alleged herein violated the federal securities laws;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, prospects, and management of the Company;

(c) whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

190. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

191. To the extent Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material to a reasonable investor;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e) Lead Plaintiff and other members of the Class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) the Company's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g) as a regulated issuer, the Company filed periodic public reports with the SEC and the NASDAQ;

(h) the Company regularly communicated with public investors via established market communication mechanisms, including *inter alia* regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i) the Company was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Roth Capital Partners, RBC Capital Markets, Cowen, Loop Capital, and Colliers Securities, and other financial, tech and automotive websites, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

192. As a result of the foregoing, the markets for the Company's securities were open, well-developed, and efficient at all relevant times, and promptly digested current information regarding the Company from publicly available sources and reflected such information in the Company's securities price(s). Lead Plaintiff and other members of

the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information relating to the Company. Under these circumstances, all persons and entities who or which purchased or otherwise acquired the Company's securities during the Class Period suffered similar injuries through their purchase of the Company's securities at artificially inflated prices and thus, the presumption of reliance applies.

193. During the Class Period, the artificial inflation of the Company's securities was caused by the material misrepresentations and/or omissions particularized herein, causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the Company's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated and maintained at artificially inflated levels at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

194. The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to misjudge the value of the Company's common stock. The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to purchase the Company's securities at artificially inflated prices.

195. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares of the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

196. To the extent Defendants concealed or improperly failed to disclose material facts with respect to the Company's business, Lead Plaintiff is entitled to a presumption

of reliance in accordance with the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Defendants were obligated to disclose, but failed to disclose, material facts with respect to the Company's business operations and financial prospects, so that "positive proof of reliance is not a prerequisite to recovery." *Id.*

## XV. STATUTORY SAFE HARBOR INAPPLICABLE

197. The PSLRA's statutory safe harbor concerning forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading herein relate to historical (*i.e.*, then-existing) facts or conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

198. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

199. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. §§ 78u-5(c)(2)(A)(i)–(ii). Defendants failed both to identify certain oral statements as forward-looking and to include the cautionary language prescribed by the PSLRA.

200. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, the Company was engaged in a "deep dive" examining the viability of the purported go-to-market strategy creating a risk that the plan would be materially altered, which risk materialized upon the announcement on March 29, 2021 of the dramatic shift in Canoo's business plans.

201. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each such statement was made, the speaker had actual knowledge, or recklessly disregarded the risk, that the forward-looking statement was materially false or misleading; or, the false forward-looking statement was authorized or approved by an executive officer of the Company who knew, or recklessly disregarded the risk, that the statement was false when made.

## COUNT I

## For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5 (Against All Defendants)

202. Lead Plaintiff repeats, realleges, and incorporates by reference each and every allegation heretofore pleaded as if fully set forth herein.

203. This Count is asserted against Defendants and arises under Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and pursuant to SEC Rule 10b-5, *codified as amended*, 17 C.F.R. § 240.10b-5.

204. During the Class Period, Defendants utilized the means or instrumentalities of interstate commerce, including but not limited to the mail, the Internet, and the

facilities of the NASDAQ, to engage in a plan, scheme, conspiracy, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiff and other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

205. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence, and which did influence, the market for the Company's securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Canoo's finances, operations, and business prospects.

206. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the

materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully, consciously, or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

207. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers, directors, and officers of the Company, the Individual Defendants had first-hand knowledge of the details of the actual state of the Company's internal affairs.

208. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the Company's statements. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's business, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company's actual business and financial condition, which were concealed by Defendants, Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

209. During the Class Period, the Company's securities were listed and actively traded on and within an efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity

of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true market value of the Company's securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein, to the injury of Lead Plaintiff and the other Class members.

210. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated both Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, *codified as amended*, 17 C.F.R. § 240.10b-5.

211. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements to the investing public.

212. By reason of the foregoing, Lead Plaintiff and the other members of the Class are entitled to recover money damages from Defendants, and each of them, for Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, *codified as amended*, 17 C.F.R. § 240.10b-5.

## COUNT II

## For Violations of Section 20(a) of the Securities Exchange Act of 1934 (Against the Individual Defendants)

213. Lead Plaintiff repeats, realleges, and incorporates by reference each and every allegation heretofore pleaded as if fully set forth herein.

214. This Count is asserted against the Individual Defendants and arises under and pursuant to Section 20(a) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a).

215. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, the Individual Defendants knew, or had access to or possession of, the adverse non-public information about the Company's misstatements and omissions alleged herein.

216. As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty, but failed, to disseminate accurate and truthful information with respect to the Company's prospects financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

217. By reason of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's prospects, financial condition, and results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause or permit the Company to engage in the wrongful acts and omissions complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the

Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a). In this capacity, the Individual Defendants participated in the unlawful conduct alleged herein, which artificially inflated the market price of the Company's securities.

218. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts, omissions, and other conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities, acts, and omissions which constitute the primary violations of the federal securities laws alleged elsewhere herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a). In this capacity, the Individual Defendants participated in the unlawful conducted alleged herein, which artificially inflated the market price of the Company's securities.

219. By reason of the foregoing, the Individual Defendants are liable in money damages to Lead Plaintiff and the other members of the Class for the Company's primary violations of the federal securities laws alleged elsewhere herein, pursuant to Section 20(a) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78t(a).

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays relief and judgment, as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class Representative on behalf of the Class;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and other members of the Class by reason of the acts, omissions, and transactions alleged herein, in an amount to be proven at trial;

C. Awarding Lead Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs and expenses; and

D. Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all issues so triable in this Action.

Dated: September 8, 2023

Respectfully submitted,

**POMERANTZ LLP**

By: /s/ Murielle J. Steven Walsh
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mjsteven@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

**HOLZER & HOLZER, LLC**

By: /s/ Corey D. Holzer
Corey D. Holzer (*pro hac vice*)
Marshall P. Dees (*pro hac vice*)
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Co-Lead Counsel for Lead Plaintiff & the Proposed Class*