1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**

7                    **CENTRAL DISTRICT OF CALIFORNIA**

8
9   SAMUEL BLAKE, Individually and on          Case No. CV 21-2873 FMO (JPRx)
    Behalf of All Others Similarly Situated,
10
                        Plaintiff,
11                                              **ORDER Re: PENDING MOTION**
            v.
12
    CANOO INC., et al.,
13
                        Defendants.
14  _____

15          Having reviewed and considered all the briefing filed with respect to the Motion to Dismiss

16  Lead Plaintiff's Third Consolidated Amended Class Action Complaint (Dkt. 130, "Motion"), filed by

17  defendants Canoo Inc., Tony Aquila, Ulrich Kranz, and Paul Balciunas (collectively, "defendants"),

18  the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78(b);

19  Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes

20  as follows.

21                                    **INTRODUCTION**

22          Vladi Shaulov ("lead plaintiff" or "Shaulov"), filed the operative Consolidated Third Amended

23  Class Action Complaint for Violations of the Federal Securities Laws ("Dkt. 125, "TAC") against:

24  Canoo Inc. ("Canoo"),[1] Tony Aquila ("Aquila"), Ulrich Kranz ("Kranz"), and Paul Balciunas

25  ("Balciunas" and together with Aquila and Kranz, "Individual Defendants"), (see id. at ¶¶ 32-35),

26

27  _____

28          [1] After Canoo filed a Notice of Suggestion of Bankruptcy, (see Dkt. 146), plaintiff dismissed
    it from this action without prejudice.  (See Dkt. 149, Notice of Dismissal).

asserting claims for violations of:  (1) § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j, et seq., as well as Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) § 20(a) of the Exchange Act, 15 U.S.C. §§ 78t, et seq.  (Id. at ¶¶ 202-19).  Plaintiff filed this action "on behalf . . . of all those who purchased or otherwise acquired [Canoo's] securities during the Class Period[,] . . . and who were damaged upon the revelation of the alleged corrective disclosures."  (Id. at ¶¶ 1, 185).  The Class Period runs from December 21, 2020 through March 29, 2021.  (See id. at ¶ 1).

### THE TAC'S ALLEGATIONS[2]

The gist of the TAC is that defendants issued materially false and misleading statements in connection with Canoo's merger with a special purpose acquisition company ("SPAC"), Hennessy Capital Acquisition Corp. IV ("Hennessy"), and a post-merger shelf offering of Canoo stock.  (See Dkt. 125, TAC at ¶ 2).

I.     CANOO, HENNESSY, AND THE MERGER.

Founded by Kranz and non-party Stefan Krause in November 2017, Canoo's predecessor entity operated as a private technology company developing electric vehicles.  (Dkt. 125, TAC at ¶ 40).  Canoo was working on a concept for an electric vehicle platform called a "skateboard," which, due to its modular design, enabled Canoo to design customized models for multiple vehicle programs in commercial and consumer markets.  (Id.).

Kranz was the CEO of Canoo until the merger, when he became CEO-in-Charge.  (Dkt. 125, TAC at ¶ 34).  Balciunas served as Chief of Finance and Corporate Development until the merger, when he became Chief Financial Officer ("CFO").  (Id. at ¶ 35).  Through his investment vehicle, Aquila Family Ventures Partners, LLP ("AFV Partners"), Aquila was a pre-merger investor in Canoo.  (Id. at ¶ 33).  He was named Canoo's Chairman of the Board on October 19, 2020, and began serving as its Executive Chairman and Director on December 21, 2020.  (Id.).  On April 30, 2021, he became Canoo's CEO.  (Id.).

---

[2]  Capitalization, quotation and alteration marks, and emphasis in record citations may be altered without notation.

Hennessy was incorporated in August 2018, as a SPAC, which "is a shell, or 'blank check' company formed for the sole purpose of raising money through a public offering to eventually acquire one or more companies." (Dkt. 125, TAC at ¶ 42). Pursuant to its IPO documents, Hennessy was obligated to complete a merger or provide investors with redemption rights. (Id. at ¶¶ 46, 48). On August 17, 2020, Hennessy and Canoo signed a Merger Agreement and Plan of Reorganization. (Id. at ¶ 49).

On December 21, 2020 – the beginning of the class period – Canoo announced that the merger had been completed, and Canoo's stock began trading on the NASDAQ that day at $19.20. (Dkt. 125, TAC at ¶¶ 56, 90). On March 29, 2021 – the end of the class period – Canoo held its first public conference call to discuss its quarterly results for 2020. (Id. at ¶ 18). Canoo's stock, which was trading at $12.46 when the markets opened that day, fell to $9.64 at the market's open on March 30, 2021, and reached a low of $8.52. (Id. at ¶ 22). On April 29, 2021, the Securities and Exchange Commission ("SEC") announced it was investigating Canoo and its merger with Hennessy. (Id. at ¶ 23).

II.    DEFENDANTS' ALLEGEDLY FALSE AND MISLEADING STATEMENTS.

Plaintiff alleges that defendants made false or misleading statements to investors regarding Canoo's phased go-to-market strategy, which featured three revenue streams. (See Dkt. 125, TAC at ¶¶ 10-14, 50, 64); (id. at ¶¶ 10-14, 64). Canoo described the strategy as follows:

> We have three phases of revenue, so three different revenue streams. The first one is what we call engineering. This is a revenue stream that we make money already today. . . . The second revenue stream is when we launch our consumer vehicle, our lifestyle vehicle that will be available in Q2 2022. This vehicle will be available for subscription only. And the third revenue stream is what we call B2B. This is when we launch our last mile delivery vehicle, a commercial vehicle. This vehicle will be for sale only. So these are three different revenue streams that gives us a big flexibility to really attract different customers[.]

(Id. at ¶ 73); (see also id. at ¶ 64) ("We have three phases of revenue streams.  In the first phase, we call it Engineering Services. . . . The second revenue stream is a B2C. . . . This is a consumer vehicle and it will be on subscription.  The B2B services . . . is our third revenue stream.  This will be a vehicle introduced in 2023. . . .  Three different revenue streams give us very good flexibility, and it also makes sure that we can really tap into different areas to be profitable.").

The statements at issue were made during two time periods:  (1) August 18, 2020, through December 4, 2020, in support of the merger, (see Dkt. 125, TAC at ¶¶ 9, 10-14, 47-55); and (2) December 21, 2020 through January 25, 2021, in support of the shelf offering, which allowed insiders and early investors to sell Canoo shares.  (See id. at ¶¶ 15-17, 58-60).  The statements fall into three categories:  (1) statements regarding Canoo's revenue stream relating to "engineering services" ("Engineering Services Statements"); (2) statements regarding Canoo's plan to offer its first vehicles through a subscription-based model ("Subscription Statements"); and (3) statements regarding Canoo's "asset-light, low-cost, flexible manufacturing strategy" ("Manufacturing Statements").

A.    Engineering Services Statements.

On August 18, 2020, Hennessy announced the merger by filing a Form 8-K with the SEC, which described Canoo's three-pronged, phased go-to-market strategy as "de-risked" and "asset light," and emphasized the then-existing engineering services pipeline as being supportive of hundreds of millions of dollars in revenue before Canoo's vehicles even reached consumers. (Dkt. 125, TAC at ¶ 50).  On the same day, Canoo held a conference call with investors, where Kranz stated that "Engineering Services . . . is a phase that already exists today" and that, in fact, Canoo was "already making money" from such services.  (Id. at ¶ 64).  Balciunas, who was also on the call, stated that engineering services was "a very important part of [Canoo's] overall strategy and it's a great way for us to pool revenues early and de-risk the Company's strategy as a whole."  (Id. at ¶ 65).  He added that, "[c]urrently in our pipeline, we have $120 million of projected revenue in 2021, which consists of a couple of projects that are in the advanced stages of negotiation."  (Id. at ¶ 66).

In a presentation accompanying the call ("August 18 Presentation"), Canoo reiterated that it had "$120 million of projected revenue in 2021E" attributable to its pipeline of projects, and identified, among others, "Delivery Contract Engineering" for a company referred to as "European Auto OEM" and "Contract Engineering & Vehicle Sales" for a company referred to as "Tech Strategic." (Dkt. 125, TAC at ¶ 68).  Canoo emphasized that engineering services was part of a "multi-phased approach to generating revenue" with the ability to generate revenue "today," and that it would "generate revenue that reduces the Company's overall execution risk."[3]  (See id. at ¶¶ 69-70).

On September 15, 2020, Krantz and Balciunas participated in an industry conference ("September 15 Conference"), during which Krantz stated that engineering services "is a revenue stream that we make money already today."  (Dkt. 125, TAC at ¶ 73).  In an accompanying presentation, Canoo touted its "near-term revenue generating business, with significant contract revenues expected in 2021."  (Id. at ¶ 74).

According to plaintiff, the August 18 and September 15, 2020, statements were "false and/or misleading because defendants affirmatively represented . . . that they were pursuing a specific business model and go-to market strategy, even though they knew but failed to disclose that . . . by mid-August 2020, the immediate revenue from Engineering Services was unlikely to be realized because discussions with . . . European Auto OEM and Tech Strategic indicated that the projects were unlikely to produce revenue in 2021 and 2022[.]" (Dkt. 125, TAC at ¶ 75); (see id. at ¶ 145) (referring to allegation from SEC Order that by mid-August 2020, significant hurdles with European Auto OEM and Tech Strategic made it unlikely either would produce revenue in 2021 or 2022 because (1) European Auto OEM told Canoo that the proposed project was too costly and would be "barely acceptable" even if costs could be shared by other parties; and (2)

---

[3]  Plaintiff avers that the August 18 Presentation showed, and Balciunas confirmed during the call, the importance of the engineering services revenue to de-risking Canoo's strategy. (Dkt. 125, TAC at ¶ 71).  Canoo expected to incur significant capital expenditures in 2021 and 2022 amounting to $218 million and $175 million, respectively, relating to the launch of its first two vehicles.  The projected engineering services revenue was expected to offset risks associated with those expenditures.  (Id.).

Tech Strategic informed Canoo that the potential project would be paused because the scope of the required work had expanded and Canoo's proposal no longer made sense such that Tech Strategic was considering other companies to partner with).

On December 4, 2020, Hennessy, relying on information provided by Canoo, filed a Definitive Proxy Statement ("Definitive Proxy Statement"). (Dkt. 125, TAC at ¶ 77). With respect to engineering services, the Proxy Statement stated that Canoo "offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021." (Id. at ¶ 81).

Plaintiff contends that the Definitive Proxy Statement was false and/or misleading because defendants knew and failed to disclose that:  (1) revenue from engineering services was unlikely because, by October 2020, Tech Strategic told Canoo the scope of the required work had expanded and the proposal no longer made sense, forcing Canoo to place the project on "hold"; and (2) in November 2020, after rejecting several proposals from Canoo, European Auto OEM told Canoo the project was "unworkable." (Dkt. 125, TAC at ¶ 89); (see id. at ¶ 145) (referring to SEC Order indicating that by October 2020, Canoo's spreadsheet showed the Tech Strategic project was on "hold" and that by November 2020, it was continuing to reject Canoo's proposals, while the European Auto OEM told Canoo a project was "unworkable").

On December 21, 2020, Hennessy shareholders approved the merger, and Canoo's common stock and warrants began trading on the NASDAQ. (See Dkt. 125, TAC at ¶¶ 15, 90). The next day, Canoo filed a Form 8-K, which incorporated by reference the Definitive Proxy Statement. (Id. at ¶ 92).

On January 13, 2021, Canoo filed with the SEC a preliminary prospectus on Form S-1 ("January 13, 2021, Prospectus") for the required shelf offering of Canoo stock. (Dkt. 125, TAC at ¶ 96). With respect to engineering services, the January 13, 2021 Prospectus, which was signed by Aquila and Balciunas, stated that it "offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021." (Id. at ¶¶ 96, 98); (see id. at ¶ 106) (January 13, 2021, Prospectus stating that the "current pipeline in this area is supportive of a

projected $120 million of revenue in 2021").  On January 25, 2021, Canoo filed the Definitive Prospectus for the issuance of common stock upon the exercise of certain warrants, "which contained each of the false or misleading statements regarding Canoo's core operations, business model, and viability made in the January 13, 2021 Prospectus."  (Id. at ¶ 110).

Plaintiff alleges that the statements in the December 22, 2020, Form 8-K, the January 13, 2021, Prospectus, and the January 25, 2021, Definitive Prospectus were false for the same reasons as the December 4, 2020, Definitive Proxy Statements, and also because by early December 2020, Canoo had begun to pause or cancel negotiations with the remaining potential engineering services partners, and a slide deck attached to a December 14, 2020, internal Budget Review meeting showed "$0M expected revenue during 2021."  (Dkt. 125, TAC at ¶¶ 94, 109); (see id. at ¶ 145) (referring to SEC Order (1) indicating that discussions with third parties about other potential engineering services projects were not advanced, and by early December 2020 those alternative third-party arrangements began to be paused or cancelled; and (2) on December 14, 2020, Canoo held an internal Budget Review meeting, which included a slide that stated Canoo would have "$0M expected revenue during 2021").

B.    Subscription and Manufacturing Statements.

Canoo's three-pronged, phased go-to-market strategy was described as "asset light." (Dkt. 125, TAC at ¶ 50).  In or about September 2020, Aquila caused Canoo to commence a multi-million dollar "deep dive" into the viability of its stated business plan.  (Id. at ¶ 52).  According to plaintiff, despite the deep dive, defendants continued to tout Canoo's unique de-risked, multi-phase go-to-market strategy.  (Id. at ¶¶ 53-55, 59-60).

During the September 15, 2020, Call, Krantz stated that one of Canoo's three revenue streams involved a consumer vehicle that would be available in 2022 "for subscription only." (Dkt. 125, TAC at ¶ 73).  In the accompanying presentation, Canoo also noted that its use of third-party manufacturers was a "low-execution risk manufacturing strategy" with "low capex requirements." (Id. at ¶ 74).  Plaintiff alleges that the September 15, 2020, statement was false and/or misleading because defendants knew, but failed to disclose that "from 'day one,' Aquila harbored serious concerns about the viability of Canoo's publicly stated go-to-market strategy, which le[]d to a costly

'deep dive' into the entire go-to-market strategy." (Id. at ¶ 75).

The December 4, 2020, Definitive Proxy Statement stated that "Canoo's B2C strategy is targeting growing EV demand from consumers with its Lifestyle Vehicle, which it plans to roll out in select U.S. urban markets through a consumer subscription model in 2022[.]" (Dkt. 125, TAC at ¶ 80). It explained that the "subscription-based consumer model can elongate the revenue generation horizon of a single vehicle over 12 years, resulting in a compelling return on equity, recurring and consistent cash flow and an estimated margin of approximately four times that of a one-time sale." (Id. at ¶ 82).  The December 4, 2020, Definitive Proxy Statement also stated that, "[b]y reducing the commitment required for a typical car purchase or lease, [Canoo] believe[s] the subscription model will help reduce the barriers to entry for consumers looking to drive an EV, while also providing Canoo with a distinct opportunity for recurring revenue and a unique profit margin profile." (Id. at ¶ 86).

With respect to third-party manufacturing, the December 4, 2020, Definitive Proxy Statement stated that "Canoo plans to utilize an asset-light, low-cost, flexible manufacturing strategy by outsourcing its vehicle production operations to a world-class vehicle contract manufacturing partner, enabling Canoo to avoid funding certain significant capital investments and to minimize the fixed costs and overhead that would be required for Canoo to own and operate its own manufacturing facility." (Dkt. 125, TAC at ¶ 83).  It explained that "[i]n doing so, Canoo will significantly reduce its up-front capital investment and eliminate the recurring fixed costs and overhead that would be required by Canoo to own and operate [its] own assembly facility." (Id. at ¶ 84).  As to the subscription model and third-party manufacturing, the December 4, 2020, Definitive Proxy Statement stated:  "Canoo's subscription business further benefits from its asset-light model that focuses on partnership with third parties for elements of the business that are capital intensive or require development of extended expertise; this reduces up front capital expenditure and improves the quality of the product offering to consumers."  (Id. at ¶ 87).

Plaintiff alleges that the statements regarding subscription and third-party manufacturing were false and/or misleading because defendants knew, but failed to disclose that "Canoo was several months into a costly 'deep dive' into serious concerns about the viability of Canoo's

publicly stated go-to-market strategy, which ultimately confirmed that the 'math' behind the model did not support its viability[.]"  (Dkt. 125, TAC at ¶ 89).

On December 21, 2020, the day of the merger, Aquila stated in a press release:  "On behalf of all of us at Canoo, we are committed and excited about our go-to-market opportunities and to bring both consumers and businesses the benefits of our platform." (Dkt. 125, TAC at ¶ 91).  And as noted above, the December 22, 2020, Form 8-K incorporated by reference the Definitive Proxy Statement.  (See id. at ¶ 92).  Plaintiff avers that these statements were false and/or misleading because "Canoo had completed or would soon complete" the deep dive.  (Id. at ¶ 94).

Plaintiff also alleges that the statements in the January 13, 2021 Prospectus were false and misleading.  (Dkt. 125, TAC at ¶ 109)  The January 13, 2021 Prospectus stated:  "Both the Lifestyle Vehicle and the Sport Vehicle are initially intended to be made available to consumers via an innovative subscription business model. . . .  We plan to utilize an asset-light, flexible manufacturing strategy by outsourcing our direct vehicle production operations[.]"  (Id. at ¶ 100). It further stated that, "[i]n doing so, we will significantly reduce our up-front capital investment and eliminate the recurring fixed costs and overhead that would be required for us to own and operate our own assembly facility."  (Id.); (see also id. at ¶¶ 101, 102-03, 108) (further statements regarding benefits of subscription plan and third-party manufacturing).  It also indicated that Canoo was "continuing to . . . establish [its] consumer subscription model and scale [its] operations to meet anticipated demand[.]"  (Id. at ¶ 101).  According to plaintiff, these statements were false and/or misleading because defendants knew but failed to disclose that Canoo had completed its "deep dive" "which showed that the 'math' behind the model did not support its financial viability, particularly in the absence of any Engineering Services revenue."  (Id. at ¶ 109).

Plaintiff further alleges that the January 25, 2021, Definitive Prospectus contained each of the false or misleading statements regarding Canoo's core operations, business model, and viability that were made in the January 13, 2021, Prospectus.  (Dkt. 125, TAC at ¶ 110).

III.    MARCH 29, 2021, DISCLOSURES.

On March 29, 2021, Canoo announced its fourth quarter and full year financial results for 2020.  (Dkt. 125, TAC at ¶ 111).  It reported no engineering services revenue during the fourth

quarter of 2020, after having reported $2.55 million in engineering services revenue during the first nine months of 2020. (Id.). On the same day, Canoo held a conference call to discuss its financial results. (See id. at ¶ 112). Neither Kranz nor Balciunas participated. (Id. at ¶ 113). Aquila reported that Balciunas had resigned effective April 2, 2021, and blamed Kranz's absence on COVID protocols. (Id.). According to Aquila, "it was decided by [Canoo's] Board to deemphasize the original stated contract engineering services line." (Id. at ¶ 116). Instead of focusing on the originally stated contract engineering services, Canoo would "move forward on [its] mega microfactory[,]" (id. ¶ 117), and move away from a focus on bringing Canoo's first vehicle to market, describing instead the benefits of focusing first on B2B sales. (Id. at ¶ 118). In response to questions regarding the de-emphasis on engineering services, (see id. at ¶ 120), Aquila stated that "it was a contradiction. . . . Just $25 million, [it] would yield us[.]" (Id. at ¶ 121). Aquila went on to say that, "from my perspective, if I had been more involved earlier, certainly, once I invested and then took the Chairmanship, we started the analysis. I had concerns about this. . . . And we'll continue to look at things, but to be a contract engineering house is just really not going to drive the best shareholder value." (Id.).

In response to a question regarding statements about "OEMs . . . and . . . the contract manufacturer," (id. at ¶ 122) Aquila stated: "I think that [Kranz and Balciunas] were focused on maybe a little more aggressive than I would be in their statements. I think more maturity of this team would not be that presumptuous. We only announced what is contracted. But yes, I think they had the opportunities but they weren't at our standard of representation to the public markets." (Id. at ¶ 123). He further stated: "And then with respect to contract manufacturing again we wouldn't make an announcement. Again, this comes back to having an experienced public company here to be careful of the statements you make. So again, I think it was a little premature." (Id.).

With respect to the shift away from Canoo's previous emphasis on engineering services, Aquila stated:

> So I think the Company just like any adolescent company is it's [sic] learning,
> its way and all of us go through it. But it factored in contract manufacturing

based on the labor of engineers, not based on the value of IP, which would change the value of that contract significantly. . . .

So it's kind of caused us to say, hey, let's put that on hold, we have so much demand for our three derivatives, let's get all that work done, and then let's look at if there partnerships [sic].  Partnerships can work in this industry but contract manufacturing work is, as you know, is not the best business line to be in.  And so was there some leakage?  Well, I'll leave it to you to make that decision.  But obviously, I'm not a big fan of doing that type of business.

(Dkt. 125, TAC at ¶ 128).

In response to a question regarding the subscription model and the focus "on the commercial side," (Dkt. 125, TAC at ¶ 124), Aquila stated: "[W]hen I came in and took my role and we spent a lot of money analyzing the weight that this will have on the balance sheet. . . .  And so you can only have a certain percentage of your business on membership.  Otherwise, you've got a big cash hit that starts to develop on you as you can probably imagine. . . .  Had I been here from day 1, . . . I [would] have changed the sequence of top hats and use cases I would have went after based on my experience, without a doubt."  (Id. at ¶ 125).  He also "apologize[d] to anybody."  (Id.).  When asked if Canoo would focus on the subscription model in the future, (id. at ¶ 129), Aquila responded, "No, it's a ratio issue. . . .  We're going to focus on something sub 20% of our sales will be in category.  We just – otherwise, we . . . have to raise a lot more capital, as you know, because you're going to have to see this on your books, and then you're going to have all this accounting mark to market."  (Id.).

Aquila discussed changes to the way Canoo would present financial information, stating:

[A]t this point, it doesn't make sense to give guidance until we complete the work that we have started. . . .  And so we will be step-by-step building this and we will be delivering information as it is known and contracted, not based on light rev reservation models.  I think that's dangerous.  I think this could be somewhat misleading.

1        And so typical of any leadership change, different standard comes in . . .

2        Certainly do acknowledge your point, . . . so to speak, as you mentioned,

3        showed a different model[.]

4    (Dkt. 125, TAC at ¶ 127).  He stated further:

5        [C]ertainly I wanted to get ahead of this and explain to you how this really is

6        going to work and how to build a profitable company, which we've done in the

7        past.  And we intend to do here.  But hey, we understand the situation it puts

8        you in, and we will work closely to rectify that so you can understand very

9        clearly where we're going.

10   (Id.).

11        Following the March 29, 2021, disclosures, the price of Canoo stock fell from $11.80 on

12   March 29, 2021, to a low of $8.11 on March 30, 2021.  (Dkt. 125, TAC at ¶ 131).

13                                    **LEGAL STANDARD**

14        A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal

15   Rules of Civil Procedure[4] should be granted if plaintiff fails to proffer "enough facts to state a claim

16   to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly (Twombly), 550 U.S. 544, 570,

17   127 S.Ct. 1955, 1974 (2007); Ashcroft v. Iqbal (Iqbal), 556 U.S. 662, 678, 129 S.Ct. 1937, 1949

18   (2009); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011).  "A claim has facial plausibility when

19   the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

20   defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; Cook,

21   637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 U.S. 806, 812 (9th Cir.

22   2010).  Although the plaintiff must provide "more than labels and conclusions, and a formulaic

23   recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, 127 S.Ct.

24   at 1965; Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; see also Cholla Ready Mix, Inc. v. Civish, 382

25   F.3d 969, 973 (9th Cir. 2004) ("[T]he court is not required to accept legal conclusions cast in the

26

27   ――――――――――

28        [4]   All further references to "Rule" refer to the Federal Rules of Civil Procedure with the exception of Rule 10b-5.

form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citations and internal quotation marks omitted), "[s]pecific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) (per curiam) (internal quotation marks omitted); Twombly, 550 U.S. at 555, 127 S.Ct. at 1964.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, Erickson, 551 U.S. at 94, 127 S.Ct. at 2200; Albright v. Oliver, 510 U.S. 266, 268, 114 S.Ct. 807, 810 (1994), construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor.  Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir. 2005).  "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).  A complaint may also be dismissed for failure to state a claim if it discloses some fact or complete defense that will necessarily defeat the claim.  See Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984), abrogated on other grounds by Neitze v. Williams, 490 U.S. 319, 109 S.Ct. 1827 (1989); 2 Moore's Federal Practice § 12.34[4][b] ("Dismissal under Rule 12(b)(6) . . . is also appropriate when a successful affirmative defense or other bar to relief on the claim is conclusively established on the face of the complaint.").

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  This includes "the who, what, when, where, and how of the misconduct charged."  Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted). "The plaintiff must set forth what is false or misleading about a statement, and why it is false."  Yourish v. Cal. Amplifier, 191 F.3d 983, 993 (9th Cir. 1999).  This requirement "can be satisfied by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants."  Rubke v. Capitol Bancorp Ltd, 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted).

1

2                                   **DISCUSSION**

3    I.      SECTION 10(b) AND RULE 10b-5.

4            To state a claim under the Exchange Act, a plaintiff must meet the "exacting pleading

5    standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act[,

6    15 U.S.C. § 78u-4] (PSLRA)."  Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604

7    (9th Cir. 2014); Rubke, 551 F.3d at 1164 ("At the pleading stage, a complaint stating claims under

8    section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil

9    Procedure 9(b) and the PSLRA.").  Under the PSLRA, a plaintiff must "specify each statement

10   alleged to have been misleading, the reason or reasons why the statement is misleading, and, if

11   an allegation regarding the statement or omission is made on information and belief, the complaint

12   shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).

13   Additionally, "the complaint shall, with respect to each act or omission alleged to violate this

14   chapter, state with particularity facts giving rise to a strong inference that the defendant acted with

15   the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  Finally, "the plaintiff shall have the burden

16   of proving that the act or omission of the defendant alleged to violate this chapter caused the loss

17   for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  The PSLRA's and

18   Rule 9's "heightened [pleading] standards apply to all elements of a securities fraud action."  In

19   Re: Genius Brands Int'l, Inc. Sec. Litig., 97 F.4th 1171, 1181 (9th Cir. 2024) (internal quotation

20   marks omitted).

21           "The elements of a private securities fraud claim based on violations of § 10(b) and Rule

22   10b-5 are:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

23   connection between the misrepresentation or omission and the purchase or sale of a security; (4)

24   reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Erica

25   P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809-10, 131 S.Ct. 2179, 2184 (2011) (internal

26   quotation marks omitted).  Here, defendants contend plaintiff has failed to adequately plead any

27   actionable false or misleading statement and scienter, and that the TAC's allegations as to the

28

1    Individual Defendants are insufficient.[5]  (Dkt. 130, Motion at 1); (Dkt. 130-1, Memorandum of

2    Points and Authorities in Support of Motion to Dismiss ("Memo") at 1-2, 8-20).

3        A.    Material Misrepresentations or Omissions.

4        Under § 10(b), it is unlawful "[t]o use or employ, in connection with the purchase or sale of

5    any security registered on a national securities exchange . . . any manipulative or deceptive device

6    or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as

7    necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. §

8    78j(b).  Rule 10b-5, which "is 'coextensive' with Section 10(b)[,]" In Re: Genius Brands Int'l, Inc.

9    Sec. Litig., 97 F.4th at 1180, makes it unlawful:  "(a) [t]o employ any device, scheme, or artifice

10   to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact

11   necessary in order to make the statements made, in the light of the circumstances under which

12   they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business

13

---

14   ⁵  As an initial matter, the court agrees with defendants that the SEC Order and Complaint
     are not binding on this court.  (See Dkt. 130-1, Memo at 8); see, e.g., In re UBS Auction Rate Sec.

15   Litig., 2010 WL 2541166, *19 n. 11 (S.D.N.Y. 2010) ("[S]tatements made by the SEC . . . in . . .
     settlement documents are not law; they are rather untested assertions made by litigants . . .[and]

16   the position articulated in [an] SEC settlement agreement is not binding on this Court.").  However,
     to the extent defendants contend that factual allegations in an SEC order or complaint cannot be

17   relied upon at all, (see Dkt. 130-1, Memo at 8), the court is unpersuaded.  While defendants rely
     primarily on district court cases for propositions such as "[t]here is no authority suggesting that the

18   allegations in an SEC order, which are unproved and contested, can properly be considered
     evidence of scienter[,]" ScriptsAmerica, Inc. v. Ironridge Glob. LLC, 119 F.Supp.3d 1213, 1263

19   (C.D. Cal. 2015), defendants have not cited any Ninth Circuit authority for such a broad
     proposition.  (See, generally, Dkt. 130-1, Memo at 8); (Dkt. 136, Reply at 2-3).  In Glazer Capital

20   Management, LP v. Magistri, 549 F.3d 736 (9th Cir. 2008) ("Magistri"), cited by defendants, (see

21   Dkt. 130-1, Memo at 8), the Ninth Circuit found that the district court correctly held that SEC and
     DOJ settlement agreements were insufficient to meet the PSLRA's pleading requirements

22   because (1) the admissions in the settlements "were largely legal conclusions[] rather than
     particularized facts giving rise to a strong inference of scienter" and (2) even if the corporate

23   defendant accepted the statements of fact in the settlements, there was nothing in the settlement
     agreements that "support[ed] the conclusion that [the individual corporate defendant] had actual

24   knowledge of the violations."  Magistri, 549 F.3d at 748-49.  But as one court in this circuit has

25   noted, "the Ninth Circuit's discussion of the SEC cease-and-desist order in [Magistri] does not
     suggest that such settlements can never be relevant to scienter or other aspects of a Section

26   10(b) claim. Instead, in [Magistri] the Court found that reliance on the SEC order was simply 'not

27   sufficient' to infer scienter in that case."  Anschultz Corp. v. Merrill Lynch & Co. Inc., 785
     F.Supp.2d 799, 821 (N.D. Cal. 2011).

28

which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5 (formatting omitted).

"When defendants tout positive information to the market, they must do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63 F.4th 747, 764 (9th Cir. 2023) (internal quotation marks omitted).  "In determining whether a statement is misleading, the court applies the objective standard of a reasonable investor."  Id. (internal quotation marks omitted).

### 1. **Engineering Services Statements**.

Defendants do not directly or meaningfully challenge the falsity of the Engineering Services Statements.[6]  (See, generally, Dkt 130-1. Memo at 8-9, 11-14).  Instead, they argue that such statements fall within the PSLRA's safe harbor as forward-looking statements.  (See id. at 11-14).  According to defendants, plaintiff "relies on protected forward-looking Engineering Services Statements accompanied by meaningful cautionary statements in SEC filings." (Id. at 12).  Plaintiff responds that "[n]one of the false statements are forward-looking" because "defendants repeatedly claimed their 'current' pipeline 'is' supportive of $120 million for 2021, which is an actionable statement of current fact."  (Dkt. 135, Plaintiff's Opposition to Motion ("Opp.") at 10).

"Even when a plaintiff has adequately pleaded all six elements of a Section 10(b) claim, the defendant may be protected under the PSLRA's 'safe harbor' provision for forward-looking statements."[7] Glazer Capital, 63 F.4th at 767.  The "safe harbor is designed to protect companies

---

[6]  At most, defendants contend that plaintiff "formulaically lists alleged omissions" without specifying the reasons why the statements were misleading or untrue.  (See Dkt. 130-1, Memo at 8).  However, with respect to the Engineering Services Statements, the TAC sets forth why such statements were allegedly misleading.  (See, e.g., Dkt. 125, TAC).

[7]  The PSLRA defines forward-looking statements as including, among others, (1) "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;" (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" (3) "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;" and (4) "any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)[.]"  15 U.S.C. § 78u-5(i)(1).

and their officials when they merely fall short of their optimistic projections." Wochos v. Tesla, Inc., 985 F.3d 1180, 1189 (9th Cir. 2021) (internal quotation marks omitted).

Pursuant to the safe harbor, a defendant is not liable with respect to any forward-looking statement, "whether written or oral," 15 U.S.C. § 78u-5(c)(1), if:  "(A) the statement is 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement'; or (B) the plaintiff fails to prove that the statement 'was made with actual knowledge . . . that the statement was false or misleading.'"  Glazer Capital, 63 F.4th at 767 (quoting 15 U.S.C. § 78u-5(c)(1).  "That is, a defendant will not be liable for a false or misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading."  In re Quality Systems, Inc. Sec. Litig., 865 F.3d 1130, 1141 (9th Cir. 2017).  "Consequently, where a defendant has made a sufficient showing that a challenged forward-looking statement was accompanied by meaningful cautionary statements, see 15 U.S.C. § 78u-5(e), a plaintiff cannot defeat that invocation of [the PSLRA's] safe harbor merely by alleging, for example, that the company knew that the announced forward-looking objective was unlikely to be achieved.  Rather, the plaintiff must plead additional facts that would vitiate an element of that version of the safe harbor – such as, for example, facts indicating that the 'cautionary statements' cited by the defendant were not 'meaningful.'"  Tesla, 985 F.3d at 1190.

Plaintiff alleges that defendants made the following statements with respect to engineering services:

(1)    Balciunas's statement during August 18, 2020, conference call that "[c]urrently in our pipeline, we have $120 million of projected revenue in 2021, which consists of a couple of projects that are in the advanced stages of negotiation."  (Dkt. 125, TAC at ¶ 66).

(2)    The August 18, 2020, Canoo presentation stating that it had "$120 million of projected revenue in 2021E" attributable to its pipeline of projects, and identified, among others, "Delivery Contract Engineering" for a "European

Auto OEM" and "Contract Engineering & Vehicle Sales" for a "Tech Strategic." (Dkt. 125, TAC at ¶ 68).

(3)    The December 4, 2020, Hennessy Definitive Proxy Statement (and Form 8-K) stating that engineering services "offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021."[8] (Dkt. 125, TAC at ¶¶ 81, 92).

(4)    The December 22, 2020, Canoo Form 8-K, which incorporated by reference the December 4, 2020 Definitive Proxy Statement. (Dkt. 125, TAC at ¶ 92).

(5)    The Canoo January 13, 2021, Prospectus stating that engineering services "offers a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles and our current pipeline in this area is supportive of a projected $120 million of revenue in 2021." (Dkt. 125, TAC at ¶ 98).

(6)    The January 25, 2021, Canoo Definitive Prospectus, "which contained each of the false and misleading statements . . . made in the January 13, 2021, Prospectus." (Dkt. 125, TAC at ¶ 110).

Because these statements provide a projection of $120 million in revenue in 2021, they fall within the definition of forward-looking statements under the PSLRA. See 15 U.S.C. § 78u-5(i)(1) (forward looking statements include ones that "contain[] a projection of revenues").

However, the "PSLRA's safe harbor does not apply in an all-or-nothing fashion[.]" Tesla, 985 F.3d at 1190. It does not provide complete protection for "mixed" statements – those "containing non-forward-looking statements as well as forward-looking statements[.]" In re Quality Sys., 865 F.3d at 1141. In other words, "a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the

---

[8]   Plaintiff alleges that Hennessy "rel[ied] on information provided directly by Canoo[.]" (Dkt. 125, TAC at ¶ 77).

PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements[.]"   Id.   "In the context of such 'mixed' statements, only the forward-looking aspects could be immunized from liability[.]" Tesla, 985 F.3d at 1190.

Here, the statements at issue are "mixed statements" in that they also contain elements that refer to current facts.  That is, defendants made statements about Canoo's "current" engineering services "pipeline."  (See Dkt. 125, TAC at ¶¶ 66, 81, 92, 98).  Thus, statements that refer to Canoo's current pipeline for engineering services do not come within the safe-harbor's ambit.[9] See, e.g., In re Quality Systems, 865 F.3d at 1142-44 (finding statements referring to company's sales pipeline, such as "[o]ur pipeline is deep[,]" to be false or misleading non-forward looking statements not entitled to immunity under safe harbor) (internal quotation marks omitted); Glazer Capital, 63 F.4th at 774 (finding statement that company's "pipeline was large, healthy, and continuing to grow" was not forward-looking since it "describe[d] . . . current conditions").

Plaintiff also contends that even if the engineering services "pipeline statements" were considered forward-looking, they are not immune under the safe harbor because:  (1) the statements were not accompanied by sufficient cautionary language; and (2) defendants had actual knowledge the statements were misleading.  (See Dkt. 135, Opp. at 10).  With respect to cautionary statements, defendants point to SEC filings stating that "any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements."[10]  (Dkt. 130-1, Memo at 12).  The SEC

---

9  Defendants contend that even if the statements are mixed statements, "any statements of current fact cannot be meaningfully distinguished from the future projection and therefore do not cause the projections to lose the protections of the safe harbor."  (Dkt. 130-1, Memo at 14) (citing Tesla, 985 F.3d at 1192) ("Statement[s] of the assumptions underlying or relating to a declared objective are also deemed to be forward-looking statements."); (see also Dkt. 136, Reply at 4-5).  Tesla does not support defendants' position.  Here, the statements at issue were not in connection with a "declared objective."  Rather, defendants' statements involved Canoo's "current pipeline" which Canoo stated was supportive of a projected $120 million.  In other words, plaintiff is not necessarily challenging Canoo's failure to realize the $120 million in revenue, but rather is challenging the statement that Canoo, at the time the statements were made, had a pipeline with potential engineering services partners.  Those statements are actionable.

10  Defendants note that the transcripts of calls and presentations also identify forward-looking statements and include cautionary language similar to the language contained in SEC

filings also state that forward-looking statements are subject to numerous "risks and uncertainties" and that "factors that could cause actual results to differ include . . . the ability of Canoo to execute its business model[.]" (See id. at 12-13). The statements, according to defendants, cautioned that projected engineering services revenue may never materialize: "Canoo currently expects to add . . . contract engineering revenue in 2021 and 2022, which may occur later or not at all." (Dkt. 130-1, Memo at 13) (citing Exh. 6 at 35, 42); (Exh. 1 at 8, 14); (Exh. 7 at 35-36, 43); (Exh. 8 at 37-38, 45); (Exh. 9 at 37-38, 45); (Exh. 10 at iii-iv, 14); (see also Dkt. 131-4, Exh. 4, August 18, 2020, Transcript at 17); (Dkt. 131-1, Exh. 1,  Canoo's Form S-1 Registration Statement Excerpts, filed on January 13, 2021 ("Form S-1") at iii).

Beginning with the mixed-statements, "[w]here a forward-looking statement is accompanied by a non-forward-looking factual statement that supports the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement." In re Quality Sys., 865 F.3d at 1146.  Indeed, "[i]f the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language – short of an outright admission of the false or misleading nature of the non-forward-looking statement – would be 'sufficiently meaningful' to qualify the statement for the safe harbor." Id. at 1146-47.  That appears to be the situation here.

At least as of December 14, 2020, when  the internal Budget Review deck reflected that engineering services would have "$0M expected revenue during 2021[,]" Canoo's non-forward looking statements regarding its "current" "pipeline" were false or misleading such that no cautionary statement, short of an admission, would be "sufficiently meaningful."  As the Ninth Circuit has explained, "[f]or cautionary language accompanying a forward-looking portion of a mixed statement to be adequate under the PSLRA, that language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement.  Where . . . forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an important factor of which investors should be made

filings.  (See Dkt. 130-1. Memo at 12 n. 5).

aware." In re Quality Sys., 865 F.3d at 1148 (internal quotation marks omitted).

Even if the court considered the Engineering Services Statements to be entirely forward looking, the outcome would not differ given the lack of meaningful cautionary language. In Glazer Capital, the defendant company announced on February 6, 2020, that it had entered into a merger agreement with a private equity firm. See 63 F.4th at 757. On May 8, 2020, the firm informed the defendant company's CEO that it was considering not closing the merger. Id. Nonetheless, on May 11, 2020, the defendant company issued a press release stating, "[w]e look forward to completing our pending transaction with [the firm]." Id. On May 15, 2020, the firm sent the defendant company "a termination letter explaining that it no longer planned to proceed with the merger." Id. The Ninth Circuit held that the May 11, 2020, press release statement was not protected by the safe harbor because it was not accompanied by meaningful cautionary language. Id. at 780. The court explained that "[t]o be 'meaningful,' the cautionary language must 'identify important factors that could cause actual results to differ.'" Id. (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i) (alteration marks omitted). In that case, the risk disclosed was "the risk that the conditions to the closing of the transaction are not satisfied or that the transaction is not consummated." Id. (internal quotation marks omitted). The Ninth Circuit found that the language was not meaningful because it amounted to a "boilerplate listing of generic risks" and did "not mention the specific risk to which [the defendant company] had been alerted – the risk that [the firm] would back out of the merger." Id. (emphasis added). "When analyzing the falsity element of a securities claim, [the Ninth Circuit] has held that risk disclosures can be misleading to investors when they speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition."[11] Id. at 781 (internal quotation and alteration marks omitted).

---

[11] Defendants argue that plaintiff cites "inapplicable cases that do not concern the safe harbor or involve forward looking statements[,]" including In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 702 (9th Cir. 2021). (See Dkt. 136, Reply at 8 n. 8). However, the Ninth Circuit in Glazer Capital explained that "[t]he same logic follows in the context of the safe harbor: cautionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized." Glazer Capital, 63 F.4th at 781 (emphasis omitted).

Here, while defendants point to the statement that "Canoo currently expects to add . . . contract engineering revenue in 2021 and 2022, which may occur later or not at all[,]" (Dkt. 130-1, Memo at 13), (citing Exh. 6 at 35, 42); (Exh. 1 at 8, 14); (Exh. 7 at 35-36, 43); (Exh. 8 at 37-38, 45); (Exh. 9 at 37-38, 45); (Exh. 10 at iii-iv, 14); (see also Dkt. 131-4, Exh. 4, August 18, 2020, Transcript at 17); (Dkt. 131-1, Exh. 1, Canoo's Form S-1 Registration Statement Excerpts, filed on January 13, 2021 ("Form S-1") at iii), that language was insufficient after December 14, 2020, when Canoo knew that European Auto OEM and Tech Strategic had backed out, and Canoo's internal Budget Review showed "$0M expected revenue during 2021." (See Dkt. 125, TAC ¶¶ 94, 109); (id. at ¶ 145). The risk disclosure, as well as other generic risks set out in Canoo's SEC filings and other documents, was misleading because it "sp[oke] entirely of as-yet-unrealized risks and contingencies and d[id] not alert the reader that . . . the[] risks [had] already . . . come to fruition." Glazer Capital, 63 F.4th at 781 (internal quotation and alteration marks omitted); see, e.g., In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 704 (9th Cir. 2021) ("[T]he complaint plausibly alleges that Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized.").

Moreover, despite the fact that Canoo no longer had European Auto OEM and Tech Strategic in its pipeline as of December 14, 2020, Canoo's risk warnings were repeated nearly verbatim from August 2020 through January 2021. (See Dkt. 135, Opp. at 11). Indeed, the cautionary language upon which defendants rely, (see Dkt. 130-1, Memo. at 13), does not differ in any material way between September 18, 2020, and January 25, 2021:

- "Canoo currently expects to add its second model, the Delivery Vehicle, as early as 2023 and expects to add contract engineering revenue in 2021 and 2022, which may occur later or not at all." (Dkt. 131-6, Exh. 6, September 18, 2020, Hennessy Form S-4 Registration Statement at 42).
- "Canoo currently expects to add its second model, the Delivery Vehicle, as early as 2023 and expects to add contract engineering revenue in 2021 and 2022, which may occur later or not at all." (Dkt. 131-7, Exh. 7, October 23, 2020, Hennessy Amendment No. 1 to Form S-4 Registration at 43).

- "Canoo currently expects to add its second model, the Delivery Vehicle, as early as 2023 and expects to add contract engineering revenue in 2021 and 2022, which may occur later or not at all." (Dkt. 131-8, Exh. 8, November 25, 2020, Hennessy Amendment No. 2 to Form S-4 Registration Statement at 45).

- "Canoo currently expects to add its second model, the Delivery Vehicle, as early as 2023 and expects to add contract engineering revenue in 2021 and 2022, which may occur later or not at all." (Dkt. 131-9, Exh. 9, December 4, 2020, Hennessy Prospectus at 45).

- "We believe we will continue to incur operating and net losses each quarter until at least the time we expand our contract engineering, which is not expected until 2021, and begin deliveries of our EVs, which are not expected to begin until 2022, and may occur later or not at all." (Dkt. 131-1, Exh. 1, January 13, 2021, Canoo Form S-1 Registration Statement at 8).

- "We currently expect to add our second model, the Multi-Purpose Delivery Vehicle, as early as 2023 and expect to add contract engineering revenue in 2021 and 2022, which may occur later or not at all." (Dkt. 131-1, Exh. 1, January 13, 2021, Canoo Form S-1 Registration Statement at 14).

- "We currently expect to add our second model, the Multi-Purpose Delivery Vehicle, as early as 2023 and expect to add contract engineering revenue in 2021 and 2022, which may occur later or not at all." (Dkt. 131-10, Exh. 10, January 25, 2021, Canoo Prospectus at 14).

Canoo's failure to update its risk disclosures to take into account that European Auto OEM and Tech Strategic had backed out, (see Dkt. 125, TAC at ¶¶ 94, 109, 145), makes it clear that Canoo failed to provide meaningful cautionary language with respect to the Engineering Services Statements made after December 14, 2020. See, e.g., Glazer Capital, 63 F.4th at 780 ("Our conclusion is bolstered by the fact that Defendants did not meaningfully update the risk disclosure after the May 8, 2020, phone call to reflect the new development that [the firm] was reconsidering

the transaction."). Thus, the Engineering Services Statements regarding Canoo's current pipeline made after December 14, 2020, are not subject to the PSLRA's safe harbor under the cautionary language prong.

With respect to whether the statements were "made with actual knowledge . . . that [they] were false or misleading[,]" Glazer Capital, 63 F.4th at 767 (quoting 15 U.S.C. § 78u-5(c)(1)), defendants did not address that prong of the safe harbor analysis,[12] (see, generally, Dkt. 130-1, Memo at 13-14), and have thus waived it for purposes of this Order.  See Chaisson v. University of Southern California, 2023 WL 5747329, *4 (C.D. Cal. 2023) (construing a party's failure to address all factors "as a concession that those factors" favor opposing party).

### 2.   **Subscription and Manufacturing Statements**.

Defendants also contend that the Subscription and Manufacturing Statements are forward-looking and therefore covered by the safe harbor.  (See Dkt. 130-1, Memo at 11, 13-14).  Plaintiff did not address this argument in his Opposition.   (See, generally, Dkt. 135, Opp. at 7-15). Plaintiff's failure to address whether these statements fall within the safe harbor is tantamount to a concession on that issue.  See GN Resound A/S v. Callpod, Inc., 2013 WL 1190651, *5 (N.D. Cal. 2013) (when plaintiff failed to oppose a motion as to a particular issue, "the Court construes as a concession that this claim element [is] not satisfied]"); In re Point Ctr. Fin., Inc., 2016 WL 11723668, *2 n. 1 (C.D. Cal. 2016) ("A party can waive an argument by failing to raise it in their opposition to a motion to dismiss."); Silva v. U.S. Bancorp, 2011 WL 7096576, *3 (C.D. Cal. 2011) (ruling that plaintiff's failure to respond in his opposition brief to defendants' argument in motion to dismiss amounted to a concession that his claim should be dismissed); Tatum v. Schwartz, 2007 WL 419463, *3 (E.D. Cal. 2007) (explaining that a party "tacitly concede[d] [a] claim by failing to address defendants' argument in her opposition").  Accordingly, the court finds that plaintiff has failed to adequately allege falsity as to the Subscription and Manufacturing Statements.

---

[12]   In their Reply, defendants allude to such an argument by stating that "plaintiff does allege [sic] particularized facts to show that defendants did not expect to add revenue at the time of challenged statements" and refer to their discussion of scienter.  (See Dkt. 136, Reply at 9). For the reasons set forth below, defendants' argument is unavailing.

B.    Scienter.

"To meet [the scienter] pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." Metzler Inv. GMBH v. Corinthian Colls., 540 F.3d 1049, 1066 (9th Cir. 2008) (internal quotation marks omitted). A strong inference of scienter exists where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009) (internal quotation marks and emphasis omitted). The Supreme Court has instructed courts to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323, 127 S.Ct. 2499, 2509 (2007). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." Zucco Partners, 552 F.3d at 991; see also In re Alphabet, 1 F.4th at 701 ("Merely reasonable or permissible inferences are insufficient. As a result, courts must take into account plausible opposing inferences and determine that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.") (cleaned up). The Ninth Circuit employs a two-part test for scienter: "first, [the court] determine[s] whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, [the court] conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." Curry v. Yelp Inc., 875 F.3d 1219, 1226 (9th Cir. 2017) (internal quotation marks omitted).

Moreover, a corporation "can only act through its employees and agents and can likewise only have scienter through them." In re Alphabet, 1 F.4th at 705 (internal quotation marks omitted). "[T]he scienter of the senior controlling officers of a corporation may be attributed to the

corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." Id. (internal quotation marks omitted). Additionally, a plaintiff must "plead scienter with respect to those individuals who actually made the false statements." Magistri, 549 F.3d at 745.

In light of the foregoing, the court will address only the Engineering Services Statements regarding Canoo's "current pipeline," when Canoo's internal documents reflected $0 in 2021 revenue. Plaintiff first contends that the TAC adequately alleges scienter based on allegations that "Kranz and Balciunas knew facts contradicting their claims." (Dkt. 135, Opp at 16). According to plaintiff, defendants "knew Canoo's engineering services was unlikely to produce any revenue in either 2021 or 2022 when they told investors the current pipeline supported $120 million in 2021 revenue," (Dkt. 135, Opp at 16) (citing Dkt. 125, TAC at ¶¶ 10-11, 145, 150), and, indeed, by early December 2020, internal forecasts showed $0 expected revenue. (Id. at 17) (citing Dkt. 125, TAC at ¶ 150).

Plaintiff also relies on the core operations theory to support the scienter element. (See Dkt. 135, Opp at 17-19). The core operations theory "allows [courts] to infer that facts critical to a business's core operations or an important transaction are known to a company's key officers." Webb v. SolarCity Corp., 884 F.3d 844, 854 (9th Cir. 2018) (internal quotation marks omitted). "There are three circumstances under which core operations allegations can support a strong inference of scienter: (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the rare circumstances when they are not particularized, but the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." Prodanova v. H.C. Wainwright & Co., Inc., 993 F.3d 1097, 1111 (9th Cir. 2021) (internal quotation marks omitted); see also Webb, 884 F.3d at 854 (setting forth same circumstances). The Ninth Circuit has cautioned that "[p]roof under this theory is not easy." Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1062 (9th Cir. 2014).

Plaintiff does not specifically set forth which formulation of the core operations doctrine he

is advancing, but it appears that he is proceeding under the first and third formulations.  (See Dkt. 135, Opp at 17-18).  Under the first formulation, allegations regarding management's role may satisfy the scienter requirement when the allegations are considered "as part of a holistic analysis[.]"  See Webb, 884 F.3d at 854.  Kranz was the CEO of Canoo Holdings until the Merger, and thereafter became its CEO-in-Charge.  (See Dkt. 125, TAC at ¶ 34).  Balciunas served as Chief of Finance and Corporate Development of Canoo Holdings until the Merger, and subsequently became its CFO.  (Id. at ¶ 35).  Plaintiff alleges that Kranz and Balciunas "were responsible for Canoo's engineering services 'pipeline'" and Kranz was "the primary contact for several of Canoo's potential revenue-generating business partners."  (Id. at ¶ 150).  Plaintiff also alleges that the $120 million in 2021 projected revenue for engineering services "was expected to be derived almost exclusively" from European Auto OEM and Tech Strategic, and that Canoo maintained an Excel spreadsheet that attributed $100 million and $20 million to European Auto OEM and Tech Strategic, respectively.  (See id. at ¶ 145).  In July 2020, Kranz and Balciunas "received an email from the European Auto OEM stating Canoo's proposed work was too costly" (id. at ¶ 150) (citing SEC Complaint at ¶ 23), and received notice between July and November 2020, of European Auto OEM's repeated rejections of Canoo's proposals, which culminated in November 2020, when Canoo was told the project was "unworkable" "either directly from the European Auto OEM or from a junior Canoo employee."  (Id.) (citing SEC Complaint at ¶¶ 23-24).

As to Tech Strategic, plaintiff alleges that in August 2020, a representative from Tech Strategic "informed Kranz via phone that the proposed project was being paused[,]" and that Balciunas received an email stating the same.  (See Dkt. 125, TAC at ¶ 150) (citing SEC Complaint at ¶ 25).  By October 2020, Canoo's spreadsheet showed that the Tech Strategic project was on "hold," and by November 2020, Tech Strategic was continuing to reject Canoo's proposals.  (See id. at ¶ 145) (citing SEC Order at ¶ 12).  On December 14, 2020, the Canoo internal Budget Review deck slide stated that Canoo would have "$0 expected revenue during 2021."  (Id. at ¶ 145) (citing SEC Order at ¶ 15).  These allegations – Kranz's and Balciunas's responsibility for the engineering services pipeline, the direct notice they received from European Auto OEM and Tech Strategic regarding the proposed projects, and the December 14, 2020, slide

showing "$0M expected revenue in 2021" – strongly support an inference of scienter.[13]  See, e.g., Glazer Capital, 63 F.4th at 779-80 ("We . . . hold that Plaintiffs adequately alleged scienter as to the May 11, 2020, statement. . . . The fact that DeCesare was aware as of May 8, of Advent's reconsideration of the merger is sufficient to raise a strong inference that Defendants knew of the possibility of misleading the shareholders by stating on May 11, 2020, '[w]e look forward to completing our pending transaction with Advent.'").

        With respect to the third formulation of the core operations theory, the court has no difficulty concluding that this is that "rare" instance where "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."  Prodanova, 993 F.3d at 1111 (internal quotation marks omitted).  Plaintiff alleges that Canoo repeatedly touted its three-pronged "de-risked" strategy, (see, e.g., Dkt. 125, TAC at ¶¶ 50, 60), which included Canoo's engineering services as one of the prongs.  (See id. at ¶ 64) ("We have three phases of revenue streams.  In the first phase, we call it Engineering Services.").  During an investor call in which Kranz and Balciunas participated, Balciunas stated that engineering services was "a very important part of our overall strategy and it's a great way for us to pool revenues early and de-risk the Company's strategy as a whole."  (Id. at ¶ 65).  The August 18 Presentation showed, and Balciunas confirmed during a call, the importance of the engineering

---

[13] Defendants argue that there are no particularized allegations that the "Individual Defendants attended the meeting, saw that document or any similar estimate, or agreed with the estimate at that time."  (Dkt. 136, Reply at 15).  However, as noted above, given Kranz's and Balciunas's positions at Canoo and their involvement in communications with European Auto OEM and Tech Strategic in the latter part of 2020, it is not plausible that they were not aware of the collapse of the pipeline in December 2020, with respect to the two major companies. Defendants also maintain that plaintiff failed to distinguish In re Fastly, Inc. Sec. Litig., 2021 WL 5494249, *16 (N.D. Cal. 2021), where, as in this case, "Defendants' statements were forward-looking, and plaintiff therefore must establish that defendants could 'never' meet the projections they laid out." (Dkt. 136, Reply at 14 n. 14).  As an initial matter, and contrary to defendants' assertion, plaintiff did distinguish In re Falsity, (see Dkt. 135, Opp at 17 n. 6), stating that there were no allegations in that case supporting defendants' actual knowledge of the alleged falsity of their statements. (See id.).  Moreover, that case is not binding on this court, and the court has already determined that the Engineering Services Statements are mixed-statements, and even if they were entirely forward-looking, they do not come within the safe harbor because they were unaccompanied by meaningful cautionary statements.  See supra at § I(A)(1).

services revenue to Canoo's de-risking strategy. (Id. at ¶ 71).  The projected engineering services revenue was expected to offset the risks associated with Canoo's expected capital expenditures of $128 million and $175 million in 2021 and 2022, respectively, for the launch of its first two vehicles.  (See id.).  Moreover, defendants stated that engineering services offered "a unique opportunity to generate immediate revenues in advance of the offering of our first vehicles[.]"  (Id. at ¶ 81); (id. at ¶ 92) (December 22, 2020, Canoo Form 8-K, which incorporated Hennessy's December 4, 2020, Proxy Statement).  Given the TAC's allegations regarding the importance of the engineering services pipeline to Canoo's three-pronged, phased go-to-market strategy, it would be absurd to suggest that the Individual Defendants, Kranz, Balciunas, and Aquila, were not aware of the collapse of the pipeline in December 2020.[14]  In short, the court finds that the TAC adequately alleges scienter as to the Individual Defendants with respect to the Engineering Services Statements.[15]  (See Dkt. 125, TAC at ¶¶ 96, 106).

Based on the foregoing, IT IS ORDERED THAT:

1.  Defendants' Motion to Dismiss **(Document No. 130)** is **granted in part** and **denied in part**.  The Motion is granted with respect to the manufacturing and subscription statements.  The Motion is denied in all other respects.

---

[14]   Because the court finds that scienter has been properly alleged based on the core operations theory, the court will not address plaintiff's additional scienter contentions.

[15]   Section 20(a) "imposes joint and several liability on persons in control of any person liable under any provision of the securities law."  In re Alphabet, 1 F.4th at 698 (internal quotation marks omitted).  In order to adequately plead a § 20(a) violation, plaintiff must allege "(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator."  No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003) (internal quotation marks omitted).  "[T]he inquiry into actual power or control is normally an intensely factual question."  In re Alphabet, 1 F.4th at 702 (internal quotation marks omitted).  Here, plaintiff has sufficiently alleged a primary violation.  With respect to the second factor, defendants devote a single paragraph in their Memo, (see Dkt. 130-1, Memo at 20), and two sentences in their Reply.  (See Dkt. 136, Reply at 19).  The court thus denies defendants' Motion as to this claim.  See Beasley v. Astrue, 2011 WL 1327130, *2 (W.D. Wash. 2011) ("It is not enough merely to present an argument in the skimpiest way, and leave the Court to do counsel's work – framing the argument, and putting flesh on its bones through a discussion of the applicable law and facts."); Ballew v. City of Pasadena, 642 F.Supp.3d 1146, 1170 (C.D. Cal. 2022) (same).

2.  Defendants shall file their Answer(s) no later than **November 5, 2025**.

Dated this 22nd day of October, 2025.

_____/s/_____
Fernando M. Olguin
United States District Judge